**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

PHILIP MORRIS USA INC.,

SHERMAN GROUP HOLDINGS, LLC,

      Plaintiffs,

v.

UNITED STATES FOOD AND DRUG
ADMINISTRATION,

UNITED STATES DEPARTMENT OF
HEALTH AND HUMAN SERVICES,

STEPHEN M. HAHN, in his official capacity
as Commissioner of the United States Food
and Drug Administration,

ALEX AZAR, in his official capacity as
Secretary of the United States Department of
Health and Human Services,

      Defendants.

Case No.:  20-cv-1181 (KBJ)

**PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT
AND A PRELIMINARY INJUNCTION**
[*Oral Argument Requested*]

On March 18, 2020, the Food and Drug Administration ("FDA") published a Final Rule under the Family Smoking Prevention and Tobacco Control Act of 2009, Pub. L. No. 111-31 ("TCA"), mandating graphic warning labels on cigarette packaging and in cigarette advertisements. *See Rule on Tobacco Products; Required Warnings for Cigarette Packages and Advertisements*, 85 Fed. Reg. 15,638 (Mar. 18, 2020) (the "Rule").  The Rule requires a complete overhaul of cigarette packaging and advertising to display 11 new textual warning statements paired with shocking and disturbing graphic images.  Those new graphic warnings must occupy

the top 50% of the front and rear panels of cigarette packages and the top 20% of cigarette advertisements. *Id.* In May 2020, FDA agreed to delay the Rule's August 18, 2021 effective date by 120 days in light of the COVID-19 pandemic. Dkt. 5, Notice of Recent Development, May 14, 2020 & Ex. A. As a result, all cigarette packaging and advertising must bear the new graphic warnings starting on October 16, 2021. *Id.*

## SUMMARY JUDGMENT

Under Federal Rule of Civil Procedure 56 and Local Rule 7(h), Plaintiffs respectfully move this Court for entry of an Order granting summary judgment on their claims. Plaintiffs contend that the Rule's graphic warnings requirements were promulgated without adequate notice in violation of 5 U.S.C. § 553(b)(3), are "contrary to constitutional right, power, privilege, or immunity" in violation of 5 U.S.C. § 706(2)(B), are arbitrary and capricious in violation of 5 U.S.C. § 706(2)(A), and violate the First Amendment to the United States Constitution.

As discussed in the supporting Memorandum, there is no genuinely disputed issue as to any material fact. Plaintiffs are entitled to judgment as a matter of law that the Rule was promulgated in violation of the Administrative Procedure Act ("APA"), §§ 551-559, 701-706, and that the Rule violates the First Amendment. Accordingly, Plaintiffs respectfully ask that this Court grant summary judgment in their favor and grant the following relief:

(A) A judgment declaring that the Rule violates the APA and vacating the Rule;

(B) A judgment declaring the Rule to be unlawful under the First Amendment and vacating the Rule;

(C) A judgment declaring that the new textual and graphic warnings for cigarette packaging and advertising shall not become effective until 15 months after FDA issues

regulations that are constitutionally permissible and that are promulgated in compliance with federal law; and

(D)   Such additional or other relief as the Court deems just and proper, including an award of reasonable attorneys' fees and the costs of this action.

## <u>PRELIMINARY INJUNCTION</u>

Under 5 U.S.C. § 705, Federal Rule of Civil Procedure 65, and Local Rules 7 and 65.1, Plaintiffs respectfully move this Court for entry of a preliminary injunction postponing the effective date of the new warnings to avert irreparable constitutional and financial injury and preserve the status quo pending judicial review of the Rule.

For the reasons provided in the supporting Memorandum, Plaintiffs meet the requirements for preliminary relief under Rule 65 and 5 U.S.C. § 705:

1.      Plaintiffs' challenge to the Rule has a high probability of success on the merits because the Rule violates the APA and the Constitution.  To start, the Rule is contrary to FDA's statutory authority, was promulgated without sufficient notice and opportunity for comment, and is arbitrary and capricious, rendering it unlawful under the APA.

2.      Further, the Rule's entire graphic-warnings regime violates the First Amendment on several independent grounds.  *First*, the Rule unlawfully commandeers 50% of manufacturers' packaging and 20% of their advertising to showcase the government's message.  *Second*, the Rule forces manufacturers to speak against their own products by prominently featuring outrageous images of smoking-related health consequences, from amputated toes to a man shamed by erectile dysfunction.  This is a quintessential content-, speaker-, and viewpoint-based restriction that FDA cannot justify based on its asserted interest in educating consumers.  *Third*, the government cannot compel misleading speech, and FDA's graphic warnings threaten to mislead consumers about the

3

relative risks of smoking-related health consequences.  The merits of Plaintiffs' APA and First Amendment claims are set forth in additional detail in their supporting Memorandum, filed with and incorporated in this Motion.

3.      Without preliminary relief, Plaintiffs will suffer immediate and irreparable harm. They face the loss of First Amendment rights, and the harm from such unconstitutional speech restrictions is *per se* irreparable.  Independently, Plaintiffs face immediate irreparable harm from implementation costs associated with complying with the Rule.  They have already incurred more than one million dollars in costs and stand to incur tens of millions more—none of which could be recovered if this Court ultimately invalidates the Rule.  Plaintiffs can be protected from those irreparable injuries only by a preliminary injunction postponing the effective date of the graphic-warning requirement until 15 months after this Court renders final judgment.

4.      The equities clearly favor the grant of injunctive relief.  Absent preliminary relief, the Rule will eviscerate Plaintiffs' First Amendment rights and impose massive, unwarranted, and unrecoverable compliance costs and loss of consumer goodwill.  By contrast, preliminary relief would not substantially injure the government.  FDA has disavowed that its Rule was intended to or in fact would affect consumers' smoking behavior.  FDA itself previously told another federal court that it needed until November 2021 to promulgate a graphic warnings rule—meaning that FDA saw no need for the rule to go into effect before early 2023.  *See Am. Academy of Pediatrics v. FDA*, 2019 WL 1047149 (D. Mass. Mar. 5, 2019).   And FDA has already delayed implementation of the Rule by 120 days.  FDA will not suffer any harm from delaying the Rule's October 2021 effective date to allow for full judicial review.

5.      Preliminary relief is in the public interest because it is necessary to forestall the Rule's unconstitutional infringement of core First Amendment rights, particularly before the

constitutionality of the regulation has been definitively determined.  Preliminary relief would also further the public interest in ensuring that FDA acts within the limits of its authority.  Moreover, it is manifestly in the public interest to avoid exposing consumers to graphic warnings that could mislead them about the relative risks of various smoking-related health conditions.

Plaintiffs therefore respectfully request that the Court grant this Motion and enter an Order under Federal Rule of Civil Procedure 65 and 5 U.S.C. § 705, containing the following injunction:

- Preliminarily enjoin the current effective date of October 16, 2021 of FDA's Rule and allow Plaintiffs to continue using their current packaging and advertising until 15 months after this Court issues a Final Judgment on Plaintiffs' claims.

Plaintiffs have conferred with Defendants on this motion.  *See* LCvR 7(m).  Defendants do not agree to the relief sought.

## ORAL ARGUMENT REQUEST

Plaintiffs are filing a Memorandum of Points and Authorities in support of this Motion, along with Proposed Orders.  Plaintiffs respectfully request oral argument on this Motion.

DATED:  August 5, 2020                Respectfully submitted,


/s/ Lisa S. Blatt
LISA S. BLATT (D.C. Bar No. 429544)
STEPHEN D. ANDREWS (D.C. Bar. No. 470994)
SARAH M. HARRIS (D.C. Bar No. 1004964)
MATTHEW J. GREER (D.C. Bar No. 241858)
JOHN F. PARARAS (D.C. Bar No. 229920)
WHITNEY D. HERMANDORFER (D.C. Bar No.
   888314222)
WILLIAMS & CONNOLLY LLP
   *725 Twelfth Street. N.W.,*
   *Washington, DC 20005*
   *Tel: (202) 434-5000*
   *Fax: (202) 434-5029*
   *lblatt@wc.com*
   *sandrews@wc.com*
   *sharris@wc.com*
   *mgreer@wc.com*
   *jpararas@wc.com*
   *whermandorfer@wc.com*

   *Attorneys for Plaintiffs Philip Morris USA*
   *Inc. and Sherman Group Holdings LLC*

6

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

PHILIP MORRIS USA INC.,

SHERMAN GROUP HOLDINGS, LLC,

      Plaintiffs,

v.

UNITED STATES FOOD AND DRUG
ADMINISTRATION,

UNITED STATES DEPARTMENT OF
HEALTH AND HUMAN SERVICES,

STEPHEN M. HAHN, in his official capacity
as Commissioner of the United States Food
and Drug Administration,

ALEX AZAR, in his official capacity as
Secretary of the United States Department of
Health and Human Services,

      Defendants.

Case No.:  20-cv-1181 (KBJ)

## MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY
## JUDGMENT AND A PRELIMINARY INJUNCTION

LISA S. BLATT (D.C. Bar No. 429544)
STEPHEN D. ANDREWS (D.C. Bar. No. 470994)
SARAH M. HARRIS (D.C. Bar. No. 1004964)
MATTHEW J. GREER (D.C. Bar. No. 241858)
JOHN F. PARARAS (D.C. Bar. No. 229920)
WHITNEY D. HERMANDORFER (D.C. Bar No.
  888314222)
WILLIAMS & CONNOLLY LLP
  *725 Twelfth Street NW*
  *Washington, D.C. 20005*
  *Tel.:  (202) 434-5000*
  *Fax:  (202) 434-5029*

*lblatt@wc.com*
*sandrews@wc.com*
*sharris@wc.com*
*mgreer@wc.com*
*jpararas@wc.com*
*whermandorfer@wc.com*

*Attorneys for Plaintiffs Philip Morris USA Inc.*
*and Sherman Group Holdings, LLC*

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ................................................................................................................1

FACTUAL BACKGROUND ...........................................................................................5

      A.    The Tobacco Control Act...................................................................5

      B.    FDA's Invalid 2011 Graphic-Warnings Rule .......................................7

      C.    FDA's Ensuing Rulemaking Process...................................................9

      D.    FDA's Proposed Rule .......................................................................16

      E.    FDA's Final Rule ..............................................................................17

STANDARD OF REVIEW ...........................................................................................19

ARGUMENT ..................................................................................................................19

    I.   FDA'S RULE VIOLATES THE APA .........................................................19

      A.    The TCA Bars FDA from Mandating 11 Warnings .............................20

      B.    FDA Failed to Justify Changing TCA-Mandated Textual Statements .................24

      C.    FDA's Failure to Disclose Key Information Prevented Meaningful Comment...........................................................................................26

      D.    FDA Irrationally Chose Which Health Risks to Feature .....................30

      E.    FDA Arbitrarily Assessed Consumer Understanding..........................32

      F.    FDA Arbitrarily Relied on Inapposite Foreign Evidence ....................40

    II.  FDA'S RULE VIOLATES THE FIRST AMENDMENT ................................41

      A.    The Rule's Size and Placement Requirements Alone Are Unconstitutional.........42

      B.    The Rule Unconstitutionally Requires Inflammatory Messages .........................47

      C.    FDA's Warnings Risk Misinforming Consumers.................................58

    III. THE ENTIRE RULE SHOULD BE VACATED...............................................61

    IV. PLAINTIFFS ARE ENTITLED TO A PRELIMINARY INJUNCTION........................61

      A.    Absent a Preliminary Injunction, Plaintiffs Will Suffer Irreparable Harm............62

      B.    Injunctive Relief Will Not Prejudice FDA or the Public Interest.........................64

CONCLUSION................................................................................................................65

## TABLE OF AUTHORITIES

Cases:

*44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484 (1996) ......................................58

*Allstate Ins. Co. v. Abbott*, 495 F.3d 151 (5th Cir. 2007) ........................................52

*Am. Acad. of Pediatrics v. FDA*, 2019 WL 1047149 (D. Mass. Mar. 5, 2019) ..................9, 64

*\*Am. Beverage Ass'n v. City & Cty. of S.F.*, 916 F.3d 749 (9th Cir. 2019) ................... passim

*Am. Farm Bureau Fed'n v. EPA*, 559 F.3d 512 (D.C. Cir. 2009) ...........................................35

*Am. Meat Inst. v. U.S. Dep't of Agric.*, 760 F.3d 18 (D.C. Cir. 2014)........................... passim

*Am. Petrol. Inst. v. EPA*, 862 F.3d 50 (D.C. Cir. 2017)........................................................61

*Am. Radio Relay League, Inc. v. FCC*, 524 F.3d 227 (D.C. Cir. 2008)......................26, 27, 29

*Barnhart v. Peabody Coal Co.*, 537 U.S. 149 (2003) ..............................................................21

*Barr v. Am. Ass'n of Political Consultants, Inc.*, 140 S. Ct. 2335 (2020) ..............................54

*Burson v. Freeman*, 504 U.S. 191 (1992) ..............................................................................46

*Cent. United Life Ins. Co. v. Burwell*, 827 F.3d 70 (D.C. Cir. 2016) ....................................21

*Cent. Hudson Gas & Elec. Corp. v. Public Service Comm'n*, 447 U.S. 557 (1980) ................8

*Chamber of Commerce v. SEC*, 443 F.3d 890 (D.C. Cir. 2006)..............................................26

*Chem. Mfrs. Ass'n v. EPA*, 28 F.3d 1259 (D.C. Cir. 1994) ....................................................35

*Cigar Ass'n of Am. v. FDA*, 964 F.3d 56 (D.C. Cir. 2020)........................................23, 26, 41

*City of Arlington v. FCC*, 569 U.S. 290 (2013) ......................................................................20

*Clarke v. Office of Fed. Hous. Enter. Oversight*, 355 F. Supp. 2d 56 (D.D.C. 2004) .............65

*Clinton v. City of New York*, 524 U.S. 417 (1998).................................................................22

*Conn. Light & Power Co. v. Nuclear Regulatory Comm'n*, 673 F.2d 525 (D.C. Cir.
    1982) ................................................................................................................26, 29

*Discount Tobacco City & Lottery, Inc. v. United States*, 674 F.3d 509 (6th Cir. 2012)....44, 52

*Dist. Hosp. Partners, L.P. v. Burwell*, 786 F.3d 46 (D.C. Cir. 2015)......................................32

*Doe v. Mattis*, 928 F.3d 1 (D.C. Cir. 2019) ...........................................................................63

*Edenfield v. Fane*, 507 U.S. 761 (1993) ...............................................................57

*Entm't Software Ass'n v. Blagojevich*, 469 F.3d 641 (7th Cir. 2006)................................44, 52

*FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120 (2000) ..........................................5

*Gordon v. Holder*, 721 F.3d 638 (D.C. Cir. 2013) .................................................62

*Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500 (D.C. Cir. 2016).......................................65

*Iancu v. Brunetti*, 139 S. Ct. 2294 (2019).........................................................54

*Ibanez v. Fla. Dep't of Business & Prof'l Reg.*, 512 U.S. 136 (1994)........................42, 55, 58

*League of Women Voters v. Newby*, 838 F.3d 1 (D.C. Cir. 2016) .....................................61, 65

*Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525 (2001)...............................................43

*Matal v. Tam*, 137 S. Ct. 1744 (2017) .............................................................54

*MD/DC/DE Broads. Ass'n v. FCC*, 253 F.3d 732 (D.C. Cir. 2001)......................................61

*Merck & Co. v. HHS*, 962 F.3d 531 (D.C. Cir. 2020) ...........................................20, 24

*Michigan v. EPA*, 135 S. Ct. 2699 (2015) ..........................................................20

*Minn. Voters All. v. Mansky*, 138 S. Ct. 1876 (2018) ..............................................46

*Motor Vehicle Mfrs. Ass'n v. State Farm*, 463 U.S. 29 (1983)......................................30, 40

*Nat'l Ass'n of Mfrs. v. SEC*, 800 F.3d 518 (D.C. Cir. 2015) .............................49, 50, 51, 57

*Nat'l Inst. Family & Life Advocates v. Becerra*, 138 S. Ct. 2361 (2018).................... passim

*Nicopure Labs, LLC v. FDA*, 944 F.3d 267 (D.C. Cir. 2019)......................................5, 56, 58

*Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n of Cal.*, 475 U.S. 1 (1986)..............................41

*Pearson v. Shalala*, 164 F.3d 650 (D.C. Cir. 1999)................................................56

*Prometheus Radio Project v. FCC*, 652 F.3d 431 (3d Cir. 2011).......................................26

*Pub. Citizen v. Fed. Motor Carrier Safety Admin.*, 374 F.3d 1209 (D.C. Cir. 2004).............26

*R.J. Reynolds Tobacco Co. v. FDA*, 696 F.3d 1205 (D.C. Cir. 2012) ........................ passim

*R.J. Reynolds Tobacco Co. v. FDA*, 823 F. Supp. 2d 36 (D.D.C. 2011) ...................45, 62, 63

*R.J. Reynolds Tobacco Co. v. FDA*, 845 F. Supp. 2d 266 (D.D.C. 2012) ................................7

*Reed v. Town of Gilbert*, 576 U.S. 155 (2015) ................................................................54, 58

*Sierra Club v. Jackson*, 833 F. Supp. 2d 11 (D.D.C. 2012)......................................................61

*Sierra Club v. Mainella*, 459 F. Supp. 2d 76 (D.D.C. 2006) ...................................................19

*Smoking Everywhere, Inc. v. FDA*, 680 F. Supp. 2d 62 (D.D.C. 2010) ...................................63

*Sprint v. FCC*, 315 F.3d 369 (D.C. Cir. 2003)........................................................................27

*Stewart v. D.C. Armory Bd.*, 789 F. Supp. 402 (D.D.C. 1992)................................................65

*Texas v. EPA*, 829 F.3d 405 (5th Cir. 2016) ..........................................................................63

*Util. Air Regulatory Grp. v. EPA*, 573 U.S. 302 (2014) .........................................................20

