## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| PHILIP MORRIS USA INC., *et al.*,<br><br>　　　　*Plaintiffs*,<br><br>　　　　　　v.<br><br>UNITED STATES FOOD AND DRUG<br>ADMINISTRATION, *et al.*,<br><br>　　　　*Defendants*. | No. 20-cv-1181 (KBJ) |

## DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT

Pursuant to Federal Rule of Civil Procedure 56 and Local Civil Rule 7(h), for the reasons stated in the accompanying memorandum of law, Defendants hereby move for summary judgment. A proposed order is attached.

Dated: October 8, 2020

Of Counsel:

ROBERT P. CHARROW
General Counsel

STACY CLINE AMIN
Chief Counsel
Food and Drug Administration
Deputy General Counsel
United States Department of Health and
Human Services

PERHAM GORJI
Deputy Chief Counsel for Litigation

JULIE B. LOVAS
Senior Counsel
Office of the Chief Counsel
Food and Drug Administration
10903 New Hampshire Avenue
Bldg. 31, Room 4520
Silver Spring, MD 20993-0002
(301) 796-8575

JEFFREY BOSSERT CLARK
Acting Assistant Attorney General

ERIC B. BECKENHAUER
Assistant Branch Director

/s/ Michael H. Baer
MICHAEL H. BAER (New York 5384300)
STEPHEN M. PEZZI (D.C. Bar No. 995500)
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20005
Tel: (202) 305-8574
Email: Michael.H.Baer@usdoj.gov

*Counsel for Defendants*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| PHILIP MORRIS USA INC., *et al.*, | |
| *Plaintiffs*, | |
| v. | No. 20-cv-1181 (KBJ) |
| UNITED STATES FOOD AND DRUG ADMINISTRATION, *et al.*, | |
| *Defendants*. | |

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND A PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

BACKGROUND ............................................................................................................... 4

I.      THE TOBACCO INDUSTRY AND THE DANGERS OF SMOKING ........................ 4

II.     STATUTORY BACKGROUND .................................................................................. 6

III.    REGULATORY BACKGROUND ............................................................................... 8

        A.      FDA's initial approach to pictorial health warnings ................................ 8

        B.      FDA's process for developing new warnings ........................................... 8

        C.      This rulemaking .................................................................................... 12

IV.     PROCEDURAL HISTORY ....................................................................................... 13

LEGAL STANDARD ..................................................................................................... 14

ARGUMENT .................................................................................................................. 15

I.      FDA'S THOROUGH PROCESS FOR SELECTING WARNINGS EXCEEDED
        THE APA'S REQUIREMENTS FOR REASONED DECISION-MAKING ................ 15

        A.      FDA's choice of health warnings was rational and well-explained. ................... 16

        B.      FDA made reasonable predictions about consumer understanding. ................... 19

        C.      FDA reasonably relied on relevant scientific literature, including evidence
                about health warnings in other countries. .......................................... 28

II.     THE RULE IS CONSISTENT WITH THE FIRST AMENDMENT. ........................ 29

        A.      The Rule should be upheld under *Zauderer*. ...................................... 30

                1.      The warnings are purely factual and uncontroversial. ................. 30

                2.      The Rule reasonably relates to the government's interest in
                        promoting understanding of the negative health consequences of
                        smoking. ................................................................................ 37

                3.      The Rule is not unjustified or unduly burdensome. ..................... 38

   B.    The Rule is also constitutional under *Central Hudson*. ........................................ 44

         1.    The    government    has    a    substantial    interest    in    promoting
               understanding of the risks of smoking. ...................................... 45

         2.    The Rule directly furthers the government's interest. .............................. 48

         3.    The Rule imposes requirements that are a "reasonable fit" for the
               government's interest. .............................................................. 49

III.   PLAINTIFFS' REMAINING STATUTORY CLAIMS ARE MERITLESS. ................. 51

   A.    The Tobacco Control Act authorizes FDA to require eleven warnings. ............... 51

   B.    FDA found that the warnings in the Final Rule "would promote greater
         public understanding of the risks associated with the use of tobacco
         products."  15 U.S.C. § 1333(d)[2]. ...................................................... 56

   C.    Plaintiffs had a meaningful opportunity to comment on the proposed rule. ......... 59

         1.    FDA had no obligation to publish the raw data from its studies with
               its "general notice of proposed rulemaking." ............................................ 59

         2.    Any notice-and-comment error was harmless. ........................................ 65

IV.   PLAINTIFFS' REQUESTS FOR RELIEF ARE OVERBROAD. ................................. 67

   A.    Any unlawful portions of the Rule should be severed. .......................................... 67

   B.    Nationwide relief is inappropriate. ...................................................... 70

   C.    Plaintiffs' motion for a preliminary injunction should be denied. ........................ 72

         1.    A preliminary injunction is unnecessary because this case can be
               litigated to final judgment before Plaintiffs suffer any irreparable
               harm. .............................................................................. 72

         2.    The Rule should take effect on October 16, 2021. ................................. 74

         3.    The public interest disfavors injunctive relief. ........................................ 74

CONCLUSION ........................................................................... 75

## TABLE OF AUTHORITIES

**CASES**

*Action for Children's Television v. FCC*,
  58 F.3d 654 (D.C. Cir. 1995) ............................................................. 41, 42

*Air Transp. Ass'n of Am., Inc. v. Exp.-Imp. Bank of the U.S.*,
  840 F. Supp. 2d 327 (D.D.C. 2012) ........................................................ 73

*Alaska Dep't of Env't Conservation v. EPA*,
  540 U.S. 461 (2004) ........................................................................ 43

*Alaska v. Lubchenco*,
  825 F. Supp. 2d 209 (D.D.C. 2011) ........................................................ 66

*Alfa Int'l Seafood v. Ross*,
  264 F. Supp. 3d 23 (D.D.C. 2017) ......................................................... 67

*Am. Acad. of Pediatrics v. FDA*,
  No. 1:16-cv-11985-IT, 2019 WL 1047149 (D. Mass. Mar. 5, 2019) ..................... 12

*Am. Bioscience, Inc. v. Thompson*,
  269 F.3d 1077 (D.C. Cir. 2001) ........................................................... 14

*Am. Radio Relay League, Inc. v. FCC*,
  524 F.3d 227 (D.C. Cir. 2008) ......................................................... 62, 63

*American Beverage Association v. City & County of San Francisco*,
  916 F.3d 749 (9th Cir. 2019) ...................................................... 38, 39, 41

*Baystate Med. Ctr. v. Leavitt*,
  587 F. Supp. 2d 37 (D.D.C. 2008) ......................................................... 74

*Bd. of Trustees of State Univ. of N.Y. v. Fox*,
  492 U.S. 469 (1989) ........................................................................ 40

*Bellion Spirits, LLC v. United States*,
  335 F. Supp. 3d 32 (D.D.C. 2018),
  *appeal pending*, No. 19-5252 (D.C. Cir., argued Sept. 11, 2020) .................... 42

*Bellion Spirits, LLC v. United States*,
  393 F. Supp. 3d 5 (D.D.C. 2019),
  *appeal pending*, No. 19-5252 (D.C. Cir., argued Sept. 11, 2020) .................... 15

*Buckley v. Valeo,*
   424 U.S. 1 (1976)...................................................................................................... 41

*Burson v. Freeman,*
   504 U.S. 191 (1992)............................................................................................. 41, 49

*Califano v. Yamasaki,*
   442 U.S. 682 (1979)............................................................................................. 70, 71

*Central Hudson Gas & Electric Corp. v. Public Service Commission of New York,*
   447 U.S. 557 (1980)............................................................................................. 30, 45

*Chamber of Commerce of U.S. v. SEC,*
   443 F.3d 890 (D.C. Cir. 2006) ............................................................................ 62, 63

*Chaplaincy of Full Gospel Churches v. England,*
   454 F.3d 290 (D.C. Cir. 2006) .................................................................................. 73

*Chem. Mfrs. Ass'n v. EPA,*
   870 F.2d 177 (5th Cir.),
   *clarified on other grounds on reh'g,* 885 F.2d 253 (5th Cir. 1989)................... 62, 67

*Chemical Manufacturers Association v. EPA,*
   28 F.3d 1259 (D.C. Cir. 1994) .................................................................................. 23

*Chevron, USA, Inc. v. Nat. Res. Def. Council, Inc.,*
   467 U.S. 837 (1984) .................................................................................................. 56

*Citizens to Pres. Overton Park, Inc. v. Volpe,*
   401 U.S. 402 (1971) .................................................................................................. 15

*Citizens United v. FEC,*
   558 U.S. 310 (2010) .................................................................................................. 47

*City of Arlington, Tex. v. FCC,*
   569 U.S. 290 (2013) .................................................................................................. 56

*Clinton v. City of New York,*
   524 U.S. 417 (1998) .................................................................................................. 53

*Combat Veterans for Cong. Political Action Comm. v. FEC,*
   795 F.3d 151 (D.C. Cir. 2015) .................................................................................. 65

*Conn. Light & Power Co. v. Nuclear Regulatory Comm'n,*
   673 F.2d 525 (D.C. Cir. 1982) .............................................................. 60, 62, 63, 64

*Conservation Force v. Ashe,*
   979 F. Supp. 2d 90 (D.D.C. 2013) ....................................................... 61

*Conservation Law Found. v. Ross,*
   374 F. Supp. 3d 77 (D.D.C. 2019) ....................................................... 14

*ConverDyn v. Moniz,*
   68 F. Supp. 3d 34 (D.D.C. 2014) ......................................................... 73

*CTIA - The Wireless Ass'n v. City of Berkeley,*
   928 F.3d 832 (9th Cir. 2019) ........................................... 33, 35, 37, 47

*Dep't of Homeland Sec. v. New York,*
   140 S. Ct. 599 (2020) ............................................................................ 71

*Disc. Tobacco City & Lottery, Inc. v. United States,*
   674 F.3d 509 (6th Cir. 2012) ................................................... 33, 42, 46

*District Hospital Partners, L.P. v. Burwell ("DHP"),*
   786 F.3d 46 (D.C. Cir. 2015) ............................................................... 19

*Edenfield v. Fane,*
   507 U.S. 761 (1993) ........................................................................ 29, 38

*Entertainment Software Association v. Blagojevich,*
   469 F.3d 641 (7th Cir. 2006) ............................................................... 41

*FCC v. Fox Television Stations, Inc.,*
   556 U.S. 502 (2009) .............................................................................. 15

*FDA v. Brown & Williamson Tobacco Corp.,*
   529 U.S. 120 (2000) ......................................................................... 4, 72

*Fla. Power & Light Co. v. Lorion,*
   470 U.S. 729 (1985) .............................................................................. 14

*Gill v. Whitford,*
   138 S. Ct. 1916 (2018) ......................................................................... 70

*Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.,*
   527 U.S. 308 (1999) .............................................................................. 70

*Gulf Oil Corp. v. Dep't of Energy,*
   514 F. Supp. 1019 (D.D.C. 1981) ....................................................... 73

*Hecht Co. v. Bowles*,
    321 U.S. 321 (1944) ........................................................................................ 71

*Huls Am. Inc. v. Browner*,
    83 F.3d 445 (D.C. Cir. 1996) ........................................................................ 19

*Iancu v. Brunetti*,
    139 S. Ct. 2294 (2019) .................................................................................. 45

*International Dairy Foods Ass'n v. Amestoy*,
    92 F.3d 67 (2d Cir. 1996) ......................................................................... 47, 48

*Kennecott Greens Creek Min. Co. v. Mine Safety & Health Admin.*,
    476 F.3d 946 (D.C. Cir. 2007) .................................................................. 19, 27

*L.A. Haven Hospice, Inc. v. Sebelius*,
    638 F.3d 644 (9th Cir. 2011) ........................................................................ 71

*Lewis v. Casey*,
    518 U.S. 343 (1996) ...................................................................................... 70

*Little Sisters of the Poor Saints Peter and Paul Home v. Pennsylvania*,
    140 S. Ct. 2367 (2020) .................................................................................. 58

*Lorillard Tobacco Co. v. Reilly*,
    533 U.S. 525 (2001) ...................................................................................... 48

*Marsh v. Or. Nat. Res. Council*,
    490 U.S. 360 (1989) ...................................................................................... 24

*MD/DC/DE Broadcasters Ass'n v. FCC*,
    236 F.3d 13 (D.C. Cir. 2001) .................................................................... 68, 69

*Milavetz, Gallop & Milavetz, P.A. v. United States*,
    559 U.S. 229 (2010) .................................................................................. 30, 47

*Milk Train, Inc. v. Veneman*,
    310 F.3d 747 (D.C. Cir. 2002) ...................................................................... 25

*Mylan Pharms., Inc. v. Shalala*,
    81 F. Supp. 2d 30 (D.D.C. 2000) .................................................................. 73

*National Association of Manufacturers v. SEC*,
    800 F.3d 518 (D.C. Cir. 2015) ...................................................................... 37

*Nat'l Ass'n of Home Builders v. Defs. of Wildlife* ("*NAHB*"),
    551 U.S. 644 (2007)................................................................................ 15, 18, 28, 65

*Nat'l Ass'n of the Deaf v. Trump*,
    No. 20-cv-2107 (JEB), 2020 WL 5411171 (D.D.C. Sept. 9, 2020) ........................................ 72

*Nat'l Inst. of Family & Life Advocates v. Becerra* ("*NIFLA*"),
    138 S. Ct. 2361 (2018)........................................................................ 40, 41, 43, 44

*Nat'l Lifeline Ass'n v. FCC*,
    921 F.3d 1102 (D.C. Cir. 2019) .......................................................................... 62

*Nat'l Min. Ass'n v. Jackson*,
    768 F. Supp. 2d 34 (D.D.C. 2011) ....................................................................... 73

*Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*,
    145 F.3d 1399 (D.C. Cir. 1998) .......................................................................... 72

*Nicopure Labs, LLC v. FDA*,
    944 F.3d 267 (D.C. Cir. 2019) ........................................................................... 46

*Nuclear Energy Inst., Inc. v. EPA*,
    373 F.3d 1251 (D.C. Cir. 2004) .......................................................................... 55

*Ohralik v. Ohio State Bar Ass'n*,
    436 U.S. 447 (1978).................................................................................... 30

*Palisades Gen. Hosp. Inc. v. Leavitt*,
    426 F.3d 400 (D.C. Cir. 2005) ........................................................................... 74

*PDK Labs., Inc. v. DEA*,
    362 F.3d 786 (D.C. Cir. 2004) ........................................................................... 65

*Pearson v. Shalala*,
    164 F.3d 650 (D.C. Cir. 1999) ........................................................................ 38, 43

*Perez v. Mortg. Bankers Ass'n*,
    575 U.S. 92 (2015)..................................................................................... 59

*Pharm. Mfg. Research Servs., Inc. v. FDA*,
    957 F.3d 254 (D.C. Cir. 2020) ........................................................................... 14

*POM Wonderful, LLC v. FTC*,
    777 F.3d 478 (D.C. Cir. 2015) ....................................................................... 15, 49

*R.J. Reynolds Tobacco Co. v. FDA* (*"R.J. Reynolds I"*),
   696 F.3d 1205 (D.C. Cir. 2012),
   *overruled in part by Am. Meat Inst. v. USDA*, 760 F.3d 18 (D.C. Cir. 2014) .................. *passim*

*Republic of Sudan v. Harrison*,
   139 S. Ct. 1048 (2019) ........................................................................... 42

*Rotkiske v. Klemm*,
   140 S. Ct. 355 (2019) ............................................................................. 58

*Rural Cellular Ass'n v. FCC*,
   588 F.3d 1095 (D.C. Cir. 2009) ............................................................. 24

*Sierra Club v. Costle*,
   657 F.2d 298 (D.C. Cir. 1981) ............................................................... 61

*Solite Corp. v. EPA*,
   952 F.2d 473 (D.C. Cir. 1991) ............................................................... 62

*Sprint v. FCC*,
   315 F.3d 369 (D.C. Cir. 2003) ............................................................... 64

*Tesoro Ref. & Mktg. Co. v. FERC*,
   552 F.3d 868 (D.C. Cir. 2009) ............................................................... 55

*Town of Chester v. Laroe Estates, Inc.*,
   137 S. Ct. 1645 (2017) ........................................................................... 70

*Trump v. Hawaii*,
   138 S. Ct. 2392 (2018) ........................................................................... 71

*Turner Broad. Sys., Inc. v. FCC*,
   520 U.S. 180 (1997) .......................................................................... 39, 45

*U.S. Cellular Corp. v. FCC*,
   254 F.3d 78 (D.C. Cir. 2001) ................................................................. 19

*U.S. Dep't of Commerce v. New York*,
   139 S. Ct. 2551 (2019) ...................................................................... 15, 18

*United States v. Philip Morris USA, Inc.*,
   449 F. Supp. 2d 1 (D.D.C. 2006),
   *aff'd in relevant part*, 566 F.3d 1095 (D.C. Cir. 2009) ...................... 5, 44

*Univ. of Tex. v. Camenisch*,
   451 U.S. 390 (1981) ............................................................................... 74

*Va. Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*,
    425 U.S. 748 (1976) ........................................................................... 48

*Va. Soc'y for Human Life, Inc. v. FEC*,
    263 F.3d 379 (4th Cir. 2001) ............................................................ 71

*Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*,
    435 U.S. 519 (1978) ................................................................... 59, 61

*Weinberger v. Romero-Barcelo*,
    456 U.S. 305 (1982) ........................................................................... 71

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ...................................................................... 72, 74

*Wis. Gas Co. v. FERC*,
    758 F.2d 669 (D.C. Cir. 1985) .......................................................... 73

*Yates v. United States*,
    574 U.S. 528 (2015) ........................................................................... 52

*Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio*,
    471 U.S. 626 (1985) .................................................................. *passim*

**STATUTES**

5 U.S.C. § 553 ................................................................................. 59, 61

5 U.S.C. § 706 ............................................... 14, 15, 61, 65, 71, 72

15 U.S.C. § 1331 .............................................................................. 6, 45

15 U.S.C. § 1333 ........................................................................ *passim*

15 U.S.C. § 1334 .............................................................................. 53, 54

15 U.S.C. § 4402 .............................................................................. 42, 55

21 U.S.C. § 387 ................................................................................ 68, 72

Pub. L. No. 89-92, 79 Stat. 282 (1965) .............................. 6, 30, 31, 39

Pub. L. No. 91-222, 84 Stat. 87 (1970) ..................................... 6, 31, 39

Pub. L. No. 98-474, 98 Stat. 2200 (1984) ............................ 6, 7, 39, 45

Pub. L. No. 111-31, 123 Stat. 1776, 1779 (2009) (codified at 21 U.S.C. § 387) ......... 4, 5, 7, 9, 45

Pub. L. No. 111-31, 123 Stat. 1776, § 201(d) (2009) (codified at 15 U.S.C. § 1333) ................... 7

**REGULATIONS**

21 C.F.R. § 201.57 ............................................................................................................ 36

21 C.F.R. § 1141.10 .......................................................................................................... 13

75 Fed. Reg. 69,524 (Nov. 12, 2010) ............................................................................... 4

76 Fed. Reg. 36,628 (June 22, 2011) ............................................................................... 8

84 Fed. Reg. 42,754 (Aug. 16, 2019) ...................................................................... *passim*

85 Fed. Reg. 15,638 (Mar. 18, 2020) (to be codified at 21 C.F.R. pt. 1141) ........... *passim*

**OTHER AUTHORITIES**

146 Cong. Rec. H1847 (2000) ......................................................................................... 4

155 Cong. Rec. S13904 (2009) .................................................................................... 7, 39

155 Cong. Rec. S6000 (2009) ........................................................................................... 4

H.R. Rep. No. 111-58 at 471 (2009) .......................................................................... 7, 39

https://www.fda.gov/tobacco-products/labeling-and-warning-statements-tobacco-
products/cigarette-labeling-and-health-warning-requirements ................................. 12

U.S. Department of Health and Human Services, *The Health Consequences of Smoking—50
Years of Progress: A Report of the Surgeon General* (2014) ................................... 35

## INTRODUCTION

It is undisputed that the government can require manufacturers of dangerous products to warn the public about the very dangers they are responsible for creating.  For no other consumer product is that danger greater—nor the manufacturers' responsibility clearer—than cigarettes.  Smoking remains the leading cause of preventable death in the United States.  But that oft-repeated fact risks eclipsing the myriad ways in which cigarette smoking is harmful.  It causes type 2 diabetes; it causes fatal lung disease even in non-smokers; and it results in consequences as varied as amputation, blindness, bladder cancer, and erectile dysfunction.

Even though cigarette smoking remains a public-health scourge, the public remains strikingly unaware of many of smoking's negative health consequences.  In March, the Food and Drug Administration (FDA) completed a years-long effort to develop cigarette health warnings that will help correct that deficit in understanding.  The result of that undertaking, announced in the final rule at issue here, was eleven new warnings (the "final warnings") that describe and depict some of the serious, but lesser-known, health consequences of smoking.  *See Tobacco Products; Required Warnings for Cigarette Packages and Advertisements*, 85 Fed. Reg. 15,638 (Mar. 18, 2020) (to be codified at 21 C.F.R. pt. 1141) ("the Rule" or "the Final Rule").  The Rule implements provisions of the Tobacco Control Act (TCA) that reflect Congress's judgments about the appropriate content, size, and placement of cigarette health warnings.  Consistent with those congressional judgments, the final warnings include color graphics and must be featured prominently on cigarette packages (occupying at least the top 50% of the front and back panels) and advertisements (occupying at least the top 20%).

The Rule is FDA's second effort to implement these statutory provisions.  Its prior attempt was invalidated by the D.C. Circuit in 2012.  *See R.J. Reynolds Tobacco Co. v. FDA ("R.J. Reynolds I")*, 696 F.3d 1205 (D.C. Cir. 2012), *overruled in part by Am. Meat Inst. v. USDA*, 760 F.3d 18 (D.C. Cir. 2014) (en banc).  The D.C. Circuit concluded that FDA's prior warnings did not just "convey information to consumers" but instead crossed the line into advocacy, reflecting an "unabashed" aim to "browbeat consumers into quitting."  *Id.* at 1217.

1

In response, FDA discarded the prior warnings, went back to the drawing board, and undertook an exhaustive effort to get it right the second time. The agency conducted a thorough review of the relevant literature, carefully consulted with agency experts and a medical illustrator, and carried out some of the largest quantitative consumer-research studies *ever* conducted on cigarette warnings. At each step, FDA had a singular focus: developing warnings that will help consumers better understand the negative health consequences of cigarette smoking. The record reflects the agency's success. Of particular note, an FDA study with nearly 10,000 participants found that all eleven of the final warnings outperformed the current Surgeon General's warnings, to a statistically significant degree, on measures that predict improved understanding.

The animating aim of Plaintiffs' opening brief is to recast FDA's careful work as sloppy. But the grab bag of alleged deficiencies they offer up does not undermine the reasonableness of the agency's decision-making. Instead, Plaintiffs rely on irrelevant and out-of-context comments from focus groups, as well as a series of invented principles—often at odds with the literature—that they claim should have shaped FDA's process. But FDA's task was not to dwell on colorful comments or to re-invent the wheel with respect to the established scientific consensus; it was to design and implement a robust process for predicting whether the warnings it developed would promote greater public understanding of the dangers of smoking. That is what the agency did. FDA made reasonable methodological choices, relied on study measures that are supported by the scientific literature, and selected warnings that have ample basis in the record. And it did all of that in a setting where the agency's findings—and expertise—are entitled to maximum deference.