*Va. Uranium, Inc. v. Warren*, 139 S. Ct. 1894 (2019)............................................................20

*Whole Foods Mkt. Grp. v. Wical LP*, 288 F. Supp. 3d 176 (D.D.C. 2018) .............................62

*Yates v. United States*, 574 U.S. 528 (2015).........................................................................23

*\*Zauderer v. Office of Disciplinary Counsel of Supreme Ct. of Ohio*, 471 U.S. 626
(1985)............................................................................................................... passim

Constitution, Statutes, and Regulations:

U.S. Const. amd. I .................................................................................................. passim

Administrative Procedure Act, 5 U.S.C. §§ 551 -559, 701-706 ...................................... passim

Family Smoking Prevention and Tobacco Control Act of 2009, Pub. L. No. 111-31,
123 Stat. 1776 ...................................................................................................... passim

5 U.S.C.

§ 705......................................................................................................................61
§ 706(2)..................................................................................................................19

15 U.S.C.

§ 1331(a) ................................................................................................................21
§ 1333(a)(1) ..................................................................................................... passim
§ 1333(a)(2) ............................................................................................................42
§ 1331(b) ................................................................................................................21
§ 1333(b)(2) .........................................................................................................7, 42
§ 1333(c)(1)-(2) .....................................................................................................7, 23
§ 1333......................................................................................................................5
§ 1333(d)[1] .....................................................................................................6, 7, 21, 22

§ 1333(d)[2] .......................................................................... passim
§ 1334(a) ............................................................................21
§ 1335 ...........................................................................5, 43
§ 4402(a)(1) .........................................................................20
§ 4402(a)(2)(A) .....................................................................46

21 U.S.C.

§ 387 note.........................................................................6, 60
§ 387a-1(a)(2) ........................................................................6
§ 387j .............................................................................18
§ 387k.............................................................................6
§ 387k(d) ..........................................................................26

76 Fed. Reg. 36,628 (June 22, 2011) .........................................................7

81 Fed. Reg. 28,974 (May 10, 2016) ........................................................46

84 Fed. Reg. 42,754 (Aug. 16, 2019).................................................... passim

84 Fed. Reg. 50,566 (Sept. 25, 2019) .......................................................41

84 Fed. Reg. 60,966 (Nov. 12, 2019).........................................................16

85 Fed. Reg. 15,638 (Mar. 18, 2020) ................................................... passim

Other Authorities:

CMS, *FY 2020 Proposed Rule Data Files*, https://www.cms.gov/Medicare/Medicare-
    Fee-for-Service-Payment/AcuteInpatientPPS/FY2020-IPPS-Proposed-Rule-
    Home-Page-Items/FY2020-IPPS-Proposed-Rule-Data-Files...........................................26

FDA, *Public Access to Results of FDA-Funded Scientific Research*, Feb. 13, 2018,
    https://www.fda.gov/science-research/about-science-research-fda/public-access-
    results-fda-funded-scientific-research...............................................................26

Federal Rule of Civil Procedure 65 ........................................................61

H.R. Rep. No. 111-58 (2009)...............................................................5

Master Settlement Agreement (Nov. 23, 1998), https://tinyurl.com/yx63uks6......................43

Merriam-Webster Dictionary (2005 ed.) .....................................................34

New Oxford American Dictionary (3d ed. 2010) ...............................................34

Webster's Third New Int'l Dictionary (2002) .................................................34

## <u>INTRODUCTION</u>

No one questions the government's ability to require tobacco companies to disclose the health risks of their products so consumers can make informed choices.  Just as the government can require pharmaceutical manufacturers to disclose known side effects of their drugs or require makers of alcoholic beverages to warn of their products' inherent dangers, the government can require warnings about tobacco's risks.

But the First Amendment draws the line when the government tries to brand products with modern-day scarlet letters.  The First Amendment gives private actors the right to speak messages of their choosing.  The government's power to force manufacturers to adopt messages of the government's choosing is accordingly narrow.  The government can require purely factual and uncontroversial disclosures that are no broader or more burdensome than reasonably necessary.  Every other compelled disclosure faces an even higher bar.  Under any view of the First Amendment, FDA cannot force manufacturers to *cede the top 50% of their packaging and 20% of their advertisements* to displaying these 11 warnings:


Harm to Children Warning


Fetal Harm Warning


Bladder Cancer Warning


Amputation Warning


Blindness Warning


Head and Neck Cancer Warning


Smoker Lung Disease Warning


Heart Disease and Strokes Warning


Nonsmoker Lung Disease Warning


Diabetes Warning


Erectile Dysfunction Warning

In 2011, FDA issued its first graphic-warnings rule, using graphics of distressed babies, diseased lungs, and smoke blowing in a child's face to illustrate the textual warnings that Congress prescribed in the Tobacco Control Act ("TCA"). FDA projected that those images would dissuade consumers from buying cigarettes. The D.C. Circuit vacated the rule for violating the First Amendment, holding that the images were not purely factual and that FDA failed to show that the required images would directly advance any substantial governmental interest. *See R.J. Reynolds Tobacco Co. v. FDA*, 696 F.3d 1205, 1216-19 (D.C. Cir. 2012), *overruled on other grounds by Am. Meat Inst. v. U.S. Dept. of Agric.*, 760 F.3d 18 (D.C. Cir. 2014) (en banc).

FDA drew the wrong lessons from *R.J. Reynolds*. Then, the D.C. Circuit faulted FDA for picking images that provoked emotional reactions. 696 F.3d at 1216-17. But in promulgating its new Rule, FDA refused to assess whether the above images are unnecessarily provocative, and dismissed prolific evidence that its new warnings make viewers fearful and disgusted. Then, the D.C. Circuit faulted FDA for failing to show that its graphic warnings would materially advance FDA's asserted interest in deterring smoking. *Id.* But here, FDA never identified an interest with

2

some meaningful and achievable metric for success.  Instead, FDA asserted a circular interest in promoting consumer education that any compelled disclosure would satisfy.

Moreover, since *R.J. Reynolds*, First Amendment law has turned more decisively against FDA.  Courts have rejected far *less* onerous government compelled disclosures based purely on the size and placement of the offending labels, and have further held that it is presumptively unconstitutional for the government to dictate the content or viewpoint of commercial speech.

 FDA's new Rule thus is even less constitutional than its predecessor.  Three independent flaws doom the Rule under any standard of First Amendment scrutiny.  *First*, the Rule's size and placement restrictions, which seize 50% of manufacturers' packaging and 20% of advertising, are alone unconstitutional.  *Second*, the Rule unconstitutionally forces manufacturers to speak against their own products by displaying enormous, provocative images that are unnecessary to FDA's asserted aim of educating consumers.  *Third*, the Rule compels potentially misleading speech.  By presenting a mix of likely and less-likely health risks without differentiation, the warnings could confuse consumers about the relative risks of different smoking-related health consequences.

Accepting FDA's justifications for these warnings would neuter the First Amendment.  FDA claims the right to compel factually accurate pictures to inform the public better.  Under that view, the First Amendment would never rule out any compelled warnings.  Today's graphic cigarette warnings could be tomorrow's graphic vaccine warnings about the risks of amputation or anaphylaxis from adverse reactions, or graphic alcohol warnings about the risks of liver transplants or debilitating alcoholism.  If more information is always better, the government has unbounded power to use any manufacturer as its mouthpiece to convey its views about any product.

But this Court need not reach the myriad First Amendment problems with FDA's Rule.  FDA's Rule also violates the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551 -559, 701-

706, five times over.  *First*, Congress in the TCA authorized FDA to create *nine* warnings on specified topics.  The Rule requires 11, which is two too many.  *Second*, Congress allowed FDA to adjust any of the nine prescribed warnings if necessary to improve consumer understanding. But FDA jettisoned the TCA warnings about addiction, death, and the benefits of quitting without making the required statutory finding that FDA's new warnings about amputation, blindness, diabetes, or erectile dysfunction would better inform consumers than the warnings that FDA replaced.

*Third,* FDA unlawfully failed to publicly disclose all of the studies and data that FDA relied on.  FDA did not release heavily critical peer reviews of its quantitative studies until it issued the Final Rule, and never publicly released any of the data underlying its quantitative or qualitative studies.  Instead, FDA wrote a "Memo to File" commemorating the agency's decision to hide its data, lest commenters "analyze the data in different … ways" that FDA considered illegitimate. But the APA's disclosure requirement exists to prevent agencies from deciding that no one else should check their analysis.  Here, the data FDA withheld until producing the administrative record for this litigation reveals more problems with FDA's analysis.

*Fourth*, the APA further demands that agencies give reasoned, rational explanations for their decision-making.  But FDA's general interest in spotlighting lesser-known health consequences of smoking does not explain why FDA picked the conditions that its warnings showcase, or why FDA featured well-known consequences that consumers universally understand.

*Fifth*, FDA's own studies do not support the idea that its warnings will improve consumers' understanding of "less-known" smoking-related health risks, as FDA claimed as the justification for its Rule.  Tobacco Products; Required Warnings for Cigarette Packages and Advertisements (the "Rule"), 85 Fed. Reg. 15,638, 15,640 (March 18, 2020).  FDA mandated warnings that various study participants did not consider new information, or found confusing and non-believable.

These mistakes are unsurprising; FDA had to rush this rulemaking under an injunction that FDA strenuously resisted.  FDA projected that it could not properly complete this rulemaking until at least late 2021, with any rule to take effect no sooner than 2023.  But a district court injunction compelled FDA to issue this rule nearly two years faster than FDA thought possible.  The end result is a rule riddled with unlawful shortcuts, even setting the First Amendment aside.  This Court should vacate the entire Rule.

This Court should also grant Plaintiffs a preliminary injunction so that Plaintiffs do not continue to suffer irreparable harm during this litigation.  FDA's Final Rule mandated an effective date of June 18, 2021, or 15 months after its issuance.  85 Fed. Reg. at 15,638.  FDA has since delayed the effective date for 120 days, until October 16, 2021, due to COVID-19.  ECF No. 5, Notice of Recent Development, May 14, 2020 & Ex. A.  A modest delay of the Rule during this litigation would harm neither FDA nor the public.

## FACTUAL BACKGROUND

### A.     The Tobacco Control Act

Federal law has long mandated warnings about the health risks of smoking on tobacco packaging and advertising, and prohibits manufacturers from advertising cigarettes on television or radio.  *E.g.*, 15 U.S.C. §§ 1333, 1335; Compl. ¶¶ 22-24.  The TCA, however, gave FDA new authority.  After *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120 (2000), held that FDA exceeded its authority by attempting to regulate tobacco as a drug, Congress enacted the TCA to "give[] FDA explicit authority over tobacco products."  H.R. Rep. No. 111-58, at 3-4 (2009).

FDA's authority under the TCA "does not authorize the FDA to ban nicotine in tobacco products or completely prohibit tobacco product sales."  *Nicopure Labs, LLC v. FDA*, 944 F.3d 267, 271 (D.C. Cir. 2019) (citing 21 U.S.C. § 387g(d)(3)).  But the TCA empowers FDA to curb the sale and marketing of tobacco products.  *See id.* at 271-73.  The TCA significantly limits the

promotion of existing tobacco products.  The TCA prohibits manufacturers from distributing "any free samples of cigarettes."  21 U.S.C. § 387a-1(a)(2).  And the TCA restricts any advertising that would "portray the use of tobacco as … healthful to minors," including by barring manufacturers from using "light," "mild," and "similar descriptors" and restricting manufacturers' ability to make health claims about their products.  *See id.* § 387 note; *id.* § 387k.

The TCA also directs FDA to develop graphic warnings depicting health-related risks associated with cigarette smoking.  The TCA spells out the text of those warnings, prohibiting manufacturers from selling or advertising "any cigarette" unless its "package" and "advertising bears … one of the following" nine statements:

- WARNING:  Cigarettes are addictive.
- WARNING:  Tobacco smoke can harm your children.
- WARNING:  Cigarettes cause fatal lung disease.
- WARNING:  Cigarettes cause cancer.
- WARNING:  Cigarettes cause strokes and heart disease.
- WARNING:  Smoking during pregnancy can harm your baby.
- WARNING:  Smoking can kill you.
- WARNING:  Tobacco smoke causes fatal lung disease in nonsmokers.
- WARNING:  Quitting smoking now greatly reduces serious risks to your health.

15 U.S.C. §§ 1333(a)(1), 1333(b)(1).  With respect to graphics, the TCA directed FDA to "issue regulations that require color graphics depicting the negative health consequences of smoking to accompany the[se] label statements" by June 2011.  *Id.* § 1333(d)[1].[1]

These warnings must comprise "the top 50 percent of the front and rear panels of the package," *id.* § 1333(a)(2), and "at least 20 percent of the area of [any] advertisement and shall appear in a conspicuous and prominent format and location at the top of each advertisement," *id.*

---

[1] There are two subsections (d) in 15 U.S.C. § 1333.  The first codifies part of TCA section 201(a); the second codifies TCA section 202(b).  Plaintiffs cite those provisions as sections 1333(d)[1] and 1333(d)[2], respectively.

§ 1333(b)(2).  Manufacturers must "randomly display[]" and "rotate[] quarterly in alternating se-quence" the nine specified "label statements" and accompanying graphics.  *Id.* § 1333(c)(1)-(2).

The TCA gives FDA limited authority to adjust those warnings.  FDA may make cosmetic changes: FDA can "adjust the type size, text and format of the [nine specified] label statements" to improve clarity and legibility.  *Id.* § 1333(d)[1].  For more significant changes, FDA "through a rulemaking … may adjust the format, type size, color graphics, and text of any of the label requirements"—but FDA must "find[] that such a change would promote greater public under-standing of the risks associated with the use of tobacco products."  *Id.* § 1333(d)[2].

### B.     FDA's Invalid 2011 Graphic-Warnings Rule

In 2011, FDA implemented the TCA by mandating nine graphic warnings that paired the TCA's nine prescribed textual warnings with images of disembodied organs, autopsies, and a dis-tressed baby in an incubator.  FDA's purpose was to make consumers "depressed, discouraged, and afraid" to buy tobacco products.  *See* Required Warnings for Cigarette Packages and Adver-tisements, 76 Fed. Reg. 36,628, 36,638 (June 22, 2011).  Based on an 18,000-person consumer study, FDA concluded that these warnings "will effectively communicate the negative health con-sequences of smoking to a wide range of population groups."  *Id.* at 36,636.

In 2012, the U.S. District Court for the District of Columbia invalidated this rule under the First Amendment.  *R.J. Reynolds Tobacco Co. v. FDA*, 845 F. Supp. 2d 266, 277 (D.D.C. 2012).  The D.C. Circuit affirmed and vacated the entire rule as unconstitutional.  696 F.3d at 1221-22.  The D.C. Circuit noted that "the government can certainly require that consumers be fully in-formed about the dangers of hazardous products," *id.* at 1212, and observed that "the industry has complied precisely with all of the government's previous disclosure requirements, and continues

to do so," *id.* at 1215.  But FDA's graphic-warnings rule raised "novel questions" about the government's power "to compel a product's manufacturer to convey the state's subjective—and perhaps even ideological—view that consumers should reject this otherwise legal, but disfavored, product." *Id.* at 1212.  And FDA's attempt to "mak[e] every single pack of cigarettes in the country a mini billboard for the government's anti-smoking message" violated the First Amendment.  *Id.*

In reaching that conclusion, the D.C. Circuit rejected the notion that FDA's graphic warnings should "be evaluated in the context of" manufacturers' previous deceptive statements about smoking-related health risks.  *Id.* at 1215.  The court explained that FDA had not identified any statements that required correction and had "not shown that the graphic warnings were designed to correct any false or misleading claims made by cigarette manufacturers in the past," or that manufacturers' packaging would likely be deceptive absent graphic warnings.  *Id.* at 1215-16. Further, "[t]o the extent that there is a concern about [manufacturers'] past deception," other TCA provisions remedy that concern by "preclud[ing manufacturers] from 'portray[ing] the use of tobacco as … healthful to minors'" and by barring "'light' and other descriptors."  *Id.* at 1215 n.9.

The D.C. Circuit also held that FDA's graphic warnings were not "purely factual and uncontroversial information" as required for compelled speech under *Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio*, 471 U.S. 626, 651 (1985).  The court reasoned that the warnings were "primarily intended to evoke an emotional response, or, at most, shock the viewer into retaining the information in the text warning."  *R.J. Reynolds*, 696 F.3d at 1216.  The warnings also were not "uncontroversial," because many "could be misinterpreted." *Id.* at 1216.

Applying the intermediate-scrutiny standard of *Central Hudson Gas & Electric Corp. v. Public Service Commission*, 447 U.S. 557, 566 (1980), the court held that the rule did not pass

8

muster.  FDA did not offer "a shred of evidence" showing that the warnings would "directly advance" its interest in reducing smoking rates.  *R.J. Reynolds*, 696 F.3d at 1219.  The court was "skeptical that the government can assert a substantial interest in discouraging consumers from purchasing a lawful product, even one that has been conclusively linked to adverse health consequences."  *Id.* at 1218 n.13.  And the court rejected FDA's backup interest in "'effectively communicating health information'" because "'effective' communication is too vague to stand on its own."  *Id.* at 1221.

### C.    FDA's Ensuing Rulemaking Process

Several years later, in 2016, several nonprofit organizations sued FDA, claiming the agency had unreasonably delayed issuing a new graphic-warnings rule.  *See* Compl., *Am. Acad. of Pediatrics v. FDA*, No. 16-cv-11985 (D. Mass. Oct. 4, 2016), ECF No. 1.  FDA responded that this rulemaking demanded significant time to complete because such warnings would be unprecedented.  Zeller Decl. ¶ 10, *id.* (D. Mass. May 26, 2017), ECF No. 33-2.  In May 2017, FDA estimated that properly completing the dozens of steps remaining in its process would take until at least July 2021.  FDA later pushed that date to November 2021, meaning the rule would take effect in 2023.  *See id.* ¶¶ 21-37; 1st Suppl. to Def.'s Statement of Undisputed Material Facts 2, *id.* (D. Mass. Jan. 22, 2018), ECF No. 42.  But the U.S. District Court for the District of Massachusetts ordered FDA to issue a final rule by March 15, 2020—almost two years less than the minimum time FDA considered necessary.  *Am. Acad. of Pediatrics v. FDA*, 2019 WL 1047149, at *4 (D. Mass. Mar. 5, 2019).  By then, each step in FDA's rulemaking was already rife with defects.