The warnings that FDA selected as a result of that process satisfy any applicable level of First Amendment scrutiny. The final warnings convey purely factual, uncontroversial information about the negative health consequences of smoking; they are (at a minimum) reasonably related to the government's interest in ensuring that the public understands those risks; and they are not unduly burdensome, particularly in light of the critical purpose they serve. Under the Supreme Court's test for commercial disclosures set forth in *Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio*, 471 U.S. 626 (1985), no more is required.

Plaintiffs attempt to remove this case from *Zauderer*'s ambit on the theory that, although the warnings straightforwardly and accurately depict the consequences of smoking, they reflect an insidious attempt to emotionally manipulate consumers. The record forecloses that contention. Indeed, FDA specifically affirmed, for *each* warning that it ultimately selected, that the warning "does not contain any elements intended to evoke a negative emotional response." 85 Fed. Reg. at 15,672-84. Even if FDA had not spoken so clearly on this point, the record speaks for itself. The agency repeatedly made methodological choices that can only be explained by the goal of *informing* consumers, not shaming them. And the possibility that consumers nonetheless had an "emotional" reaction to warnings about potentially life-altering health consequences does not shape the constitutional analysis; it reflects the magnitude of the harms the warnings address.

In any event, even under intermediate scrutiny—the only other form of First Amendment scrutiny that could possibly apply to the commercial-speech disclosures at issue here—the Rule is constitutional. Plaintiffs' principal argument to the contrary—that the government lacks any substantial interest in promoting public understanding of the risks of smoking—is foreclosed by precedent, as well as by the opening sentence of their brief. *See* Mem. in Supp. of Pls.' Mot. for Summ. J. & Prelim. Inj. at 1, ECF No. 22-1 ("Pls.' Br.") (conceding that the government can "require tobacco companies to disclose the health risks of their products so consumers can make informed choices").

Plaintiffs' remaining arguments are equally meritless. They invent extra-textual limits on FDA's ability to change the default warning statements in the TCA; they had (and took advantage of) extensive opportunities to comment on the proposed rule and the materials underlying it; and they insist on relief that would contravene the clear language of the TCA.

At bottom, Plaintiffs agree that the government can require tobacco manufacturers to level with their customers about the harms of smoking. But they ignore that Congress, the scientific community, and the experts at FDA agree on how best to promote understanding of those harms. The warnings FDA selected reasonably reflect that consensus, and the Court should uphold the Rule and grant summary judgment to Defendants.

**BACKGROUND**

### I.     THE TOBACCO INDUSTRY AND THE DANGERS OF SMOKING

**a.**   Congress enacted the Family Smoking Prevention and Tobacco Control Act in 2009, based on evidence compiled over decades about the health risks of tobacco products and the industry's deceptive marketing practices.   That evidence established four key points:   First, "tobacco use, particularly among children and adolescents, poses perhaps the single most significant threat to public health in the United States."   *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 161 (2000).   Congress found that "[e]ach year, 440,000 people die of diseases caused by smoking or other forms of tobacco use—that is about 20 percent of all deaths in our nation."   155 Cong. Rec. S6000 (2009) (statement of U.S. Surgeon General).

Second, tobacco's public-health harm is "inextricably linked" to nicotine addiction.   75 Fed. Reg. 69,524, 69,528 (Nov. 12, 2010).   "The pharmacologic and behavioral processes that determine tobacco addiction are similar to those that determine addiction to drugs such as heroin and cocaine."   *Id.*   The power of nicotine addiction is perhaps best illustrated by the failure rate of cessation efforts.   In 2004, over 40% of adult smokers reported trying to quit; only 3-5% were successful.   *Id.* at 69,529.   The tobacco industry has long appreciated the importance of nicotine addiction to sales.   In an internal memo, a leading manufacturer long ago acknowledged that "a tobacco product is, in essence, a vehicle for the delivery of nicotine"—a "potent drug with a variety of physiologic effects"—and that the "industry is then based upon the design, manufacture, and sale of attractive forms of nicotine."   146 Cong. Rec. H1847, H1849 (2000) (statement of Rep. Ganske) (quoting a 1972 industry memo).

Third, the tobacco industry has long depended on recruiting underage users who become addicted before age 18.   Despite laws prohibiting sales to minors, the "overwhelming majority of Americans who use tobacco products begin using such products while they are minors and become addicted to the nicotine in those products before reaching the age of 18."   Leg. Finding 31, Pub. L. No. 111-31, § 2, 123 Stat. 1776, 1779 (2009) (codified at 21 U.S.C. § 387 (note)).   Congress also found that "[a]dvertising, marketing, and promotion of tobacco products have been especially

directed to attract young persons to use tobacco products, and these efforts have resulted in increased use of such products by youth." *Id.* at 1777, Leg. Finding 15.

Fourth, for decades, the tobacco industry intentionally misled its own customers and the general public about the health risks and addictiveness of its products. In 1964, the Surgeon General began issuing reports on the health consequences of tobacco use and nicotine addiction. In response, tobacco companies undertook a coordinated campaign to deny these health hazards and attack those studies—even though they knew they were accurate. These efforts are "demonstrated by not only decades of press releases, reports, booklets, newsletters, television and radio appearances, and scientific symposia and publications, but also by evidence of their concerted[] efforts to attack and undermine the studies in mainstream scientific publications such as the Reports of the Surgeon General." *United States v. Philip Morris USA, Inc.*, 449 F. Supp. 2d 1, 855 (D.D.C. 2006), *aff'd in relevant part*, 566 F.3d 1095, 1118-19 (D.C. Cir. 2009) (per curiam) ("[I]n a televised interview in 1971, Philip Morris President Joseph Cullman III denied that cigarettes posed a health hazard to pregnant women or their infants, contradict[ing] the information Helmut Wakeham, Philip Morris's Vice President for Corporate Research and Development, had given him two years earlier.") (citation omitted).

**b.** This unique industry has thus been built upon the twin pillars of a powerfully addictive product, and decades of deception—which allowed cigarettes to become deeply entrenched in American society. Smoking remains addictive (by design), and death and disease caused by cigarettes are not a problem of the past. To this day, "[c]igarette smoking remains the leading cause of preventable disease and death in the United States and is responsible for more than 480,000 deaths per year among cigarette smokers and those exposed to secondhand smoke." 85 Fed. Reg. at 15,652. And "[o]ver 16 million Americans alive today live with disease caused by smoking cigarettes." *Id.* Usage rates remain staggering: "approximately 34.2 million U.S. adults smoke cigarettes, and, among these adult smokers, the vast majority—74.6 percent, or approximately 25.5 million people—smoke every day." *Id.* FDA estimates that 860,000 high school students smoke. *Id.* As the Surgeon General put it, "[t]he tobacco epidemic was initiated

and has been sustained by the aggressive strategies of the tobacco industry, which has deliberately misled the public on the risks of smoking cigarettes." *Id.* at 15,645.

## II.   STATUTORY BACKGROUND

Congress enacted the Federal Cigarette Labeling and Advertising Act ("the Labeling Act") in 1965.  Pub. L. No. 89-92, 79 Stat. 282 (1965).  Congress's stated "policy" and "purpose" was to establish a system of warnings on cigarette packages and advertisements through which "the public may be adequately informed about any adverse health effects of cigarette smoking[.]"  15 U.S.C. § 1331(1).  Originally, the Labeling Act "required that a printed text-only warning appear on cigarette packages," 85 Fed. Reg. at 15,640, which read: "Caution: Cigarette Smoking May Be Hazardous to Your Health."  Pub. L. No. 89-92, § 4, 79 Stat. at 283.  In 1970, Congress amended the warning statement to read: "Warning: The Surgeon General Has Determined That Cigarette Smoking Is Dangerous to Your Health."  Public Health Cigarette Smoking Act of 1969, Pub. L. No. 91-222, 84 Stat. 87 (1970)

In the Comprehensive Smoking Education Act of 1984, Pub. L. No. 98-474, 98 Stat. 2200 (1984), Congress expanded the warning requirement to apply to both labeling and advertising.  85 Fed. Reg. at 15,640.  Congress's stated purpose was to "mak[e] Americans more aware of any adverse health effects of smoking, to assure the timely and widespread dissemination of research findings and to enable individuals to make informed decisions about smoking."  Pub. L. No. 98-474, § 2, 98 Stat. at 2200.  To that end, Congress updated and replaced the 1969 warning with a rotating set of the following four statements:

> SURGEON GENERAL'S WARNING: Smoking Causes Lung Cancer, Heart Disease, Emphysema, and May Complicate Pregnancy.

> SURGEON GENERAL'S WARNING: Quitting Smoking Now Greatly Reduces Serious Risks to Your Health.

> SURGEON GENERAL'S WARNING: Smoking By Pregnant Women May Result in Fetal Injury, Premature Birth, And Low Birth Weight.

> SURGEON GENERAL'S WARNING: Cigarette Smoke Contains Carbon Monoxide.

*Id.* § 4, 98 Stat. at 2202.  These warnings are colloquially known (including in this brief) as "the Surgeon General's warnings."  To this day, every pack of cigarettes sold in the United States is required to bear one of these warnings, which have not changed in 35 years.

In 2009, Congress determined that "[t]he current Surgeon General warnings on tobacco products are ineffective in providing adequate warnings about the dangers of tobacco products," and it decided to "require[] stronger and more specific health warnings," and to "give[] FDA the authority to enlarge them further and to incorporate color graphics."  H.R. Rep. No. 111-58 at 471 (2009).  To that end, the Family Smoking Prevention and Tobacco Control Act ("Tobacco Control Act" or "TCA") required FDA, within 24 months (*i.e.*, by June of 2011), to "issue regulations that require color graphics depicting the negative health consequences of smoking," which would "accompany" the "label statements" contemplated by the statute.  Pub. L. No. 111-31, § 201(d), 123 Stat. 1776, (2009) (codified at 15 U.S.C. § 1333(d)[1]).[1]  Congress also authorized FDA to change the label requirements (including the text of the label statements), through rulemaking, upon a finding "that such a change would promote greater public understanding of the risks associated with the use of tobacco products."  *Id.* § 202(b) (codified at 15 U.S.C. § 1333(d)[2]).  Congress specified that the warnings (1) "shall comprise the top 50 percent of the front and rear panels" of any cigarette package, *id.* § 201(a)(2) (codified at 15 U.S.C. § 1333(a)(2));[2] (2) "shall comprise at least 20 percent of the area" of any cigarette advertisement, *id.* § 201(b)(2) (codified at 15 U.S.C. 1333(b)(2)); (3) "shall be randomly displayed . . . as equal a number of times as is possible on each brand" of cigarettes, *id.* § 201(c)(1) (codified at 15 U.S.C. § 1333(c)(1)); (4) and

---

[1] As Plaintiffs note, Pls.' Br. 6 n.1; *see also* 85 Fed. Reg. at 15,641 n.4, two separate provisions of the Tobacco Control Act were codified as 15 U.S.C. § 1333(d).  To avoid confusion, this brief (like Plaintiffs') will refer to those provisions as Sections 201(a) and 202(b) of the Tobacco Control Act, and will cite those provisions as § 1333(d)[1] and § 1333(d)[2], based on the order in which they appear in the statute.

[2] *See, e.g.*, 155 Cong. Rec. S13904 (2009) (Statement of Sen. Durbin) ("My colleague from North Carolina has improved the warning labels he would require on cigarettes.  But they would not be strong enough.  The Burr substitute would allocate 25 percent of the bottom front of the package to a warning label.  In contrast, the Kennedy bill reflects the latest science on warning labels by requiring text and graphic warning labels that cover 50 percent of the front and back of the package.  Clearly, a health warning that takes up the top half of the front and back of a package will be more noticeable and easier to read than one that takes up only a quarter of the bottom of the package— an area that may be hidden by the sales rack.").

"shall be rotated quarterly in alternating sequence in advertisements for each brand of cigarettes," *id.* § 201(c)(2) (codified at 15 U.S.C. § 1333(c)(2)).

## III.    REGULATORY BACKGROUND

### A.    FDA's initial approach to pictorial health warnings

Immediately after the Tobacco Control Act was enacted, FDA, as directed by Congress, got to work on "regulations that require color graphics depicting the negative health consequences of smoking" to "accompany" the "label statements" contemplated by the statute.  15 U.S.C. § 1333(d)[1].  "FDA promulgated the final set of nine images—one for each warning statement— by regulations issued on June 22, 2011."  *R.J. Reynolds I*, 696 F.3d at 1209; *see* 76 Fed. Reg. 36,628.  In the 2011 rule, in addition to the warning text-image pairs, "FDA also required each graphic image to bear the phone number of the National Cancer Institute's 'Network of Tobacco Cessation Quitlines,' which uses the telephone portal '1-800-QUIT-NOW.'"  *R.J. Reynolds I*, 696 F.3d at 1209 (quoting 76 Fed. Reg. at 36,681).

The 2011 rule was enjoined by the U.S. District Court for the District of Columbia (Leon, J.), and ultimately invalidated by a divided panel of the D.C. Circuit.  *See id.* at 1205.  The panel majority interpreted FDA's objective in issuing the rule as reducing smoking rates—rather than informing consumers about the health risks of smoking—and concluded that there was insufficient record evidence to demonstrate that the rule would directly advance the government's interest in promoting meaningful behavior change.  *See id.* at 1219.  The original rule never went into effect.

### B.    FDA's process for developing new warnings

After the decision in *R.J. Reynolds I*, FDA began a years-long process to develop new cigarette health warnings—an effort that differed markedly from the agency's initial approach. Those differences started at the foundational level.  When assessing the 2011 rule, the D.C. Circuit found that FDA's real interest was "in reducing smoking rates."  *R.J. Reynolds I*, 696 F.3d at 1218. But in its second effort, FDA made clear that it was targeting a different goal, grounded in the TCA's text: promoting greater public understanding of the negative health consequences of

smoking.  That goal, in turn, shaped the steps the agency took in its iterative process for developing, testing, and selecting the eleven health warnings that were included in the Rule.  That process included a thorough literature review, several qualitative studies (including focus groups), and two large-scale quantitative consumer research studies.  Those quantitative consumer research studies "represent some of the largest experimental studies on cigarette warnings conducted to date."  85 Fed. Reg. at 15,663.  Each of the two quantitative studies underwent external peer review, and FDA revised the lengthy reports it generated for each study to address the reviewers' feedback.  All of those materials—FDA's initial study reports, the report of the peer reviewers, and FDA's responses and final study reports—have been made public and are now part of the administrative record.

FDA's process began with a "careful[] review [of] the scientific literature on the health risks associated with cigarette smoking."  85 Fed. Reg. at 15,658.  That review included "a focus on negative health effects that are less known, less understood, or about which the public holds misperceptions."  *Tobacco Products; Required Warnings for Cigarette Packages and Advertisements*, 84 Fed. Reg. 42,754, 42,765 (Aug. 16, 2019) ("NPRM" or the "Proposed Rule").  One reason for that review was to determine whether FDA should propose changes to the default text of the warnings set forth in the TCA.  As noted above, Section 202(b) of the TCA allows FDA to change those warning statements if the agency finds "that such a change would promote greater public understanding of the risks associated with the use of tobacco products."  Pub. L. No. 111-31 § 202(b).  Given the focus that FDA placed on promoting public understanding, determining whether different warning statements could better achieve that end was an important step.

Based on its consideration of the relevant research, FDA found that "consumers are largely unaware of the negative health consequences of cigarette smoking not mentioned in current warnings as well as more specific information about the negative health effects and their mechanisms."  84 Fed. Reg. at 42,766.  Accordingly, FDA's next task was to identify warning statements that might better promote understanding of the risks of smoking.  As part of that process, FDA held a series of qualitative focus groups—with adolescent smokers, adolescents at

risk for starting smoking, and adult smokers—to gather further input on consumers' awareness of the health consequences of smoking and to gauge the participants' initial responses to both the TCA's default statements and a selection of revised statements that FDA drafted.  *Id.* at 42,767. The qualitative feedback generally indicated that FDA's revised statements did a better job of presenting new information than did the default statements from the TCA.  In light of that feedback, FDA identified 15 revised statements for further testing.  *Id.*

FDA then conducted a large consumer research study (the "first quantitative study"), with 2,505 participants, "to assess which, if any, of 15 revised warning statements would promote greater public understanding of the risks associated with cigarette smoking as compared to the 9 TCA statements."  85 Fed. Reg. at 15,658.  This study was akin to a qualifying heat.  FDA's ultimate aim, of course, was to develop and assess health warnings that included text-image pairs. But first, it needed to decide which warning statements it would pair with images for its second (and final) quantitative study.  FDA's first quantitative study found that 10 of the 15 statements it had drafted performed better than the TCA's default statements on key metrics of improved consumer understanding.  *See* 84 Fed. Reg. at 42,768.  Accordingly, FDA selected those 10 statements, along with 5 from the TCA, to pair with images for further testing.  *See id.* at 42,769.[3]

At the same time that FDA was moving forward with its development and testing of warning statements, it was preparing concordant photorealistic images to pair with those statements.  To determine "what to depict in the photorealistic illustrations, FDA consulted the medical literature and medical experts to identify common, visual presentations of each health condition described by the textual warning statements."  85 Fed. Reg. at 15,661.  FDA "refined and reduced" its initial set of possible images after conducting another series of qualitative focus groups and interviews.  *Id.*  Based on that feedback, "FDA further refined some images for

---

[3] Of the five default TCA warning statements that were selected for further testing, one (warning that smoking can harm your children) was selected because it performed comparably to an FDA-drafted statement on the same topic, and four (warning that smoking is addictive, can kill you, and causes fatal lung disease in nonsmokers, and urging smokers to quit now) were selected because they addressed topics for which FDA did not draft a revised statement.  *See* 84 Fed. Reg. at 42,769.

additional clarity and eliminated other images that were not well understood or where potential confusion could not be resolved through additional revisions." 84 Fed. Reg. at 42,771. These qualitative studies—like the first set of focus groups FDA conducted—were never intended to be "nationally representative" or to "yield data that can be generalized." 85 Fed. Reg. at 15,666. Rather, they were a piece of FDA's iterative research process to develop and refine elements of the warnings that would then be tested in its quantitative consumer research studies. At the conclusion of this warning-development process, FDA prepared "16 statement-and-image pairings to test in the final quantitative consumer research study." 84 Fed. Reg. at 42,771.

That study (the "second quantitative study") was even larger than the first, including 9,760 participants. 85 Fed. Reg. at 15,658. It tested these "16 text-and-image pairings against the current Surgeon General's warnings" and was designed "to identify which," if any, of the warnings "increase understanding of the negative health consequences of cigarette smoking." *Id.* FDA collected data on ten different "outcome measures" to allow it to assess which warnings would promote greater public understanding. *Id.* at 15,658-59. None of those measures sought to gauge the effect that the warnings would have on consumer behavior, intentions, or emotions. *See* AR 50772[4] ("The study is not designed, nor is it the intent of the study, to investigate the effect of these warnings on behavior, behavioral intentions, or emotional reactions.").

Of the ten measures FDA chose for the study, it identified two to serve as the benchmark for determining which warnings (if any) to select for the Proposed Rule: "new information" and "self-reported learning." FDA chose those two metrics after surveying the relevant literature and finding that they were most "predictive of improved understanding." *See* 84 Fed. Reg. at 42,769. Critically, FDA made that determination *before* it conducted the study. *See* 85 Fed. Reg. at 15,658. In other words, *before* FDA knew what the study would show, it tied its own hands by committing to select only warnings that, at a minimum, outperformed the Surgeon General's warnings on both the "new information" and "self-reported learning" metrics. *See id.*; AR 50772.

---

[4] Experimental Study of Cigarette Warnings, FDA Supporting Statement Part A. Citations to "AR XXXXX" are to the Bates-numbered pages of the administrative record.

Most of the warnings FDA tested showed significant gains in improving understanding of the negative health consequences of smoking.  For instance, more than 85% of participants indicated that the warning for "Smoking causes bladder cancer, which can lead to bloody urine" was new information.  85 Fed. Reg. at 15,675.  More broadly, all 11 of the warnings FDA ultimately chose for the Final Rule "outperformed the current Surgeon General's warnings on 8 of the 10 outcome measures, including the two that FDA determined were predictive of improved understanding (*i.e.*, 'new information' and 'self-reported learning')."  *Id.* at 15,659.  The three warnings that did not clear that bar were discarded.  *See id.* at 15,658 (rejecting "3 of the 16 warnings that were tested because they did not outperform the current Surgeon General's warnings on both the 'new information' and 'self-reported learning' outcome measures").  The remaining 13 were the subject of FDA's proposed rule.

### C.      This rulemaking

FDA published the Proposed Rule on August 16, 2019.[5]  84 Fed. Reg. at 42,754.  In the Proposed Rule, FDA recounted its iterative research process, explained how it arrived at the 13 warnings it was proposing, and sought public comment on those warnings.

FDA issued the Final Rule on March 18, 2020.  85 Fed. Reg. at 15,638.[6]  Of the 13 warnings included in the Proposed Rule, FDA ultimately selected 11 for the Final Rule.  *See id.* at 15,658.  Those 11 warnings comprise the following factual statements, each paired with a concordant, medically accurate, photorealistic image:[7]

   (i)      WARNING: Tobacco smoke can harm your children.

   (ii)     WARNING: Tobacco smoke causes fatal lung disease in nonsmokers.

   (iii)    WARNING: Smoking causes type 2 diabetes, which raises blood sugar.

_____

[5] The deadline for this proposed rule, along with the deadline for the final rule, were set after separate litigation in the District of Massachusetts.  *See Am. Acad. of Pediatrics v. FDA*, No. 1:16-cv-11985-IT, 2019 WL 1047149, at *3 (D. Mass. Mar. 5, 2019).

[6] For ease of reference, and given their central role in this case, Defendants have attached the Proposed Rule and the Final Rule to this brief as Exhibits 1 and 2, respectively.

[7] The final warnings are reproduced on FDA's website, at https://www.fda.gov/tobacco-products/labeling-and-warning-statements-tobacco-products/cigarette-labeling-and-health-warning-requirements.  *See also* Pls.' Br. 1-2, 17.

(iv)     WARNING: Smoking reduces blood flow to the limbs, which can require amputation.

(v)      WARNING: Smoking causes cataracts, which can lead to blindness.

(vi)     WARNING: Smoking causes bladder cancer, which can lead to bloody urine.

(vii)    WARNING: Smoking reduces blood flow, which can cause erectile dysfunction.

(viii)   WARNING: Smoking causes head and neck cancer.

(ix)     WARNING: Smoking can cause heart disease and strokes by clogging arteries.

(x)      WARNING: Smoking during pregnancy stunts fetal growth.

(xi)     WARNING: Smoking causes COPD, a lung disease that can be fatal.