1.  ***FDA's Unexplained Choice of Health Risks***.  At some early stage, FDA decided to single out four new risks—amputation, blindness, diabetes, and erectile dysfunction.  FDA developed warnings depicting those risks alongside warnings depicting the nine health consequences that Congress singled out in the TCA, *i.e.*, addiction, harm to children, fatal lung disease, cancer,

heart disease and strokes, fetal harm, death, fatal lung disease in nonsmokers, and the benefits of quitting.  15 U.S.C. § 1333(a)(1).  Even with respect to the risks the TCA identified in its default warning statements (like "[c]igarettes cause cancer"), FDA decided to test specific adjustments (like featuring bladder cancer) but not other options (like featuring many other types of cancer).

Why and how FDA decided to require more and different warnings beyond what Congress specified in the TCA is a mystery.  FDA stated that it "review[ed] the scientific literature on the health risks associated with cigarette smoking," 85 Fed. Reg. at 15,658, and decided to "focus[] on less-known health consequences of smoking," *id.* at 15,640.  It is unclear what FDA meant by this.  If FDA meant its March 2014 literature review, disclosed only in the administrative record, that review did not give criteria for assessing which risks FDA should feature.  That review concluded that "smokers are generally aware of the negative health effects of smoking," and "did not find evidence of a large fraction of smokers expressing misperceptions about the general health risks of smoking."  AR26979, AR26982.

FDA also consulted the Surgeon General's 2014 report identifying 51 smoking-related conditions, including "newly identified" smoking-related health risks.  85 Fed. Reg. at 15,640, 15,655 (citing AR37995-39075); Tobacco Products; Required Warnings for Cigarette Packages and Advertisements, 84 Fed. Reg. 42,754, 42,766 (Aug. 16, 2019).  That report listed many newly identified risks, including colorectal cancer, liver cancer, rheumatoid arthritis, and tuberculosis.  FDA did not say why it opted against developing warnings about those conditions and zeroed in on other newly identified risks, *i.e.*, amputation, blindness, diabetes, and erectile dysfunction.

2.  ***FDA's Qualitative Studies***.  Having picked 13 smoking-related consequences to develop into warnings, FDA never once tested whether different smoking-related conditions would help consumers better understand risks associated with smoking.  Between 2015 and 2018, FDA

performed four qualitative studies—*i.e.*, studies assessing participants' reactions to specified qual-

ities of warning text, images, and text-image pairings—which only tested participants' reactions

to those 13 categories of health consequences.  Despite spending three years on these studies and

setting their parameters, FDA later disavowed these qualitative studies as "not … nationally rep-

resentative" and "not yield[ing] data that can be generalized."  85 Fed. Reg. at 15,666.

July 2015 Qualitative Study of Text:  This study evaluated focus groups' reactions to 26

text-only warning statements about FDA's 13 pre-selected health consequences.  Nine textual

warnings came from the TCA, *see* 15 U.S.C. § 1333(a)(1), and FDA drafted 17 new warnings.  84

Fed. Reg. at 42,767; *see* AR23365-66.  The study results indicted nearly all of the textual warnings:

"[t]he most prevalent finding across groups and statements was the negative reaction to statements

of the type 'X causes Y.'"  AR23337.  Participants "reasoned" these definitive statements "are not

true"—they cited other causal factors besides smoking, and knew that not all smokers contracted

the warned-against condition.  84 Fed. Reg. at 42,767; *see* AR23311, AR23327, AR23329.

Nonetheless, FDA used this study's results to rule out only two textual warnings (involving

quitting and death in nonsmokers), and sent the remaining 24 textual warnings for further testing.

84 Fed. Reg. at 42,767.  FDA stated that it dropped the quitting and death warnings because those

consequences are "better-known."  *Id.* at 42,767 n.5.  But FDA's study reported that *0%* and *2.6%*

of adults, respectively, found the warnings "[s]moking during pregnancy can stunt your baby's

growth" and "[t]obacco smoke can harm your children" to contain new information.  AR23318,

AR23320.  Yet the Final Rule required both warnings virtually verbatim.  *Supra* pp. 1-2.

March 2016 Spanish-Language Study:  This study of reactions to textual warnings found

that participants were *less* likely to believe warnings that contained "new information."  AR23382.

June 2016 Qualitative Study of Images:  This study evaluated 24 proposed images illustrating ten of FDA's 13 selected health conditions (amputation, blindness, cancer, death, diabetes, erectile dysfunction, fetal harm, harm to children, heart disease and strokes, and smoker lung disease).  AR23411.  FDA asked participants whether the images were "clear … attention-grabbing, worth remembering, credible, and relevant," and "provided any new information."  84 Fed. Reg. at 42,770.  Participants called several images "unclear" or "confusing," including images depicting amputation, blindness, diabetes, head and neck cancer, and heart disease.  *See* AR23452, AR23468, AR23512, AR23517, AR23534, AR23552.  Yet FDA tested those images further.

FDA also selected for further development other images that participants said did *not* provide them with "any new information," like the harm to children image, a blackened-lung image depicting smoker lung disease, an image of a man with a nasal cannula depicting chronic obstructive pulmonary disease, and an image of a baby on a scale to show fetal harm.  AR23416, AR23424, AR23429, AR23485.  And participants flagged images as evoking fear or disgust, including ones showing harm to children, heart disease and strokes, fetal harm, and nonsmoker lung disease.  AR23414-16, AR23424, AR23428, AR23521, AR23555.  Yet FDA kept those concepts.

April 2018 Qualitative Study of Text and Images:  This study was the first to test participants' reactions to proposed warnings pairing text and images.  FDA paired 24 textual warnings—the 9 TCA statements and 15 FDA-drafted statements—with one, two, or three corresponding images.  For example, FDA tested the textual statement "smoking causes bladder cancer, which can lead to bloody urine" alongside an image of blood in a toilet and the image FDA ultimately used, an orange-colored liquid in a cup.  AR23607.  FDA's proposed warnings again covered the 13 health risks that FDA pre-selected.  *See* AR23850-52.  Participants evaluated text-image pairings for clarity, accuracy, believability, and whether they provided new information.  AR23574.

FDA used this study to winnow the text-image pairings to the final 16 text-image pairings that FDA evaluated in FDA's second quantitative study.  But FDA approved for further development pairings that performed worse than comparable pairings covering the same risks.  FDA even approved text-image pairings for further development when they performed worse than pairings featuring the default TCA textual statements.  For instance, participants reported that a text-image pairing featuring the TCA's cancer warning statement was a better representation of cancer than FDA's proposed head and neck cancer and bladder cancer warnings.  AR23608.  Yet FDA developed warnings based on the latter two proposals.  85 Fed. Reg. at 15,708.  Likewise, participants ranked the bladder cancer and "stunts fetal growth" graphic warnings that FDA ultimately finalized as the *worst* options for illustrating cancer and fetal harm.  AR23597, AR23608.  And FDA kept developing warnings that imparted new information to only a "few" participants.  AR23594 (fetal harm), AR23614 (nonsmoker lung disease).

3. ***FDA's Quantitative Studies***.  FDA also performed two quantitative studies (*i.e.*, studies using numerical measurements) to test warnings covering FDA's 13 pre-selected conditions.

April 2018 Quantitative Study:  This text-only study tested participants' reactions to the same 24 textual warning statements that FDA assessed in the April 2018 qualitative study.  FDA intended to test which of 15 FDA-drafted textual warning statements would "promote greater public understanding" of smoking-related health risks, as compared with the TCA's nine warning statements.  84 Fed. Reg. at 42,767.  But FDA never had participants assess head-to-head comparisons of any of its new proposed statements about amputation, blindness, diabetes, or erectile dysfunction against the three TCA warnings FDA ultimately discarded, concerning addiction, death, and quitting.  *Id.* at 42,769 n.8; *compare* AR39337 *with* AR39339-40.  FDA also had participants compare longer FDA-drafted statements to short TCA statements warning of similar risks

13

(*e.g.*, fetal harm), without controlling for whether people inherently consider longer, more detailed statements new information.  AR28507.  FDA used this study to select 15 textual statements—10 FDA-drafted statements and 5 TCA ones—for its final quantitative study.  84 Fed. Reg. at 42,769.

Though FDA had participants rate the textual warning statements across ten metrics, FDA decided that two would be dispositive: whether participants considered the warnings "new information," and whether participants perceived themselves as having learned something new from the warnings (or "self-reported learning").  *See id.*; 85 Fed. Reg. at 15,658; AR50772.  FDA selected for further development all 10 of the 15 FDA-drafted warnings that performed well on the "new information" and "self-reported learning" metrics.  85 Fed. Reg. at 15,658.  But FDA did not assess *what* information participants believed they had learned or considered new, nor whether that information was accurate.  *See* AR 28507, AR54066, AR54073.

FDA also committed in advance to disregarding whether participants considered the new, FDA-drafted warnings to be less informative, less factual, less believable, less likely to prompt thought about the warned-against health risks, or less successful at influencing health beliefs than the TCA's nine default textual statements.  The FDA-drafted warnings performed terribly on those metrics.  FDA ultimately used nine FDA-drafted warning statements in its Final Rule; eight of those (covering amputation, bladder cancer, blindness from cataracts, diabetes, erectile dysfunction, fetal growth, head and neck cancer, and heart disease and strokes) did *not* show statistically significant improvements in informativeness over Congress' default warning language.  AR39345 & tbl.24.  Participants rated six of the FDA-drafted warnings that FDA used in its Final Rule (covering amputation, bladder cancer, blindness from cataracts, diabetes, erectile dysfunction, and head and neck cancer) as both significantly *less* factual and *less* believable than the TCA warning statements.  *See* AR39343-46 & tbls. 24-25; Compl. ¶ 119 (summarizing results).  Participants

14

considered only *one* FDA-drafted statement, about chronic obstructive pulmonary disease, to be significantly more believable than a TCA statement.  AR39343.

<u>May 2019 Quantitative Study</u>:  This was the only quantitative study evaluating the combined text and images comprising FDA's graphic warnings.  Participants compared the four current Surgeon General statements to 16 graphic warnings occupying 50% of a mock package or 20% of a mock advertisement.  FDA created the 16 warnings by (1) taking the text-image pairings FDA developed for its April 2018 qualitative study and (2) selecting the text-image pairings associated with the 15 textual statements that FDA deemed to have performed best in the April 2018 quantitative study.  (This produced 16 options because FDA paired one textual statement, involving chronic obstructive pulmonary disease, with two images).  AR39756-87.  Participants viewed the warnings multiple times and rated them on criteria like whether the warnings contained "new information," caused them to "learn[] something," and seemed "understandable" or "factual[]."  85 Fed. Reg. at 15,658-59; AR39687-88.  FDA used the results to winnow the 16 warnings to the 13 in the Proposed Rule; FDA cut warnings concerning addiction, death, and the benefits of quitting.

Again, FDA pre-committed to judging warnings based solely on "new information" and self-reported learning, and thus ignored other metrics.  *See* 85 Fed. Reg. at 15,658.  The addiction, benefits of quitting, and death warnings were the only ones that did not outperform Surgeon General warnings on those two metrics.  *Id.*  Peer reviewers critiqued this "arbitrary" way of measuring consumer understanding.  AR 54059; *see* AR54063, AR54070-73.  Again, many of the warnings FDA mandated in the Final Rule performed terribly on the metrics FDA disregarded.  *Five* of FDA's finalized warnings did not meaningfully affect participants' health beliefs about smoking over time.  85 Fed. Reg. at 15,669; AR28510.  *Seven* of FDA's finalized warnings "were perceived

as factual statistically significantly less than the Surgeon General's warnings," 85 Fed. Reg. at 15,660, suggesting that they "may not be accepted by the target audience," AR54070.

### D.     FDA's Proposed Rule

On August 16, 2019, FDA published its Proposed Rule.  84 Fed. Reg. 42,754.  FDA's sole justification was to "promote greater public understanding of the negative health consequences of cigarette smoking," particularly "less-known" risks, by promoting "increase[d] information processing and learning."  *Id.* at 42,756, 42,764.  Based on its warning-development process, FDA proposed 13 images, coupled with 12 textual warning statements.  (FDA proposed having the same text accompany two images for chronic obstructive pulmonary disease.)  *Id.* at 42,773, 42,775.

FDA withheld significant information underlying its rulemaking.  FDA's notice of proposed rulemaking cited FDA's qualitative and quantitative consumer-research studies, but FDA posted "study reports" only for its quantitative studies.  FDA did not release the underlying data or reports from its qualitative studies.  Nor did FDA disclose peer reviews of FDA's quantitative studies; FDA proposed the rule before peer reviews concluded.  85 Fed. Reg. at 15,658.

On November 12, 2019, nearly a month after the comment period closed, FDA reopened the comment period for 15 days after posting study reports for FDA's four qualitative studies, totaling some 600 pages.  *See* Tobacco Products; Required Warnings for Cigarette Packages and Advertisements; Additional Materials; Reopening of the Comment Period, 84 Fed. Reg. 60,966. Though these reports long pre-dated the Proposed Rule, FDA justified "not originally includ[ing]" them by claiming that "FDA did not rely on these studies as part of the rulemaking."  *Id.* at 60,967. But elsewhere, FDA admitted that it "used [these studies] to inform further research" by "test[ing] and refin[ing] image concepts and obtain[ing] feedback on which textual statements should be selected for further study."  *Id.*; *see* 85 Fed. Reg. at 15,667.

### E.  FDA's Final Rule

FDA issued its Final Rule on March 18, 2020, after receiving several hundred comments. *See* 85 Fed. Reg. 15,638 (to be codified at 21 C.F.R. pt. 1141).  The Rule compels manufacturers to rotate the following graphic warnings on their cigarette packaging and advertisements:


Harm to Children Warning


Fetal Harm Warning


Bladder Cancer Warning


Amputation Warning


Blindness Warning


Head and Neck Cancer Warning


Smoker Lung Disease Warning


Heart Disease and Strokes Warning


Nonsmoker Lung Disease Warning


Diabetes Warning


Erectile Dysfunction Warning

17

AR39133-AR39291.  FDA again asserted only one interest in promulgating these warnings: "promoting greater public understanding of the negative health consequences of smoking," with a particular "focus[] on less-known health consequences."  85 Fed. Reg. at 15,638, 15,640.[2]

The Final Rule revealed other missing information.  Only then did FDA disclose the November 19, 2019, peer review report, in which six experts in the fields of communications, behavioral science, and public health assessed FDA's quantitative studies.  *Id.* at 15,661.  The Rule states that the peer reviewers deemed FDA's studies "strong" and "very well done."  *Id.*  In fact, peer reviewers identified serious issues with FDA's studies, ranging from the "significant weakness" of FDA's sampling methodology to FDA's "arbitrary" and "odd" focus on select study outcomes to FDA's failure to assess the "crucially important" issue of warning credibility.  AR54059, AR54072-73, AR54089.  FDA also waited until issuing the Final Rule to "update[]" and post final versions of its quantitative study reports.  85 Fed. Reg. at 15,661.

FDA still did not disclose other data that FDA relied on, including the raw quantitative-study data.  Instead, FDA wrote a March 16, 2020 "Memo to File" acknowledging that "[a]ccess to the raw data could provide the ability to confirm that the findings reported in the study reports matched the pre-specified statistical analysis plan for each quantitative study."  AR23863.2.  But FDA speculated that "[a]ccess to the raw data would also allow third party attempts to analyze the

---

[2] The Final Rule (85 Fed. Reg. at 15,687) rejected Plaintiffs' request to exempt Philip Morris International Inc.'s HeatSticks® line of products, which do not produce smoke.  FDA on April 30, 2019, authorized these products as a "new tobacco product," *i.e.*, one whose marketing is "appropriate for the protection of public health" under 21 U.S.C. § 387j.  The Rule recognized that HeatSticks® present different considerations than traditional cigarettes, but stated that FDA "does not believe that a broad rule requiring cigarette health warnings generally is the appropriate place to address the requirements as they apply to one specific product" and that FDA intends to address the issue when "issuing or revising individual product marketing orders."  85 Fed. Reg. at 15,687.  On July 7, 2020, FDA, without addressing graphic warnings, authorized the marketing of HeatSticks® as "significantly reduc[ing] your body's exposure to harmful or potentially harmful chemicals," and whose marketing with reduced-exposure claims is "expected to benefit the health of the population as a whole."  Because discussions with FDA are continuing, Plaintiffs do not now seek relief with respect to HeatSticks®.

data in different and potentially selective, biased, or misleading ways other than what FDA pre-specified."  *Id.*  FDA thus denied anyone else a chance to identify red flags in FDA's data.

FDA finally released the raw study data as part of the administrative record.  Analysis of the data reveals new findings that seriously impeach FDA's reasoning and conclusions.  For instance, the data underlying FDA's second quantitative study shows that there was no statistically significant difference between the text-only Surgeon General's warning about carbon monoxide versus many of FDA's final graphic warnings on critical measures.  Not only that, the current carbon-monoxide warning even registered statistically significant *improvements* in "new information" as compared to FDA's graphic warnings for harm to children, nonsmoker lung disease, fetal harm, and chronic obstructive pulmonary disease.  *Infra* p. 28.

## STANDARD OF REVIEW

Summary judgment is "the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review."  *Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 90 (D.D.C. 2006).  The APA requires courts to "hold unlawful and set aside agency action, findings, and conclusions found to be": (1) "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"; (2) "contrary to constitutional right, power, privilege, or immunity"; (3) "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right"; or (4) "without observance of procedure required by law."  5 U.S.C. § 706(2).