85 Fed. Reg. at 15,708-09 (codified at 21 C.F.R. § 1141.10(a)(1)).

In the Rule, FDA meticulously walked through its reasoning for selecting each warning—explaining why the evidence supported the conclusion that each would promote understanding of the harms of smoking—and refuted claims that the warnings were inaccurate or misleading.  *See* 85 Fed. Reg. at 15,671-84.  FDA did so with careful attention to detail and scientific accuracy. *See, e.g.*, *id.* at 15,673 (discussing different presentations of lung cancer in explaining why the image accompanying the warning that "Tobacco smoke causes fatal lung disease in nonsmokers" is medically accurate).  FDA provided thorough responses to the public's comments—including to many from the tobacco industry that are repeated in this case.  *See, e.g.*, *infra* at 66 n.28.

## IV.   PROCEDURAL HISTORY

Plaintiffs Philip Morris USA Inc. and Sherman Group Holdings, LLC manufacture, advertise, and sell cigarettes.  Both are subsidiaries of Altria Group, Inc., one of the world's largest tobacco companies.  According to the complaint, since 1983, Plaintiff Philip Morris "has been the leading manufacturer of cigarettes in the United States."  Compl. ¶ 11, ECF No. 1.  Plaintiffs' complaint names four Defendants: the United States Food and Drug Administration (FDA), the United States Department of Health and Human Services (HHS), Stephen M. Hahn (in his official

capacity as the Commissioner of Food and Drugs), and Alex M. Azar II (in his official capacity as the Secretary of Health and Human Services). Plaintiffs bring a series of Administrative Procedure Act (APA), First Amendment, and other statutory challenges to the Rule.[8]

## LEGAL STANDARD

Where, as here, "a party seeks review of agency action under the APA, the district judge sits as an appellate tribunal," and "[t]he 'entire case' on review is a question of law." *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001). The Court's role is "to apply the appropriate APA standard of review to the agency decision based on the record the agency presents to the reviewing court." *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743-44 (1985) (citation omitted). FDA's "action[s], findings, and conclusions" must be upheld unless they are "arbitrary, capricious, an abuse of discretion, . . . contrary to constitutional right, . . . [or] in excess of statutory jurisdiction, authority, or limitations[.]" 5 U.S.C. § 706(2).

Judicial review is particularly deferential for the sort of agency findings at issue here. Indeed, in the specific "context of a challenge to the FDA's decisionmaking," the D.C. Circuit recently emphasized that courts should "'give[] a high level of deference' to the agency's scientific analysis of the evidence before it, and must avoid 'unduly second-guess[ing] [those] scientific judgments.'" *Pharm. Mfg. Research Servs., Inc. v. FDA*, 957 F.3d 254, 262 (D.C. Cir. 2020) (citations omitted); *see also Conservation Law Found. v. Ross*, 374 F. Supp. 3d 77, 89 (D.D.C. 2019) ("[W]hen an agency talks scientific data, courts listen. As long as the ultimate decision is reasonable and reasonably explained, that decision will stand.").

This high degree of deference applies even when FDA's factual findings are relevant to Plaintiffs' First Amendment claims. *See R.J. Reynolds I*, 696 F.3d at 1217-18 (holding that "the Administrative Procedure Act governs [the] review of the record" for First Amendment claims);

---

[8] Although Plaintiffs included a challenge to the constitutionality of the TCA in their complaint, *see* Compl. ¶¶ 186-91, they have challenged only the constitutionality of the Rule, not the statute, at summary judgment, *see* Mot. for Summ. J. & Prelim. Inj. at 2-3, ECF No. 22. Accordingly, any constitutional challenge to the TCA is abandoned. *See Styrene Info. & Research Ctr., Inc. v. Sebelius*, 944 F. Supp. 2d 71, 83 (D.D.C. 2013) (deeming an argument raised in the complaint but not "in [plaintiffs'] summary judgment briefs" abandoned); *see also SEIU Nat'l Indus. Pension Fund v. Harborview Healthcare Ctr. Inc.*, 191 F. Supp. 3d 13, 17 n.9 (D.D.C. 2016).

*see also POM Wonderful, LLC v. FTC*, 777 F.3d 478, 499-500 (D.C. Cir. 2015) ("Our precedents . . . call for reviewing the [agency's] factual finding of a deceptive claim under the ordinary (and deferential) substantial-evidence standard, even in the First Amendment context."). Put differently, although courts "review *de novo* any question of constitutional law," they "apply the substantial-evidence test . . . to the agency's scientific and fact-bound determinations." *Bellion Spirits, LLC v. United States*, 393 F. Supp. 3d 5, 12 (D.D.C. 2019) (citation omitted), *appeal pending*, No. 19-5252 (D.C. Cir., argued Sept. 11, 2020).

## ARGUMENT

### I.    FDA'S THOROUGH PROCESS FOR SELECTING WARNINGS EXCEEDED THE APA'S REQUIREMENTS FOR REASONED DECISION-MAKING.

FDA implemented a careful, iterative process to select the final warnings, and its actions were not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A).  Agency action is arbitrary and capricious only if the agency has "relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Nat'l Ass'n of Home Builders v. Defs. of Wildlife* ("*NAHB*"), 551 U.S. 644, 658 (2007) (citation omitted).  Under this "narrow standard of review, . . . a court is not to substitute its judgment for that of the agency," *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513 (2009) (citations omitted), but instead to assess only whether the decision was "based on a consideration of the relevant factors and whether there has been a clear error of judgment," *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971).  In other words, the APA requires that the agency "examine[] the relevant data and articulate[] a satisfactory explanation" for its action, "including a rational connection between the facts found and the choice made." *U.S. Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2569 (2019) (citation omitted).

FDA did precisely that.  The agency relied on rigorously designed studies, bolstered by an exhaustive review of the relevant literature, and it provided a thorough, well-reasoned explanation

of its decision.  Any fair reading of the Proposed and Final Rules confirms as much.  *See* Proposed Rule, 84 Fed. Reg. 42,754 (Ex. 1); Final Rule, 85 Fed. Reg. 15,638 (Mar. 18, 2020) (Ex. 2).

Plaintiffs' arguments to the contrary rest on a caricature of FDA's careful process.  Plaintiffs pluck isolated quotes from FDA's qualitative focus groups, ignoring that a "pitfall with qualitative studies" is placing "too much emphasis on a single quote or comment that sparks interest."  85 Fed. Reg. at 15,666 (citation omitted).  And they argue that FDA should have been bound by a series of inconsistent principles and unreasonable expectations that Plaintiffs have invented.  For example, although Plaintiffs criticize FDA for using an allegedly unrepresentative sample in its large quantitative studies, *see* Pls.' Br. 33, they insist that the agency should have deferred instead to the findings of the smaller and far-less-representative *qualitative* focus groups—going so far as to suggest that the results of those focus groups indicate which risks consumers "*universally* appreciate[,]" *id.* at 31 (emphasis added).  Similarly, they contend that FDA should not have relied on pre-implementation studies *at all*.  *See id.* at 38.  To state the obvious, FDA could not have conducted a *post*-implementation study of these warnings at the time of the rulemaking because the point of the rulemaking was to determine which *new* warnings to implement in the first place.  The only kinds of post-implementation studies that FDA could (and did) rely on—ones that, by necessity, are from other countries that have already implemented pictorial health warnings—are the very studies that Plaintiffs simultaneously claim should never have been considered.  *See* Pls.' Br. 40-41.  In sum, as explained in more detail below, Plaintiffs' scattershot criticisms are meritless, and FDA's reasoned decision-making should be upheld.

**A.      FDA's choice of health warnings was rational and well-explained.**

FDA's process for selecting the health warnings to include in the Final Rule was lengthy but straightforward, and the agency carefully explained that process in the Federal Register.  *See* 84 Fed. Reg. at 42,765-72 (section VI of the Proposed Rule, titled "FDA's Process for Developing and Testing the Proposed Cigarette Health Warnings"); *see also* 85 Fed. Reg. at 15,658-67 (recounting FDA's process and responding to comments).  In brief:  FDA first "examined the nine

TCA [warning] statements" and considered "whether to revise those statements to promote greater public understanding of the risks associated with cigarette smoking." 84 Fed. Reg. at 42,765. To make that assessment, the agency "reviewed the scientific literature" and relevant data "on current consumer knowledge and misperceptions about the health risks of smoking." *Id.* at 42,766. It used the "Surgeon General's Reports to identify all negative health consequences that are causally linked to cigarette smoking," including consequences for which the causal link was established *after* the passage of the TCA in 2009. *Id.* When drafting revised warnings to test against the default statements in the TCA, FDA relied on evidence "that consumers are largely unaware of the negative health consequences of cigarette smoking not mentioned in [the Surgeon General's] current warnings" and similarly lack "more specific information about . . . the[] mechanisms" through which smoking causes negative health consequences. *Id.*

Next, FDA used these insights to "develop[] initial versions of revised statements for further review, testing, and refinement." *Id.* at 42,767. FDA's "internal epidemiological experts" reviewed those statements "to ensure that the health conditions under consideration were causally linked to cigarette smoking or exposure to secondhand smoke, and that these smoking-attributed conditions were not rare." *Id.* And FDA used the feedback from "a series of 16 qualitative focus groups" to identify 15 revised statements it would test alongside the 9 TCA statements. *Id.* After FDA's first quantitative study, FDA whittled those 24 statements down to 15, based on the "new information" and "self-reported learning" measures that were "predictive" of which statements would "promote greater public understanding" of smoking's risks. *Id.* at 42,768. FDA evaluated the 15 remaining statements—which were paired with concordant images—in the second quantitative study. *Id.* at 42,771. It selected for the Proposed Rule "only the warnings that demonstrate[d] statistically significant improvements . . . on both the outcomes of 'new information' and 'self-reported learning.'" *Id.* at 42,772. And, finally, FDA chose 11 warnings for the Final Rule, ruling out two warnings from the Proposed Rule that addressed topics also covered by one of the other warnings. *See* 85 Fed. Reg. at 15,685 (explaining that FDA rejected

a macular degeneration warning and an alternative COPD warning to "reflect[] the Congressional intent of representing a diverse set of health conditions").

FDA's thorough explanation of its process exceeds the "satisfactory" one the APA requires, *New York*, 139 S. Ct. at 2569, and Plaintiffs' suggestion that "FDA irrationally chose which health risks to feature" cannot be reconciled with this record, *see* Pls.' Br. 30. As the above recap reinforces, FDA used clear principles to generate and refine possible warnings, and it then engaged in rigorous empirical study to choose among those options. Throughout the process, FDA articulated a "rational connection" between the choices it made and its ultimate goal of promoting greater public understanding of the negative health consequences of smoking. *See New York*, 139 S. Ct. at 2569. There is no "mystery" here. *See* Pls.' Br. 31.

Plaintiffs' dissatisfaction with this explanation is curious. They do not dispute that it was reasonable for FDA to focus on promoting greater public understanding of the risks of smoking—the goal that Congress enshrined in the TCA. *See* 15 U.S.C. § 1333(d)[2]. Nor do they meaningfully dispute that FDA structured its process, and explained its choices, with reference to that overarching aim. Instead, their primary complaint appears to be that FDA did not say enough about how it arrived at the initial universe of *possible* warnings. *See* Pls.' Br. 30-31. But as outlined above, FDA *did* explain its starting place, noting that it looked to conditions caused by smoking or aspects of a disease that have not been addressed through prior warnings, and then examined whether warnings addressing those consequences would likely promote consumer understanding. *See* 84 Fed. Reg. at 42,765-67.

Moreover, the fact that FDA had to start somewhere in developing the warnings—given that smoking causes too many negative health consequences to manageably tackle them all at once—does not undermine the Rule. Only FDA's final selection of the warnings in the Rule is at issue. *See NAHB*, 551 U.S. at 659 (holding that courts "are empowered to review only an agency's *final* action"). So long as FDA reasonably found that *those* warnings promote greater understanding of the negative health consequences of smoking, the possibility that warnings about other health consequences might *also* promote greater understanding cannot render *this* Rule

18

arbitrary and capricious.  *Cf. U.S. Cellular Corp. v. FCC*, 254 F.3d 78, 86 (D.C. Cir. 2001)
("[A]gencies need not address all problems 'in one fell swoop.'" (citation omitted)).[9]

### B.     FDA made reasonable predictions about consumer understanding.

FDA's conclusion that the final warnings "will promote greater public understanding of
the negative health consequences of cigarette smoking," 85 Fed. Reg. at 15,639, is the most
important finding in this case.  That finding aligns the Rule with Congress's stated goal in the
TCA, demonstrates (for purposes of First Amendment scrutiny) that the Rule directly advances a
significant government interest, *see infra* at 48-49, and confirms that FDA's selection of warnings
was reasonable.  Unsurprisingly, then, Plaintiffs go to great rhetorical lengths to call that finding
into question.  *See, e.g.*, Pls.' Br. 34-35 (labeling alleged flaws in FDA's studies "astonishing,"
"inexcusable," and an "abdication of [FDA's] duty").  But the substance of their criticism is
wanting.  And even if Plaintiffs' critiques had superficial appeal, they all but ignore the "extreme
degree of deference" owed to an agency "when it 'is evaluating scientific data within its technical
expertise.'"  *Huls Am. Inc. v. Browner*, 83 F.3d 445, 452 (D.C. Cir. 1996) (citation omitted).

**1.**     Plaintiffs open with a kitchen-sink list of methodological criticisms of FDA's
quantitative studies.  *See* Pls.' Br. 33.  But FDA reasonably deployed its expertise in designing and
explaining its studies, and in any event, "complex judgments about sampling methodology and
data analysis" fall squarely "within the agency's technical expertise."  *Kennecott Greens Creek
Min. Co. v. Mine Safety & Health Admin.*, 476 F.3d 946, 956 (D.C. Cir. 2007) (citation omitted).

For instance, Plaintiffs fault FDA for not using a nationally representative sample in its
quantitative studies.  *See* Pls.' Br. 33.  But they ignore the agency's justification for that choice:
"an experimental design does not require a nationally representative sample to demonstrate a valid

---

[9] The one case Plaintiffs cite on this issue, *District Hospital Partners, L.P. v. Burwell* ("*DHP*"), 786 F.3d 46
(D.C. Cir. 2015), offers them no support.  In *DHP*, a case about Medicare outlier payments, the court held that the
agency arbitrarily failed to consider data from "123 turbo-charging hospitals," even though it had previously identified
data from those hospitals as relevant.  *Id.* at 58.  That failure, in turn, potentially affected the threshold for outlier
payments—*i.e.*, it potentially had real ramifications for Medicare reimbursement rates.  *Id.* at 59.  In other words, the
procedural failure to consider certain data created the risk that the agency arrived at a substantively unreasonable
outcome.  There is no analogous risk here.  What matters is whether FDA reasonably selected warnings that promote
greater public understanding of the risks of smoking.  For the reasons outlined above, it did.

and reliable effect." 85 Fed. Reg. at 15,663. All studies require tradeoffs in their design and execution, and FDA's selection of participants was reasonable and consistent with best scientific practices. *See* AR 54055 (Peer Review Report) (FDA's selection of the "study population represents a good trade off" because although the sample is not nationally representative, it is "diverse," "easily recruitable," and "appropriate to address the research questions"). Indeed, as Professor David Hammond noted in his comment, "non-probability samples are acceptable for randomized trials, such as the FDA experiment," because "[t]o the extent that bias is present in a sample, randomization across conditions helps to ensure that this bias is equally distributed across experimental conditions." AR 28774 (cited at 85 Fed. Reg. at 15,663). In any event, FDA set "specific recruitment targets for the number of study participants in each age group and tobacco-use category to be recruited into the study population," which "strengthen[ed] the conclusions and applicability of the study findings." 85 Fed. Reg. at 15,663. These were large, robust, peer-reviewed studies, and Plaintiffs cite no authority suggesting the APA requires more.

Plaintiffs also contend that the quantitative studies "lacked meaningful controls," Pls.' Br. 33, but they fail to explain what FDA should have done differently. In the first quantitative study, FDA sought to measure whether its revised statements would better promote understanding than the default statements in the TCA; accordingly, it used the TCA's statements as the control. *See* 84 Fed. Reg. at 42,767. And in the second quantitative study, FDA sought to measure whether the warnings it developed would promote understanding better than the existing Surgeon General's warnings; accordingly, it used the existing warnings as the control. *See id.* at 42,771. As one peer reviewer (Reviewer #3) explained, these were "appropriate control groups," and the "studies are very well done in terms of design and data analysis." AR 54070, 54076 (Peer Review Report). That reviewer's endorsement should carry particular weight on this issue, seeing as he or she is the same (and only) reviewer that Plaintiffs point to for their criticism of the controls. *See* Pls.' Br. 33 (citing AR 54072, 54078). To be sure, Reviewer #3 had his or her own opinions—as peer reviewers inevitably do—about how FDA could have tweaked its studies to pursue further avenues of interest. But declining to pursue those angles—such as the reviewer's suggestion that FDA

20

study how the warning statements it drafted would perform against "inaccurate claims," AR 54072—casts no doubt on the overall reasonableness of FDA's selection of controls.

Plaintiffs' suggestion that FDA should have compared each of the text-and-image pairs to each individual Surgeon General's warning separately—rather than to the average results for all four of the Surgeon General's warnings—is similarly unavailing. *See* Pls.' Br. 28 (zeroing in on the Surgeon General's warning about carbon monoxide and comparing that warning to a subset of FDA's final warnings). As FDA explained in responding to peer reviewer comments, the goal of the second quantitative study "was to approximate the potential effect . . . on understanding when changing from the current status quo (i.e., Surgeon General's warnings) to the proposed warnings (i.e., [FDA's] cigarette health warnings)." AR 54176. In light of that goal, "a one-to-one comparison" between individual FDA-created warnings and individual Surgeon General's warnings "was not necessary." *Id.* Put differently, FDA was interested in assessing how replacing the Surgeon General's warnings would affect public understanding of the negative health consequences of smoking; using the average of *all* of the existing Surgeon General's warnings as a control was a reasonable way for FDA to make that assessment.

**2.** Plaintiffs' principal critique of FDA's work concerns the data it collected and evaluated to assess which warnings would promote greater understanding of the health risks of smoking. Plaintiffs first argue that FDA failed to include "the right metric" in its studies, Pls.' Br. 34-35, and then argue that the two measures FDA identified as necessary conditions for choosing warnings—"new information" and "self-reported learning"—are the wrong metrics, *id.* at 35-39. These arguments misapprehend the nature of the specific quantitative research FDA undertook, as well as basic scientific principles underlying this kind of research.

The conceit on which Plaintiffs' criticism rests—that "*the* right metric" for predicting understanding exists—is itself misguided. In fact, "getting individuals to understand a message is a multifaceted process," as they "must first attend to the message (i.e., notice and be made aware of the message), and then they must process the information in the message (i.e., acquire knowledge of and learn that information)." 85 Fed. Reg. at 15,655-56. No one measure perfectly

or comprehensively captures that process, which is why FDA "selected multiple components of understanding based upon the literature." AR 39705 (Final Second Quantitative Study Report).

Plaintiffs do not identify *any* specific measure of understanding that has a basis in the scientific literature and that would have aligned better with the purposes of FDA's studies. Instead, they offhandedly suggest that FDA should just have "ask[ed] participants to identify what information they learned" after viewing the warnings. Pls.' Br. 34. But that suggestion rests on a false premise—namely, that FDA had no idea "what information participants drew from the warnings," Pls.' Br. 34.[10] In fact, FDA directly asked participants: "Before today, had you heard about the specific smoking-related health effect described in the warning?" AR 39707. The record thus suggests that a participant who responded "no" had learned about the specific health effect; that knowledge is what FDA's "new information" measure tracked. *See id.*

Moreover, all 11 final warnings outperformed the current Surgeon General's warnings on measures of "perceived informativeness" and "perceived understandability." 85 Fed. Reg. at 15,659. Plaintiffs provide no plausible reason to think that some significant number of participants—who reported learning about specific smoking-related health conditions from warnings they found comparatively easy to understand—were somehow duped into taking different information away from the warnings. The only support they cite comes from cherry-picked snippets of the qualitative study reports, and even those do not withstand scrutiny. For instance, although Plaintiffs claim that one participant found the "erectile dysfunction *warning[]*" to be "unclear," Pls.' Br. 35 (emphasis added), the quoted reaction was not to a warning, but to a standalone image, *see* AR 23641. Two pages *after* that quoted reaction, in the same report, FDA highlighted that when the warning text was added to the standalone image, "[m]ost participants stated that the words helped them understand what the picture was." AR 23643. In other words,

_____

[10] If FDA had just asked participants to narratively recount what they learned, that would have raised a host of methodological problems, such as how to code open-ended responses in a study of nearly 10,000 participants and then assess what to consider "correct" learning. That, perhaps, is why the suggestion appears in Plaintiffs' brief, rather than as a validated measure in the literature. FDA, by contrast, had support from the literature for each of the measures it employed in its quantitative studies. *See, e.g.*, AR 39705 (explaining that "[i]tems selected for each component of understanding are bulleted and their citations reflect the source of the original or adapted survey item").

when the image became an actual warning with text (and to be clear, this was still just a draft of what would become the final erectile dysfunction warning), participants understood the information conveyed by the warning. And although feedback about the clarity of images from the qualitative study groups helped FDA refine the images, feedback about the images in isolation cannot render the final text-*and*-image warnings arbitrary and capricious. *See* Pls.' Br. 12, 40 (citing feedback about the images in isolation). What matters is whether the final warnings promote understanding, and FDA reasonably found that they did.

FDA reached that conclusion in the wake of the second quantitative study. As previously noted, that groundbreaking study featured 9,760 participants, tested 16 warnings, and collected data on ten different outcome measures to help FDA identify which, if any, of the warnings "increase understanding of the negative health consequences of cigarette smoking." 85 Fed. Reg. at 15,658-59. Before conducting the study, FDA selected "new information" and "self-reported learning" as necessary conditions for any final warning; in other words, to even "be considered for the final rule, a tested warning would need to demonstrate statistically significantly better performance than the control (the current Surgeon General's warnings) on these two" measures. *Id.* at 15,659.[11] Contrary to Plaintiffs' suggestion, though, FDA did not "*disregard*[] all other study metrics[.]" Pls.' Br. 35. In fact, the Rule includes extensive discussion of those other metrics and their relevance to the predicted success of the warnings. *See, e.g.*, 85 Fed. Reg. at 15,659-60.

In any event, selecting "new information" and "self-reported learning" as necessary conditions for new warnings was not "illogical," Pls.' Br. 35, but entirely reasonable. Plaintiffs

---

[11] Plaintiffs bizarrely suggest that sticking to this commitment was unreasonable, and perhaps even deprives the agency of any deference. *See* Pls.' Br. 35. But setting the conditions to be met *before* conducting the study was consistent with best scientific practice and guaranteed that the agency could not move the goalposts after the results came in. Plaintiffs' confusion appears to stem from their reading of *Chemical Manufacturers Association v. EPA*, 28 F.3d 1259, 1265 (D.C. Cir. 1994), in which the D.C. Circuit made the uncontroversial observation that "[t]he more inflexibly the agency intends to apply [a] model, . . . the more searchingly . . . the court [will] review the agency's response" when there is "evidence of a poor fit between the agency's model and . . . reality." To be sure, if an agency receives data indicating that a model does not comport with "reality," that can be a problem. *See id.* But the whole point of FDA's studies—and of this type of predictive empirical research generally—is to *predict* how consumers will react to warnings that are not yet in circulation. In other words, there is no data set reflecting the "reality" for these warnings larger than the one FDA generated through its quantitative studies. It was not only rational for FDA to rely on that data; it might very well have been *irrational* for FDA to overlook it.

do not dispute that "new information" and "self-reported learning" are, as FDA found, measures that encapsulate a necessary component of understanding a message. *See* 84 Fed. Reg. at 42,769. And although they claim that reliance on those measures is "neither based in empirical evidence nor theory," Pls.' Br. 36 (citation omitted), they ignore that FDA drew directly from the literature in selecting them. *See* AR 39705.