## ARGUMENT

### I.   FDA'S RULE VIOLATES THE APA

FDA's rulemaking violated the APA from start to finish.  FDA exceeded its statutory authority, both by requiring 11 warnings instead of the required nine, and by failing to make statutorily required findings to alter Congress' prescribed text.  FDA also failed to disclose critical

data—including the raw data underlying its quantitative studies—that reveals yet further short-comings in FDA's analyses.  FDA's Rule is also rife with arbitrary and capricious decision-making.  FDA failed to explain its choices about what risks to feature.  And FDA adopted flawed measures of consumer understanding, even though FDA's own studies and peer reviewers raised repeated questions about whether consumers actually comprehended the warnings and whether their content would backfire.  Any of these errors warrants vacating the entire Rule.

### A.      The TCA Bars FDA from Mandating 11 Warnings

Agencies can only act "within the bounds" that Congress prescribes.  *City of Arlington v. FCC*, 569 U.S. 290, 297 (2013).  Congress authorized FDA to create nine warnings, and nine only.  Congress thus unambiguously precluded FDA from promulgating 11 warnings.  *See generally Michigan v. EPA*, 135 S. Ct. 2699, 2707 (2015); *Util. Air Regulatory Grp. v. EPA*, 573 U.S. 302, 321 (2014); *Merck & Co. v. HHS*, 962 F.3d 531, 535-36 (D.C. Cir. 2020).

1. The text of the TCA clearly limits FDA to promulgating nine graphic warnings.  Congress prohibited sales of cigarettes if the package "fails to bear … one of the following labels," and then listed nine warning options (*e.g.*, "Cigarettes are addictive").  15 U.S.C. § 1333(a)(1).  Congress prohibited advertising cigarettes "unless [the manufacturer's] advertising bears … one of the labels specified in [section 1333(a)(1)]," *i.e.*, one of the nine specified warning labels.  *Id.* § 1333(b)(1).  When Congress prohibits something unless "one of the following" nine conditions are met, Congress affords exactly nine ways of complying.  Courts have a "duty to respect not only what Congress wrote but, as importantly, what it didn't write."  *Va. Uranium, Inc. v. Warren*, 139 S. Ct. 1894, 1900 (2019) (plurality op.).  When Congress wanted to require a different number of warning label statements, it did so, authorizing just four warning label statements for smokeless tobacco products.  15 U.S.C. § 4402(a)(1).

"Nothing in the [statutory scheme] suggests Congress left any leeway for [FDA] to tack on additional criteria." *Cent. United Life Ins. Co. v. Burwell*, 827 F.3d 70, 73 (D.C. Cir. 2016). Congress authorized FDA to "adjust the format, type size, color graphics, and text of any of the label requirements" for purposes of improving consumer understanding. 15 U.S.C. § 1333(d)[2]. In other words, FDA can adjust the nine labels, not require ten or five. Likewise, FDA may "adjust the type size, text and format" of the nine specified "label statements" to ensure conspicuousness and legibility in conjunction with color graphics. *Id.* § 1333(d)[1]. Those provisions grant FDA discretion to adjust some things—like text and format—but not to change the number of warnings. When Congress lists related items subject to change but excludes "members of an associated group or series," the "items not mentioned were excluded by deliberate choice, not inadvertence." *Barnhart v. Peabody Coal Co.*, 537 U.S. 149, 168 (2003).

2. Even were the TCA ambiguous, FDA's claim of discretion over the number of warnings and its decision to impose 11 warnings are impermissible and stem from unreasonable interpretations of section 1333. Start with FDA's breathtaking claim of authority to adjust the number of warnings. FDA disputed whether the TCA requires nine warnings, noting that the statute does not speak in terms of "9 labels." 85 Fed. Reg. at 15,642. Apparently, under FDA's view, FDA could have required graphic warnings for all 51 conditions that the Surgeon General's 2014 report discussed. The TCA repeatedly states that manufacturers must feature "one of the following labels" in a list of nine. 15 U.S.C. § 1331(a), (b). FDA cannot be serious that Congress has not prescribed a fixed number just because readers must count the listed conditions to see that they total nine.

FDA also erroneously relied on 15 U.S.C. § 1334(a). 85 Fed. Reg. at 15,642. Section 1334(a) states: "Except to the extent [FDA] requires additional or different statements on any cigarette package," no other health-related statements besides "the statement required by section 1333

21

… shall be required."  The reference to "additional" statements refers to (i) the other textual disclosures that FDA can "establish" under the Federal Food, Drug, and Cosmetics Act and require manufacturers to display, 15 U.S.C. § 1333(d)[2]; (ii) tar and nicotine yield disclosures that FDA can compel, *id.* § 1333(e)(1); and (iii) other tobacco product constituent disclosures, *id.* § 1333(e)(3).  Section 1334(a) neither alters the meaning of section 1333 nor grants FDA the authority to change the number of warnings.

FDA further argued that its authority under section 1333(d)[2] lets FDA adjust *any* "label requirement" in section 1333(a), which lists nine warnings and dictates their size, placement, and other features.  85 Fed. Reg. at 15,642.  That interpretation is nonsensical.  Under FDA's reading, FDA's authority to "adjust the format, type size, color graphics, and text of any of the label requirements" empowers FDA to "adjust" the *statutory text—i.e.*, the language Congress codified that spells out "label requirements," including the number of labels and their size and placement. *See id.*  But adjusting statutes requires legislation; Congress cannot delegate the power to "adjust" the text Congress enacted.  *E.g.*, *Clinton v. City of New York*, 524 U.S. 417, 439-40 (1998).  FDA's interpretation also makes no sense.  Adjustments to the "color graphics … of any of the label requirements" can only mean adjusting the color graphics associated with the TCA's nine textual warnings.  Likewise, FDA's authority to change the "format" or "type size" of the label requirements clearly refers to the format or type size of warnings, not Congress' statutory language.

FDA's interpretation presupposes a world of difference between "label *statements*" under section 1333(d)[1] and "label *requirements*" under section 1333(d)[2], contending that the latter phrase empowers FDA to change any statutory requirement in section 1333.  But Congress did not give such talismanic significance to the word "requirements" in section 1333(d)[2]; after all, Congress entitled that provision "Change in Required *Statements*."  That title signals that Congress had

changes to the content and format of the nine statements—not their number—in mind. *See Yates v. United States*, 574 U.S. 528, 540 (2015) (plurality op.) (titles and headings can "resol[ve] doubt about the meaning of a statute").

Tellingly, FDA disavowed this interpretation elsewhere, contending that the TCA tied FDA's hands with respect to the warnings' size and placement so that FDA has no choice but to commandeer an unprecedented 50% of packaging and 20% of advertising. *See* 85 Fed. Reg. at 15,647. FDA cannot have it both ways: either FDA's authority to modify the "text" and other specified features of the "label requirements" does not allow the agency to change the warnings' number, size, or placement, in which case FDA cannot turn nine warnings into some other number. Or FDA does have the power to change the warnings' number, size, and placement, and FDA's failure to explore less-speech-restrictive options violates the First Amendment. *Infra* pp. 45-46.

Even if FDA had discretion to change the number of warnings, FDA still violated the TCA by picking 11. Even under FDA's view, FDA could change the number of warnings only after "find[ing]" in a rulemaking that such a change "would promote greater public understanding of the risks" of smoking. 15 U.S.C. § 1333(d)[2]; 85 Fed. Reg. at 15,642. Yet FDA never analyzed the relative merits of nine versus 11 warnings. FDA asserted without any elaboration that "all 11 warnings" would promote greater consumer understanding. 85 Fed. Reg. at 15,642. So, presumably, would 51. "Merely referencing a [statutory] requirement is not the same as complying with that requirement," and FDA's failure to "reach[] an express and considered conclusion" renders this choice unlawful. *Cigar Ass'n of Am. v. FDA*, 964 F.3d 56, 61 (D.C. Cir. 2020).

Moreover, the TCA requires equal display of FDA's prescribed warnings. *See* 15 U.S.C. § 1333(c)(1)-(2). But requiring 11 warnings—or any other prime number—makes compliance with that mandate functionally impossible, because the industry prints designs using grid layouts,

and using a prime number like 11 would upend existing industry printing processes.  *See* AR 28487-88, 28686-88.  FDA acknowledged that problem by relaxing the equal-display requirement to allow "some level of deviation."  *See* 85 Fed. Reg. at 15,691, 15,693.  But the fact that FDA had to override a core display requirement shows the impermissibility of FDA's choice of 11 warnings.

Finally, FDA's interpretation raises serious First Amendment concerns that militate against FDA's reading.  *See Merck & Co.*, 962 F.3d at 540-41 (rejecting agency interpretation that raised significant constitutional difficulties).  The more warnings FDA mandates, the more messaging FDA dictates to manufacturers, and the greater the First Amendment problems.  Yet FDA's interpretation puts no limit on the number of labels it could require, whether that number is 11 or 1,100.  This Court should reject the notion that Congress wrote a blank check for FDA to dictate an unlimited amount of content in as many warnings as FDA pleases.

## B.     FDA Failed to Justify Changing TCA-Mandated Textual Statements

As stated, FDA can "adjust" the TCA's nine default textual statements only if FDA finds, in a rulemaking, that "such a change would promote greater public understanding of the risks associated with the use of tobacco products."  15 U.S.C. § 1333(d)[2].  Thus, to modify the text of any existing textual statement (which, in turn, dictates the content of the graphics), FDA had to determine that the alteration "would promote greater public understanding" of smoking-related risks than what the original TCA version would achieve.

Yet FDA never made that determination for three TCA warnings: "Cigarettes are addictive," "Smoking can kill you," and "Quitting now greatly reduces serious risks to your health."  FDA replaced those TCA warnings with four new warnings: "Smoking causes type 2 diabetes, which raises blood sugar," "Smoking reduces blood flow, which can cause erectile dysfunction," "Smoking causes cataracts, which can lead to blindness," and "Smoking reduces blood flow to the limbs, which can lead to amputation."  Section 1333(d)[2] thus required FDA to determine that

each new textual warning would better promote public understanding of health risks than the TCA warning that FDA was replacing.  For instance, to replace "Smoking can kill you" with the erectile-dysfunction warning, FDA had to compare the two statements and show that the erectile-dysfunction warning better promotes consumer understanding.

But FDA never even tried to show that its new warnings would improve upon three of the TCA warnings—*i.e.*, those covering quitting, death, and addiction—that FDA discarded.  FDA's April 2018 quantitative study purported to compare the effectiveness of the TCA's nine textual warnings versus new, FDA-drafted statements.  85 Fed. Reg. at 15,658.  But that study never tested the text of *any* of the new amputation, blindness, diabetes, or erectile dysfunction textual warnings against the TCA warnings FDA eliminated.  *Compare* AR39337, *with* AR39339-40.  Not only that, FDA did not report any results indicating how the quitting and death TCA warnings performed on any metrics.  Instead, FDA's study "randomly selected" a TCA warning to compare to the four new warnings, for instance comparing the TCA warning that "Smoking during pregnancy can harm your baby" to both the new blindness and erectile dysfunction textual warnings.  AR39339-40.  But that did not comply with the TCA, because FDA did not then replace the TCA pregnancy warnings with one of the new textual warnings.  Rather, FDA adjusted the TCA's pregnancy warning and featured that message in a *different* graphic warning.  *Id.*  Finding that the blindness and erectile-dysfunction warnings promoted consumer understanding compared to the TCA pregnancy warning shows (at most) that the new warnings might improve consumer understanding compared to *that* TCA warning only.  It says nothing about whether FDA's new warnings might improve consumer understanding compared to any of the TCA warnings that FDA eliminated.

FDA thus failed to do what Congress asked: establish that any replacement textual warning improves upon the discarded warning that Congress greenlit.  In APA terms, FDA failed to

25

"reach[] an express and considered conclusion" regarding a factor Congress required FDA to consider. *Cigar Ass'n*, 964 F.3d at 61; *see Pub. Citizen v. Fed. Motor Carrier Safety Admin.*, 374 F.3d 1209, 1216 (D.C. Cir. 2004).  That same error invalidated FDA's rule imposing warnings for pipe tobacco and cigars, where FDA failed to determine if its rule would increase or decrease the number of smokers, as the TCA requires.  *Cigar Ass'n*, 964 F.3d at 64-65.

### C.   FDA's Failure to Disclose Key Information Prevented Meaningful Comment

FDA's rulemaking also flouted the cardinal APA requirement that agencies "reveal[] for public evaluation … the technical studies and data upon which the agency relies in its rulemaking." *Am. Radio Relay League, Inc. v. FCC*, 524 F.3d 227, 236 (D.C. Cir. 2008); *Chamber of Commerce v. SEC*, 443 F.3d 890, 899 (D.C. Cir. 2006).  FDA's internal qualitative and quantitative studies were the only studies to assess participants' reactions to the graphic warnings FDA selected.  It was thus incumbent on FDA to disclose the studies and data from these studies during the notice-and-comment period, so that commenters could check FDA's work and identify any other trends in the data.  Agencies disclosed these materials in other rulemakings.[3]  And manufacturers must submit all data underlying every study when FDA reviews safety and health claims about tobacco and other products.  *See, e.g.*, 21 U.S.C. § 387k(d).  But here, FDA refused to publicly disclose the building blocks of any of its studies, despite Plaintiffs' requests.  AR36897 & n.16.  That failure was a "serious procedural error" that invalidates the Rule.  *See Conn. Light & Power Co. v. Nuclear Regulatory Comm'n*, 673 F.2d 525, 530 (D.C. Cir. 1982).

---

[3] *E.g.*, *Prometheus Radio Project v. FCC*, 652 F.3d 431, 447 (3d Cir. 2011)  (FCC released 10 studies with associated "large underlying data sets"); CMS, *FY 2020 Proposed Rule Data Files*, https://www.cms.gov/Medicare/Medicare-Fee-for-Service-Payment/AcuteInpatientPPS/FY2020-IPPS-Proposed-Rule-Home-Page-Items/FY2020-IPPS-Proposed-Rule-Data-Files (CMS disclosure of a huge amount of data underlying a proposed rule); *see also* FDA, *Public Access to Results of FDA-Funded Scientific Research*, Feb. 13, 2018, https://www.fda.gov/science-research/about-science-research-fda/public-access-results-fda-funded-scientific-research (FDA noting that making available "underlying data allow[s] for the critical review, replication, and verification of findings that are central to the scientific method [and] promotes robust and open communication").

1. ***FDA's Quantitative Studies***.  In FDA's first quantitative study, participants judged the text of the nine TCA warnings versus 15 new, FDA-drafted warnings on metrics like whether the warnings provided new information or were factual.  84 Fed. Reg. at 42,767-68.  In FDA's second quantitative study, participants rated 16 proposed graphic warnings against the text of existing Surgeon General's warnings.  FDA singled out these studies—especially their finding that FDA's new warnings scored well on the "new information" and "self-reported learning" measures—as the seminal evidence supporting its Rule.  *E.g.*, 85 Fed. Reg. at 15,658.  But FDA declined to release the data underlying these studies, instead providing only processed study reports.  FDA even withheld harshly critical peer reviews of these studies until issuing the Final Rule.

FDA's choice plainly violated the APA.  Once FDA chose to rely upon the quantitative studies, FDA needed to disclose the studies and their underlying data in full.  *See Am. Radio*, 524 F.3d at 239.  FDA's curious "Memo to File," which the agency finalized immediately before issuing the Final Rule, only confirms that FDA's decision prejudiced the notice-and-comment process. As the "Memo to File" noted, "[a]ccess to the raw data could provide the ability to confirm … the findings … matched the pre-specified statistical analysis."  AR23863.2.  Yet FDA refused to give commenters that chance, citing the risk that they might take a "different" or "misleading" approach to analyzing the data compared to "what the FDA pre-specified."  *Id.*

What FDA called an unwanted "different" approach, the D.C. Circuit calls "genuine inter-change."  *Am. Radio*, 524 F.3d at 236-37.  Such disclosure "improves the quality of agency rulemaking by exposing regulations to diverse public comment, ensures fairness to affected parties, and provides a well-developed record that enhances the quality of judicial review."  *Sprint v. FCC*, 315 F.3d 369, 373 (D.C. Cir. 2003).  Exchanges about the raw data underlying the quantitative studies would have been critical.  For the first quantitative study, FDA reported out *no* data

for two of the TCA warnings (about quitting and death) that FDA discarded, leaving open questions about what data justified FDA's choices.  And for the second quantitative study, FDA did not report individual data for the four Surgeon General's warnings it tested.  Instead—in an approach that drew peer reviewer critiques, AR54064—FDA lumped all of the Surgeon General's warnings together, averaging their scores on the study measures and comparing that average score against each of its new graphic warnings.  But those averages deceptively masked findings that undermine FDA's rulemaking.  FDA's raw data, just disclosed in the administrative record, reveals that the Surgeon General's warning for carbon monoxide either outperformed or did not significantly differ from *four* of FDA's final graphic warnings (harm to children, nonsmoker lung disease, fetal harm, and chronic obstructive pulmonary disease) on FDA's favored new information and self-reported learning measures.  *See* Ex. 1, Vansickel Decl. ¶ 23.  That raw data also shows that, in the only apples-to-apples match-up FDA conducted between one of the graphic warnings FDA developed (about quitting) and the text-only version of that warning, participants did *not* perceive any difference in "new information" or "self-reported learning."  *See id.* ¶ 22.

These previously inaccessible findings raise red flags about FDA's study design and the efficacy of the graphic warnings FDA ultimately mandated.  Yet, by hiding these findings during the rulemaking, FDA prevented commenters from raising and engaging with FDA on these critical points during the notice-and-comment period.  FDA's non-disclosure is particularly ironic in a rulemaking that FDA rested on portraying informational disclosures as a public good.  FDA contended that the public needs more information to understand smoking-related risks, but FDA claimed the right to withhold information because it cannot trust the public to use data responsibly.  "To allow an agency to play hunt the peanut with technical information … is to condone a practice

in which the agency treats what should be a genuine interchange as mere bureaucratic sport." *Conn. Light & Power*, 673 F.2d at 530.