Moreover, although Plaintiffs point to some peer reviewers who expressed concerns with the measures, they ignore the other peer reviewers who endorsed the agency's choice. *See* AR 54097 (explaining that, in light of "the outcomes listed in the original legislation, the outcomes chosen are appropriate," and praising the study for "prob[ing] the credibility, understandability of the images, as well as their ability to grab viewers' attention"); AR 54105 ("The rationale for the new knowledge, learning and health beliefs is clear."). Where "specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own [internal] experts even if, as an original matter, a court might find contrary views more persuasive." *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378 (1989).

Perhaps most importantly, Plaintiffs conflate the role of these two measures—which is to be "*predictive* for promoting understanding of the risks associated with cigarette smoking"—with the goal of the warnings themselves—which is to *actually* promote that understanding. 85 Fed. Reg. at 15,658-59 (emphasis added). FDA "prioritize[d] the outcomes that provide the best assessment of initial reactions" because "more 'delayed' outcomes . . . are unlikely to change after only brief exposure to a warning." *Id.* at 15,662. In other words, measuring an early indicator of understanding makes sense in a study with a limited time horizon. Plaintiffs suggest that this is somehow an indictment of all "pre-implementation studies" and reflects a "stunning problem" with FDA's approach. Pls.' Br. 38. But a *post*-implementation study is not an option when an agency is considering whether to introduce a regulatory requirement for the first time. That is among the reasons why "[t]he 'arbitrary and capricious' standard is particularly deferential in matters implicating predictive judgments." *Rural Cellular Ass'n v. FCC*, 588 F.3d 1095, 1105 (D.C. Cir. 2009). FDA reasonably made predictive judgments here concerning the warnings' effects on

24

consumer understanding and the data needed to make that assessment.  *See Milk Train, Inc. v. Veneman*, 310 F.3d 747, 754 (D.C. Cir. 2002) ("An agency 'typically has wide latitude in determining the extent of data-gathering necessary to solve a problem.'" (citation omitted)).[12]

Even if Plaintiffs could overcome the high bar necessary to set aside FDA's selection of "new information" and "self-reported learning" as the most predictive measures, there would still be no basis for upsetting the agency's conclusion that the final warnings promote understanding of the negative health consequences of smoking.  That is because all eleven warnings also "surpassed the Surgeon General's warnings on six *other* measures" (*i.e.*, all but two)—specifically, the warnings "led to more thinking about risks; were higher on perceived informativeness, perceived understandability, and perceived helpfulness [in] understanding health effects; attracted more attention; and were better recalled."  85 Fed. Reg. at 15,658 (emphasis added).

Plaintiffs offer no persuasive explanation for their theory that warnings that performed so consistently well, across so many different measures of understanding, are nonetheless ineffective at promoting consumer understanding.  Instead of a coherent explanation of the totality of FDA's research, they isolate particular measures and suggest—without relevant context—that results for those measures call into question FDA's entire undertaking.

Take for instance, Plaintiffs' concerned observation that "*five* of the warnings FDA finalized in the Final Rule did not meaningfully affect participants' health beliefs" after two exposures.  Pls.' Br. 37 (emphasis in original).  Although italicizing the word "five" may make that result sound bad, it is not.  To measure the warnings' effect on health beliefs, FDA collected data at three separate points in the second quantitative study: first, it collected baseline health-belief information (Session 1), before showing participants the warnings; then, one or two later

---

[12] Further evidence of the reasonableness of the agency's judgment comes from the warnings that FDA did *not* select.  Indeed, Plaintiffs highlight that a comparison of the "quitting" text-and-image warning with the text-only Surgeon General's "quitting" warning yielded no statistically significant difference on the "new information" and "self-reported learning" measures.  *See* Pls.' Br. 28; Vansickel Decl. ¶ 22, ECF No. 22-2.  But it was *because* of the "quitting" warning's poor performance on FDA's more conservative comparison against the average of the 4 Surgeon General's warnings that FDA did not include the "quitting" warning in the final rule.  *See* 85 Fed. Reg. 15,658 ("FDA rejected 3 of the 16 warnings that were tested because they did not outperform the current Surgeon General's warnings on both the 'new information' and 'self-reported learning' outcome measures that FDA determined are predictive of improved understanding.").

(Session 2), it showed the warnings a second time and had participants fill out a second set of questions about their health beliefs; finally, roughly 14 days later (Session 3), participants filled out a final set of questions about their health beliefs. AR 39687. Given the structure of this study, FDA did not expect health beliefs to change meaningfully because such a result is "unlikely . . . after only brief exposure to a warning." 85 Fed. Reg. at 15,662. Viewed through that lens, the warnings performed remarkably well on the "health beliefs" measure. Nine of the final eleven warnings "demonstrated statistically significant improvements over the Surgeon General's warnings between Session 1 of the study and Session 2," and six of the final eleven warnings (the flip side of Plaintiffs' "*five*"), "demonstrated statistically significant improvements over the Surgeon General's warnings" between Session 1 and Session 3, even though Session 3 was approximately 17 days later. 85 Fed. Reg. at 15,659. In other words, six of the warnings were so effective at changing health beliefs that the effects still lingered, to a statistically significant degree, roughly two weeks after just "two brief exposures" to the warnings. *Id.*; *see also* AR 28784 (comment affirming that "[t]he high threshold for changing health beliefs after brief exposure to a health warning makes the findings of [the study] all the more remarkable."). Plaintiffs cite no research indicating that FDA could, or should, have hoped for the warnings to perform better.

Plaintiffs' discussion of the "thinking about risks" measure is similarly flawed. *See* Pls.' Br. 37. They ignore the finding that all 11 *final* warnings led to more thinking about risks than the current Surgeon General's warnings, to a statistically significant degree. *See* 85 Fed. Reg. at 15,658. Instead, they try to shift focus to the results for that measure from the *first* quantitative study, when FDA was testing the textual warning statements it had drafted against the default statements in the TCA, without images. Plaintiffs profess concern that the statements drafted by FDA "did not make consumers comparatively more likely to think about the health risks of smoking." Pls.' Br. 37 (emphasis omitted). One might get the impression from this characterization that none of the FDA-drafted textual statements made consumers more likely to think about the health risks of smoking. That impression would be incorrect. A number of the FDA warnings outperformed their TCA comparison (to a statistically significant degree) on that

outcome, whereas only one TCA statement outperformed its FDA-drafted counterpart. *See* AR 39342-43. More to the point, Plaintiffs offer no reason why this one metric, from an earlier point in FDA's process, should have *any* bearing on the validity of the final text-and-image warnings.

Finally, Plaintiffs profess concern about FDA's failure to test "the possibility of backfiring in its [second] quantitative study." Pls.' Br. 39. But "backfiring" is not a study variable, and the results from the variables FDA *did* measure illustrate that Plaintiffs' concern that the warnings will be avoided "out of fear or disgust," *id.* at 38, is unfounded. Specifically, the measures FDA examined included "thinking about risks," "perceived understandability," and "recall[]"— measures on which all 11 warnings outperformed the Surgeon General's warnings. 85 Fed. Reg. at 15,658. In other words, participants indicated that they understood the warnings, remembered them, and even thought more about health risks because of them—results that are inconsistent with consumers mentally blocking, avoiding, or otherwise ignoring the warnings.

Plaintiffs dismissively suggest that the "recall" finding is of no moment because it should not be surprising "that study participants whom FDA paid to carefully examine its warnings generally recalled their content[.]" Pls.' Br. 39. Here, again, the lack of relevant context in Plaintiffs' argument is key. The value of the recall finding—as with all of the findings in the second quantitative study—is that it is comparative: The fact that study participants recalled the warnings is not especially useful in the abstract; what matters is that study participants recalled them *better* than they did the current Surgeon General's warnings. Indeed, whereas the Surgeon's General's warnings were recalled "at levels very similar to what [participants] would achieve through chance guessing [25.7 percent]," FDA's health warnings "were recalled substantially more, with recall ranging from 49.4 to 73.9 percent." 85 Fed. Reg. at 15,660. If that result is somehow consistent with "backfiring," Plaintiffs have failed to explain how.

In sum, FDA made careful decisions regarding "methodology and data analysis"— decisions that fall squarely within "the agency's technical expertise." *Kennecott Greens*, 476 F.3d at 956 (citation omitted). And although Plaintiffs disagree with many of those decisions, the

decisions were eminently reasonable, and certainly not "so implausible that [they] could not be ascribed to a difference in view or the product of agency expertise." *NAHB*, 551 U.S. at 658.

C.   **FDA reasonably relied on relevant scientific literature, including evidence about health warnings in other countries.**

FDA found robust support in scientific literature for the intuitive proposition that "large, pictorial cigarette warnings, such as those required in the final rule, promote greater public understanding about the health consequences of smoking." 85 Fed. Reg. at 15,656; *see also* 84 Fed. Reg. at 42,762-65 (recounting these studies in the Proposed Rule). That literature "includes studies conducted outside of the United States." 85 Fed. Reg. at 15,657. Contrary to Plaintiffs' suggestion, *see* Pls.' Br. 40-41, FDA was not required to ignore these foreign studies.

As an initial matter, Plaintiffs do not contest the key conceptual points: that foreign studies can be useful in reinforcing "the scientific validity and reliability of the effect of pictorial cigarette warnings," and that they allow for a *post*-implementation assessment of such warnings, "which is not currently possible to study in the United States." 85 Fed. Reg. at 15,657. Instead, Plaintiffs note that the particular studies FDA cited were (naturally) about different countries, and they argue that the studies were inconsistent and failed to examine the right variables. Even if taken at face value, those are arguments for giving appropriate *weight* to foreign studies, not casting them aside altogether. But the arguments are independently unavailing.

First, FDA did not use foreign studies to make one-to-one demographic comparisons between the United States and specific countries; it used the studies to draw reasonable conclusions about the "consistency of findings on the effectiveness of pictorial cigarette warnings"— conclusions that were also supported by many other sources in the record. 85 Fed. Reg. at 15,657. Plaintiffs do not dispute that the studies were indeed consistent in showing that pictorial health warnings are effective; they simply note that the *magnitude* of that effect differed in different countries. *See* Pls.' Br. 41. But FDA relied on these studies to confirm the overall effectiveness of the type of pictorial health warnings required by the TCA, not for more granular comparisons.

Second, Plaintiffs claim that none of the studies assessed whether pictorial health warnings promote understanding better than "just viewing text alone." Pls.' Br. 41. That is wrong. Indeed, one is titled "Smokers' Reactions to Cigarette Package Warnings with Graphic Imagery and with Only Text: A Comparison Between Mexico and Canada." 85 Fed. Reg. at 15,703 (reference 59); *see also* AR 08051 (noting, on the first page of the study, that its "results are consistent with other studies that indicate that cigarette packages whose warning labels contain prominent graphic imagery are more likely than text-only warnings labels to promote smoking-related knowledge").

Ultimately, Plaintiffs' criticism of foreign studies is another example of their scattershot effort to chip away at the foundations of the Rule, and it reflects a familiar industry tactic of attempting to muddy the scientific waters. By inventing a series of hurdles—that FDA must ignore studies from other countries, or that it cannot rely at all on studies that used slightly different metrics—Plaintiffs seek to narrow the universe of acceptable data as much as possible. Indeed, Plaintiffs go so far as to claim that FDA's two quantitative studies were the "only evidence" it used to demonstrate the Rule furthers the agency's stated goal. Pls.' Br. 32. Taken at face value, that claim is clearly wrong. As the above analysis makes clear, the record is rife with evidence that pictorial health warnings, like the ones FDA developed, promote understanding. But to the extent Plaintiffs mean that the two quantitative studies are the only *direct* evidence of the specific effect that these 11 warnings will have on consumer understanding, well, yes: FDA is guilty of "only" subjecting the precise question it sought to answer to rigorous empirical analysis involving two of "the largest experimental studies on cigarette warnings conducted to date," 85 Fed. Reg. at 15,663. That is not an indictment of the agency's process; it is an endorsement.

## II.      THE RULE IS CONSISTENT WITH THE FIRST AMENDMENT.

There is no dispute that a requirement to include warnings on a product's package or in its advertisements regulates commercial speech—*i.e.*, speech "'linked inextricably' with the commercial arrangement that it proposes," *Edenfield v. Fane*, 507 U.S. 761, 767 (1993) (citation omitted)—which receives a more "limited measure of protection" under the First Amendment.

*Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 456 (1978).  Courts generally assess restrictions on commercial speech under the intermediate scrutiny standard set forth in *Central Hudson Gas & Electric Corp. v. Public Service Commission of New York*, 447 U.S. 557 (1980).  But where, as here, "the challenged provisions impose a *disclosure* requirement rather than an affirmative limitation on speech," courts apply "the less exacting scrutiny described in" *Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio*, 471 U.S. 626 (1985).  *Milavetz, Gallop & Milavetz, P.A. v. United States*, 559 U.S. 229, 249 (2010) (emphasis added).  Under *Zauderer*, compelled disclosures of "purely factual and uncontroversial information" are upheld as long as they are "reasonably related" to the government's interest and not "unjustified or unduly burdensome."  471 U.S. at 651; *see also Nat'l Inst. of Family & Life Advocates v. Becerra* ("*NIFLA*"), 138 S. Ct. 2361, 2372 (2018).  The final warnings readily withstand review under that standard, and, indeed, under any other applicable standard of First Amendment review.

### A.    The Rule should be upheld under *Zauderer*.

#### 1.    The warnings are purely factual and uncontroversial.

These warnings satisfy *Zauderer's* threshold requirement: they are "purely factual and uncontroversial."  471 U.S. at 651.[13]  Warnings generally are "factual" if they convey "facts [that] are directly informative of intrinsic characteristics of [a] product," and "uncontroversial" so long as they are not "so one-sided or incomplete" as to be misleading or inaccurate.  *Am. Meat Inst. v. USDA* ("*AMI*"), 760 F.3d 18, 27 (D.C. Cir. 2014) (en banc).  The final warnings meet this standard.

In general, there is "no dispute about Congress's authority to require health warnings on cigarette packages," *AMI*, 760 F.3d at 31 (Kavanaugh, J., concurring in the judgment), which have been required in some form since 1965.  *See* Labeling Act, Pub. L. No. 89-92 § 4; Public Health

---

[13]  In a footnote, Plaintiffs attempt to impose an additional threshold requirement, arguing that *Zauderer* applies only "to disclosures correcting misinformation."  Pls.' Br. 52 n.6.  Plaintiffs fail to mention upfront that binding circuit precedent forecloses this argument.  The D.C. Circuit's *en banc* decision in *AMI*—which Plaintiffs relegate to a parenthetical-less "*but see*" citation—overruled any case in "this circuit [that] may be read as . . . limiting *Zauderer* to cases in which the government points to an interest in correcting deception," 760 F.3d at 22, including the relevant portion of *R.J. Reynolds I*.  In any event, the Rule *was* "intended in part to correct consumer misperceptions regarding the risks presented by cigarettes, and thereby 'to dissipate the possibility of consumer confusion or deception.'"  85 Fed. Reg. at 15,645 (quoting *Zauderer*, 471 U.S. at 651).

Cigarette Smoking Act of 1969, Pub. L. No. 91-222 § 4; *see also NIFLA*, 138 S. Ct. at 2376 (declining to "question the legality of health and safety warnings long considered permissible"). The warnings at issue here fall squarely within the bounds of that undisputed authority. The specific statements in the final warnings address only health conditions where "the causal link between cigarette smoking and the negative health consequences . . . is rated at the highest level . . . provided in the Surgeon General's Reports." 85 Fed. Reg. at, 15,670. All eleven statements are factually accurate, and Plaintiffs have offered no evidence to the contrary.

The final warnings—with their concordant text and image pairs—are just as accurate as the standalone text. The warnings were the product of a "science-based, iterative research process." *Id.* at 15,658. FDA "used a certified medical illustrator to design [the] images," included "common visual presentations of the health conditions," and presented "the health conditions in a realistic and objective format devoid of non-essential elements." *Id.* at 15,646. For instance, to illustrate the warning that "Tobacco smoke can harm your children," FDA depicted the sort of harm that secondhand smoke causes in children—namely, chronic asthma that requires nebulizer treatment, *id.* at 15,671. And to illustrate the warning that "Smoking causes head and neck cancer," FDA depicted a woman with a medically accurate cancerous mass in her neck. *See id.* at 15,674.

   

Plaintiffs do not meaningfully contest that the warnings accurately depict the health conditions that the warning statements accurately link to smoking. That should be sufficient to conclude that the warnings are factual and uncontroversial. *See AMI*, 760 F.3d at 27. Plaintiffs, however, maintain that the warnings are not "purely factual" and "uncontroversial" for three

reasons: (1) they evoke emotion, (2) they are misleading, and (3) they require cigarette manufacturers to convey the government's viewpoints.  Each argument is meritless.

*First*, Plaintiffs insist that FDA "primarily intend[ed] to evoke an emotional response, or, at most, shock the viewer[s] into retaining the information in the text warning."  Pls.' Br. 47 (quoting *R.J. Reynolds I*, 696 F.3d at 16-17).  Not so.  In fact, FDA sought only to "promote greater public understanding of the negative health consequences of cigarette smoking," 85 Fed. Reg. at 15,639—not to scare consumers or "browbeat [them] into quitting," *R.J. Reynolds I*, 696 F.3d at 1217.  That was true throughout FDA's process:  It chose statements that promote understanding, *see* 84 Fed. Reg. at 42,769; it chose images that "present[] the effects of smoking in a clear and objective format" and "feature health effects of smoking without being overly menacing or grotesque," AR 23399; its studies sought to measure understanding and did not attempt "to investigate the effect of the[] warnings on . . . emotional reactions," AR 50772; and it specifically *rejected* comments that asked the agency to make the warnings "more 'gross' or 'shocking,'" 85 Fed. Reg. at 15,670.  Finally, FDA affirmed in the Federal Register that each warning "does not contain any elements intended to evoke a negative emotional response."  *See id.* at 15,672-84.

Plaintiffs offer little to counter this clear record of FDA's intent.  Their evidence consists principally of cherry-picked examples from the agency's qualitative studies, which supposedly reflect an FDA agenda to choose the most emotionally charged warnings.  *See* Pls.' Br. 48-49.  But even the snippets they point to paint an inaccurate picture.  For instance, Plaintiffs infer nefarious intent from recommendations, in a qualitative study report, on ways to revamp the image for the erectile dysfunction warning.  *See* Pls.' Br. 49 (citing AR 23556).  But in context, it is evident that those recommendations were geared towards improving *comprehension*, not provoking emotion.  For instance, the report recommends deleting one image that "may be deemed inappropriate for some audiences," and it recommends revising another image to more clearly depict that the health condition is erectile dysfunction.  AR 23556.  The advice to "[m]ake it clear that the man's emotion is shame," *id.*, was not an effort to "heighten emotional response," Pls.' Br. 49; rather, it was an attempt to make clear that the man was *not* experiencing "fatigue or body aches," because they are

not associated with erectile dysfunction.  AR 23556.  In any case, isolated examples of FDA choosing warnings that Plaintiffs subjectively consider more gruesome cannot overcome FDA's clear explanation of its goals, or its express disavowal that any of the warnings contain "elements intended to evoke a negative emotional response."  *See* 85 Fed. Reg. at 15,672-84.

Presumably, Plaintiffs seek to frame this as a question of what FDA "intend[ed]," Pls.' Br. 47 (citation omitted), because they recognize that intent was key to the majority's analysis in *R.J. Reynolds I*.  The court found the warnings at issue there to be "unabashed attempts" on the part of the agency "to evoke emotion (and perhaps embarrassment) and browbeat consumers into quitting."  696 F.3d at 1217.  It was *that* finding of intent that led the court to conclude that the warnings could not "rationally be viewed as pure attempts to convey information to consumers." *Id.* at 1216-17.  But FDA took that admonishment to heart.  It did not craft warnings "to evoke an emotional response."  *Id.* at 1216.  Nor did it include images—like a "T-shirt emblazoned with the words 'I QUIT'"—that "do not offer any information about the health effects of smoking."  *Id.* FDA's process this time around was entirely consistent with *R.J. Reynolds I*, and the resulting warnings, accordingly, do not "fall outside the ambit of *Zauderer*."  *Id.* at 1217.

Plaintiffs' fallback position is to point to evidence that, intent aside, the warnings in fact provoked emotional reactions, and to try to use *that* evidence as a basis for finding that the Rule is non-factual or controversial.  But just because "a disclosure . . . provokes a visceral response" does not mean the disclosure "fall[s] outside *Zauderer*'s ambit."  *Disc. Tobacco City & Lottery, Inc. v. United States*, 674 F.3d 509, 569 (6th Cir. 2012).  Rather, "whether a disclosure is scrutinized under *Zauderer* turns on whether the disclosure conveys factual information or an opinion, not on whether the disclosure emotionally affects its audience[.]"  *Id.*; *see also CTIA - The Wireless Ass'n v. City of Berkeley*, 928 F.3d 832, 847 (9th Cir. 2019) (upholding required disclosure about cell-phone radiation that "may not be reassuring, but . . . is hardly inflammatory").

Although Plaintiffs' brief includes scattered quotes about individual study participants' reactions to the warnings, *see* Pls.' Br. 47-49, it is thin on any analysis as to why the presence of some evidence that some people had an emotional response to an otherwise factual warning takes

33

that warning out of *Zauderer*'s ambit.  For example, Plaintiffs initially suggest that "warnings [that] trigger emotion" do not lead to "comprehension," *id.* at 47, but they cite no evidence for that claim.  And, as discussed, FDA specifically found that the warnings selected in the Final Rule promote understanding.  *See supra* at 19-28.  Plaintiffs also argue that declining to assess whether the "warnings would provoke emotion" constitutes a failure "to consider an important aspect of the problem."  *Id.* at 49.  But FDA had no reason to separately try to measure "emotion" in its studies, absent some evidence that "emotion" is a better proxy for understanding than the measures FDA ultimately used.  Plaintiffs have pointed to no such evidence.

It is possible that some may find medically accurate depictions of the consequences of smoking upsetting.  But that applies to any number of warnings, whether textual or pictorial. Warnings about deadly conditions like cancer, or a skull-and-crossbones graphic on a bottle of poison, may generate emotional responses in some viewers.  But that does not somehow mean that *Zauderer* ceases to apply to an otherwise purely factual warning.  Accordingly, although they claim to fear sliding down a slippery slope—whereby "*Zauderer* would be a dead letter," Pls.' Br. 50—it is *Plaintiffs* who identify no limiting principle.  If "provoking emotion" is the new threshold test for *Zauderer*, then the perverse result would be to *increase* the level of First Amendment scrutiny that applies to warnings about products that happen to cause more profound harms.