2. ***FDA's Qualitative Studies***.  FDA similarly withheld key information about FDA's four qualitative studies assessing consumer perceptions of various text and image options for FDA's graphic warnings.  FDA did not even disclose the qualitative study reports during the initial comment period, instead giving commenters just 15 days to review 600 pages of study reports that indicted FDA's qualitative studies.  *Supra* p. 10.  Even after that, FDA declined to disclose notes and transcripts of the interviews that formed the basis for FDA's study reports.  *See, e.g.*, AR23288.

FDA thus made it impossible to verify whether its reports accurately identified "patterns across responses" in interviews, 85 Fed. Reg. at 15,666, let alone whether FDA omitted reactions that cast doubt on FDA's choices of text and images.  And indeed, voluminous raw data from the transcripts FDA disclosed as part of the administrative record suggests that FDA's study reports downplayed important reactions to FDA's proposed text and images, including many reactions that showed just how unbelievable and emotionally explosive FDA's warnings are.  *Infra* p. 48 n.5.  Withholding this information during the comment period prevented commenters from pointing out misleading conclusions in FDA's study reports and showing that FDA should have been aware of the strong emotional reactions its warnings provoked.  *See Am. Radio*, 524 F.3d at 237-38 (vacating rule in light of agency non-disclosure where commenters would have "ha[d] something useful to say … if given the opportunity to comment").  While FDA's Final Rule disclaimed reliance on these studies due to their serious methodological flaws, *see* 85 Fed. Reg. at 15,666-67, FDA still used these studies to winnow its options for text and graphics—deeming them "formative" in one instance, *id.* at 15,664.  Because that winnowing rested on studies that FDA itself deemed flawed, FDA's choice to stick with those options was arbitrary and capricious.

### D.      FDA Irrationally Chose Which Health Risks to Feature

FDA's decision about which smoking-related risks to feature was the most critical choice in the rulemaking, yet FDA failed to show a "rational connection between the facts found and the choice made," nor did FDA consider "important aspect[s] of the problem." *Motor Vehicle Mfrs. Ass'n v. State Farm*, 463 U.S. 29, 42-43 (1983).  FDA could have decided to use the smoking-related health consequences in the nine warnings that Congress included in the TCA.  Or FDA could have decided to feature health consequences that smokers are most likely to face, or those affecting the greatest number of people.

FDA instead justified its new warnings based on its conclusion that consumers would appreciate the risks of smoking more if warnings "focused on less-known health consequences of smoking." 85 Fed. Reg. at 15,640; *see* 84 Fed. Reg. at 42,765.  FDA stated that its warnings reflect FDA's "evaluat[ion of] the public's general awareness of" smoking-related health risks and FDA's conclusion that consumers "suffer from a pervasive lack of knowledge about and understanding of many of the negative health consequences of smoking."  85 Fed. Reg. at 15,655, 15,658.

But that criterion does not explain how FDA decided what health consequences to feature in the first place.  Before FDA conducted its first study in July 2015, FDA had apparently picked 13 health-related consequences of smoking based on unknown and undiscernible criteria.  FDA isolated four new risks—amputation, blindness, diabetes, and erectile dysfunction—as well as the nine health consequences that Congress singled out in the TCA, *i.e.*, addiction, harm to children, fatal lung disease, cancer, heart disease and strokes, fetal harm, death, fatal lung disease in non-smokers, and the benefits of quitting.  *See* 15 U.S.C. § 1333(a)(1).  FDA has never claimed that all the risks its warnings feature are lesser-known, nor could it.  As FDA's March 2014 literature review noted, many FDA-featured risks are well-known, including lung disease, harm to children, and heart disease.  AR26959-60, AR26977, AR26963-64, AR26978.  FDA's qualitative studies

confirmed that consumers universally appreciated risks like fetal harm, harm to children, smoker lung disease, and heart disease and strokes.  *See* Compl. ¶¶ 94, 99, 106 (quoting AR23318, AR23320, AR23416, AR23424, AR23429, AR23485, AR23594).

The mystery remains: why did FDA decide to develop warnings based on some new risks, and not others?  And why keep various TCA-identified risks that had long been the subject of Surgeon General's warnings?  For some TCA-identified risks (like "[c]igarettes cause cancer"), FDA early on decided to develop warnings singling out particular consequences (like bladder cancer).  AR23365.  But if FDA planned to develop warnings based on specific types of cancer, why bladder cancer and not others (like liver or stomach or kidney cancers)?  Why develop warnings based on certain conditions arising from a particular disease (like elevated blood sugar from diabetes or bloody urine from bladder cancer) but not other conditions?

FDA stated that it "carefully examined" the Surgeon General's 2014 report identifying 51 smoking-related conditions, 85 Fed. Reg. at 15,640, but that report does not explain FDA's criteria for picking what conditions to feature.  FDA is correct that this report "newly identified" various conditions as causally connected to smoking, and identified a "wide range" of conditions that smoking generally causes.  *Id.* at 15,640, 15,655 (citing AR37995-39075); 84 Fed. Reg. at 42,776.  But that report listed many "newly identified" conditions as smoking-related, including colorectal cancer, liver cancer, rheumatoid arthritis, and tuberculosis.  AR38027.  The report thus only deepens the mystery as to why FDA bypassed so many other conditions and apparently randomly picked amputation, blindness, diabetes, and erectile dysfunction.  The report itself offers no insight into why FDA featured particular consequences of selected conditions, but not others.

Not surprisingly, FDA's peer reviewers were "perplexed about the sources and topics that generated the new warnings" and asked FDA to "more clearly describe[]" its opaque process, to

no avail.  AR54071, AR54089.  In short, FDA arbitrarily and capriciously failed to explain why

FDA picked the health consequences that its graphic warnings feature.  *See Dist. Hosp. Partners,*

*L.P. v. Burwell*, 786 F.3d 46, 58-59 (D.C. Cir. 2015) (agency acted arbitrarily and capriciously by

failing to explain criteria for selecting 50 hospitals out of a broader list of 123).

### E.      FDA Arbitrarily Assessed Consumer Understanding

FDA's evaluation of whether its warnings would achieve FDA's stated aim of educating

consumers arbitrarily ignored significant methodological flaws in FDA's evidence and failed to

consider critical dimensions of consumer understanding.  Again, FDA's sole justification for this

Rule was to "more effective[ly]" educate consumers about "the negative health consequences of

smoking," particularly risks that are "less known or less understood by consumers."  85 Fed. Reg.

at 15,643, 15,654.  FDA repeatedly disavowed any other justification, including affecting con-

sumer behavior or smoking rates.  *Id.* at 15,644, 15,650, 15,660; AR 54165, AR54172-73.  The

only evidence that FDA ultimately relied on to show that the Rule accomplishes FDA's desired

consumer-understanding end is FDA's two quantitative studies; FDA disavowed its qualitative

studies.  *See* 85 Fed. Reg. at 15,651, 15,666, 15,667.  But no reasonable adherent of the scientific

method would have gone about assessing consumer understanding the way FDA did.  Many of

FDA's peer reviewers rightly expressed severe concerns about whether FDA's quantitative studies

could show that FDA's warnings meaningfully advance FDA's consumer-understanding aim.

1. FDA's conclusion that the Rule will improve consumer understanding relies most heav-

ily on FDA's final quantitative study, which compared the four current, text-only Surgeon General

statements on existing packaging and advertising to 16 graphic warnings occupying 50% of a mock

package or 20% of a mock advertisement.  *See id.* at 15,658-59; *supra* p. 13.  FDA concluded that

its Rule would attain FDA's consumer-education aims because study participants considered the

graphic warnings "new information" and a source of "self-reported learning" as compared with

the old Surgeon General's warnings.  FDA also relied on its first quantitative study, comparing the text of FDA-drafted warning statements to Congress' warning language in the TCA.  *Supra* pp. 13-14.  But FDA's quantitative studies were flawed to the point of futility.

To start, both quantitative studies used a non-representative sample that precludes generalizing the studies' results to the broader public—the very flaw FDA cited when repudiating its qualitative studies.  *See* 85 Fed. Reg. at 15,666.  Peer reviewers roundly critiqued FDA's sampling methodology, with one deeming it "a significant weakness for this research."  AR54089; *see* AR54066, AR54073, AR54085.  On top of that, FDA's quantitative studies did not assess key demographic differences, like health literacy and socioeconomic status—even though the literature strongly suggests that these factors influence reactions to warnings.  AR28508.  FDA's study designs then skewed the results in FDA's favor by asking participants pre-test questions that likely primed them to conclude that FDA-drafted warnings were new information—a problem that FDA's peer reviewers again emphasized.  *See* AR28507, AR54176.

Both quantitative studies lacked meaningful controls.  As a peer reviewer noted, by testing FDA-modified warning statements only against existing TCA statements, FDA "could easily overstate the effectiveness of the new" warnings, especially when FDA's new warnings featured different risks than TCA ones.  AR54072.  And FDA's comparison of "existing [Surgeon General's] warnings" covering "established" health claims against FDA's graphic warnings provided only "weak" support for FDA's conclusion that graphic warnings would be effective.  AR54078.  That is borne out by new analysis of the underlying data, which shows that FDA's graphic warnings *did not* meaningfully affect consumer ratings of "new information" or "self-reported learning" in the only apples-to-applies comparison (*i.e.*, the Surgeon General's warning about quitting versus a graphic warning about quitting with the same text) the study examined.  *Supra* p. 28.

2.  Even if FDA's quantitative studies were capable of producing reliable results, FDA did not use them to test the right metric, *i.e.*, whether FDA's graphic warnings actually help consumers understand the health information that FDA sought to convey.  That, after all, is the metric Congress prescribed in the TCA for altering its default warnings: new versions must "promote greater public *understanding* of the risks associated with the use of tobacco products."  15 U.S.C. § 1333(d)[2].  Ordinarily, "understanding" refers to having "knowledge and ability to judge" or "comprehen[sion]" of a concept.  *E.g.*, Merriam-Webster Dictionary 537 (2005 ed.); *see* AR54072.[4]  FDA acknowledged as much, equating understanding with comprehension in both the Proposed and Final Rule.  *See* 84 Fed. Reg. at 42,764; 85 Fed. Reg. at 15,659.

Yet that was not what FDA assessed.  Both FDA quantitative studies proceeded by asking participants to use subjective, "self-reported" measures, like whether participants believed they had learned new information, whether they believed the warnings were informative, and whether they perceived the warnings to be understandable or helpful.  *Supra* pp. 13-16.  As peer reviewers explained, just because participants volunteered that they felt like they learned something new or believed what they read says nothing about *what* participants learned, or whether they accurately comprehended the risks at issue.  *See* AR54063, AR54072-73, AR28507.  FDA could have easily assessed what information participants drew from the warnings—for example, by asking participants to identify what information they learned.  But FDA did not.

That failing is astonishing; FDA's stated aim is to help consumers better understand smoking-related health risks.  That failing is inexcusable; FDA's studies indicated that the risk of misunderstanding was high.  FDA's qualitative studies found that participants considered FDA's

---

[4] *See also* New Oxford American Dictionary 1884 (3d ed. 2010) ("[t]he ability to understanding something; comprehension"); Webster's Third New Int'l Dictionary 2490 (2002) ("the act of grasping mentally; comprehension, discernment, interpretation").

amputation, blindness from cataracts, diabetes, erectile dysfunction, and heart disease and strokes images "unclear." *Supra* p. 12. Participants likewise called the amputation and erectile dysfunction warnings "confusing" and "unclear." AR23639, AR23641. And participants deemed the heart disease and strokes and nonsmoker lung disease warning statements "misleading" and "not true." AR23323, AR24162.

FDA's abdication of its duty to evaluate the actual effect of the warnings precludes deference to its findings. *E.g.*, *Chem. Mfrs. Ass'n v. EPA*, 28 F.3d 1259, 1265 (D.C. Cir. 1994) (the more inflexibly an agency applies its chosen models, the less deference it receives in the face of evidence that its models are a poor fit for real-world conditions). FDA's reasoning is also arbitrary and capricious for failing to consider a critical dimension of the problem. *E.g.*, *Am. Farm Bureau Fed'n v. EPA*, 559 F.3d 512, 520-21 (D.C. Cir. 2009) (agencies must consider *all* relevant factors).

3. Even if FDA had room to judge its warnings based on some other criterion than what consumers actually gleaned, FDA's two metrics for gauging consumer understanding were illogical. Before conducting its quantitative studies, FDA decided to assess its warnings based solely on whether participants considered them "new information" and whether participants believed they had "learned something from the warning." 85 Fed. Reg. at 15,658. FDA disregarded all other study metrics, including the fundamental criterion of whether participants believed the warnings.

FDA encountered a mountain of objections to these metrics. Even if FDA reasonably assumed at first that "new information" and "self-reported learning" would be good proxies for consumer understanding, persisting in that assumption in the face of massive contrary evidence was "wrongheaded in the extreme." *Chem. Mfrs. Ass'n*, 28 F.3d at 1265. To start, FDA's precursor studies reiterated that many of FDA's textual warning statements and images—like those covering fetal harm, harm to children, and heart disease and strokes—did *not* provide any new

information to consumers. *Supra* pp. 12-13. Yet FDA's quantitative studies found that these same statements and images regarding fetal harm, harm to children, and heart disease and strokes contained "new information" and promoted "self-reported learning" in FDA's quantitative studies. That glaring disconnect should have signaled that something went haywire with FDA's study designs. Instead, FDA ignored these incongruent results.

Peer reviewers criticized FDA's focus on "new information" and "self-reported learning" as "arbitrary," "odd," "underdetermined," and "not convincing." AR54050, AR54052, AR54057, AR54059, AR54070, AR54072; *see* Compl. ¶¶ 135-136. One peer reviewer illustrated the disconnect between actual understanding and FDA's chosen measures of understanding: "If I created an exam for students in my class and I asked them 'is this information new to you and I asked them to report whether they learned something from the information' would I then conclude that they understood it? I think the answer is obviously no." AR54072. Peer reviewers condemned FDA's choice to equate understanding to those outcomes as "neither based in empirical evidence nor theory," and disconnected from "the ordinary concept of understanding," which is typically "identified with comprehension and linkage with established knowledge." AR54068, AR54072. Peer reviewers explained that conveying "new" information to consumers is pointless and counterproductive if consumers do not understand the information, reject the information as non-factual or not credible, or fail to process the new information in a way that influences their beliefs about the risks of smoking—problems that peer reviewers thought FDA's warnings raised. *See* AR54059, AR54073, AR54081. In short, by focusing solely on the "new information" and "self-reported learning" measures, FDA blinded itself to other "crucially important" considerations that cast serious doubt on its warnings' ability to educate consumers. AR54073.

The results of FDA's internal studies should have raised further red flags about whether "new information" and "self-reported learning" were reasonable proxies for consumer understanding. For instance, even as FDA's revised textual statements performed well on FDA's preferred metrics of "new information" and "self-reported learning," FDA's first quantitative study revealed that the vast majority of FDA's revised textual warnings did *not* make consumers comparatively more likely to think about the health risks of smoking. AR39342-43. One (the erectile dysfunction warning) made participants comparatively *less* likely to think about smoking-related health risks. AR39343. Similarly, *five* of the warnings FDA finalized in the Final Rule did not meaningfully affect participants' health beliefs about smoking after repeated exposure. AR39732-35; *see* AR28510. Consumers might have considered the information in these warnings new, but the warnings did nothing to improve consumers' appreciation of risks. Similarly, the text-only Surgeon General's warning for carbon monoxide performed either better than or equally to four of FDA's final graphic warnings on FDA's key measures, suggesting that FDA's graphic warnings about new conditions were not improvements over a warning that the federal government has required manufacturers to feature for decades. *Supra* p. 28.

Significant evidence also revealed that consumers did not consider FDA's new warnings believable. The "most prevalent finding across groups and statements" in FDA's first qualitative study was participants' rejection of warnings with definitive causal statements (*i.e.*, 'X causes Y'). AR23337; *accord* AR43032-34 (same results in other FDA-cited studies). Yet FDA retained that definitive language in many warnings. FDA's first quantitative study showed that participants judged six of FDA's textual warning statements to be less believable than the TCA's generic warning statements. AR39343-44. Yet, to peer reviewers' dismay, FDA *did not even assess* believability in its final study. AR54079 ("What happened to believability?"). Although FDA's

second quantitative study assessed whether consumers saw FDA's warnings as factual, the study revealed that *seven* of FDA's final warnings "were perceived as factual statistically significantly less than the Surgeon General's warnings," 85 Fed. Reg. at 15,660, which peer reviewers saw as proof that the warnings "may not be accepted by the target audience," AR54070.

As peer reviewers noted, those dismal results undermine the warnings' "legitimacy and utility." AR54078; *see* AR54059.  FDA's responses are unpersuasive.  FDA observed: "Consumer perceptions that a warning provides new information and can contribute to self-reported learning are necessary precursors to message comprehension and learning." 85 Fed. Reg. at 15,659; *see id.* ("raising awareness" of risks is "an important first step in promoting public understanding").  But by testing only the first steps in understanding, and not whether the later stages bear fruit, FDA guaranteed that its assessments would be incomplete.  FDA also dismissed these results as "not surprising" in light of its studies' design, asserting that pre-implementation studies do not reliably predict whether warnings with new information will have their "intended effects."  85 Fed. Reg. at 15,672; AR54166.  But the unreliability of pre-implementation studies shows a stunning problem with FDA's near-total reliance on such studies to purportedly show the efficacy of its warnings.  FDA's other response, that there is an "inverse association" between the "newness of a health warning and its believability" such that believability generally improves over time, 85 Fed. Reg. at 15,663, contradicts FDA's study findings that the warnings grew *less* effective with repeated exposure, *compare* AR39728-32, *with* AR39732-35.