Under *R.J. Reynolds I*, by contrast, the limiting principle is clear: an agency that *intends* to use a disclosure requirement to browbeat or shame consumers—rather than to provide purely factual information—cannot claim the more relaxed scrutiny of *Zauderer*.  *See R.J. Reynolds I*, 696 F.3d at 1216-17.  The record confirms that FDA had no such intent.  So *Zauderer* applies.[14]

---

[14] Additional limiting principles abound.  Plaintiffs point to no other product for which (1) the health risks are of the same magnitude as cigarettes, (2) the government has spent decades determining how best to inform consumers of those risks, (3) existing warnings are demonstrably ineffective, and (4) the government has implemented a multi-year, multi-study strategy for developing accurate warnings that promote understanding of health risks. Perhaps most strikingly, for all of the listed items in Plaintiffs' parade of horribles (lawnmowers, ladders, trampolines, *etc.*), the imagined warnings would be for accidents or incorrect uses of the product.  *See* Pls.' Br. 51.  The warnings FDA required here, by contrast, are for the expected results of using Plaintiffs' products as intended by Plaintiffs.

*Second*, Plaintiffs claim that the warnings are not factually accurate because they "are misleading."  Pls.' Br. 50 (emphasis omitted); *see also id.* at 58-60.  That charge is baseless.  FDA selected each warning because it identifies a known consequence of smoking for which "the causal link" to cigarettes "is rated at the highest level . . . provided in the Surgeon General's Reports."  85 Fed. Reg. at, 15,669.  And contrary to Plaintiffs' suggestion, *see* Pls.' Br. 58-59, a warning that provides important, accurate information is not misleading just because it does not include all possible information about the precise likelihood of a given health risk, or because there is more that could be said.  *See CTIA*, 928 F.3d at 847 (upholding a disclosure about cell-phone radiation that "provides in summary form information that . . . consumers should know").  A bottle of poison with a skull-and-crossbones graphic is not misleading just because it does not pinpoint the precise probability of death.  Indeed, *no* warning provides the volume or detail that Plaintiffs claim the Constitution demands, and such a requirement would be particularly unworkable for cigarette warnings—given the sheer quantity of serious health consequences caused by smoking, and the degree to which scientists are *still* learning about the harms that cigarettes cause.  *See* AR 38026 (explaining that "new causal conclusions are still being added to th[e] long list" of "health consequences and diseases caused by tobacco use").  No single warning on a product package or advertisement can fully portray all of smoking's harms, and that is not what the First Amendment requires.  The threshold question under *Zauderer* is whether required warnings are "so one-sided or incomplete that they would not qualify as 'factual and uncontroversial,'" and these plainly are not.  *AMI*, 760 F.3d at 27.

Moreover, although Plaintiffs criticize the causal language in the warnings chosen by FDA, *see* Pls.' Br. 59-60, those warnings use the same causal language as the Surgeon General's reports.  Those reports include assessments of "the strength of the evidence establishing that smoking cause[s] a specific disease."  AR 38076;[15] *see also, e.g.*, AR 38748 ("[S]moking causes diabetes.").  In other words:  Smoking in fact causes the conditions described in the warnings; many individuals

---

[15] U.S. Department of Health and Human Services, *The Health Consequences of Smoking—50 Years of Progress: A Report of the Surgeon General* (2014).

do not understand that smoking causes those conditions; and FDA chose to provide that information to consumers, using language that mirrors the Surgeon General's, through warnings the agency rigorously tested.  Nothing about that is misleading—it is science.

Finally, Plaintiffs suggest that the images included in the warnings are misleading because they allegedly depict more severe, "relatively unlikely consequences of a given condition[.]"  Pls.' Br. 60.  But this is merely a repackaged version of earlier critiques—*i.e.*, Plaintiffs fault FDA for depicting a range of health conditions that occur with varied frequency.  FDA dealt with these same arguments, at length, in its explanations for selecting each warning.  *See* 85 Fed. Reg. at 15,671-84.  Take, for instance, Plaintiffs' claim that "[a]n otolaryngologist stated" that "it would be 'extraordinarily rare' for someone to *develop* a 'cancerous mass' of the size" depicted in the warning for head and neck cancer.  Pls.' Br. 60 (quoting AR 28124 ¶ 5) (emphasis added).  But that is not what the otolaryngologist said.  Rather, she explained that it would be "extraordinarily rare for someone to *wait* to have a mass of that size before coming to the doctor" and that any "reasonable person" would have sought treatment before that point.  AR 28124 ¶ 5 (emphasis added).  FDA took on this critique directly.  *See* 85 Fed. Reg. at 15,674.  It cited research indicating that, among other factors, "lack of health insurance coverage, lack of financial resources, lack of transportation, and lack of cancer knowledge" contribute to "late-stage diagnosis for head and neck cancer."  *Id.*  FDA then reasonably concluded that "it is not unusual for patients from underserved communities to present at advanced stages for head and neck cancer as depicted in the warning's image."  *Id.*  And even without that finding, the warning would not be misleading.  It is important to inform consumers of serious health risks that are caused by a product—even risks that occur infrequently.  *See, e.g.*, 21 C.F.R. § 201.57(c)(6) (requiring prescription drug labels to describe "clinically significant adverse reactions," including ones that "are serious even if infrequent").

*Third*, the Rule does not require Plaintiffs to convey any "ideological message."  Pls.' Br. 52.  Unlike the warnings at issue in *R.J. Reynolds I*, the final warnings do not include any images with messages like "I QUIT" or text like a "1–800–QUIT–NOW" phone number.  696 F.3d at 1216.  They do not even include a statement akin to the current Surgeon General's warning that

36

"Quitting Smoking Now Greatly Reduces Serious Risks to Your Health"—a statement that has been required for more than thirty years, is the product of Congress's long-recognized "authority to require health warnings on cigarette packages," *AMI*, 760 F.3d at 31 (Kavanaugh, J., concurring in the judgment), and that Plaintiffs do not challenge.  And unlike the "conflict free" disclosure at issue in *National Association of Manufacturers v. SEC*, 800 F.3d 518, 530 (D.C. Cir. 2015), which the court characterized as "a metaphor that conveys moral responsibility for the Congo war," the medically accurate warnings required by the Rule are "factual and non-ideological."

Plaintiffs nonetheless suggest that the warnings "are biased against or are expressly contrary to [their] views."  Pls.' Br. 52 (quoting *AMI*, 760 F.3d at 27).  But what "views" do the warnings contradict, exactly?  In fact, the warnings accurately depict what will undeniably happen to many of Plaintiffs' customers if they use Plaintiffs' products as intended.  That is not a viewpoint; it is scientific fact—one that Plaintiffs cannot and do not meaningfully contest.

Because the Rule requires Plaintiffs to provide their customers with purely factual, uncontroversial information about their own products, it should be evaluated under *Zauderer*.

## 2.  The Rule reasonably relates to the government's interest in promoting understanding of the negative health consequences of smoking.

Once *Zauderer* applies, the conclusion that the Rule withstands scrutiny readily follows. Under *Zauderer*, the government need identify an interest only in "remedy[ing] a harm that is potentially real, not purely hypothetical."  *NIFLA*, 138 S. Ct. at 2377.[16]  Plaintiffs do not dispute that the government's interest in promoting understanding of the risks of smoking satisfies that standard.  *See* Pls.' Br. 55-56 (challenging the government's interest only under *Central Hudson*). Nor do they dispute that the Rule is "reasonably related" to that interest.  *See Zauderer*, 471 U.S. at 651.  Indeed, FDA undertook years of rigorous research and made careful scientific judgments

---

[16] Although the Ninth Circuit has held that the government's interest must be "substantial," *CTIA*, 928 F.3d at 844, this Court need not decide whether *Zauderer* imposes that requirement because the government's interest in promoting understanding of the negative health consequences of smoking no doubt meets that bar.  *See AMI*, 760 F.3d at 23 (holding that "the government's interest in country-of-origin labeling for food" is "substantial" and therefore declining to "decide whether a lesser interest could suffice under *Zauderer*"); *see also infra* at 45-48.

to ensure that the warnings it chose further the government's interest in promoting greater public understanding of the negative health consequences of smoking.  *See* 85 Fed. Reg. at 15,639.

### 3.    The Rule is not unjustified or unduly burdensome.

Under *Zauderer*, the Rule cannot be "unjustified or unduly burdensome."  471 U.S. at 651. To clear that bar, the Rule need only further the government's interest in a manner that is "no broader than reasonably necessary."  *NIFLA*, 138 S. Ct. at 2377.  This "fit" inquiry is lenient, and far less searching than a least-restrictive-means test.  *See AMI*, 760 F.3d at 26-27 (*Zauderer* requires no more than a "'reasonable fit' between means and ends").  That is particularly true given the nature of this product.  Commercial speech "is 'linked inextricably' with the commercial arrangement that it proposes," and as a result, the regulatory tools the government has at its disposal vary with "the State's interest in regulating the underlying transaction[.]"  *Edenfield*, 507 U.S. at 767 (citation omitted).  Where, as here, the underlying transaction is the sale of a deadly, addictive product, the government's authority to regulate commercial speech about that product is at its zenith.  *See Pearson v. Shalala*, 164 F.3d 650, 656 & n.6 (D.C. Cir. 1999) (explaining that products where "the potential [for] harm presumably is much greater" are "in an entirely different category" from products that have not been shown to present safety concerns).

Plaintiffs claim the Rule is unduly burdensome because of (1) the size and placement of the warnings and (2) the content of the images.  Both arguments are meritless.

**a.**  At the outset, Plaintiffs are wrong to suggest that *Central Hudson*, rather than *Zauderer*, should apply in assessing the size and placement of the warnings, on the theory that the warning requirements "essentially operate[] as a restriction on . . . speech."  Pls.' Br. 42 (citation omitted). There is no basis for applying different levels of scrutiny to different aspects of the Rule.  The "unjustified or unduly burdensome" component of the *Zauderer* inquiry already asks whether a "disclosure requirement[] might offend the First Amendment by chilling protected commercial speech."  *Zauderer*, 471 U.S. at 651; *see also AMI*, 760 F.3d at 27.  Plaintiffs cite no case where a court has disaggregated the size of a disclosure from its content, to apply a two-tiered legal

analysis.  Indeed, although Plaintiffs elsewhere rely on *American Beverage Association v. City & County of San Francisco*, 916 F.3d 749 (9th Cir. 2019) (en banc)—and even highlight that the warning at issue there (a health warning for sugar-sweetened beverages) took up just as much space on advertisements as these warnings, *see* Pls.' Br. 43-44—they ignore that the Ninth Circuit held that it should "apply *Zauderer*," not *Central Hudson*, in assessing whether that warning requirement, as a whole, was "unjustified or unduly burdensome."  916 F.3d at 756.

**b.**  The Rule's size and placement requirements—*i.e.*, that the warnings occupy at least the top 50% of the front and back panels of cigarette packages, and at least the top 20% of cigarette advertisements—are not unjustified or unduly burdensome.  Rather, they reflect the considered judgment of Congress and FDA about what is reasonably necessary to promote understanding of the negative health consequences of smoking.  And they still leave manufacturers with more than half of the packaging area, and 80% of advertising space, in which to engage in their own speech.

Here, FDA was not writing on a clean slate: the size and placement requirements come directly from the TCA, and it is squarely within Congress's "traditional legislative authority to make predictive judgments when enacting nationwide regulatory policy."  *Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180, 196 (1997).  Deference to Congress's judgment is particularly appropriate here because Congress is not new to the business of cigarette health warnings.  Congress first required such warnings in 1965, Pub. L. No. 89-92, modified them in 1970, Pub. L. No. 91-222, updated them in 1984, Pub. L. No. 98-474, § 2, and revamped them once more in 2009 through the TCA.  Congress knows how to draw reasonable lines with respect to such warnings, and it carefully considered whether its prior efforts had achieved the desired ends.

To that end, Congress reasonably concluded that "[t]he current Surgeon General warnings . . . are ineffective in providing adequate warnings about the dangers of tobacco products," H.R. Rep. No. 111-58 at 4, and it exercised its legislative judgment in setting the size and placement requirements for new cigarette health warnings, *see* 15 U.S.C. § 1333(a)(2), (b)(2).  *See also* 155 Cong. Rec. S13904 (2009) (Statement of Sen. Durbin) (explaining that "a health warning that takes up the top half of the front and back of a package will be more noticeable and easier to read than

one that takes up only a quarter of the bottom of the package—an area that may be hidden by the sales rack."); *Turner*, 520 U.S. at 196 ("[D]eference must be accorded to [Congress's] findings as to the harm to be avoided and to the remedial measures adopted for that end.").

FDA's review of the literature bolsters Congress's conclusion.  FDA found that "the scientific literature strongly supports that larger warnings, such as those of the size proposed in this rule, are *necessary* to ensure that consumers notice, attend to, and read the messages conveyed by the warnings[.]"  85 Fed. Reg. at 15,650-51 (emphasis added).  FDA also found that "placement of the warnings at the top 50 percent of the front and rear panels of the packages and at least the top 20 percent of advertisements will better ensure noticeability of the warnings."  *Id.* at 15,651.

Nothing in the record undermines the reasonableness of these conclusions.  Indeed, Plaintiffs decline to dispute FDA's finding that the literature "strongly supports" the need for warnings of roughly the size at issue in the Rule.  *See* Pls.' Br. 45 (quoting 85 Fed. Reg. at 15,650). Instead, they suggest that FDA failed to sufficiently consider the alternatives of tweaking the size or placement of the warnings.  But that argument fails for two independent reasons.

*First*, FDA was under no obligation to consider alternatives at that level of granularity. Courts should not "strike down [disclosure] requirements merely because other possible means by which the State might achieve its purposes can be hypothesized."  *Zauderer*, 471 U.S. at 651 n.14. Despite this precedent, Plaintiffs argue that "a compelled disclosure is 'unjustified or unduly burdensome'" *whenever* "the government has a less-speech restrictive alternative" available.  Pls.' Br. 45 (citation omitted).  Plaintiffs attempt to ground that supposed requirement—which sounds a lot like a thinly-disguised least-restrictive-means test, *but see Bd. of Trustees of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 480 (1989) (rejecting least-restrictive-means test for regulations of commercial speech)—in *NIFLA*.  *See* Pls.' Br. 45.  But *NIFLA* does not require an evaluation of alternatives for disclosures that are reviewed under *Zauderer*.  In *NIFLA*, the Court considered two disclosure requirements: one for licensed clinics, and another for unlicensed ones.  *See* 138 S. Ct. at 2368.  Because the disclosure requirement for licensed clinics did not "relate[] to the services that licensed clinics provide," the Court held that "*Zauderer* ha[d] no application" to *that*

disclosure requirement.  *Id.* at 2372; *see also id.* at 2377 (assuming, without deciding, that *Zauderer* applied to the disclosure requirement for *unlicensed* clinics).  Yet it was only in the Court's discussion of the licensed clinics—*i.e.*, the portion of the opinion *not* governed by *Zauderer*—that the Court emphasized that California could have tried "a public-information campaign." *Id.* at 2376.  Because the warnings at issue here should be evaluated under *Zauderer*, they are constitutional even if Plaintiffs could successfully hypothesize "other possible means by which the State might achieve its purposes[.]" *Zauderer*, 471 U.S. at 651 n.14.[17]

*Second*, the kinds of tweaks that Plaintiffs hypothesize—such as warnings that would take up slightly less space or oriented differently—are not "of 'constitutional dimension.'" *Burson v. Freeman*, 504 U.S. 191, 210 (1992) (plurality op.) (citation omitted).  Again, Plaintiffs have not disputed the record-based conclusion that warnings of roughly this size and prominence "are necessary to ensure that consumers notice, attend to, and read the messages conveyed[.]" 85 Fed. Reg. at 15,650-51.  Any alternative requirements would thus reflect, at most, minor changes.  Those kinds of "restrictions in degree" do not raise constitutional concerns. *Action for Children's Television v. FCC*, 58 F.3d 654, 667 (D.C. Cir. 1995) (en banc).  In fact, even when courts apply strict scrutiny, "there may be a range of safe harbors, each of which will satisfy the 'narrowly tailored' requirement of the First Amendment." *Id.*; *see also id.* (declining to police the time that "is most reasonable to permit indecent broadcasts"); *Buckley v. Valeo,* 424 U.S. 1, 30 (1976) ("[A] court has no scalpel to probe, whether, say, a $2,000 ceiling [on campaign contributions] might not serve as well as $1,000." (citation omitted)).  To be sure, this constitutional margin of error is

---

[17] The two out-of-circuit cases Plaintiffs cite do not undermine this conclusion.  In *Entertainment Software Association v. Blagojevich*, 469 F.3d 641, 643 (7th Cir. 2006), the Seventh Circuit applied strict scrutiny—not *Zauderer*, or even *Central Hudson*—in invalidating a state requirement to place "a four square-inch label with the numerals '18' on any 'sexually explicit' video game."  But strict scrutiny is not on the table here, *see infra* at 45 n.22, and in any event, the restriction on speech in *Entertainment Software* was problematic because it risked censoring "games that have 'social importance for minors,'" 469 F.3d at 650—a kind of risk not implicated by requiring cigarette manufacturers to disclose accurate information about their products.  Additionally, in *American Beverage*, the record affirmatively demonstrated "that a smaller warning—half the size—would accomplish Defendant's stated goals." 916 F.3d at 757.  No such evidence is in the record here.  *See also id.* (distinguishing the warning at issue from larger "tobacco and prescription warnings").

not limitless, *see* Pls.' Br. 46, but for the range of options at issue here—for instance, a warning that takes up 50% versus 30% of the front and rear panels of a cigarette package—"[w]e are dealing with questions of judgment," and the Court should "defer to Congress's determination of where to draw the line[.]" *Action for Children's Television*, 58 F.3d at 667.[18]

Plaintiffs' remaining argument about the size-and-placement requirements—that they unduly impinge on Plaintiffs' speech, *see* Pls.' Br. 42-43—is unavailing. The warnings do not impermissibly interfere with Plaintiffs' ability to speak. The Sixth Circuit rejected that argument in *Discount Tobacco City & Lottery, Inc. v. United States*, 674 F.3d 509, 567-68 (6th Cir. 2012), in upholding these same size-and-placement requirements from the TCA. Here, FDA reasonably concluded that "[t]here is ample room for manufacturers to distinguish their products from other products using the lower half of a cigarette package and the remaining 80 percent of advertisements for brand names, logos, or other information." 85 Fed. Reg. at 15,647. And even if Plaintiffs have to make adjustments to their packages or advertisements, those inconveniences do not outweigh the need to provide accurate, understandable information about the risks of smoking.[19]

---

[18] Plaintiffs suggest that FDA's endorsement of Congress's judgment about the size and placement of cigarette health warnings is somehow in tension with FDA's decision to adjust many of the warning statements in the TCA. *See* Pls.' Br. 23, 45. It is not. As an initial matter, although FDA emphasized that the size and placement requirements are established "[b]y statute," it also found, based on applicable evidence, that those requirements are "not unduly burdensome" because they are "reasonably necessary to achieve the Government's interest . . . and because manufacturers retain adequate space in which to undertake their preferred speech," 85 Fed. Reg. at 15,647. As discussed, FDA found ample evidence that warnings of this size promote consumer understanding. In any event, the TCA treats changes to the size and placement of cigarette health warnings differently from changes to the warnings' text. FDA's authority to change the label statements is clear from the TCA's text—the relevant provision (section 202(b) of the TCA) is titled "Change in Required Statements." 15 U.S.C. § 1333(d)[2]. *See also infra* at 51-56. While Plaintiffs might argue that FDA could find a similar authority to change the size and placement of the warnings in the portion of section 202(b) that authorizes FDA to "adjust the format" of the warnings, such a reading is foreclosed by a different provision of the TCA. That provision (section 205 of the TCA) specifies—in the context of smokeless tobacco warnings—that FDA may "adjust the format, type size, and text of any of the label requirements, . . . [or] increase the required label area from 30 percent up to 50 percent of the front and rear panels of the package[.]" 15 U.S.C. § 4402(d). Congress thus made clear that it viewed changes to "the format" of warnings as different from changes to "the required label area." *Id.* And although Congress expressly authorized FDA to change "the required label area" for smokeless tobacco warnings, it did not do so in the parallel provision for cigarette health warnings. *See Republic of Sudan v. Harrison*, 139 S. Ct. 1048, 1058 (2019) ("Congress generally acts intentionally when it uses particular language in one section of a statute but omits it in another." (citation omitted)).

[19] The principal evidence Plaintiffs point to of the burden on their speech is the Golden Declaration, which is not a part of the administrative record and therefore should not be considered at summary judgment. *See, e.g.*, *Bellion Spirits, LLC v. United States*, 335 F. Supp. 3d 32, 43 (D.D.C. 2018) ("[W]hen a constitutional challenge to agency action requires evaluating the substance of an agency's decision made on an administrative record, that

Moreover, the fact that both federal and state governments have imposed *other* restrictions on Plaintiffs' speech, *see* Pls.' Br. 43—in light of the unrivaled dangers posed by Plaintiffs' products, and their history of misrepresenting them—is not a point in their favor.  *See Pearson*, 164 F.3d at 656 & n.6.  It would be a perverse result if those other restrictions made it *harder* to require Plaintiffs to disclose the same dangers that necessitated the restrictions in the first place.

**c.**  The warning images that FDA selected are "reasonably necessary" to further its goal of promoting greater understanding of the negative health consequences of smoking.  *See NIFLA*, 138 S. Ct. at 2377.  In arguing to the contrary, Plaintiffs contend that FDA should have ignored the consensus across the communications-science literature that "messages that are accompanied by images closely linked to the message content (*i.e.*, concordant) are shown to increase the likelihood that consumers will comprehend the message."  84 Fed. Reg. at 42,764.  To be clear, Plaintiffs acknowledge that consensus, and they point to no evidence calling it into question.  Yet they insist that FDA cannot rely on "the effectiveness of graphic warnings in the abstract" as evidence that using images helps promote understanding of the risks of smoking.  Pls.' Br. 54.

That makes no sense.  Of course FDA may rely on the literature for evidence of what does or does not improve understanding; that is the point of "the literature"—it enables others to benefit from past scientific work that may be generalizable to new contexts.  Imagine, for instance, that there were a scientific consensus that yellow road signs with black images and text were the most effective at warning drivers of hazards on the road.  In Plaintiffs' view, it would be irrational for the government to apply that "abstract" finding every time the government sought to construct a new road sign.  Instead, each individual warning sign—from duck crossing, to deer crossing, to slippery roads, to falling rocks, and so on—would need to be tested to re-establish that the yellow-black combination is effective.  There is no limiting principle to this absurdist approach, in which every study must go back to first principles because those principles have not already

_____

challenge must be judged on the record before the agency."), *appeal pending*, No. 19-5252 (D.C. Cir. argued Sept. 11, 2020).  Even if the Court were to consider it, the Golden Declaration contains no allegations to suggest that any burden is unreasonable when weighed against the degree to which the Rule promotes understanding of the negative health consequences of smoking.

been applied in that particular context.  That is not science; it is Zeno's paradox.  *See, e.g.*, *Alaska Dep't of Env't Conservation v. EPA*, 540 U.S. 461, 515 (2004) (Kennedy, J., dissenting).