By sidestepping these problems, FDA failed to rule out that its mandated warnings could backfire with consumers.  Significant evidence suggests that graphic warnings can cause consumers generally, and smokers in particular, to avoid the warnings out of fear or disgust. *See, e.g.*,

AR28514-15; AR43129 (FDA-cited study noting "significant avoidant behaviours" among smokers); AR43480 (FDA-cited study finding "marked increases in avoidance of warnings, especially to graphic warnings").  FDA's qualitative studies indicated that consumers viewed FDA's graphics as disturbing, prompting FDA to acknowledge that its images may "concern[]" "some viewers." 85 Fed. Reg. at 15,670.  But FDA never tested the possibility of backfiring in its final quantitative study.  And FDA's response that it "did not design the required warnings to evoke negative emotions," *id.* at 15,663, is no guarantee that its warnings would not turn off consumers more than the existing warnings.  FDA's other answer—that study participants whom FDA paid to carefully examine its warnings generally recalled their content, *see id.*—provides little assurance that consumers would not avoid the warnings in the real world.

4.  All in all, the evolution of each category of graphic-health warning reveals how little consumers appear to have gleaned from FDA's new warnings, and yet how little FDA changed in response.  *See generally* AR36908-36919.  The erectile dysfunction warning is illustrative.  FDA has never explained why it chose erectile dysfunction.  FDA developed this warning by first testing the textual warning statement that smoking "causes sexual dysfunction in men."  AR23327. FDA's first qualitative study revealed that "[m]any participants did not believe this statement." *Id.*  FDA nonetheless proceeded with the concept.

FDA next tested an image of the groin area of a headless body crouched in apparent pain that some participants considered pornographic, and an image of a man and nurse that generated uniform confusion.  *See* AR23500-23510.



The study report urged FDA to start over, bizarrely suggesting that a woman "in a negligee" appear with a man, and that FDA "[m]ake it clear that the man's emotion is shame."  AR23556.

In response, FDA changed the depicted scene as follows:



But those alterations still mystified FDA's test subjects: Was the man angry?  Sad?  Ashamed? What went wrong in the bedroom, and what did it have to do with smoking?  Participants had no idea what the image conveyed without the text.  *See* AR23641.

FDA's quantitative studies revealed further problems.  In the first quantitative study, participants did not consider the erectile dysfunction warning statement informative by any statistically significant measure.  AR39344.  Study participants ranked it as significantly *less* believable, factual, and likely to cause viewers to think about their risk of erectile dysfunction, even when compared to TCA statements that do not discuss erectile dysfunction.  AR39343-46.  And in the second quantitative study, the erectile dysfunction graphic warning ranked as significantly less factual than the Surgeon General's warnings, AR39723-24, and did not meaningfully affect participants' health beliefs after repeated exposure, AR39733.  As one peer reviewer observed, such results "would recommend against" the warning's use.  AR54063.  Yet FDA pressed forward.

### F.      FDA Arbitrarily Relied on Inapposite Foreign Evidence

Aside from FDA's flawed internal studies, FDA's only other evidence supporting this rulemaking was foreign studies that come nowhere close to clearing the substantial-evidence threshold. *See State Farm*, 463 U.S. at 42-43.  It was arbitrary for FDA to rely on foreign studies involving the effectiveness of different graphic warnings in different countries with different demographics.

*See* 85 Fed. Reg. at 15,656; AR28510-13.  None evaluated whether graphics improve comprehension more than just viewing text alone.  Few studies even evaluated comprehension.  AR28512-13

FDA's reliance on non-U.S. data also flouted FDA's own scientific standards rejecting the use of non-U.S. population studies.  To implement other TCA requirements, FDA requires tobacco manufacturers relying on studies of non-U.S. populations to give "a scientific rationale for why the results of the study can be generalized to other demographic groups that are representative of the U.S. population as [a] whole."  Premarket Tobacco Product Applications and Recordkeeping Requirements, 84 Fed. Reg. 50,566, 50,600 (Sept. 25, 2019).  FDA here cited "the consistency of findings … across countries" for graphic warnings.  85 Fed. Reg. at 15,657.  But that consistency is illusory: FDA ignored findings that "very similar" health warnings have varying levels of effectiveness even in countries within the same region, like the European Union.  AR28511.

## II.    FDA'S RULE VIOLATES THE FIRST AMENDMENT

Because FDA's Rule fails for the above reasons under the APA, this Court need not even reach the Rule's constitutionality.  *See Cigar Ass'n*, 964 F.3d at 61 (invalidating FDA cigar warnings rule on APA grounds without addressing First Amendment arguments).  But the Rule's many First Amendment violations are all the more reason to reject FDA's interpretations of the TCA, and these flaws independently doom the Rule.  The First Amendment protects "the choice to speak" at all, including "the choice of what not to say."  *Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n of Cal.*, 475 U.S. 1, 16 (1986) (plurality op.).  For three reasons, the Rule violates the First Amendment under any standard of review.  *First*, the Rule, tracking statutory provisions, commandeers 50% of packaging and 20% of advertisements to government-scripted messages, drowning out manufacturers' speech where they have the greatest interest in speaking for themselves.  *Second*, the Rule compels manufacturers to speak against their own products by displaying provocative images that will disgust and frighten consumers, and are not reasonably necessary to

41

inform consumers.  *Third*, FDA's warnings risk conveying misleading impressions about the relative risks of different smoking-related conditions.

### A.    The Rule's Size and Placement Requirements Alone Are Unconstitutional

The Rule violates the First Amendment based solely on the size and prominent placement of the graphic warnings manufacturers must feature.  The Rule does not just compel manufacturers to "provide somewhat more information than they might otherwise be inclined to present."  *Zauderer*, 471 U.S. at 650.  The Rule limits speech by seizing a substantial portion of manufacturers' limited package and advertising space.  Because the Rule "essentially operates as a restriction on constitutionally protected speech," *Am. Meat*, 760 F.3d at 27, the Rule is subject to intermediate scrutiny at a minimum, *e.g.*, *Ibanez v. Fla. Dep't of Business & Prof'l Reg.*, 512 U.S. 136, 142-43 (1994).  But the Rule's size and placement requirements fail even *Zauderer* review.  Under *Zauderer*, the government cannot compel disclosures that are "unjustified or unduly burdensome."  *Nat'l Inst. Family & Life Advocates v. Becerra*, 138 S. Ct. 2361, 2372 (2018) (*NIFLA*) (quoting *Zauderer*, 471 U.S. at 651).  Here, the Rule's size and placement requirements extend far more "broad[ly] than reasonably necessary" and are thus "unduly burdensome."  *Id.* at 2377.

1. The amount of speech FDA seeks to commandeer is unprecedented.  In no other context has any government seized *half* of a manufacturer's packaging and 20% of advertisements to display the government's message.  FDA would also commandeer prime marketing real estate by seizing "the top 50 percent of the front and real panels of cigarette packages," and "at least the top 20 percent" of advertisements.  85 Fed. Reg. at 15,686; 15 U.S.C. § 1333(a)(2), (b)(2).  FDA's graphic warnings would thus take away manufacturers' ability to speak in the very places where manufacturers have the greatest interest in conveying their own messages and where consumers are likely to look.  Packaging is a key part of the product.  Ex. 2, Golden Decl. ¶ 17; AR40506,

AR40508.  Advertising is the primary way manufacturers convey a distinctive message to consumers.  Golden Decl. ¶ 17.  And FDA's graphic warnings would make Plaintiffs speak less.  Plaintiffs' packaging would no longer have room to refer to Plaintiffs' own website or provide other product-identifying information.  *Id.* ¶¶ 34-36.  Plaintiffs' advertisements would no longer have space to encourage customers to visit Plaintiffs' age-verified website or communicate offers or retail discounts.  *Id.* ¶¶ 39-41.

That speech grab is all the more problematic because FDA seeks to seize virtually the only means of communication that cigarette manufacturers have left.  Federal and state restrictions on cigarette advertising leave packaging and limited forms of advertising as virtually the *only* way cigarette manufacturers can communicate with consumers.  *See id.* ¶¶ 9-16; *e.g.*, 15 U.S.C. § 1335 (criminal ban on television and radio advertising of cigarettes); *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 571 (2001); Master Settlement Agreement (Nov. 23, 1998), https://tinyurl.com/yx63uks6 (state-level restrictions on cigarette advertising); Compl. ¶¶ 32-34.

Courts have repeatedly invalidated lesser speech restrictions based solely on the amount of speech the government takes away.  The Supreme Court in *NIFLA* invalidated a statute requiring pregnancy centers to include a 29-word, "government-drafted statement" on "all print and digital advertising materials."  138 S. Ct. at 2378.  The law "impose[d] an unduly burdensome disclosure requirement" that would "chill [the pregnancy centers'] protected speech" because it required facilities to "call attention to the [government's] notice, instead of [their] own message, by some method such as larger text or contrasting type or color," and in multiple languages.  *Id.*

Similarly, the Ninth Circuit struck down an ordinance requiring a government-drafted warning on at least 20% of "any advertisement" for sugar-sweetened beverages.  *Am. Beverage Ass'n v. City & Cty. of S.F.*, 916 F.3d 749, 753-54 (9th Cir. 2019) (en banc).  The government

claimed this requirement adhered to "best practices for health and safety warnings," but failed to show that the 20% requirement would not "drown out" manufacturers' messages and "effectively rule out the possibility of having an advertisement in the first place." *Id.* at 757 (cleaned up).

Likewise, the Seventh Circuit in *Entertainment Software Association v. Blagojevich*, 469 F.3d 641 (7th Cir. 2006), invalidated a state law requiring video-game sellers to display a 4-square-inch sticker labeled "18" on "sexually explicit" games that covered under 10% of the front of a typical box, far less than the Rule requires. *See id.* at 651-52 & n.13. Yet the court invalidated the requirement, holding that "at four square inches, the '18' sticker *literally* fails to be narrowly tailored—the sticker covers a substantial portion of the box," and the State "failed to even explain why a smaller sticker would not suffice." *Id*. at 652. If the First Amendment forbids the government from compelling a 29-word "government-drafted statement," a mandatory disclosure on 20% of advertisements, and a label covering 10% of video-game packages, the government plainly cannot commandeer 50% of all cigarette packaging and 20% of all advertising.

2.   FDA justified its Rule by invoking *Discount Tobacco City & Lottery, Inc. v. United States*, 674 F.3d 509 (6th Cir. 2012), where a divided Sixth Circuit panel rejected a facial challenge to the TCA's graphic-warnings requirement. *See* 85 Fed. Reg. at 15,647-48. *Discount Tobacco* applied what it called "*Zauderer*'s rational-basis rule," and rejected any need to "separately analyze whether the warnings are unduly burdensome." *Id.* at 558, 566-67 (binding op. of Stranch, J.). In dictum, *Discount Tobacco* added that the TCA warnings' size was not unduly burdensome because manufacturers had not "shown that the remaining portions of their packaging are insufficient for them to market their products." 674 F.3d at 567.

But *NIFLA* rejected the Sixth Circuit's test: "Even under *Zauderer*, a disclosure requirement cannot be unjustified or unduly burdensome," and may "extend no broader than reasonably

necessary."  138 S. Ct. at 2377; *accord Am. Meat*, 760 F.3d at 27.  And the notion that manufacturers must show that their remaining space is inadequate for their messaging turns the First Amendment upside down.  Would-be speakers need not prove the benefit of additional speech; the First Amendment takes that as a given.  Rather, the government "has the burden to prove" that the amount of speech it seeks to compel is not excessively burdensome.  *NIFLA*, 138 S. Ct. at 2377.

FDA's refusal to consider less-restrictive alternatives also violates *NIFLA* and other compelled-speech precedents.   Under *NIFLA*, a compelled disclosure is "unjustified or unduly burdensome" if the government has a less-speech restrictive alternative that "would accomplish [its] stated goals."  *Am. Beverage*, 916 F.3d at 756-57.  Yet FDA "disagree[d]" that the agency even needed to "consider[] smaller or differently placed warnings."  85 Fed. Reg. at 15,650.  FDA interpreted the TCA as "requir[ing]" the Rule's size and placement requirements and leaving FDA with no discretion to change them.  *See id.* at 15,647.  But FDA repudiated that position elsewhere. FDA justified its decision to mandate 11 rather than nine warnings by claiming that the TCA gave FDA discretion to change any "label requirements"—including the number of warnings and, presumably, size and placement.  *See* 85 Fed. Reg. at 15,647.  If FDA has the power it claims, FDA's refusal to consider different size and placement options is unconstitutional.  Regardless, FDA cannot immunize the Rule from challenge by blaming any problem on underlying statutory requirements.  Agencies "may not promulgate Rules that violate the Constitution," and Congress added the size and placement requirements without any fact-finding justifying commandeering that much speech; they, too, are unlawful.  *R.J. Reynolds*, 823 F. Supp. 2d at 48 n.25, 52.

Nor can FDA bypass its duty to consider less-restrictive alternatives, like smaller warnings, by asserting that "the scientific literature strongly supports that larger warnings … are necessary to ensure that consumers" pay attention.  85 Fed. Reg. at 15,650-51.  That does not explain away

one less-restrictive alternative, *i.e.*, placing warnings in different locations so that they are not the *only* messages that consumers will see in most retail settings.  *See* Golden Decl. ¶ 37.  Nor does FDA's explanation obviate its need to consider smaller warnings.  FDA cited studies suggesting that bigger warnings are generally better, but none concluded that the Rule's onerous size and placement mandates are the only way to vindicate FDA's interests.  Insistence that "larger warnings are more effective" did not save a health warning covering 20% of sugar-sweetened beverages when the record "suggest[ed] that the [government's] goals could be accomplished with a smaller warning."  *Am. Beverage*, 916 F.3d at 757.  And here, Congress (in the TCA) and FDA (in another rulemaking) decided that much *smaller*, text-only warnings would be effective to warn consumers about other tobacco products.  *See* 15 U.S.C. § 4402(a)(2)(A) (30%, text-only requirement for smokeless tobacco packages); 81 Fed. Reg. 28,974, 28,988 (May 10, 2016) (30%, text-only requirement for cigar packages), *vacated by Cigar Ass'n*, 964 F.3d 56.

FDA's other response—that "the exact size of the required warnings is not a constitutional issue"—is plainly incorrect.  85 Fed. Reg. at 15,647 (citing *Burson v. Freeman*, 504 U.S. 191, 210-11 (1992) (plurality op.)).  Were FDA right, FDA could commandeer 99.9% of packaging.  And *Burson* involved viewpoint-*neutral* restrictions on speech in polling places to protect the fundamental right to vote, so the government needed only to show reasonable restrictions.  *See Minn. Voters All. v. Mansky*, 138 S. Ct. 1876, 1886 (2018).  In sum, even putting the warnings' content aside, FDA's Rule is unconstitutional because it would impermissibly force manufacturers to turn over much of their most prized avenues of communication for governmental use.

## B.     The Rule Unconstitutionally Requires Inflammatory Messages

FDA's Rule also unlawfully compels manufacturers to repulse would-be buyers of their products by parading images of amputated toes, bloody urine, and men shamed by erectile dysfunction.  Under any standard of scrutiny, that shock-and-awe approach suppresses too much speech while failing to sufficiently advance the government's interest in consumer education.

### 1.     FDA's Graphic Warnings Fail *Zauderer*

FDA cannot justify its warnings under the *Zauderer* standard.  The warnings are not purely factual; they are not uncontroversial; and they are more burdensome than necessary.  Any one of these shortcomings warrants invalidation of the Rule.

a.  *Zauderer* only applies to "purely factual" disclosures.  But FDA's selected graphic warnings are not "pure attempts to convey information to consumers," and instead "primarily intend[] to evoke an emotional response, or, at most, shock the viewer[s] into retaining the information in the text warning."  *R.J. Reynolds*, 696 F.3d at 1216-17.  FDA acknowledged that it sought to create "attention-grabbing" graphic warnings, 85 Fed. Reg. at 15,665, defined by FDA's own study as warnings that "elicit[] a visceral reaction," AR23408.  FDA can hardly have missed the expressive responses its graphic warnings provoked.  Study after study confirmed that FDA's warnings trigger emotion, not comprehension:

- Participants described the image of a sickly child in an oxygen mask as "scary," "cruel[]," and provoking "despair."  AR23549.

- Participants said the fetal-harm image was "heartbreaking" and "very emotional," and "would really creep me out."  AR23555.

- Participants found the original amputated-toes image "startling," "gross," "powerfully disturbing," and "disgust[ing]."  AR23521.  Unsurprisingly, FDA's final amputation image "scare[d] some participants and grab[bed] their attention."  AR23639.

- Participants called the image of disembodied, blackened lungs "attention-grabbing because of its gruesome depiction and implication of death."  AR23428.

*See* Compl. ¶¶ 97, 104.  The transcripts underlying FDA's qualitative studies (released only in the administrative record) provide further remarkable examples that the public could not access during the notice-and-comment process.[5]  Another survey confirmed what FDA's own studies made obvious: more than 80% of survey participants believed that FDA's chosen warnings were "trying to make people feel afraid" and were "trying to shock people."  AR28016.  One FDA peer reviewer summed it up as follows:  "The goal of putting graphic warning labels on cigarette packaging is that the image will continue to generate an emotive response."  AR54053; *cf. infra* p. 54 n.7.