Setting aside that foundational point, Plaintiffs' specific criticisms of FDA's images are also off base.  They challenge particular details of the images FDA selected, *see* Pls.' Br. 53, but miss the forest for the trees.  The point is not that any one depiction of amputation, or head-and-neck cancer, or another smoking-caused health condition is more "necessary" than another; rather, the point is that a concordant image depicting the health consequence warned of in the text improves understanding of the text it accompanies and is therefore "reasonably necessary" to achieve FDA's interest.  84 Fed. Reg. at 42,764.  The literature and the administrative record are both clear on this point.  *See, e.g.*, AR 8494[20] ("Graphic warning labels improve smokers' recall of warning and health risks[.]"); AR 10326[21] ("[P]ictorial health warning labels that depict the risk of specific health effects from smoking can increase beliefs and knowledge about the negative health consequences of smoking, particularly for health effects that are lesser-known.").

In sum, FDA reasonably balanced Congress's judgment, relevant scientific literature, and the findings of its own studies on the degree to which the final warnings promote understanding of the harms of smoking.  It charted a regulatory path that was "no broader than reasonably necessary," *NIFLA*, 138 S. Ct. at 2377, and the Rule should therefore be upheld under *Zauderer*.

### B.     The Rule is also constitutional under *Central Hudson*.

For the foregoing reasons, this Court should apply *Zauderer* and uphold the Rule under that standard.  But if the Court finds that *Zauderer* does not apply, the Rule should be upheld under *Central Hudson*.  As the D.C. Circuit has held in multiple cases involving the tobacco industry, commercial-speech regulations that are not evaluated under *Zauderer* are subject to the intermediate scrutiny of *Central Hudson*.  *See R.J. Reynolds I*, 696 F.3d at 1217 (citing *Philip*

---

[20] Andrew A. Strasser et al., *Graphic Warning Labels in Cigarette Advertisements: Recall and Viewing Patterns*, 43(1) Am. J. Prev. Med., 41-47 (2012).

[21] Jessica L. Reid et al., *Influence of Health Warnings on Beliefs about the Health Effects of Cigarette Smoking, in the Context of an Experimental Study in Four Asian Countries*, 14 Int'l J. Envt. Res. Public Health 2017, 868 (2017).

*Morris*, 566 F.3d at 1142-43).  That makes sense: "commercial speech receives a lower level of protection under the First Amendment," and a regulation targeting *only* commercial speech should therefore not receive the strictest form of scrutiny.  *See id.* (holding that "that *Central Hudson* is the appropriate standard" for "compelled speech that falls outside the *Zauderer* framework").[22]

Under *Central Hudson*, courts "ask whether the asserted governmental interest [in regulation] is substantial" and "whether the regulation [at issue] directly advances" that interest. 447 U.S. at 566.  If so, the regulation withstands review so long as it is "not more extensive than . . . necessary" to further the government's interest.  *Id.*  The Rule clears each of these bars.

### 1.   The government has a substantial interest in promoting understanding of the risks of smoking.

Congress's judgment, decades of precedent, and record evidence all confirm that the government has a substantial interest in "promoting greater understanding of the negative health consequences of cigarette smoking."  85 Fed. Reg. at 15,638.  When Congress first required cigarette health warnings, it stated its goal clearly: to ensure that "the public [will] be adequately informed about any adverse health effects of cigarette smoking[.]" 15 U.S.C. § 1331.  It reaffirmed that goal in 1984, revising the requirements to make "Americans more aware of any adverse health effects of smoking" and "enable individuals to make informed decisions about smoking."  Pub. L. No. 98-474 § 2.  And in the TCA, Congress expressly linked any change in the text of the cigarette health warnings to a finding that "such a change would promote greater public understanding of the risks associated with the use of tobacco products."  Pub. L. No. 111-31 § 202(b).  Plaintiffs,

---

[22] Because this Court is bound by D.C. Circuit precedent, it need not even consider Plaintiffs' strict scrutiny Hail Mary.  *See* Pls.' Br. 54-55.  But the arguments that Plaintiffs advance in support of strict scrutiny are also meritless on their own terms.  The Rule does not require Plaintiffs to adopt a particular viewpoint, nor does it "'aim[] at the suppression of' views."  *Iancu v. Brunetti*, 139 S. Ct. 2294, 2302 (2019).  And Plaintiffs' suggestion that the Rule "is subject to strict scrutiny" because it targets speakers (cigarette manufacturers) and prescribes content (the warnings) cannot be squared with basic commercial-speech doctrine.  *See* Pls.' Br. 55.  Nearly every disclosure requirement targets manufacturers, retailers, an industry, or some other set of commercial actors, and the *point* of such disclosure requirements is that they are content-based, insofar as they require the publication of scripted content to inform of a particular harm or to avoid a specific point of confusion.  Such requirements have consistently been evaluated under familiar commercial-speech standards.  *See, e.g., Zauderer*, 471 U.S. at 650 (requirement that "attorneys who advertise their willingness to represent clients on a contingent-fee basis" must "state that the client may have to bear certain expenses even if he loses").  Accordingly, *Central Hudson* is the most searching form of scrutiny that could apply.

accordingly, cannot question the sufficiency of the government's interest here without setting aside half a century's worth of congressional judgments. *See Turner Broad. Sys.*, 520 U.S. at 196 ("Even in the realm of First Amendment questions[,] . . . deference must be accorded to [Congress's] findings as to the harm to be avoided and to the remedial measures adopted for that end[.]").

Courts, similarly, have recognized the significance of the government's interest in promoting the public's understanding of the harms of smoking. The Sixth Circuit—evaluating the same statutory provisions at issue here—found that "[t]here can be no doubt that the government has a significant interest . . . in warning the general public about the harms associated with the use of tobacco products." *Disc. Tobacco*, 674 F.3d at 519. And in *Nicopure Labs, LLC v. FDA*, 944 F.3d 267, 284 (D.C. Cir. 2019), the D.C. Circuit held that "the government has a substantial interest in" requiring accurate risk statements about e-cigarettes "in order to protect consumers from buying a highly addictive product with a false sense of the risks it presents."

Moreover, FDA's extensive research validated the need for improved understanding of the specific health risks at issue. FDA found "a pervasive lack of knowledge about and understanding of the many negative health consequences of smoking," particularly with respect to the "range of illnesses caused by smoking." 84 Fed. Reg. at 42,761-62. FDA's quantitative research from this rulemaking provides additional evidence of this deficit in public understanding. In FDA's second quantitative study, *all* of the warnings FDA selected in the Rule provided new information to a significant portion—ranging from 35.7% to 88.7%—of participants. 85 Fed. Reg. at 15,655.

Despite this evidence, Plaintiffs claim that FDA cannot rely on an interest in promoting understanding because that interest is "too circular to be substantial." Pls.' Br. 55. Plaintiffs are mistaken. FDA has not "define[d] 'effectiveness' however it sees fit" here. *Id.* (quoting *R.J. Reynolds I*, 696 F.3d at 1221). To the contrary, it set clear metrics for measuring understanding, grounded those metrics in scientific literature, and set *ex ante* minimum requirements for the selection of warnings. To be sure, Plaintiffs say those metrics are unreasonable. But as discussed above, Plaintiffs' challenge to those metrics is unavailing. *See supra* at 19-28. More to the point, there is no meaningful dispute that the metrics FDA selected are specific and quantifiable. Because

FDA has established a clear "barometer for assessing the effectiveness of the graphic warnings," *R.J. Reynolds I*, 696 F.3d at 1221, and selected text and image pairings according to those measures, the majority's concerns in *R.J. Reynolds I* do not apply here.

Plaintiffs' principal argument on this point is that disclosures must "affect consumer behavior or public health" to count as sufficient.  Pls.' Br. 56.  But courts have repeatedly upheld disclosure requirements based solely on the importance of conveying the information being disclosed, rather than on a prediction as to how the required disclosure might affect consumer behavior.  For instance, in *Zauderer*, the Court held that it was constitutional to require that an attorney operating on contingency fees disclose that his clients would still have to pay litigation costs in the event of a loss—without asking whether such a disclosure would cause the contingency-fee attorney to lose clients.  471 U.S. at 652.  In *Milavetz*, the Court upheld a disclosure law—which required debt-relief agencies to reveal that their services might include filing for bankruptcy—without any inquiry into whether fewer people would avail themselves of the debt-relief agencies' services.  559 U.S. at 232-33, 251.  And in *Citizens United v. FEC*, 558 U.S. 310 (2010), the Court upheld a disclosure requirement for electioneering communications because "transparency enables the electorate to make *informed* decisions and give proper weight to different speakers and messages."  *Id.* at 371 (emphasis added).  The Court did not, by contrast, demand evidence that such disclosures would actually swing an election or lead shareholders to oust a corporate board—the importance of the disclosed information, standing alone, sufficed.

To be sure, there must be *some* value to the disclosed information—*i.e.*, "the interest at stake must be more than the satisfaction of mere 'consumer curiosity.'"  *CTIA*, 928 F.3d at 844 (citation omitted).  But understanding that cigarette smoking can lead to blindness or bladder cancer is not a matter of idle "curiosity"; it is knowledge of material risks to one's health.  The Second Circuit's decision in *International Dairy Foods Ass'n v. Amestoy*, 92 F.3d 67 (2d Cir. 1996), illustrates this distinction.  There, the court preliminarily enjoined a state law requiring dairy manufacturers to disclose whether their cows had been treated with a growth hormone, and it rejected the argument that "consumer interest alone was sufficient to justify requiring" a

warning. *Id.* at 73. But the key piece of the court's reasoning was that the warning would have been for "a production method that has no discernable impact"; indeed, "the FDA ha[d] 'concluded that . . . there are no human safety or health concerns associated with food products derived from cows treated'" with the hormone. *Id.* at 69, 73. If, however, there had been "some indication that th[e] information bears on a reasonable *concern* for human health or safety," manufacturers could have been "compelled to disclose it." *Id.* at 74 (emphasis added). Then-Judge Kavanaugh drew the same line in *AMI*, suggesting that requirements for "nutrition labels and health warnings"—including "health warnings on cigarette packages"—plainly further a substantial interest, whereas disclosures that serve "consumer interest alone" do not. *AMI*, 760 F.3d at 31-32 (Kavanaugh, J., concurring in the judgment) (quoting *Int'l Dairy Foods*, 92 F.3d at 74).

At bottom, every person who smokes, or who even *considers* smoking, deserves to know the risks to which they are exposing themselves and others so that they can "perceive their own best interest[.]" *Va. Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.,* 425 U.S. 748, 770 (1976). The government has a substantial interest in ensuring that they do.

Finally, the speed with which warnings do (or do not) become "stale," Pls.' Br. 56, has no relevance to whether FDA's underlying aim of promoting understanding of the risks of smoking is a substantial interest. To the extent this concern has any relevance, it underscores the conclusion reached by Congress and FDA that new warnings are needed to replace the 1984 Surgeon General's warnings, which "have not changed" in the intervening 35 years. 85 Fed. Reg. at 15,653.

### 2.    The Rule directly furthers the government's interest.

FDA's research establishes a direct link between the government's interest in promoting greater public understanding and the warnings required by the Rule. When courts assess the extent to which a commercial-speech regulation furthers a government interest, they may consider a range of evidence to identify a sufficient link between a regulation of speech and a government interest, including "studies and anecdotes"—even ones that "pertain[] to different locales altogether"—as well as "history, consensus, and 'simple common sense.'" *Lorillard Tobacco Co. v. Reilly*, 533

U.S. 525, 555 (2001) (citation omitted).  Here, however, the task is simple, because FDA studied the precise question at issue.  The agency's second quantitative study applied rigorous scientific methods to evaluate whether 16 pictorial health warnings, including all 11 of the warnings selected in the Final Rule, promote understanding of the negative health consequences of smoking.  FDA found that all 11 of the final warnings did, and to a statistically significant degree.  Specifically, the final warnings *all* outperformed the Surgeon General's warnings on the two key metrics for promoting understanding—"new information" and "self-reported learning"—as well as on six (of eight) other measures that FDA studied.  *See* 85 Fed. Reg. at 15,658.

Plaintiffs continue to question the validity of these findings—labeling them speculative, challenging the country-of-origin of scientific studies, and raising other miscellaneous quibbles. *See* Pls.' Br. 57.  But Defendants have already addressed those concerns at length and have demonstrated that FDA's studies, together with its review of the scientific literature, provide robust evidence that the warnings promote understanding of the negative health consequences of smoking.  *See supra* at 19-29.  That evidence demonstrates the Rule directly furthers the government's interest, and that conclusion is bolstered by the deference that FDA's scientific judgments are owed.  *See POM Wonderful*, 777 F.3d at 499-500.

### 3. The Rule imposes requirements that are a "reasonable fit" for the government's interest.

"The government's burden on the final *Central Hudson* factor is to show a 'reasonable fit[]' . . . between means and ends." *AMI*, 760 F.3d at 26 (citation omitted).  As explained, the Rule's size-and-placement requirements clear that bar.  *See supra* at 39-43.  In particular, those requirements rest on the considered judgment of Congress and FDA, and the scientific literature further confirms that warnings of roughly the size and prominence of the final warnings "are necessary to ensure that consumers notice, attend to, and read the messages conveyed[.]" 85 Fed. Reg. at 15,650-51.  And even if the warnings could be made slightly smaller or re-oriented without significantly reducing their effectiveness—a claim that Plaintiffs have failed to support—those possibilities do not render the Rule unconstitutional.  *See Burson*, 504 U.S. at 210.

Plaintiffs toss out a couple of additional proposed alternatives, such as public-information campaigns or different text-only warnings. *See* Pls.' Br. 58. But FDA addressed these alternatives at length in the Rule and explained why they would not be equally effective. FDA found that although "voluntary public education campaigns can provide effective targeting and messaging, they do not reach every person who looks at a package of cigarettes or advertisements and do not receive as many impressions as a comprehensive program of cigarette package and cigarette advertisement warnings." 85 Fed. Reg. at 15,648. The decision to ensure that every person who picks up a pack of cigarettes be informed of the negative health consequences of smoking reflects a decades-long policy judgment by Congress. *See id.* The wisdom of that decision was confirmed by the research FDA performed in support of the Rule, which found that "pictorial cigarette warnings placed directly on products convey the risks to those who look at packages and advertisements with more immediacy and noticeability." *Id.* FDA thus reasonably concluded that public-health campaigns were not a sufficient substitute for pictorial health warnings.

Similarly, FDA thoroughly considered the arguments in favor of text-only warnings. *See* 84 Fed. Reg. at 42,762-65; 85 Fed. Reg. at 15,648. And it rejected that option among other reasons because "the scientific literature strongly supports that pictorial cigarette warnings promote greater public understanding about the health consequences of smoking" for several reasons, including that they "increase the noticeability of the warning's messages," "increase knowledge and learning of the negative health consequences of smoking," and "benefit subpopulations that have disparities in knowledge about the negative health consequences of smoking." 85 Fed. Reg. at 15,648. Although Plaintiffs fault FDA for relying on the literature, rather than designing another round of tests to evaluate these alternatives, FDA did not need to add *another* study to its lengthy process to confirm what has already been proven. *Central Hudson* does not require otherwise.

# III.    PLAINTIFFS' REMAINING STATUTORY CLAIMS ARE MERITLESS.

## A.    The Tobacco Control Act authorizes FDA to require eleven warnings.

Despite taking a different position before the agency, Plaintiffs now assert that Congress "unambiguously" "authorized FDA to create nine warnings, and nine only," Pls.' Br. 20, so the Rule is unlawful because it includes eleven.  Plaintiffs are wrong.  The TCA authorizes substantive changes to the statute's default "label requirements"—including their "text"—so long as such a change (1) is carried out "through a rulemaking," and (2) the agency "finds that such a change would promote greater public understanding of the risks associated with the use of tobacco products." 15 U.S.C. § 1333(d)[2].  FDA satisfied both requirements.  And Plaintiffs have not identified any statutory provision that fixes the number of warnings at nine—because no such provision exists.  Accordingly, the TCA unambiguously authorized FDA's changes to the default statutory statements—including the deletion or modification of some existing statements, and the addition of some new statements—which, all taken together, resulted in eleven warnings.

**1.**  In the Tobacco Control Act, Congress gave FDA specific authority to revise cigarette warnings.  This new authority includes two separate provisions, which differ in important ways:

> **Section 201(a): GRAPHIC LABEL STATEMENTS**
> . . . [T]he Secretary shall issue regulations that require color graphics depicting the negative health consequences of smoking to accompany the label statements specified in subsection (a)(1). The Secretary may adjust the type size, text and format of the label statements specified in subsections (a)(2) and (b)(2) as the Secretary determines appropriate so that both the graphics and the accompanying label statements are clear, conspicuous, legible and appear within the specified area.

> **Section 202(b): CHANGE IN REQUIRED STATEMENTS**
> The Secretary through a rulemaking conducted under section 553 of Title 5, United States Code, may adjust the format, type size, color graphics, and text of any of the label requirements, or establish the format, type size, and text of any other disclosures required under the Federal Food, Drug, and Cosmetic Act, if the Secretary finds that such a change would promote greater public understanding of the risks associated with the use of tobacco products.

15 U.S.C. § 1333(d).  As is clear from their text and from the statutory scheme as a whole, these provisions address two different types of changes.

Section 201(a)'s second sentence—which does *not* require a substantive factual finding about promoting greater public-health understanding—is focused only on "the type size, text and format of the label statements specified in subsections (a)(2) and (b)(2)." *Id.* § 1333(d)[1].  Those statutory cross references all relate to the *formatting* of "the label statements specified in" the statute.  *See id.* § 1333(a)(2) (discussing the "Placement; typography; etc." of warning labels, including use of "capital letters," "17-point type," and other matters of "layout" and "color"); *id.* § 1333(b)(2) (discussing "Typography, etc." of warning labels, including "format," "location," "capital letters," "conspicuous and legible type," a "rectangular border," and "typeface").  In other words, read in context and as a cohesive set, the adjustments authorized by the second sentence of section 201(a) focus on the placement, typography, clarity, conspicuousness, and legibility of the label statements—that is, changes that go to the visual presentation or *formatting* of the warnings, rather than their substance.  *See Yates v. United States*, 574 U.S. 528, 543 (2015) (discussing "the principle of *noscitur a sociis*—a word is known by the company it keeps").  Unsurprisingly, Congress broadly authorized those less significant changes "as the Secretary determines appropriate so that both the graphics and the accompanying label statements are clear, conspicuous, legible, and appear within the specified area," 15 U.S.C. § 1333(d)[1]—with no requirement for a factual finding about promoting understanding.

Section 202(b), by contrast, gives FDA more significant authority to "adjust the format, type size, color graphics, and text of any of the label requirements"—although that broader authority may only be exercised (1) through "a rulemaking," and (2) after a substantive factual finding by the agency "that such a change would promote greater public understanding of the risks associated with the use of tobacco products."  15 U.S.C. § 1333(d)[2].  Section 202(b) therefore authorizes adjustments to "any of the label requirements" of the statute—including significant changes to things like the actual "text" of the warnings—rather than only the minor formatting or style adjustments cross-referenced in 15 U.S.C. § 1333(a)(2) and (b)(2).

2. Plaintiffs do not appear to dispute that FDA can alter the default statutory warning text.[23] *See* Pls.' Br. 21. Yet Plaintiffs claim that FDA's authority to alter the warnings somehow only applies if those alterations result in exactly nine warnings. But the statute imposes no such limitation—it instead broadly authorizes changes to "any of the label requirements" at issue, including their "text." 15 U.S.C. § 1333(d)[2]. The word "nine" appears nowhere, nor does any statutory provision that specifies the "number" of permissible warnings. Accordingly, when FDA "adjust[ed]" the "text" of "the label requirements," *id.*, through a process specifically authorized by the TCA—by discarding some text, modifying some text, and adding some text—it ended up with eleven warnings. That result was consistent with and contemplated by the statute.

Nearby statutory provisions confirm FDA's reading. Section 202(a), a preemption provision, provides that, "[e]xcept to the extent the Secretary requires *additional or different* statements on any cigarette package by a regulation, . . . no statement relating to smoking and health, other than the statement required by section 4 of [the FCLAA, now amended by the TCA], shall be required." 15 U.S.C. § 1334(a) (emphasis added). This adjacent reference to "*additional or different*" statements, *id.* (emphasis added), cannot be squared with Plaintiffs' view that Congress (silently) mandated that the number of warnings must be permanently fixed at nine.

Plaintiffs speculate that Congress's reference to "additional or different" statements in 15 U.S.C. § 1334(a) might solely include tar-and-nicotine-yield or smoke-constituent disclosures authorized by 15 U.S.C. § 1333(e), or some "other textual disclosures that FDA can 'establish'" under other statutory authority. Pls.' Br. 22. That speculation has no textual basis. In other words, Plaintiffs have invented a statutory limit on the number of warnings, and they seek to justify *that*

---

[23] Plaintiffs' precise position is sometimes hard to pin down. They first state that the TCA "grant[s] FDA discretion to adjust some things—like text and format—but not to change the number of warnings." Pls.' Br. 21. On the next page, however, they seem to suggest that even adjustments to warning *text* might be off limits—despite the plain language of 15 U.S.C. § 1333(d)[2], which is titled "Change in Required Statements." *See* Pls.' Br. 22 ("[A]djusting statutes requires legislation; Congress cannot delegate the power to 'adjust' the text Congress enacted.") (citing *Clinton v. City of New York*, 524 U.S. 417 (1998)). *But see id.* at 24 ("As stated, FDA can 'adjust' the TCA's nine default textual statements only if FDA finds, in a rulemaking, that 'such a change would promote greater public understanding of the risks associated with the use of tobacco products.'" (quoting 15 U.S.C. § 1333(d)[2])). To be clear, Congress of course did not authorize FDA to alter the text of any *statute*; it delegated to FDA the authority to alter the text of required *cigarette warning statements*, including by departing from the default text that Congress provided as a starting point—so long as FDA proceeds via rulemaking, and makes the requisite statutory finding.

limit by concocting another one—a claim that when Congress referred to "additional or different" statements, it somehow meant to include disclosures described in § 1333(e), but to exclude statements described in § 1333(d).  The implausibility of this interpretation is underscored by the fact that Congress did not even require any of the other disclosures that Plaintiffs point to, making it unlikely that that narrow category of comparatively less significant (potential) disclosures was Congress's *only* concern in drafting the TCA's preemption provision—and that Congress also failed to say so.  On top of that, 15 U.S.C. § 1333 generally refers to the cigarette warnings required by sub-section (a)(1) as either "labels" or "label statements," but the tar-and-nicotine-yield or smoke-constituent disclosures discussed in sub-section (e) as "disclosures."  Accordingly, 15 U.S.C. § 1334(a)'s reference to additional or different "statements"—not "disclosures"—is another strike against Plaintiffs' convenient interpretation.

**3.**  Plaintiffs' nine-is-the-magic-number argument is largely atextual, but Plaintiffs do try to rely on the fact that Congress required "one of the following labels," and then listed default warning statements, which happen to sum to nine.  Pls.' Br. 20.  But that cannot be dispositive, because Congress also authorized FDA to modify any or all of those nine warnings.  *See* 15 U.S.C. § 1333(d)[2].  As long as FDA is authorized to modify *all* "of the following labels," 15 U.S.C. § 1333(a)(1), the fact that the statute originally offered nine default statements has no permanent significance.  Indeed, on Plaintiffs' reading, FDA would also be prohibited from *reducing* the total number of warnings to seven or eight—even if, hypothetically, future science disproved some of the default statutory statements.  Congress wisely authorized more flexibility than that.