FDA claimed to "use[] different criteria" to assess its new warnings, focusing only on ensuring that the warnings "are unambiguous and unlikely to be misinterpreted or misunderstood." 85 Fed. Reg. at 15,646.  But that justification does not reflect reality.  FDA consistently picked its emotionally charged warning images even when FDA's own studies reported that they were "unclear," "confusing," or did not provide "any new information."  Compl. ¶¶ 98-99, 105-106; *supra* pp. 12-13.  FDA's June 2016 study revealed that the fetal-harm image did not provide "any new information" to participants, yet recommended using the image because "[p]articipants clearly demonstrated an emotional connection," and FDA kept it.  AR23484-85, AR23555.  So too, FDA

---

[5] These examples include: "Well, they're trying to scare you.  Right . . . They're doing a good job," AR23968; "It's a scare tactic.  It's misleading," AR24162; "If they can force fear on you, they can control you," AR24287; "Basically, it sounds like a bunch of scare tactics to keep people from smoking," AR24374; "They scare me," AR24479; "That has an impact on me, although nasty.  Gross. . . . [I]t's gagging," AR24758; "It looks gross but I have no idea what body part that is or what it's supposed to be," AR24957;  "[Q:] Does it grab your attention? [A:] Yes.  [Q:] Why? [A:] Because it's gross.  [Q:] Does the image provide you with any new information about smoking and health consequences? [A:] No," AR25012; "It grabbed my attention because it's probably one of the grosser pictures . . . . ," AR25015; "[Q:] Did this image grab your attention? [A:]  A little bit because the feet look gross. . . . I can't tell what condition it is," AR25154; "I just think this is just—I just—it's just nasty.  I just want to gag.  This is really—just to see this hole on somebody's foot is just something—I just don't—don't show me the larger picture please.  Yes, this is disgusting.  Really, it's repulsive so I don't want to see it any more," AR24828; "I don't know what that is but it's disgusting," AR25625; "Again, the baby always messes me up.  It's very sad to see that. . . . ," AR 25687; "[I]t looks disgusting and you wouldn't want the same thing—you'd want the lungs to look like that.  It just looks frightening," AR25724; "I don't even know what that is, to be honest.  [Q:] We'll show you the larger photo maybe that will help. Any idea what is being shown here?  [A:]  No, but it was disgusting," AR25728.

48

advanced the "very attention grabbing" and "startling" amputation image, even though the study deemed the image "unclear" and ineffective in communicating health risks.  AR23517, AR23557.

FDA even refashioned images to heighten emotional response.  FDA revamped its erectile-dysfunction warning image after a study report recommended "[m]ak[ing] it clear that the man's emotion is shame."  AR23556.  FDA similarly altered the "harm to children" graphic to make the child look sicker, while following the study's recommendation to "[m]aintain the look of dismay (e.g., sadness in the eyes)" to grab attention.  AR23549.  FDA adopted a study recommendation to "[m]ake the blood on the gloves" in the already "gruesome" lung-disease image "more discernable," and to "[k]eep the surgeon/coroner's hands in the picture, as they convey the realism of the resulting death."  AR23428, AR23550.  Similarly, FDA put more emphasis on the incision in the final heart disease and strokes image to increase gruesomeness.  *See* Compl. ¶ 97 (citing AR23553).  As in *R.J. Reynolds*, FDA's "unabashed attempts to evoke emotion (and perhaps embarrassment)" through its "inflammatory" and "provocative[]" warnings are not confined to facts, and convey the government's "preferred" message:  smoking should be stigmatized and avoided.  696 F.3d at 1216-17; *Nat'l Ass'n of Mfrs. v. SEC*, 800 F.3d 518, 530 (D.C. Cir. 2015).

FDA nonetheless contended that it did not know whether its warnings would provoke emotion because the agency deliberately declined to inquire whether FDA's new warnings caused viewers to feel frightened or disgusted.  *See* 85 Fed. Reg. at 15,668 ("an assessment of emotional responses or behavioral study outcomes is not aligned with the final rule"); AR50772 (disclaiming intent to study "emotional reactions" or effects on behavior).  But maintaining plausible deniability about the effect of FDA's own warnings is a vice, not a virtue.  By refusing to examine viewers' emotional reactions to FDA's gruesome warnings, FDA failed to consider an important aspect of the problem and thus violated the APA.  *Supra* pp. 37-39.  If the government could portray any

speech as "purely factual" just by willfully blinding itself to how any reasonable viewer would interpret the speech, every compelled disclosure—no matter how shocking or opinionated—would fall within *Zauderer*, and that framework would become the universal rule, not a narrow exception.

The First Amendment also prohibits FDA from dismissing emotional reactions as irrelevant so long as its warnings are "factually accurate." *See, e.g.*, 85 Fed. Reg. at 15,646. FDA's warnings *are* misleading; taken together, they convey misimpressions about the relative risk of different conditions. *Infra* pp. 58-60. Anyway, FDA's position contradicts the Supreme Court's repeated description of *Zauderer* as applicable only to compelled speech that is "*purely* factual," *i.e.*, devoid of extraneous emotion. *See NIFLA*, 138 S. Ct. at 2372 (emphasis added) (quoting *Zauderer*, 471 U.S. at 651). FDA's position is also irreconcilable with *R.J. Reynolds*, which did not analyze any of FDA's 2011 warnings under *Zauderer* even though those warnings' depictions of babies in incubators and lips with cancerous lesions are just as "factually accurate" as FDA's new warnings. 696 F.3d at 1222. Likewise, the D.C. Circuit invalidated an SEC rule compelling manufacturers to disclose whether they used "conflict free" minerals, even though the Dodd-Frank Act defined "conflict free" minerals using entirely factual criteria. The factual content of that definition "cannot save this law," the court held, because the "conflict free" label exuded moral judgments about supply-chain decisions. *Nat'l Mfrs. Ass'n*, 800 F.3d at 529-30.

FDA in a similar vein asserts that the adverse effects of cigarettes, not FDA's graphic warnings, are what provokes emotion. *E.g.*, 85 Fed. Reg. at 15,646. FDA has no idea whether that is true; FDA did not test images that might provoke less-emotional reactions. And FDA's apparent belief that viewers *should* be outraged by smoking-related health risks just underscores that FDA's graphic warnings are advocacy, not purely factual disclosures. If agencies could always blame the regulated product for provoking emotion, *Zauderer* would be a dead letter. Many

50

other products carry significant risks—lawnmowers, swimming pools, ladders, chainsaws, trampolines, and so on.  Yet the First Amendment surely bars the government from compelling those products' manufacturers to wrap half of their packaging in graphic warnings showing factually accurate autopsies, severed appendages, or broken necks.  Plaintiffs in no way diminish the risk that smoking can cause many serious health conditions.  But there is no tobacco exception to the First Amendment, and FDA's position has no limiting principle.

Applying *Zauderer* to any factually accurate disclosure would transform *Zauderer* into an open-ended license for the government to drown out protected speech and force speakers to communicate against their will.  Peanut butter is a common allergen that causes anaphylaxis in severe cases—but that fact alone cannot possibly authorize the government to require peanut-butter manufacturers to feature accurate photographs of fatal reactions to heighten consumer awareness of that risk.  Likewise, steak knives cause untold emergency-room visits—but requiring manufacturers to show factually accurate images of bloody, severed fingers crosses the line.  Otherwise, FDA could require makers of prescription painkillers to cover their labels with images of heroin addicts injecting themselves to show the risk of opioid addiction.  Or the government could make cell phone manufacturers showcase pictures of deadly car crashes caused by distracted driving.  Nothing stops the government from broadcasting these messages itself.  But the First Amendment does not let the government compel *others* to engage in any speech the government wishes, so long as it contains factually accurate information.

b.  FDA's warnings also do not fall within *Zauderer* because they are not "uncontroversial" or "non-ideological."  *Nat'l Ass'n of Mfrs.*, 800 F.3d at 529-30.  They seek to "skew public debate" by compelling manufacturers to convey the government's viewpoint that consumers should shun their products.  *Id.* at 530.  A whopping 74.5% of people who viewed FDA's proposed warnings

believed that the warnings were telling people not to smoke.  AR28093.  Just because FDA did not assert an interest in smoking cessation does not justify ignoring the unambiguous effect of FDA's warnings.  *Zauderer* "does not leave the state free to require corporations to carry [its] messages," where "the messages themselves are biased against or are expressly contrary to the corporation's views."  *Am. Meat*, 760 F.3d at 27 (internal quotation marks omitted).

FDA stated that there is "no controversy about whether cigarette smoking causes the negative health consequences" depicted.  85 Fed. Reg. at 15,646.  But that rationale misses the point and again would permit the government to plaster pictures of severed limbs and dead bodies on common products.  All may agree that smoking causes health risks, but the "inflammatory" and "provocativ[e]" nature of FDA's chosen images conveys an ideological message that no one should smoke at all.  That message remains controversial because it goes beyond identifying health risks to conveying how the government wants consumers to weigh those risks.  *See R.J. Reynolds*, 696 F.3d at 1216-17.  It is no answer that cigarette warnings featuring "simple graphic images" could "pass muster under *Zauderer*."  85 Fed. Reg. at 15,646 (quoting *Discount Tobacco*, 674 F.3d at 559).[6]  *Discount Tobacco*'s speculation about hypothetical warnings rests on erroneous legal premises, *supra* pp. 44-45, and does not license the emotion-laden "form and content of the specific requirements" at issue here.  *R.J. Reynolds*, 696 F.3d at 1215.

c.  FDA's graphic warnings are also overbroad.  Even if *Zauderer* applied, FDA's Rule would flunk that test, because FDA would suppress more speech "than reasonably necessary" to

---

[6] FDA's Rule also falls outside the *Zauderer* framework because *Zauderer* is properly limited to disclosures correcting misinformation.  *Entm't Software Ass'n*, 469 F.3d at 652; *Allstate Ins. Co. v. Abbott*, 495 F.3d 151, 166 (5th Cir. 2007); *Am. Beverage*, 916 F.3d at 768 (Nguyen, J., concurring); *but see Am. Meat*, 760 F.3d at 23.  FDA's Rule cited historical misinformation about the risks of smoking, 85 Fed. Reg. at 15,645, but FDA "has not shown that the graphic warnings were designed to correct any false or misleading claims made by cigarette manufacturers," *R.J. Reynolds*, 696 F.3d at 1216.  In particular, FDA has not shown that manufacturers downplayed less-known smoking risks, let alone risks the Surgeon General associated with smoking only in 2014.

advance FDA's consumer-education goal.  *See NIFLA*, 138 S. Ct. at 2377.  The text of FDA's

warnings alone conveys everything needed for comprehension; FDA never tried to justify any of

its graphics as necessary to understand the relevant risks.  Consider:



Displaying mangled, discolored feet is not "reasonably necessary" to illustrate amputation, no

matter how factually accurate those images may be.  Indeed, participants in FDA's studies found

the image of amputated toes and diseased feet "not clear" and "confusing on its own."  AR23638.

Likewise, an image of a cup containing red-orange-colored liquid is useless on its own; viewers

need the text to know that the liquid is a mix of urine and blood caused by bladder cancer, and the

image only undercuts the text's clarity.  *See* AR23606.  An image of a man looking upset on a bed

is not "reasonably necessary" to educate consumers about smoking-related erectile dysfunction,

either.  Study participants "agreed that without the words, it was difficult to know what the image

was depicting."  AR23641.  Nor is an image of a large scar "reasonably necessary" to educate

consumers about their risk of heart disease and strokes.  Not everyone suffering from those ail-

ments will need surgery, much less giant incisions, and the image does not explain the "type of

surgery" involved.  AR23630.  And the text of the head and neck cancer warning already identifies

that condition; seeing a woman with an oversized lump on her neck adds nothing but shock value.

AR23601.  FDA's studies show that other warnings similarly fail to convey clear meaning.  *Supra*

p. 12.  If the text alone is clear, graphics by definition compel excessive speech.

FDA "disagree[d]" that any "improvements" in consumer education attributable to the

graphics "need to be measured separately" from the text.  85 Fed. Reg. 15,664.  But FDA's burden

is to show that FDA is compelling no more speech than reasonably necessary.  If FDA's graphics do not improve consumer understanding beyond FDA's required text, FDA has failed to meet its burden, and has no business drowning out manufacturers' desired speech.  FDA's assertion that scientific evidence generally supports graphic warnings also cannot sustain the Rule.  Support for the effectiveness of graphic warnings in the abstract does not show that FDA's 11 selected images are reasonably necessary to advance consumer education.  In all events, much of FDA's evidence ties the efficacy of graphic warnings to either triggering emotional reactions in viewers or prompting changes in smoking behavior.[7]  FDA cannot rely on those studies and at the same time disavow any intent to provoke emotion or encourage quitting.  *E.g.*, *id.* at 15,650, 15,657, 15,660, AR54165.

## 2.     FDA's Graphic Warnings Fail Intermediate and Strict Scrutiny

Because *Zauderer* is the wrong lens for evaluating FDA's graphic warnings, a higher bar applies.  Recent Supreme Court decisions hold that when the government regulates commercial speech by requiring private speakers to adopt a particular viewpoint (here, the government's anti-smoking message), such restrictions are *per se* unconstitutional.  *See Iancu v. Brunetti*, 139 S. Ct. 2294, 2302 (2019); *Matal v. Tam*, 137 S. Ct. 1744, 1764-65 (2017) (op. of Alito, J.); *id.* at 1765-66 (op. of Kennedy, J.).  Content- and speaker-based restrictions in the commercial context are also presumptively unconstitutional and cannot survive unless the government narrowly tailors the restriction to advance a compelling interest.  *See Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015); *Barr v. Am. Ass'n of Political Consultants, Inc.*, 140 S. Ct. 2335, 2346 (2020) (plurality op.); *id.* at 2364 (Gorsuch, J., concurring in the judgment in part).  Under those decisions, the Rule

---

[7] *E.g.*, AR42991 ("the graphics had by far the most effect … many admitted these images made them extremely uncomfortable"); AR43127-28 ("Negative emotions, such as fear, may be particularly important in the effectiveness of large pictorial warnings…. Studies … support the effectiveness of fear arousing health warnings…. [W]arnings with shocking images … were rated as most effective."); AR43480 (graphic warnings "elicit greater emotional engagement with the information, and it is this emotional engagement that drives much of the subsequent quitting related activity"); AR43498 ("pictorial warnings increased quit attempts by eliciting aversive reactions").

is subject to strict scrutiny, because it undoubtedly discriminates based on content and speaker. FDA prescribes what manufacturers, and only manufacturers, must prominently feature in their packaging and advertisements, thereby shutting out manufacturers' other speech. The Rule would fail strict scrutiny; FDA did not even contend otherwise. *See* 85 Fed. Reg. at 15,649.

At a minimum, FDA must satisfy intermediate scrutiny and show that the Rule "directly and materially advances a substantial state interest in a manner no more extensive than necessary to serve that interest." *Ibanez*, 512 U.S. at 142; *R.J. Reynolds*, 696 F.3d at 1222. FDA is incorrect that the Rule could pass intermediate scrutiny, because its asserted interest in consumer education is circular and FDA failed to adequately show that its Rule materially advances that interest without restricting more speech than necessary.

### a.    FDA's Informational Interest Is Circular

FDA repeatedly disavowed any interest in imposing graphic warnings as a means of prompting consumers to make different choices or stop smoking, and made no attempt to suggest that its Rule would advance those aims. *E.g.*, 85 Fed. Reg. at 15,644, 15,650, 15,657, 15,660; *cf. R.J. Reynolds*, 696 F.3d at 1218 n.13. Instead, FDA cited a freestanding interest in "more effec-tive[ly]" educating consumers about the risks of smoking. 85 Fed. Reg. at 15,654. But under *R.J. Reynolds*, FDA's interest in more effectively providing additional information to consumers solely to improve knowledge is too circular to be substantial. 696 F.3d at 1221. "Allowing FDA to define 'effectiveness' however it sees fit would not only render *Central Hudson*'s 'substantial interest' requirement a complete nullity, but it would also eviscerate the requirement that any re-striction 'directly advance' that interest." *Id.* The point of informing consumers about risks is to create more informed decision-making—but to show that the Rule facilitated better decisions, FDA would have to show that consumers would appreciate risks differently or make different

choices.  Instead, FDA declined to consider *how* consumers would react to FDA's warnings, including whether they would consider the warnings unbelievable or unpersuasive.  *Supra* p. 36-39.

FDA's vague informational interest starkly differs from other cases where the government has justified nutritional labels and other compelled disclosures to affect consumer behavior or public health.  *See R.J. Reynolds*, 696 F.3d at 1218 & n.13 (assuming that "FDA's interest in reducing smoking rates is substantial"); *Am. Meat*, 760 F.3d at 23 (country-of-origin labeling permissible to help prevent food-borne illness outbreaks and help consumers choose "American-made products"); *Pearson v. Shalala*, 164 F.3d 650, 656 (D.C. Cir. 1999) (evaluating whether FDA dietary-supplement labeling requirements advanced the government's interest in health and safety); *Nicopure Labs, LLC v. FDA*, 944 F.3d 267, 285 (D.C. Cir. 2019) (recognizing substantial interest in "protecting the public health from the dangers of e-cigarette use encouraged by unsubstantiated, misleading claims of relative safety").  These cases illustrate that "it is plainly not enough" for FDA to say "simply that it has a substantial interest in giving consumers information.  After all, that would be true of any and all disclosure requirements." *Am. Meat*, 760 F.3d at 31 (Kavanaugh, J., concurring in the judgment).

FDA's explanation of how frequently consumers fatigue of warnings, 85 Fed. Reg. at 15,653; *see* 84 Fed. Reg. at 42,760, further undermines the strength of its asserted informational interest.  FDA's research suggests that all warnings become stale, including, eventually, the new graphic warnings.  For those warnings to remain effective, FDA would have to compel additional new warnings continually—with perhaps even more sensational graphics and messages—just to maintain its desired level of "effectiveness."  Either the Rule is a temporary stopgap of limited effect, or the Rule is the first of many incursions on manufacturers' speech, with no standard for success and no limiting principle in sight.

> **b.**   **FDA's Rule Does Not Directly Advance FDA's Interest and Restricts More Speech Than Necessary**

The Rule also fails to directly and materially advance FDA's asserted interest in improving consumer understanding, and thus the Rule fails even intermediate scrutiny.  As the party "seeking to sustain a restriction on commercial speech," FDA "must demonstrate" that its restriction will advance its interest in educating consumers "to a material degree."  *Edenfield v. Fane*, 507 U.S. 761, 770-71 (1993).  That "burden is not light," and a "restriction that provides only ineffective or remote support for the government's purposes" cannot pass muster.  *R.J. Reynolds*, 696 F.3d at 1218-19.