Plaintiffs also note that Congress titled the key provision "Change in Required Statements," which they believe "signals that Congress had changes to the content and format of the nine statements—not their number—in mind."  Pls.' Br. 22-23.  From where Plaintiffs divine that "signal" is a mystery, because FDA's decision to drop some statements, modify some statements, and add some new statements can only be described as a "Change in Required Statements"—and it did not become something other than a "Change" just because the final result was eleven warnings instead of nine.  For example, one of the statutory default statements ("Cigarettes cause

cancer") finds analogues in *two* of the Rule's statements: "Smoking causes bladder cancer . . ." and "Smoking causes head and neck cancer." Plaintiffs offer no textual or practical reason to think that only *one* of those "Change[s] in Required Statements" was lawful.

Plaintiffs argue that "[w]hen Congress wanted to require a different number of warning label statements, it did so, authorizing just four warning label statements for smokeless tobacco products." Pls.' Br. 20 (citing 15 U.S.C. § 4402(a)(1)). But all that shows is that Congress started with four default warning statements for smokeless tobacco products, and nine for cigarettes. And, just as with cigarette warning statements, Congress also specifically authorized changes to the "label requirements" for smokeless tobacco. 15 U.S.C. § 4402(d); *see also supra* at 42 n.18 (refuting Plaintiffs' argument that FDA's interpretation of 15 U.S.C. § 1333(d)[2] is inconsistent with its interpretation of the TCA's "size and placement" requirements, in part by reference to distinct statutory language about smokeless-tobacco warnings).

**4.** Although Plaintiffs fail to mention it, their theory is of recent vintage: in October of 2019, they commented on FDA's proposal of 13 warnings by "urg[ing] FDA to reduce the number of graphic warnings to 12 or 9." Altria Client Servs., Cmt. (Oct. 15, 2019) at 14, ECF No. 1-1. If Congress had "unambiguously" required exactly nine warnings, Pls.' Br. 20, one would not expect these sophisticated, well-represented Plaintiffs to have argued for 12. Accordingly, Plaintiffs waived this argument by failing to raise it before the agency—and especially by their affirmative advocacy for 12 warnings. "It is a hard and fast rule of administrative law, rooted in simple fairness, that issues not raised before an agency are waived and will not be considered by a court on review." *Nuclear Energy Inst., Inc. v. EPA*, 373 F.3d 1251, 1297-98 (D.C. Cir. 2004) (citation omitted); *see also Tesoro Ref. & Mktg. Co. v. FERC*, 552 F.3d 868, 872 (D.C. Cir. 2009) ("A party must first raise an issue with an agency before seeking judicial review.").[24]

---

[24] Plaintiffs' previous desire for "12 or 9" warnings stems from a separate argument that they have preserved, but that is also meritless: that "requiring 11 warnings—or any other prime number—makes compliance with that mandate functionally impossible, because the industry prints designs using grid layouts, and using a prime number like 11 would upend existing industry printing processes." Pls.' Br. 23-24. The statute itself presupposes significant changes to the industry's printing processes, not least to incorporate images, and Plaintiffs offer no reason why their

**5.**  The most that can be said for Plaintiffs' interpretation is that, arguably, the statute is silent or ambiguous on the number of warnings.  But that would support FDA's position because, under *Chevron*, FDA's reasonable resolution of any such ambiguity would be entitled to deference. "When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions." *Chevron, USA, Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842 (1984). "First, applying the ordinary tools of statutory construction, the court must determine 'whether Congress has directly spoken to the precise question at issue.  If the intent of Congress is clear, that is the end of the matter.'" *City of Arlington, Tex. v. FCC*, 569 U.S. 290, 296 (2013) (quoting *Chevron*, 476 U.S. at 842-43)).  "But 'if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.'" *Id.* (quoting *Chevron*, 476 U.S. at 843).

Here, "Congress has directly spoken to the precise question at issue," *Chevron*, 476 U.S. at 842, by authorizing adjustments to any of the TCA's labeling requirements, so long as FDA (1) proceeds via rulemaking, and (2) makes the requisite factual finding about promoting greater understanding.  It did both, so "that is the end of the matter." *Id.*  At a minimum, however, FDA's interpretation of the statute "is a reasonable one," *Chevron*, 467 U.S. at 845—and that is enough. Indeed, it is hard to see how the statute could "unambiguously" foreclose FDA's interpretation, Pls.' Br. 20, given that *Plaintiffs themselves* apparently adopted that same interpretation last year.

**B.    FDA found that the warnings in the Final Rule "would promote greater public understanding of the risks associated with the use of tobacco products."  15 U.S.C. § 1333(d)[2].**

As discussed above, *see supra* at 53 & n.23, there appears to be no dispute that "FDA can 'adjust' the TCA's nine default textual statements," so long as "FDA finds, in a rulemaking, that

---

preference for a grid layout should trump the science-driven process FDA followed here—especially in the context of disclosures intended to warn consumers about the disease and disfigurement that these products indisputably cause. In any case, FDA has already addressed this prime-number concern at the industry's request, explaining that "some level of deviation" from the equal-display rule is permissible to accommodate the practicalities of printing. 85 Fed. Reg. at 15,691, 15,693.  Plaintiffs' passing suggestion that permitting deviation "override[s] a core [statutory] display requirement," Pls.' Br. 34, ignores FDA's explanation that the statute requires display in only "as equal a number of times *as is possible*." 85 Fed. Reg. at 15,693 (quoting 15 U.S.C. § 1333(c)(1)) (emphasis added).

'such a change would promote greater public understanding of the risks associated with the use of tobacco products.'" Pls.' Br. 24 (quoting 15 U.S.C. § 1333(d)[2]).  FDA made (and justified) that finding several times over, both with respect to replacing certain default textual statements from the TCA with new FDA-drafted statements, and with respect to the final text-and-image warnings as a whole.  *See* 85 Fed. Reg. at 15,643 ("FDA has . . . complied with [TCA] section 202(b) by including new textual warnings in the final rule only after finding that they will promote greater public understanding of the risks associated with smoking as compared to certain textual warnings in the Tobacco Control Act that are excluded from the final rule."); *see also id.* at 15,639 ("The required warnings will promote greater public understanding of the negative health consequences of cigarette smoking."); *id.* at 15,657 (same); *id.* at 15,660 (same); *id.* at 15,661 (same); *id.* at 15,662 (same); *id.* at 15,663 (same); *id.* at 15,686 (same).

Plaintiffs resist the obvious import of these words, arguing that FDA's findings are insufficient because FDA "never made" an individualized determination for three of the default TCA textual statements that did not make it into the Final Rule: "'Cigarettes are addictive,' 'Smoking can kill you,' and 'Quitting now greatly reduces serious risks to your health.'" Pls.' Br. 24.  In other words, much like their argument that the statute authorizes exactly nine warnings, Plaintiffs seem to think that changes to the default statutory warning text must *also* operate on a one-in, one-out basis—with the requisite statutory finding justified separately and independently for *each* matched pair (that is, one TCA textual warning statement replaced by one FDA-drafted textual warning statement, with a new finding each time).

This argument likewise fails for lack of any basis in the statutory text.  Plaintiffs assert— without any explanation, let alone a citation—that 15 U.S.C. § 1333(d)[2] "required FDA to determine that *each* new textual warning would better promote public understanding of health risks than *the* TCA warning that FDA was replacing." Pls.' Br. 24-25 (emphases added).  But the statute says no such thing.  By its terms, it authorizes any change to the "text of any of the label requirements" that "would promote greater public understanding" of smoking's risks. 15 U.S.C. § 1333(d)[2].  Plaintiffs' one-by-one-matching theory thus collides with the "fundamental

principle of statutory interpretation that 'absent provision[s] cannot be supplied by the courts.' This principle applies not only to adding terms not found in the statute, but also to imposing limits on an agency's discretion that are not supported by the text." *Little Sisters of the Poor Saints Peter and Paul Home v. Pennsylvania*, 140 S. Ct. 2367, 2381 (2020) (quoting *Rotkiske v. Klemm*, 140 S. Ct. 355, 360-61 (2019)).

Even if it had any textual basis, Plaintiffs' demanding interpretation of the finding required by 15 U.S.C. § 1333(d)[2] makes little sense on its own terms, and is inconsistent with Congress's aim of permitting FDA to make changes whenever it finds that they would promote greater understanding of the risks of smoking. *See* 15 U.S.C. § 1333(d)[2]. Suppose, for example, that FDA developed a new slate of warnings, and found that those warnings were highly effective at informing consumers, but *only* when they worked in tandem—*i.e.*, the success of each individual warning depended on the presence of the others in rotation. Surely, FDA would not have to reject these hypothetical warnings just because they did not outperform the existing warnings in one-on-one match-ups. Rather, FDA could reasonably find that substituting the entire new batch "would promote greater public understanding of the risks associated with the use of tobacco products." *Id.* Plaintiffs' reading, by contrast, could prohibit changes that clearly further Congress's purpose.

In any event, and although not required by the TCA, FDA *did* make individualized findings about the "three TCA warnings" Plaintiffs highlight. *See* Pls.' Br. 24. For example, it found that the text-and-image warnings using those "three statements"—that "cigarettes are addictive," "smoking can kill you," and "quitting smoking now greatly reduces serious risks to your health"— "did not demonstrate statistically significant improvements . . . on the outcomes of 'new information' and 'self-reported learning'" in FDA's second quantitative study. 84 Fed. Reg. at 42,772. By contrast, all 11 of the warnings FDA selected in the Final Rule did better—as compared to the *same* control condition—on the outcomes that are predictive for promoting understanding. *See* 85 Fed. Reg. at 15,659. Accordingly, FDA found that all 11 of the final warnings "would improve upon" the three TCA warnings "covering quitting, death, and addiction," Pls.' Br. 25, with respect to the goal of promoting greater public understanding of the risks of smoking.

Finally, even if Plaintiffs' interpretation of the finding required by 15 U.S.C. § 1333(d)[2] were reasonable, it too must yield to the FDA's interpretation under *Chevron*. *See supra* at 56.

### C.   Plaintiffs had a meaningful opportunity to comment on the proposed rule.

Plaintiffs' notice-and-comment argument is a narrow one, as there is no dispute that FDA provided an "opportunity to participate" in the rulemaking through the submission of comments. 5 U.S.C. § 553(c). Nor is there any dispute that Plaintiffs took advantage of that opportunity: they submitted several hundred pages of comments. Plaintiffs are thus left to argue only that their opportunity to comment was insufficiently "[m]eaningful." Pls.' Br. 26. In their view, that is because FDA's publication of certain studies in the rulemaking docket—including hundreds of pages of reports summarizing and analyzing those studies, including their design, methodology, and results—did not also include the underlying raw data from each study. Plaintiffs' argument is meritless. And even if it had any merit, any procedural error was harmless.

### 1.   FDA had no obligation to publish the raw data from its studies with its "general notice of proposed rulemaking."

**a.** The APA "prescribes a three-step procedure for so-called 'notice-and-comment rulemaking.'" *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96 (2015). "First, the agency must issue a '[g]eneral notice of proposed rulemaking,' ordinarily by publication in the Federal Register." *Id.* (quoting 5 U.S.C. § 553(b)). Second, "the agency must 'give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments.'" *Id.* (quoting 5 U.S.C. § 553(c)). "Third, when the agency promulgates the final rule, it must include . . . 'a concise general statement of [its] basis and purpose.'" *Id.* (quoting 5 U.S.C. § 553(c)). The Supreme Court has "held that generally speaking this section of the [APA] established the maximum procedural requirements which Congress was willing to have the courts impose upon agencies in conducting rulemaking procedures." *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 524 (1978). Although "[a]gencies are free to grant additional procedural rights in the exercise of their discretion," "reviewing courts are generally not free to impose them if the agencies have not chosen to grant them." *Id.*

"The purpose of the comment period is to allow interested members of the public to communicate information, concerns, and criticisms to the agency during the rule-making process." *Conn. Light & Power Co. v. Nuclear Regulatory Comm'n*, 673 F.2d 525, 530 (D.C. Cir. 1982). Accordingly, the agency's notice must be detailed enough to provide a meaningful opportunity to comment: "[i]f the notice of proposed rule-making fails to provide an accurate picture of the reasoning that has led the agency to the proposed rule, interested parties will not be able to comment meaningfully upon the agency's proposals." *Id.*

**b.** FDA's notice of proposed rulemaking spanned 45 pages of the Federal Register. 84 Fed. Reg. at 42,754-98. In Section V, titled "*Data Concerning Cigarette Health Warnings*," FDA summarized the scientific literature on the continuing effectiveness (or lack thereof) of the Surgeon General's warnings, and the potential for updated, more noticeable warnings to promote greater public understanding of the health risks of smoking. *Id.* at 42,759-65. In Section VI, "*FDA's Process for Developing and Testing the Proposed Cigarette Health Warnings*," the agency described in detail all of the studies that it carried out to develop its proposal—including summaries of key data, findings, and the studies' designs and methodology. *Id.* at 42,765-72. And in Section VII, "*FDA's Proposed Required Warnings*," FDA presented its proposed new warnings, and explained the scientific bases for its determination that the warnings would promote greater public understanding of the negative health consequences of smoking. *Id.* at 42,772-77. FDA also published detailed reports, totaling hundreds of additional pages, summarizing its two quantitative studies, and cited 220 publicly available sources, including peer-reviewed journal articles, congressional findings and reports, Surgeon General's reports, and more. *See id.* at 42,789-96.

FDA later published additional reports about its qualitative studies. The agency had not released these materials simultaneously with the NPRM because it "did not rely on these studies as part of the rulemaking." 84 Fed. Reg. at 60,997. But FDA acknowledged that "the qualitative studies were used to inform further research, namely, the quantitative consumer research studies"—on which it had relied. *Id.* For that reason, FDA decided to make "these additional

materials available," *id.*, whether or not it had any obligation to do so.  It "reopen[ed] the comment period for the proposed rule for 15 days to allow comment on the additional materials."  *Id.*

As is typical, FDA did not immediately publish all of the raw data sets for each of its studies—which were immense.[25]  But those datasets have now been provided to Plaintiffs as part of the administrative record, for which the standard is broader.  *See, e.g.*, *Conservation Force v. Ashe*, 979 F. Supp. 2d 90, 98 (D.D.C. 2013) ("The 'whole' administrative record . . . consists of all documents and materials directly or indirectly considered by agency decision-makers.").

**c.**  Plaintiffs' argument—that FDA was obligated to make available *all* underlying data for comment—presumes that the APA obligates agencies to solicit comments on virtually every piece of potentially relevant factual information.   But the APA imposes no such standard: its text contemplates only a "*[g]eneral* notice of proposed rule making," including "either the *terms or substance* of the proposed rule or a *description* of the subjects and issues."  5 U.S.C. § 553(b) (emphases added); *cf. id.* § 706 (calling for judicial review based on "the *whole* record," which is generally assembled only *after* agency action is challenged in litigation) (emphasis added).  The text of 5 U.S.C. § 553(b)—which is phrased at a high level of generality, and makes no mention of studies or data—does not fit with Plaintiffs' apparent expectation that *all* of the raw data collected in *all* of FDA's studies *must* have been disclosed before the comment period.  Nor does it square with the Supreme Court's admonitions that courts are not to require more of agencies than the APA explicitly provides for.  *See Vermont Yankee*, 435 U.S. at 524.

Instead, as a general matter, "factual or methodological information which is *critical* to a proposed rule should be available in such a way as to provide an adequate opportunity for comment."  *Sierra Club v. Costle*, 657 F.2d 298, 397 n.484 (D.C. Cir. 1981) (emphasis added);

---

[25] FDA's first quantitative study included 2,505 participants, each providing data for more than 300 items, for a total of approximately 850,000 individual data points.  FDA's second quantitative study included 9,770 participants, each providing data for more than 300 items (across three survey time points) for a total of nearly 2.2 million individual data points.  And the raw data from FDA's qualitative studies included more than two thousand pages of verbatim transcripts from focus groups and interviews.  Plaintiffs purport to have identified two prior (non-FDA) rulemakings from the past 18 years in which an agency (apparently) produced some roughly analogous amount of raw data during the comment period.  Pls.' Br. 26 n.3.  But an agency can always provide more than the APA requires.  That sparse precedent, if anything, suggests that FDA's approach was consistent with the APA, and with typical agency practice.

*accord Am. Radio Relay League, Inc. v. FCC*, 524 F.3d 227, 236 (D.C. Cir. 2008) (requiring that "the 'most critical factual material' used by the agency be subjected to informed comment"). In other words, a notice of proposed rulemaking must contain "sufficient factual detail and rationale for the rule to permit interested parties to comment meaningfully," *Nat'l Lifeline Ass'n v. FCC*, 921 F.3d 1102, 1115 (D.C. Cir. 2019)—but it need not include *everything* that was before the agency. What matters is that the notice "provide an accurate picture of the reasoning that has led the agency to the proposed rule." *Connecticut Light & Power*, 673 F.2d at 530.

FDA satisfied those obligations here, by providing an opportunity to comment on "the most critical factual material used by the agency," *American Radio*, 524 F.3d at 236—that is, on *all* of the qualitative and quantitative study *reports*. Those reports distilled, summarized, and analyzed the relevant data, and the FDA's conclusions from that data, in painstaking detail, over hundreds of pages. Because the underlying raw data itself "merely supplements information in the rulemaking record by . . . confirming or corroborating" the reports that were *already* "in the rulemaking record," FDA met its obligations by soliciting comments on the reports alone. *Chamber of Commerce of U.S. v. SEC*, 443 F.3d 890, 900 (D.C. Cir. 2006) (citations omitted); *see also, e.g.*, *Solite Corp. v. EPA*, 952 F.2d 473, 484-85 (D.C. Cir. 1991) ("[B]ecause the added data was used to check or confirm prior assessments, we hold that the Agency did not violate the notice and comment provisions of the APA by using the TSDR data."); *accord Chem. Mfrs. Ass'n v. EPA*, 870 F.2d 177, 200, 202 (5th Cir.) (no error, and any error would have been harmless, where agency "rel[ied] on economic data . . . that were never made available to the public for comment," because the agency "adequately advised interested parties of the method the [agency] had followed" through other means), *clarified on other grounds on reh'g*, 885 F.2d 253 (5th Cir. 1989).

**d.** Plaintiffs cite cases in which the D.C. Circuit has stated (often without elaboration) that an agency should "reveal[] for public evaluation . . . the technical studies and data upon which the agency relies in its rulemaking." *American Radio*, 524 F.3d at 236; *see also Chamber of Commerce*, 443 F.3d at 899; *Connecticut Light & Power*, 673 F.2d at 530. But none of those cases arose in a circumstance like this, in which the agency published fully unredacted and complete

*reports* summarizing and analyzing all of the (voluminous) data at issue—such that the only marginal value that could come from *also* publishing all of the underlying data itself would be to confirm, perhaps, that the FDA was not manufacturing the data, or that it had not made some basic calculation error.  Plaintiffs have alleged nothing of the sort.  Here, the study reports alone "provide an accurate picture of the reasoning that has led the agency to the proposed rule," and that is enough.  *Connecticut Light & Power*, 673 F.2d at 530.

For example, in *American Radio*, the FCC prepared reports about studies that contained "staff-prepared scientific data," and it "chose[] to rely on the data in those studies"—but it only "place[d] the *redacted*" versions of those reports "in the rulemaking record."  524 F.3d at 239 (emphasis added).  And the D.C. Circuit believed that "the unredacted portions [we]re likely to contain evidence that could call into question the Commission's decision to promulgate the rule." *Id.*  By contrast, FDA here produced complete, unredacted study reports summarizing and analyzing *all* of the raw data in question.  Accordingly, earlier access to the raw data would have offered "only supplementary information merely clarifying [or] expanding . . . other data that *has* been offered for comment." *Id.* (emphasis added, alterations and citation omitted).  The D.C. Circuit made clear in *American Radio* that that is a material distinction, and even emphasized "[t]he narrowness of [its] holding" on this question.  *Id.*

Much the same can be said for Plaintiffs' other authorities.  *Chamber of Commerce v. SEC* might have offered an apt analogy if FDA had withheld the *study reports themselves*.  That case turned on the SEC's decision to "base its cost estimates" for a rulemaking "on an extra-record summary of extra-record survey data" that the plaintiff had no reason to believe would be relied upon, because it "was not the sort . . . relied upon by the Commission during the normal course of its official business."  443 F.3d at 904-05.  Here, by contrast, FDA not only informed the public about its reliance on these studies and study reports—it published them in their entirety—and there was nothing unexpected about FDA's reliance on this type of information.

*Connecticut Light & Power* similarly supports Defendants.  There, the D.C. Circuit held that the agency's "unhelpful" approach nonetheless *satisfied the APA*, despite an acknowledged

failure to even "*identify* the technical studies upon which the proposed rules were based"—let alone to actually publish reports or data about those studies during the rulemaking. 673 F.2d at 532 (emphasis added). Although the panel noted that "it would have been better practice for the NRC to have identified these technical materials specifically in the notice of proposed rule-making," it held that to be unnecessary under the APA, in part because of "a background of five years during which the Commission explored safety proposals in a public forum and exposed the important technical studies to adversarial comment." *Id.* Here, FDA unquestionably opened up its "important technical studies to adversarial comment"—including, unlike in *Connecticut Light & Power*, in this very rulemaking—in the form of detailed reports about those studies that were not just "identified" by the agency, but were actually published in the rulemaking docket. And setting all of that aside, even if FDA *had* fallen short of best practices, this Rule similarly came at the tail end of nearly a decade of give-and-take with the industry about these precise issues.[26]

Plaintiffs make much of an FDA memorandum that noted that publishing raw study data could allow third parties to analyze it in potentially "selective, biased, or misleading ways," Pls.' Br. 4, 18-19, 27; *see* AR 23863.1 (citing literature cautioning against deviating from a preselected statistical analysis plan, to guard against data dredging). But that memorandum has no bearing on whether FDA satisfied its notice-and-comment obligations under the APA, which it did. And Plaintiffs ignore portions of the same memorandum that undermine their position—for example, that the quantitative study reports "contain all the necessary scientific and technical information for the public to assess the adequacy of the studies' methods, stimuli, participant samples, and statistical analyses performed to address the studies' aims and to ensure that the studies are valid and scientifically rigorous," that "the raw data are not necessary for replicating the studies or evaluating the adequacy or scientific rigor of FDA's consumer research," AR 23863.1, and that "[b]ecause the themes and feedback from the qualitative studies were comprehensively

---

[26] Plaintiffs' final authority, *Sprint v. FCC*, 315 F.3d 369 (D.C. Cir. 2003) (cited in Pls.' Br. 27), is even further afield. Among other things, in that case, the FCC "concede[d] that it did not publish a NPRM . . . in the Federal Register" at all. *Id.* at 374.

summarized in the study reports, the verbatim transcripts are not needed to meaningfully comment on the adequacy or scientific rigor of the qualitative studies," AR 23863.2.