Here, FDA did not even purport to assess whether consumers comprehend risks better after viewing FDA's graphic warnings.  *Supra* pp. 34-35.  That gap leaves FDA to speculate that its warnings would promote understanding because they are new information and because study participants reported learning something from them.  But "mere speculation" is an insufficient basis to regulate commercial speech, *Nat'l Mfrs.*, 800 F.3d at 526, and FDA's peer reviewers condemned FDA's purported assessment of understanding as "arbitrary," "odd," and "not convincing." AR54059, AR54070, AR54072.  Meanwhile, FDA's qualitative studies revealed FDA's warnings to be unclear, confusing, or lacking any new information.  *Supra* pp. 12-14; *see* Compl. Attach. Significant evidence, including FDA's qualitative studies, indicates a risk that FDA's disturbing and grotesque graphic warnings may backfire, either because consumers would reject them as unbelievable or avoid viewing them.  *E.g.*, AR42994, AR43079, AR43128, AR43480, AR54070, AR54072; Compl. ¶¶ 97, 100, 107.  FDA's only other evidence comes from non-U.S. studies of different graphic warnings, which are inapposite, *supra* p. 40, and the D.C. Circuit rejected much of the same "questionable social science" in *R.J. Reynolds*, *see* 696 F.3d at 1219-21.

Further, FDA cannot show that the Rule's speech restrictions are no more extensive than necessary to accomplish FDA's objective of informing consumers about smoking-related health risks. *See Ibanez*, 512 U.S. at 142; *Reed*, 576 U.S. at 163. Requiring enormous, gruesome images is not a narrowly tailored restriction. Manufacturers already face drastic limitations on how they can promote tobacco products. *Supra* pp. 5-6, 43; Compl. ¶¶ 32-35. FDA's Rule would, in many instances, drown out manufacturers' speech entirely; all consumers would see in many locations is the government's message. Golden Decl ¶ 37. The First Amendment does not let FDA pile on with unprecedentedly onerous restrictions when less-invasive measures abound. For instance, FDA has had marked success in using public-information campaigns to educate consumers about smoking-related issues. *See* AR28526; 85 Fed. Reg. at 15,657; *cf. 44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 507 (1996) (plurality op.).

Even if the longtime Surgeon General's warnings have become "invisible," 85 Fed. Reg. at 15,638, 15,640, FDA could have added new text. FDA could incorporate attention-grabbing headlines, such as "PLEASE READ!" Or, if existing warnings are stale, FDA could require manufacturers to rotate those warnings more frequently. Yet FDA declined to test any alternative text-only warnings, asserting that doing so "would not have been an optimal use of FDA's resources." *Id.* at 15,650. FDA instead claimed that scientific literature showed that larger, graphic warnings are more effective than smaller, text-only warnings. *E.g.*, *id.* at 15,648. But FDA and Congress took a narrower approach to smokeless tobacco and cigars by requiring text-only warnings, and FDA has not explained why such warnings would not suffice for cigarettes.

## C.   FDA's Warnings Risk Misinforming Consumers

FDA's Rule is also unconstitutional because FDA's graphic warnings are subject to mis-interpretation, and the government has no interest in requiring anything other than "accurate and nonmisleading" speech. *Nicopure*, 944 F.3d at 284. FDA's warnings generally state that smoking

"causes" all the conditions FDA highlights, suggesting that *all* of FDA's targeted risks, from dia-betes to bladder cancer, stand on the same footing.  FDA's requirement that manufacturers rotate the warnings to give each warning "equal" play, 85 Fed. Reg. at 15,686, compounds that impression.  But FDA's chosen conditions carry wildly varying degrees of risk and severity, and graphic warnings "suggesting that" relatively rare conditions are "a common consequence of smoking" are likely to be "misinterpreted by consumers."  *R.J. Reynolds*, 696 F.3d at 1216.  FDA's warnings conflate rare conditions (like bladder cancer) with far more frequent conditions (like lung disease).  FDA's warnings feature chronic, non-fatal conditions (like erectile dysfunction and diabetes), alongside conditions with high mortality rates (like head and neck cancer).  *See* AR28505 fig.8.

FDA acknowledged that it did not address "absolute, relative, or dose-response risk."  85 Fed. Reg. at 15,669.  But for consumers to better "understand[] . . . their choices in the market-place," *id.* at 15,644, consumers surely need to know how likely they are to confront particular "negative health consequences" of smoking, *id.* at 15,669, not just that some unspecified risk exists.  If consumers take the warnings to mean that harm to children is as likely (or unlikely) as amputation or blindness, consumers might either under- or over-estimate their risks, contrary to FDA's stated goal of providing "factual and accurate" warning information.  *Id.*

FDA "strongly disagree[d]" that its failure to provide information regarding causation or relative risk rendered its warnings "misleading," *id.*, but its say-so warrants no deference, not least because this *ipse dixit* contradicts the administrative record.  The "most prevalent finding" of FDA's own July 2015 study was that consumers questioned the accuracy of FDA's causal formulations.  AR23337; *supra* p. 11.  Yet FDA did not assess *what* health information consumers drew from its graphic warnings, *supra* pp. 34-35, much less whether their takeaways were accurate.

FDA cannot refuse to study how consumers actually perceive its warnings and then demand deference to its conclusory assertions that consumers would not form mistaken impressions of relative risk from FDA's unusual groupings of relatively common and uncommon smoking-related risks.

Compounding the problem, FDA selected graphics that emphasize extreme and relatively unlikely consequences of a given condition—a fault numerous medical experts emphasized in comments.  For example, an ophthalmologist deemed FDA's cataract image "not a reasonable depiction of persons with cataracts," as the "vast majority" of cataracts are "undetectable by the unaided human eye."  AR28117 ¶¶ 7-8.  An otolaryngologist stated that the head and neck cancer image was "misleading" because it would be "extraordinarily rare" for someone to develop a "cancerous mass" of the size in the image.  AR28124 ¶¶ 4-5; *see* AR28112, 28127.  Health groups noted that other warnings inexplicably single out certain complications of the warned-against health conditions, such as "raise[d] blood sugar," while omitting other, more "serious" complications, and thus "fail[] to effectively convey the gravity" of the conditions.  AR27393 (Am. Optometric Ass'n); *see* AR36073 (Am. Diabetes Ass'n) (diabetes warning could be "misconstrue[d]"); AR36068 (N.Y. State Dep't of Health) (bladder cancer warning could "mislead").

FDA's response—that some people might exhibit the conditions—does not show they are common, let alone that the warnings are not potentially misleading.  *E.g.*, 85 Fed. Reg. at 15,674.  FDA's explanation that its images depict conditions as they are "typically experienced" is head-scratching.  *E.g.*, *id.* at 15,645-46.  Portraying a rare condition as it is "typically experienced" is not the same as showing that people typically experience the *condition itself* due to smoking.  Besides, FDA never explained why (for instance) a "typical" amputee would have mangled, discolored feet or why a "typical" man with erectile dysfunction would hang his head in shame.

## III.   THE ENTIRE RULE SHOULD BE VACATED

The D.C. Circuit vacated FDA's entire 2011 rule, and the outcome here should be no different.  *See R.J. Reynolds*, 696 F.3d at 1222.  While the TCA includes a broad, generic statement concerning severability, 21 U.S.C. § 387 note, that provision did not save portions of FDA's 2011 rule, nor does it save this Rule, given the cross-cutting First Amendment and APA violations. FDA's contention that the agency can proceed with text-only warnings or any individual text and image pairings that survive a challenge, 85 Fed. Reg. at 15,695, is meritless for the same reasons.

Further, the record does not support severability, and it would be arbitrary and capricious to finalize portions of the Rule without further notice and comment.  *See MD/DC/DE Broads. Ass'n v. FCC*, 253 F.3d 732, 736 (D.C. Cir. 2001).  The TCA requires graphic warnings, not text-only warnings.  Just as FDA never tested the images alone to determine their contribution to public education, FDA never determined that text-only warnings would further FDA's stated goal.  Nor does FDA's position account for implementation challenges that would arise if FDA reverted to text-only images or changed the number of text-graphic pairings, such as how to rotate these warnings and what size the text-only warnings would be.  The D.C. Circuit has invalidated entire rules in similar circumstances where the record does not show that the agency would have adopted the severed portion alone.  *E.g.*, *Am. Petrol. Inst. v. EPA*, 862 F. 3d 50, 71-72 (D.C. Cir. 2017).

## IV.   PLAINTIFFS ARE ENTITLED TO A PRELIMINARY INJUNCTION

This Court should also enjoin the Rule and postpone the Rule's effective date until fifteen months after this Court issues a final judgment on Plaintiffs' claims.  Plaintiffs have shown a substantial likelihood of success on the merits based on APA and First Amendment violations, and amply satisfy the remaining criteria for a preliminary injunction under Federal Rule of Civil Procedure 65 based on their likelihood of success on the merits, irreparable harm to their interests, the balance of equities, and the public interest.  *See League of Women Voters v. Newby*, 838 F.3d 1, 6

(D.C. Cir. 2016).  The same criteria favor postponement of the Rule's effective date under APA

section 705.  *E.g.*, *Sierra Club v. Jackson*, 833 F. Supp. 2d 11, 30 (D.D.C. 2012).

### A.      Absent a Preliminary Injunction, Plaintiffs Will Suffer Irreparable Harm

Unless this Court enjoins the implementation and enforcement of FDA's unlawful Rule,

Plaintiffs will suffer multiple, independent forms of irreparable harm.  *First*, the Rule would violate

Plaintiffs' freedom of speech.  That harm "is *per se* irreparable," *R.J. Reynolds*, 823 F. Supp. 2d

at 50, even when speech restrictions are "prospective," *Gordon v. Holder*, 721 F.3d 638, 653 (D.C.

Cir. 2013).  The district court in *R.J. Reynolds* enjoined FDA's 2011 graphic-warnings rule more

than a year before that rule's effective date, explaining that even a "threat[]" to manufacturers'

First Amendment rights was "more than a sufficient showing of irreparable harm."  823 F. Supp.

2d at 50-51.  So too here, "[f]aced with a Rule which compels speech and threatens their First

Amendment rights, plaintiffs are not required to sit idly and wait for irreparable and irretrievable

harm to occur before they may seek relief."  *Id.* at 51 n.32.  Amplifying those harms, the Rule

forces Plaintiffs to display gruesome images that will scare, shame, and risk misleading customers.

"[H]arm to [the plaintiff's] reputation in the community [is] harm that cannot be reversed."  *Whole*

*Foods Mkt. Grp. v. Wical LP*, 288 F. Supp. 3d 176, 190 (D.D.C. 2018).

*Second*, the Rule is already irreparably harming Plaintiffs by forcing them to start shoul-

dering immense implementation costs now through the Rule's effective date.  FDA's Rule already

forced Plaintiffs to rush to submit an implementation plan on April 13, 2020, and to begin work

even before FDA approved that plan on June 26, 2020.  Plaintiffs already have spent more than $1

million procuring the tooling and other materials required to print compliant packaging.  Ex. 3,

DeVerry Decl. ¶ 17.  And the Rule is forcing Plaintiffs to spend tens of millions of dollars more

and divert thousands of hours of employee time to redesign packaging, procure and engrave new

printing materials, and produce and print new packaging.  *Id.* ¶¶ 17-18, 21-23.  Costs include:

- Modifying 600 distinct package designs for 197 cigarette products, *id.* ¶ 13, which involves thousands of hours of employee time to redesign and approve new cigarette packaging by mid-September 2020 and hundreds of thousands of dollars for outside design work, *id.* ¶ 22-23;

- $6.78 million in one-time design and tooling costs, almost $2 million of which will be spent by the end of 2020, the remainder in the first half of 2021, *id.* ¶ 17; and

- $2.9 million per week, starting in early June 2021 through the Rule's October 2021 effective date, to produce new packaging materials, including $100,000 per week in increased ink, materials, and waste above and beyond Plaintiffs' current packaging, *id.* ¶¶ 18, 32.

Plaintiffs must accomplish all of this work during unprecedented business interruptions from a pandemic—challenges FDA recognized in delaying the Rule's effective date until October 16, 2021. That crisis is still ongoing, and Plaintiffs cannot use that modest postponement to wait and see whether the Rule will survive judicial scrutiny. As FDA acknowledged, "a labeling change requires a minimum of 15 months to fully implement." AR19615. Manufacturers cannot assume that their third-party contractors, used for engraving and printing, will be operating at full capacity, much less able to accommodate overtime requests.

Without preliminary relief, if the Court ultimately invalidates the Rule, Plaintiffs will have pointlessly squandered tens of millions of dollars and thousands of employee hours. "[C]omplying with a regulation later held invalid almost *always* produces the irreparable harm of nonrecoverable compliance costs." *Texas v. EPA*, 829 F.3d 405, 433 (5th Cir. 2016). FDA has sovereign immunity, making it impossible to collect damages for FDA's unlawful actions after the fact. *E.g.*, *Smoking Everywhere, Inc. v. FDA*, 680 F. Supp. 2d 62, 77 n.19 (D.D.C. 2010), *aff'd sub nom. Sottera, Inc. v. FDA*, 627 F.3d 891 (D.C. Cir. 2010). After FDA's first attempt at imposing graphic warnings, the district court found that unrecoverable compliance costs met the "high standard" to show irreparable harm. *R.J. Reynolds*, 823 F. Supp. 2d at 49-50. That reasoning holds here.

Case 1:20-cv-01181-KBJ   Document 22-1   Filed 08/05/20   Page 77 of 79

**B.      Injunctive Relief Will Not Prejudice FDA or the Public Interest**

Courts balance the equities in cases involving injunctive relief against the government by weighing the "benefits to the private party from obtaining an injunction against the harms to the government and the public from being enjoined." *Doe v. Mattis*, 928 F.3d 1, 23 (D.C. Cir. 2019). The district court in *R.J. Reynolds* concluded that the balance of equities strongly favored the manufacturers challenging FDA's 2011 graphic-warnings rule: "[T]he constitutional protections an injunction would afford plaintiffs far outweigh any incidental prejudice the public (or indeed, the Government) could hypothetically suffer." 823 F. Supp. 2d at 51-52. So too with this Rule. While Plaintiffs face extraordinary and irrevocable harms, FDA faces no comparable harms from a modest delay in the Rule's effective date. And a preliminary injunction would benefit the public.

FDA has no defensible basis for arguing against a modest delay of the Rule until 15 months after final judgment on Plaintiffs' claims. FDA promulgated this Rule in March 2020 only pursuant to a court-ordered timetable imposed by the District of Massachusetts. During that litigation, FDA saw no harm in delaying the Rule's effective date until at least early 2023. *Am. Acad. of Pediatrics v. FDA*, 2019 WL 1047149, at *2. FDA opposed the District of Massachusetts's significantly faster timetable on the ground that the balance of factors—including the "human health and welfare at stake," and "interests prejudiced by delay"—weighed in favor of a slower process, and thus later implementation. Mem. and Order 13, 15, *id.* (D. Mass. Sept. 5, 2018), ECF No. 50.

Further, FDA already agreed to delay the Rule's effective date by 120 days, until October 16, 2021. FDA has identified no public-health rationale warranting more immediate implementation. FDA has disavowed any intention of affecting consumers' actual behavior and does not suggest that its Rule is necessary to promote smoking cessation or improve health outcomes. FDA does not (and could not) contend that Plaintiffs are engaging in any misleading representations about smoking-related health risks that requires immediate correction. While litigation is ongoing,

Plaintiffs will continue displaying existing warnings about smoking-related health risks on their products, which comprehensively warn consumers about the dangers of cigarette smoking.

As for the public interest, consumers have a self-evident interest in avoiding potential mis-information. *Supra* pp. 58-60. Further, a preliminary injunction advances the public interest given the "substantial risk" that citizens would otherwise lose a constitutionally protected fundamental right. *League of Women Voters*, 838 F.3d at 12. "[T]here is always a strong public interest in the exercise of free speech rights otherwise abridged by an unconstitutional regulation." *Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016). At a minimum, the public interest will be "served by ensuring that plaintiffs' First Amendment rights are not infringed before the constitutionality of the regulation has been definitively determined." *Stewart v. D.C. Armory Bd.*, 789 F. Supp. 402, 406 (D.D.C. 1992). Preliminary relief would also further the "substantial public interest in ensuring that [FDA] acts within the limits of its authority." *See Clarke v. Office of Fed. Hous. Enter. Oversight*, 355 F. Supp. 2d 56, 66 (D.D.C. 2004).

## <u>CONCLUSION</u>

For the foregoing reasons, this Court should grant Plaintiffs' request for summary judgment. This Court should vacate the entire Rule and declare that the Rule and the TCA violate the First Amendment, and that the Rule violates the APA and the TCA. This Court should also preliminarily enjoin the Rule's effective date of October 16, 2021 and allow Plaintiffs to continue to use their current packaging and advertising until 15 months after this Court issues final judgment.

DATED:  August 5, 2020                    Respectfully submitted,

                                          /s/ *Lisa S. Blatt*
                                          LISA S. BLATT (D.C. Bar No. 429544)
                                          STEPHEN D. ANDREWS (D.C. Bar. No. 470994)
                                          SARAH M. HARRIS (D.C. Bar. No. 1004964)
                                          MATTHEW J. GREER (D.C. Bar No. 241858)
                                          JOHN F. PARARAS (D.C. Bar No. 229920)
                                          WHITNEY D. HERMANDORFER (D.C. Bar No.
                                              888314222)
                                          WILLIAMS & CONNOLLY LLP
                                              *725 Twelfth Street. N.W.,*
                                              *Washington, DC 20005*
                                              *Tel: (202) 434-5000*
                                              *Fax: (202) 434-5029*
                                              *lblatt@wc.com*
                                              *sandrews@wc.com*
                                              *sharris@wc.com*
                                              *mgreer@wc.com*
                                              *jpararas@wc.com*
                                              *whermandorfer@wc.com*

                                              *Attorneys for Plaintiffs Philip Morris USA*
                                              *Inc. and Sherman Group Holdings LLC*

66