### 2.      Any notice-and-comment error was harmless.

For these reasons, there was no notice-and-comment error at all.  But even if the Court disagrees, Plaintiffs have still failed to carry their burden to show that any error was prejudicial. The APA expressly provides that "due account shall be taken of the rule of prejudicial error."  5 U.S.C. § 706.  And so, "[i]n administrative law, . . . there is a harmless error rule."  *NAHB*, 551 U.S. at 659-60 (quoting *PDK Labs., Inc. v. DEA*, 362 F.3d 786, 799 (D.C. Cir. 2004)).  Under that rule, "[i]f the agency's mistake did not affect the outcome, if it did not prejudice the petitioner, it would be senseless to vacate and remand."  *PDK Labs.*, 362 F.3d at 799.  "The party claiming injury bears the burden of demonstrating harm; the agency need not prove its absence."  *Combat Veterans for Cong. Political Action Comm. v. FEC*, 795 F.3d 151, 157 (D.C. Cir. 2015).

As explained above, all of FDA's studies were described in hundreds of pages of unredacted reports made available for public comment, which provided more than enough detail for interested parties to understand the agency's reasoning, and to analyze, respond to, and critique the agency's work.  In fact, Plaintiffs did just that—offering multiple rounds of extensive commentary before the agency about what they believe to be shortcomings with FDA's studies. Despite now having access to the raw data, Plaintiffs never persuasively explain how their comments would have meaningfully differed if the full datasets were published earlier, alongside FDA's detailed reports about that data.

Tellingly, outside experts found the absence of the raw study data to be no obstacle to meaningful analysis and commentary on FDA's studies.  During the rulemaking, six peer reviewers, selected by an independent contractor, were charged with "provid[ing] input on the clarity of the documents describing [FDA's] studies and the soundness of the design and analysis of the studies."  AR 54057 (Peer Review Report).  Each was asked: "Is sufficient information provided about the study design, stimuli, sample, methods, analysis, and results?"  *Id.*  And

although they asked other questions, and even requested other sorts of information—as peer reviewers do—*none* of the peer reviewers raised any concern with the amount of data that had been provided, nor did they request any of the raw study data. *See, e.g.*, *id.* at 26 ("Yes, I thought that there was plenty of detailed information about the design, stimuli, sampling methods, and analysis both in the two documents that made up Study 1 plus the supplementary materials."); *id.* at 57 ("Yes.  The methods section was thorough and detailed."); *see also id.* at 43 ("The document is exceedingly clear in its purpose and in its style of communicating. . . . Level of detail, particularly as it relates to the analytic plan and results, are crystal clear—supporting transparency of this endeavor.").  Plaintiffs had access to all of the same information.  If experts in the field did not need additional data to offer meaningful commentary, neither did Plaintiffs.[27]

In any event, Plaintiffs are now in possession of all of the raw study data in question, which was included in the administrative record.  Predictably, none of it was material to any of Plaintiffs' arguments.  In their brief, Plaintiffs only make two attempts to show prejudice with any specificity: (1) as for the quantitative study data, Plaintiffs claim that it "raise[s] red flags about FDA's study design and the efficacy of the graphic warnings," Pls.' Br. 28; and (2) as for the qualitative study data (*i.e.*, focus group and interview transcripts), Plaintiffs claim that it proves that the study reports "downplayed important reactions to FDA's proposed text and images," *id.* at 29. Defendants have already explained why these cherry-picked charges are baseless.  *See supra* at 21 25 n.12, 34.  But even setting aside their merit, these are the same sorts of critiques that Plaintiffs *already* offered (and to which FDA already responded) during the rulemaking.[28]  Plaintiffs have

---

[27] Separately, Plaintiffs mention in passing and in one sentence (Pls.' Br. 27) that this peer-review report was itself published only along with the Final Rule.  But they appear not to actually advance this as a separate notice-and-comment argument—for good reason.  The peer review report was prepared by independent experts who, like Plaintiffs, were reviewing material that FDA had published on the rulemaking docket.  Plaintiffs do not cite (and Defendants are not aware of) any authority for the proposition that an agency must solicit yet another round of comments about prior comments already received.  "Were it otherwise, an agency could find itself stuck in an infinite feedback loop of public comments on responses to public comments."  *Alaska v. Lubchenco*, 825 F. Supp. 2d 209, 224 (D.D.C. 2011).  Nor have Plaintiffs offered any argument as to how they could have been prejudiced by a lack of opportunity to comment on the peer reviewers' comments—which would have been independently fatal to this argument, had Plaintiffs actually pressed and preserved it.

[28] *See, e.g.*, Altria Client Servs., Cmt. (Oct. 15, 2019) at 33, AR 28506 ("FDA's cited research is inadequate on its face, and falls far short of the substantial evidentiary threshold FDA would need to clear."); *id.* at 34, AR 28507

not "put forward any data or information that would cast doubt on any particular" conclusion reached by FDA. *Alfa Int'l Seafood v. Ross*, 264 F. Supp. 3d 23, 57 (D.D.C. 2017). For these reasons, any notice-and-comment error was harmless. *See, e.g.*, *Chem. Mfrs. Ass'n*, 870 F.2d at 202 ("[W]e fail to discern any substantial prejudice from the EPA's use of the 1981-86 Dun & Bradstreet data to supplement the other information on which it relied. We therefore decline to overturn the regulations because of the EPA's use of undisclosed supplementary economic data.").

## IV.   PLAINTIFFS' REQUESTS FOR RELIEF ARE OVERBROAD.

Plaintiffs' claims lack merit, and the Court should enter summary judgment for Defendants. But if the Court disagrees, Plaintiffs' requested relief is still overbroad. First, both the Tobacco Control Act and the Rule contain express severability clauses, which this Court should respect by severing any unlawful portions of the Rule while leaving the rest in place. Second, Article III and general principles of equity confirm that any relief should be limited to these Plaintiffs. Third, the motion for a preliminary injunction should be denied, among other reasons because it is now unnecessary, as this case can be litigated to final judgment on the same timeline that Plaintiffs' preliminary-injunction motion would be decided, and before Plaintiffs suffer any irreparable harm.

### A.   Any unlawful portions of the Rule should be severed.

Defendants are confident that the Rule is lawful in its entirety. In any case, at an absolute minimum, and as explained above, *see supra* at 30-31, the lawfulness of the warning statements themselves—*i.e.*, of the warnings' *text*—cannot be reasonably disputed. Accordingly, to the extent the Court concludes that only some portions of the Rule are unlawful, it should still decline Plaintiffs' bold invitation to vacate the Rule in its entirety.

Typically, "[w]hether the offending portion of a regulation is severable depends upon [1] the intent of the agency and [2] upon whether the remainder of the regulation could function

---

("[T]hese studies are inherently biased."); *id.* at 36, AR 28509 ("The results of these studies . . . do not support the Proposed Rule."); *id.* at 46, AR 28519 ("The new proposed warnings . . . require manufacturers to feature content designed to provoke emotional responses that dissuade consumers from buying cigarettes."); *id.* at 51, AR 28524 ("Those images are clearly designed to 'evoke emotion' . . . rather than impart accurate or useful information regarding the health risks of cigarettes."); *id.* at 53, AR 28526 ("FDA's selected images do not themselves enhance understanding of the health risks mentioned in the textual warnings.").

sensibly without the stricken provision." *MD/DC/DE Broadcasters Ass'n v. FCC*, 236 F.3d 13, 22 (D.C. Cir. 2001). The Rule easily satisfies those requirements. But here, that inquiry is not even necessary, because Congress specified in the Tobacco Control Act itself that the Rule's requirements are severable. *See* 21 U.S.C. § 387 (note).

**1.** In Section 5 of the Tobacco Control Act—titled "Severability"—Congress included a broad severability clause that not only covers challenges to the statute, but also specifically considers the possibility that portions of FDA *regulations* issued *pursuant to* the statute might be subject to litigation. Congress expressed a clear intent in favor of maximal severability:

> **Severability**
> If any provision of this division, of the amendments made by this division, or of the regulations promulgated under this division (or under such amendments), or the application of any such provision to any person or circumstance is held to be invalid, the remainder of this division, such amendments and such regulations, and the application of such provisions to any other person or circumstance shall not be affected and shall continue to be enforced to the fullest extent possible.

21 U.S.C. § 387 (note). This provision leaves no doubt as to Congress's intent that any portion of any relevant regulation that is found to be invalid should be severed from the remainder. That is enough to resolve any severability question that arises here.

**2.** The agency's intent that any invalid portion of the Rule should be severed appears to be undisputed, and for good reason: in a section of the Rule titled "Severability," FDA was uncommonly explicit that, "in a circumstance where some but not all of the rule's provisions are invalidated, FDA's intent is for the other provisions to go into effect." 85 Fed. Reg. at 15,695; *see also id.* ("FDA intends for the various requirements established by this rulemaking to be severable."); *id.* ("FDA has concluded that the individual aspects of this rule are workable on their own and should go forward in the event that some are invalidated."). FDA could not have been clearer about its intent, going so far as to list specific non-exhaustive examples of circumstances in which a severability analysis might be relevant:

> As the proposed rule indicated, if a court were to invalidate some of the cigarette health warnings (i.e., text-and-image pairings), but some of the

> pairings remained valid, FDA intends that the remaining required warnings
> would go into effect. As another example, if a court were to invalidate some
> but not all of the images within the cigarette health warnings, FDA intends
> that those images would be severed and the corresponding textual warning
> statements would go into effect without the invalidated images, along with
> the remaining cigarette health warnings that pair a textual warning
> statement with an image. As a third example, if a court were to invalidate
> all of the images within the cigarette health warnings, FDA intends for the
> invalidated images to be severed and all the warnings to go into effect with
> only their textual warning statements.

*Id.* Given the clarity of these statements from FDA (not to mention Congress), there can be no reasonable dispute: if necessary, FDA's intends that any unlawful portions of the Rule be severed.

**3.** The final severability question is "whether the remainder of the regulation could function sensibly without the stricken provision." *MD/DC/DE Broadcasters*, 236 F.3d at 22. Here again, FDA made explicit findings: "FDA has considered each provision independently and concluded that the individual portions . . . are workable on their own." 85 Fed. Reg. at 15,695. That conclusion is entitled to deference and, in any event, is sensible. Although FDA believes that the Rule as a whole will best serve the government's interest, even portions of it would be an improvement over the status quo, given Congress's and FDA's well-documented conclusions that "the current 1984 Surgeon General's warnings ha[ve] become 'ineffective in providing adequate warnings about the dangers of tobacco products.'" *Id.* at 15,644 (citing congressional findings). Indeed, FDA determined that *each* warning "demonstrate[s] statistically significant improvements, as compared to the current Surgeon General's warnings," with respect to FDA's key "new information" and "self-reported learning" metrics (and "also led to more thinking about risks; were higher on perceived informativeness, perceived understandability, and perceived helpfulness [in] understanding health effects; attracted more attention; and were better recalled"). *Id.* at 15,658. And one warning statement does not depend on the others for its meaning or its effectiveness. Thus, if the Court found certain warnings problematic, leaving the others in place would still further the government's interests and "leave a sensible regulation in place," *MD/DC/DE Broadcasters*, 236 F.3d at 22—albeit one that falls short of FDA's and Congress's full intent.

**4.** Plaintiffs note correctly that the D.C. Circuit in *R.J. Reynolds I* vacated FDA's previous rule in its entirety, *see* 696 F.3d at 1222, but severability was not raised in the government's briefs, so the D.C. Circuit never discussed it.  Nor are speculative "implementation challenges," Pls.' Br. 61, a valid basis to ignore the clear intent (and clear findings) of Congress or the agency in favor of maximum severability.  In the event of a partial vacatur, FDA could exercise its remaining discretion to ensure that the surviving portions of the Rule were implemented sensibly.

### B.      Nationwide relief is inappropriate.

Ordering nationwide relief that would run to the benefit of non-parties—whether through vacatur under the APA, a preliminary injunction, or a permanent injunction—would be inconsistent with Article III, longstanding equitable doctrine, and the text of the Tobacco Control Act.  Instead, any relief should be limited to Plaintiffs.

**1.**  "Article III of the Constitution limits the exercise of the judicial power to 'Cases' and 'Controversies.'"  *Town of Chester v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1650 (2017) (citation omitted).  A federal court may entertain a suit only by a plaintiff who has suffered an "injury in fact," and the court may grant relief only to remedy "the inadequacy that produced [the plaintiff's] injury."  *Gill v. Whitford*, 138 S. Ct. 1916, 1929, 1930 (2018) (citations omitted).  In short, neither standing nor remedies are "dispensed in gross."  *Lewis v. Casey*, 518 U.S. 343, 358 n.6 (1996).

Principles of equity reinforce those constitutional limitations.  A court's equitable authority is generally limited to relief "traditionally accorded by courts of equity" in 1789.  *Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 319 (1999).  In that tradition, injunctive relief may "be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs" in that case.  *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979).  Nationwide injunctions are irreconcilable with these constitutional and equitable limitations, because they extend relief to those who were not "plaintiff[s] in th[e] lawsuit, and hence were not the proper object of th[e court's] remediation."  *Lewis*, 518 U.S. at 358.

**2.**  Nationwide relief would be particularly inappropriate where, as here, litigation in other districts is not merely hypothetical but presently ongoing, and the regulatory scheme at issue is important and complex.  FDA is currently defending a nearly identical lawsuit in Texas.  *See R.J. Reynolds Tobacco Co. v. FDA*, No. 6:20-cv-00176-JCB (E.D. Tex., filed April 3, 2020).  Courts have recognized the importance of allowing such legal questions to percolate through the federal judiciary.  *See, e.g.*, *L.A. Haven Hospice, Inc. v. Sebelius*, 638 F.3d 644, 664 (9th Cir. 2011) (citing *Yamasaki*, 442 U.S. at 702); *Va. Soc'y for Human Life, Inc. v. FEC*, 263 F.3d 379, 393-94 (4th Cir. 2001).  Short-circuiting that percolation "take[s] a toll on the federal court system."  *Trump v. Hawaii*, 138 S. Ct. 2392, 2425 (2018) (Thomas, J., concurring).

For example, should FDA prevail in the (latest) *R.J. Reynolds* case, ordering nationwide relief here would effectively deprive the United States of the benefit of that victory—even in the Eastern District of Texas, and even with respect to litigation adversaries that (by hypothesis) FDA defeated in court on more-or-less the same claims.  The potential for that bizarre and inequitable result illustrates one of the many practical problems with nationwide injunctions, particularly in the context of litigation against the federal government.  *See Dep't of Homeland Sec. v. New York*, 140 S. Ct. 599, 601 (2020) (Gorsuch, J., concurring).

**3.**  Plaintiffs' inclusion of APA claims does not justify a departure from these principles.  Nothing in the APA's directive to "set aside" unlawful "agency action" mandates that "agency action" shall be set aside globally, rather than as applied to the plaintiffs.  5 U.S.C. § 706(2).  And Congress enacted the APA against a background rule that statutory remedies should be construed in accordance with "traditions of equity practice."  *Hecht Co. v. Bowles*, 321 U.S. 321, 329 (1944).  While Congress "may intervene and guide or control the exercise of the courts' discretion," courts should "not lightly assume that Congress has intended to depart from established [equity] principles."  *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 313 (1982).

In fact, here, Congress *did* "intervene" to "control the exercise of the courts' discretion," *id.*—in the TCA itself.  In the statute's severability clause, Congress specified that, even if "the application of any [] provision [of the TCA] to *any person or circumstance* is held to be invalid,

71

the remainder of [the TCA or of regulations promulgated under it] . . . and the application of such provisions to *any other person or circumstance* shall not be affected and shall continue to be enforced to the fullest extent possible."  21 U.S.C. § 387 (note) (emphases added).  Accordingly, this Court need not wade into the broader debate about the overall propriety of nationwide injunctions—nor feel constrained by the APA's "set aside" language, 5 U.S.C. § 706(2), or the D.C. Circuit's interpretation of that language in cases like *Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998).  Instead, the Court should follow the more specific, and more recent, statutory language in the TCA, which counsels against relief that would run to non-parties.  *See, e.g.*, *Brown & Williamson*, 529 U.S. at 133 ("[T]he meaning of one statute may be affected by other Acts, particularly where Congress has spoken subsequently and more specifically to the topic at hand.").

C. **Plaintiffs' motion for a preliminary injunction should be denied.**

Plaintiffs also seek a preliminary injunction, which is being briefed simultaneously with the parties' cross motions for summary judgment.  But it makes no practical sense to decide this case in a preliminary-injunction posture when it can be litigated to final judgment on the same timeline, and before Plaintiffs will suffer any irreparable harm.  Plaintiffs' request for a preliminary injunction should therefore be denied—both because Plaintiffs have failed to carry their burden to demonstrate entitlement to this "extraordinary remedy never awarded as of right," *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008), and because it is now unnecessary.

1. **A preliminary injunction is unnecessary because this case can be litigated to final judgment before Plaintiffs suffer any irreparable harm.**

It will be no easier for this Court to decide the preliminary-injunction motion than the parties' summary-judgment motions—all will turn, essentially, on the same legal arguments.  A preliminary injunction, then, is both unnecessary and inappropriate: assuming Plaintiffs persuade

this Court on the merits—as they must for any of these remedial questions to matter[29]—it is not the case that Plaintiffs "would suffer irreparable injury if the injunction were not granted." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). Instead, the Court will simply enter judgment for Plaintiffs, vacate the Rule, and remand to the agency.

Plaintiffs rely on an alleged "prospective" First Amendment injury, fearing that they "*will* suffer" a violation of their First Amendment rights once the rule takes effect. Pls.' Br. 62 (emphasis added). But even assuming that Plaintiffs *will* suffer a valid First Amendment injury, no plaintiff will suffer any such injury until the Rule takes effect in October of 2021—a year away, and likely well after this Court's final judgment will issue.

Plaintiffs also argue that they face unrecoverable compliance costs, and that any economic loss arising from a suit against a defendant with sovereign immunity is per se irreparable. *See* Pls.' Br. 63. But "not only is such a rule not the law of this Circuit, but it would also effectively eliminate the irreparable harm requirement." *Air Transp. Ass'n of Am., Inc. v. Exp.-Imp. Bank of the U.S.*, 840 F. Supp. 2d 327, 335 (D.D.C. 2012) (Boasberg, J.). Instead, "[t]he wiser formula requires that the economic harm be significant, even where it is irretrievable because a defendant has sovereign immunity." *Id.*; *accord Nat'l Min. Ass'n v. Jackson*, 768 F. Supp. 2d 34, 53 (D.D.C. 2011); *ConverDyn v. Moniz*, 68 F. Supp. 3d 34, 49 (D.D.C. 2014).

To be sure, "[e]conomic harm may constitute irreparable injury . . . when 'the loss threatens the very existence of the movant's business.'" *Air Transp. Ass'n*, 840 F. Supp. 2d at 336 (quoting *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985)). But here, Plaintiffs have not even *attempted* to make the requisite "strong showing that the economic loss would significantly damage its business above and beyond a simple diminution in profits," *Mylan Pharms., Inc. v. Shalala*, 81 F. Supp. 2d 30, 43 (D.D.C. 2000), nor demonstrated that any economic losses would "cause extreme hardship to the business, or even threaten destruction of the business," *Gulf Oil*

---

[29] *Winter* itself makes this clear. Since *Winter*, the D.C. Circuit "has hinted, though not held, that *Winter* . . . should be read to abandon the sliding-scale approach in favor of requiring that likelihood of irreparable harm and likelihood of success are independent, free-standing requirements." *Nat'l Ass'n of the Deaf v. Trump*, No. 20-cv-2107 (JEB), 2020 WL 5411171, at *3 (D.D.C. Sept. 9, 2020) (citations omitted).

*Corp. v. Dep't of Energy*, 514 F. Supp. 1019, 1025 (D.D.C. 1981). Accordingly, they have failed to carry their burden to show that a preliminary injunction is necessary to prevent irreparable harm.

### 2.     The Rule should take effect on October 16, 2021.

"The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). Plaintiffs ask this Court to take that familiar procedural mechanism one step farther: by seeking an order that would "allow Plaintiffs to continue to use their current packaging and advertising until *15 months after* this Court issues final judgment." Pls.' Br. 65 (emphasis added). In other words, Plaintiffs not only want to preserve the status quo until this case can be litigated to final judgment, they want to shield themselves from regulation for an *additional* 15 months after the litigation ends—even if this Court decides their claims are entirely meritless.

Plaintiffs cite no authority to support that request, and the Court should reject it. Instead, should Defendants prevail, the Rule should take effect on October 16, 2021, as currently scheduled—under those circumstances, there would be no legal basis for the Court to order any further delay. Likewise, should the Court *reject* Defendants' arguments and enter a preliminary injunction, that injunction would be necessary only *until* the merits could be resolved. And even if the Court ultimately enters a final judgment vacating the Rule and remanding to the agency, at that point, it would still be up to the *agency*, in the first instance, to decide how and when to address whatever legal defects had been identified by the Court—including the precise timing of any further agency action. *See, e.g.*, *Palisades Gen. Hosp. Inc. v. Leavitt*, 426 F.3d 400, 403 (D.C. Cir. 2005); *Baystate Med. Ctr. v. Leavitt*, 587 F. Supp. 2d 37, 41 (D.D.C. 2008) (collecting cases).

### 3.     The public interest disfavors injunctive relief.

This lawsuit is only the most recent in a long history of tobacco industry efforts to resist (or at least delay) disclosure of information about their deadly products. Further delay is plainly not "in the public interest." *Winter*, 555 U.S. at 20. Generations of Americans have been ravaged by nicotine addiction and smoking-related disease, often with an inadequate appreciation of those

risks until it was far too late—due in part to deliberate deception by Plaintiffs and their competitors. Remarkably, these Plaintiffs argue here that "[a]s for the public interest, consumers have a self-evident interest in avoiding potential misinformation." Pls.' Br. 65. The Court can draw its own conclusion as to whether that interest is better served by allowing the warnings to take effect, or by enjoining them on Plaintiffs' theory that the warnings are "misleading" because they warn simultaneously about "conditions with high mortality rates (like head and neck cancer)" and also "chronic non-fatal conditions (like erectile dysfunction and diabetes)," Pls.' Br. 59; *see also supra* at 35-36—conditions that are all undisputedly caused by smoking cigarettes.

Consumers continue to suffer from a pervasive lack of knowledge about many of the negative health consequences of smoking. Neither the First Amendment nor the APA prohibits Congress and FDA from working together to try to narrow the remaining information gap, helping current and future smokers (or potential smokers) better understand these matters of life and death.

## CONCLUSION

For these reasons, the Court should deny Plaintiffs' motions for summary judgment and for a preliminary injunction, and enter summary judgment for Defendants on all claims.

Dated: October 8, 2020

Of Counsel:

ROBERT P. CHARROW
General Counsel

STACY CLINE AMIN
Chief Counsel
Food and Drug Administration
Deputy General Counsel
United States Department of Health and
Human Services

PERHAM GORJI
Deputy Chief Counsel for Litigation

JULIE B. LOVAS
Senior Counsel
Office of the Chief Counsel
Food and Drug Administration
10903 New Hampshire Avenue
Bldg. 31, Room 4520
Silver Spring, MD 20993-0002
(301) 796-8575

JEFFREY BOSSERT CLARK
Acting Assistant Attorney General

ERIC B. BECKENHAUER
Assistant Branch Director

/s/ Michael H. Baer
MICHAEL H. BAER (New York 5384300)
STEPHEN M. PEZZI (D.C. Bar No. 995500)
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20005
Tel: (202) 305-8574
Email: Michael.H.Baer@usdoj.gov

*Counsel for Defendants*