**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____

PHILIP MORRIS USA INC.,

SHERMAN GROUP HOLDINGS, LLC,

      Plaintiffs,

v.

UNITED STATES FOOD AND DRUG
ADMINISTRATION,

UNITED STATES DEPARTMENT OF
HEALTH AND HUMAN SERVICES,

STEPHEN M. HAHN, in his official capacity
as Commissioner of the United States Food
and Drug Administration,

ALEX AZAR, in his official capacity as
Secretary of the United States Department of
Health and Human Services,

      Defendants.

_____

Case No.:  20-cv-1181 (KBJ)

**CONSOLIDATED REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY
JUDGMENT AND A PRELIMINARY INJUNCTION AND IN OPPOSITION TO
DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT**

LISA S. BLATT (D.C. Bar No. 429544)
STEPHEN D. ANDREWS (D.C. Bar No. 470994)
SARAH M. HARRIS (D.C. Bar No. 1004964)
MATTHEW J. GREER (D.C. Bar No. 241858)
WILLIAMS & CONNOLLY LLP
  725 Twelfth Street N.W.,
  Washington, D.C. 20005
  Tel.:  (202) 434-5000
  Fax:  (202) 434-5029
  lblatt@wc.com
  sandrews@wc.com
  sharris@wc.com
  mgreer@wc.com

Attorneys for Plaintiffs Philip Morris USA Inc.
and Sherman Group Holdings, LLC

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ............................................................................................................1

I.      FDA's Rule Violates the APA ..........................................................................2

        A.      FDA Unlawfully Promulgated 11 Warnings ........................................2

        B.      FDA Unlawfully Discarded Three TCA-Mandated Warnings ..............7

        C.      FDA Unlawfully Withheld Information Central to Its Rulemaking.......9

        D.      FDA's Selection of Featured Health Risks Was Arbitrary and Capricious...........14

        E.      FDA Arbitrarily Evaluated Consumer Understanding ........................16

        F.      FDA's Reliance on Inapt Foreign Evidence Was Arbitrary and Capricious.........23

II.     FDA's Rule Violates the First Amendment.....................................................24

        A.      FDA's Size and Placement Requirements Are Unconstitutional .........24

        B.      FDA's Rule Unconstitutionally Requires Inflammatory Messages......29

        C.      The Rule's Warnings Are Misleading .................................................35

III.    Plaintiffs are Entitled to Vacatur of the Entire Rule and a Preliminary Injunction ..........37

        A.      Plaintiffs Are Entitled to Vacatur of the Entire Rule ...........................37

        B.      Plaintiffs Are Entitled to a Preliminary Injunction ..............................38

CONCLUSION...............................................................................................................40

## TABLE OF AUTHORITIES

Cases:

*Abdullah v. Bush*, 945 F. Supp. 2d 64 (D.D.C. 2013) ................................................................39

*Action for Childs. Television v. FCC*, 58 F.3d 654 (D.C. Cir. 1995) ........................................27

*Air Transp. Ass'n of Am., Inc. v. Export-Import Bank of the U.S.*,
    840 F. Supp. 2d 327 (D.D.C. 2012) ......................................................................................39

*Am. Acad. of Pediatrics v. FDA*,
    No. 16-cv-11985, 2019 WL 1047149 (D. Mass. 2019) ........................................................40

*Am. Beverage Ass'n v. City & Cnty. of S.F.*, 916 F.3d 749 (9th Cir. 2019) .................26, 27, 28

*Am. Meat Inst. v. U.S. Dep't of Agric.*, 760 F.3d 18 (D.C. Cir. 2014) ...................28, 29, 32, 34

*Am. Pub. Gas Ass'n v. Fed. Power Comm'n*, 567 F.2d 1016 (D.C. Cir. 1977) .........................24

*Am. Radio Relay League v. FCC*, 524 F.3d 227 (D.C. Cir. 2008) ..................................9, 10, 11

*Barr v. Am. Ass'n of Political Consultants, Inc.*, 140 S. Ct. 2335 (2020) ................................24

*Bates Cnty. Mem'l Hosp. v. Azar*, 464 F. Supp. 3d 43 (D.D.C. 2020) ........................................7

*Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281 (1974) ............................15

*Braintree Elec. Light Dep't v. FERC*, 667 F.3d 1284 (D.C. Cir. 2012) ......................................6

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*,
    447 U.S. 557 (1980) .............................................................................................................26

*Chamber of Commerce v. SEC*, 443 F.3d 890 (D.C. Cir. 2006) ............................10, 11, 13, 14

*\*Cigar Ass'n of Am. v. FDA*, 964 F.3d 56 (D.C. Cir. 2020) .........................................9, 27, 30, 38

*Citizens United v. FEC*, 558 U.S. 310 (2010) .....................................................................28, 34

*Conn. Light & Power Co. v. Nuclear Regul. Comm'n*, 673 F.2d 525 (D.C. Cir. 1982) .....11, 13

*Discount Tobacco City & Lottery, Inc. v. United States*, 674 F.3d 509 (6th Cir. 2012) .....27, 30

*Dist. Hosp. Partners v. Burwell*, 786 F.3d 46 (D.C. Cir. 2015) ................................................15

*District of Columbia v. U.S. Dep't of Agric.*, 444 F. Supp. 3d 1 (D.D.C. 2020) ......................38

*Edenfield v. Fane*, 507 U.S. 761 (1993) ...................................................................................34

*Entm't Software Ass'n v. Blagojevich*, 469 F.3d 641 (7th Cir. 2006) .......................................26

*Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612 (2018) .......................................................................6

*Esch v. Yeutter*, 876 F.2d 976 (D.C. Cir. 1989) .......................................................................25

*Gordon v. Holder*, 721 F.3d 638 (D.C. Cir. 2013) ...................................................................40

*Harmon v. Thornburgh*, 878 F.2d 484 (D.C. Cir. 1989) ...........................................................37

*Holiday CVS, LLC v. Holder*, 839 F. Supp. 2d 145 (D.D.C. 2012) .........................................39

*Huff v. Vilsack*, 195 F. Supp. 3d 343 (D.D.C. 2016) ................................................................17

Page:

Cases—continued:

*Iancu v. Brunetti*, 139 S. Ct. 2294 (2019) ...............................................................24

*Ibanez v. Fla. Dep't of Bus. & Prof'l Regul., Bd. of Accountancy*, 512 U.S. 136 (1994)...25, 33

*Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525 (2001) ............................................31

*MD/DC/DE Broads. Ass'n v. FCC*, 236 F.3d 13 (D.C. Cir. 2001) ...........................38

*Merck & Co. v. HHS*, 962 F.3d 531 (D.C. Cir. 2020)................................................6

*Michigan v. EPA*, 576 U.S. 743 (2015).....................................................................6

*Milavetz, Gallop & Milavetz, P.A. v. United States*, 559 U.S. 229 (2010) ...............34

*Moose Jooce et al. v. FDA*, No. 20-5048 (D.C. Cir. Dec. 1, 2020) ...........................7

*Nat. Res. Def. Council, Inc. v. EPA*, 25 F.3d 1063 (D.C. Cir. 1994) ........................7

*\*Nat'l Inst. of Fam. & Life Advocates v. Becerra (NIFLA)*,
138 S. Ct. 2361 (2018) ...................................................................... *passim*

*Nat'l Mfrs. Ass'n v. SEC*, 800 F.3d 518 (D.C. Cir. 2015)............................30, 31, 34

*Nat'l Mining Ass'n v. Jackson*, 768 F. Supp. 2d 34 (D.D.C. 2011) ...........................39

*Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399 (D.C. Cir. 1998)...............37

*Nicopure Labs, LLC v. FDA*, 944 F.3d 267 (D.C. Cir. 2019) ...................................35

*NLRB v. Sw. Gen., Inc.*, 137 S. Ct. 929 (2017) ......................................................28

*PDK Labs, Inc. v. DEA*, 362 F.3d 786 (D.C. Cir. 2004) ..........................................13

*PG&E v. Public Util. Comm'n*, 475 U.S. 1 (1986) ..................................................32

*Portland Cement Ass'n v. Ruckelshaus*, 486 F.2d 375 (D.C. Cir. 1973) .................11

*Pub. Citizen, Inc. v. FAA*, 988 F.2d 186 (D.C. Cir. 1993) .......................................20

*\*R.J. Reynolds Tobacco Co. v. FDA*, 696 F.3d 1205 (D.C. Cir. 2012)........................... *passim*

*R.J. Reynolds Tobacco Co. v. FDA*, No. 20-cv-00176 (E.D. Tex., May 8, 2020) .............39, 40

*R.J. Reynolds Tobacco Co. v. U.S. Food & Drug Admin.*,
823 F. Supp. 2d 36 (D.D.C. 2011) ....................................................................40

*Reed v. Town of Gilbert*, 576 U.S. 155 (2015)........................................................24

*Rotkiske v. Klemm*, 140 S. Ct. 355 (2019)................................................................4

*SEC v. Chenery Corp.*, 318 U.S. 80 (1943)...............................................................21

*Tele. & Data Sys., Inc. v. FCC*, 19 F.3d 42 (D.C. Cir. 1994) ..................................37

*U.S. Sugar Corp. v. EPA*, 830 F.3d 579 (D.C. Cir. 2016)........................................15

*Util. Air Regul. Grp. v. EPA*, 573 U.S. 302 (2014) ..................................................6

*Verizon Cal., Inc. v. FCC*, 555 F.3d 270 (D.C. Cir. 2009).......................................25

Page:

Cases—continued:

*Wash. Ass'n for Television & Child. v. FCC*, 712 F.2d 677 (D.C. Cir. 1983) ............................7

*Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health and Human Servs.*, |
    No. 20-1630, 2020 WL 5232076 (D.D.C. 2020) ............................................................38

*Zauderer v. Off. of Disciplinary Counsel of Supreme Court of Ohio*,
    471 U.S. 626 (1985) ............................................................................................... *passim*

Constitution, Statutes, and Regulations:

*U.S. Const. amend. I ............................................................................................... *passim*

5 U.S.C. § 706(2) ..................................................................................................................37

6 U.S.C. § 672 ........................................................................................................................2

15 U.S.C.
    § 1333 ..............................................................................................................................5
    § 1333(a) .....................................................................................................................2, 3
    § 1333(a)(1) ............................................................................................................2, 3, 5
    § 1333(a)(2) ....................................................................................................................3
    § 1333(b)(1) ....................................................................................................................2
    § 1333(b)(2) ....................................................................................................................5
    § 1333(c) .........................................................................................................................2
    § 1333(d) .........................................................................................................................2
    § 1333(d)(2) ....................................................................................................................3
    § 1333(d)[1] .................................................................................................................2, 4
    *§ 1333(d)[2] ........................................................................................................ *passim*
    § 1333(e) .........................................................................................................................5
    § 1334 ..............................................................................................................................5
    § 1334(a) ......................................................................................................................4, 5
    § 4402(a)(1) ....................................................................................................................6
    § 4402(a)(2)(A) .............................................................................................................26
    § 4402(d) .........................................................................................................................4

16 U.S.C. § 1533(b)(3)(B) ....................................................................................................2

21 U.S.C. § 387 ....................................................................................................................37

50 U.S.C. § 1803(i) ................................................................................................................4

50 U.S.C. § 1873(a)(1)(F) ......................................................................................................4

81 Fed. Reg. 28,974 (May 10, 2016) ....................................................................................27
    28,988 .............................................................................................................................27
    29,065 .............................................................................................................................27

84 Fed. Reg. 42,754 (Aug. 16, 2019) ....................................................................................8
    42,755-65 .......................................................................................................................14
    42,756 ............................................................................................................................36
    42,767 ..............................................................................................................................8

Page:

Constitutions, Statutes, and Regulations—continued:

84 Fed. Reg. 50,566, 50,600 (Sept. 25, 2019) ..........................................................23

85 Fed. Reg. 15,638, 15,642 (Mar. 18, 2020)...........................................................3
   15,640 ..........................................................................................................12, 14
   15,641-42 ...........................................................................................................7
   15,642 .........................................................................................................3, 5, 6
   15,643 .........................................................................................................6, 9, 16
   15,646 .............................................................................................................30
   15,649 .............................................................................................................33
   15,655-56 ........................................................................................................19
   15,657 ..............................................................................................................9
   15,658 .......................................................................................................9, 20, 34
   15,660 .............................................................................................................22
   15,660-63 ..........................................................................................................9
   15,663 ...........................................................................................................19, 21
   15,664 ....................................................................................................10, 12, 22, 35
   15,666 .............................................................................................................17
   15,668 .............................................................................................................30
   15,686 ..............................................................................................................9
   15,687 .............................................................................................................27
   16,654 .............................................................................................................16

## <u>INTRODUCTION</u>

FDA rushed to complete this Rule nearly a year ahead of the agency's best-case finalization date, on an expedited court-ordered timeline that FDA warned could leave the Rule vulnerable to challenge.  Those warnings proved prescient; the Rule is rife with APA violations.

- The Tobacco Control Act (TCA) instructs manufacturers to rotate nine listed warnings, yet FDA mandated 11 by implausibly asserting a limitless, atextual power to demand as many warnings as FDA wishes.

- The TCA requires FDA to find that any changes to a warning are improvements over the status quo.  FDA's Rule acknowledged as much, yet failed to make those findings when abandoning three of Congress's default warnings.

- Even after having to reopen the rulemaking to release key materials underpinning the Rule, FDA blatantly defied its APA obligation to disclose raw data that FDA relied on in the rulemaking—data that indicts major premises of FDA's Rule.

- FDA has refused to explain the fundamental choice underlying this rulemaking, namely how FDA singled out the 13 widely disparate health conditions that FDA developed into warnings.  FDA purported to pick from 51 smoking-related conditions the Surgeon General has identified, but many of those conditions are less-known, more common, or more serious than FDA's featured conditions.  FDA now does not even try to defend the Rule's patently false explanation that FDA's selected conditions were all lesser-known risks.

- FDA's much-touted principal studies were methodologically flawed and did not actually test whether FDA's warnings would improve consumer understanding, and FDA failed to justify its reliance on foreign studies involving different graphics and countries.

Any one of these APA flaws necessitates vacatur of the Rule; taken together, these errors reflect a flawed, slipshod rulemaking process.  To top it all off, the Rule represents an unprecedented speech grab that violates the First Amendment in three independent ways.  This Court should vacate the Rule in its entirety and grant Plaintiffs a preliminary injunction.

## I.      FDA's Rule Violates the APA

### A.      FDA Unlawfully Promulgated 11 Warnings

It was patently unlawful for FDA to promulgate 11 warnings; the TCA only allows nine.

1.  FDA (at 53) responds that the TCA "specifically authorize[s]" FDA to impose however many warnings it wishes because "[t]he word 'nine' appears nowhere in [§ 1333(a)]."  But that provision requires cigarette packages and advertisements to "bear . . . one of the following" nine "specified" warning "labels" listed in § 1333(a)(1) on each package and to rotate those warnings so that manufacturers display them all.  15 U.S.C. § 1333(a)(1); *id.* § 1333(b)(1); *id.* § 1333(c)(2). Other provisions repeatedly refer to "the label statements specified in [§ 1333(a)(1)]" or "all of the labels required under this section," *i.e.*, the list of nine.  *Id.* §§ 1333(c)(1)-(3), 1333(d).  When Congress prescribed "the following" conditions, *id.* § 1333(a)(1), Congress meant all of them, and left no discretion to FDA to add or subtract conditions.

Examples illustrate the point:  6 U.S.C. § 672 allows "one of the following" actors to des-ignate a "critical infrastructure program," then lists the President and the Secretary of Homeland Security.  *Id.*  That means only those two actors can make designations; Congress did not allow the Secretaries of Treasury or Education to designate critical infrastructure just by omitting the word "two."  Or take 16 U.S.C. § 1533(b)(3)(B), directing the Secretary of the Interior to "make one of the following findings" regarding a petition to add or remove a species from the endangered species list, then lists findings that action is warranted, not warranted, or unnecessary.  Congress gave the Secretary only three options.  Section 1333(a)(1) is no different.

2.  Even were FDA correct that the TCA does not explicitly cap the number of warnings at nine, the TCA still grants FDA no authority to change the number of warnings, rendering the Rule unlawful.  Both parties agree that § 1333(d)[1] allows FDA only to make minor formatting tweaks to the color or font size of each warning statement.  Pls.' Br. 21; U.S. Br. 52.  And no other TCA provision grants FDA authority to adjust the number of warnings.

While FDA's brief doubles down on the idea that Congress had to tally up § 1333(a)(1)'s statements to limit FDA to nine warnings, FDA's brief abandons the Rule's ludicrous notion that

FDA's authority to change the number of warnings derives from some broader power to redline the statutory requirements for any label. In the Rule, FDA staked its purported power to change the number of warnings on the word "requirements," which FDA claimed materially differs from "statements." FDA interpreted its authority under § 1333[d](2) to "adjust . . . the text" of "label *requirements*" to mean that FDA could "adjust[] any of the label *requirements* of [§ 1333(a)]," *i.e.*, change any of the *statutory* requirements "in the entirety of [§ 1333(a)]," not just the substance of the default warning statements. 85 Fed. Reg. 15,638, 15,642 (Mar. 18, 2020) (emphasis added). Under this reading, FDA claimed authority to change not only the TCA's warning statements (§ 1333(a)(1)), *i.e.*, "the text," but also the statute's size-and-placement requirements (§ 1333(a)(2)). The Rule thus states: "Even if [§ 1333(a)] required 'one of the following 9 labels' . . . such a numeric requirement would still be among the [TCA] 'label requirements' subject to being adjusted under [§ 1333(d)[2]]." 85 Fed. Reg. at 15,642. FDA's brief (at 42 n.18, 52) now admits that FDA's modification authority is limited, and does not include the power to entirely eliminate or modify the § 1333(a) requirements. *See* Pls.' Br. 22-23.

Instead, FDA (at 51, 53-54) hinges the Rule's 11-warning mandate on FDA's power under § 1333(d)[2] to "adjust" the "text" of "any of the" nine default statements in § 1333(a)(1). In FDA's telling, FDA's leeway to add or subtract "text" in a particular warning includes the power to change the total *number* of warnings. Because FDA could eliminate all text in one warning, FDA asserts the power to eliminate the warning entirely. And because FDA can add text to a warning, FDA says it can create many *new* warnings from whole cloth. To FDA, Congress's nine listed warnings are just fissile material to split into as many new warnings as FDA chooses.

FDA's interpretation stretches the word "text" past the breaking point. As the Rule explained, the "plain meaning of 'text'" is "'words and form.'" 85 Fed. Reg. at 15,642. Thus, § 1333(d)[2] empowers FDA to modify the words and form of each of the nine default statements. But FDA's power to replace every word in the label "Cigarettes are addictive" with others (like "Smoking causes colon cancer") does not extend to adding four, 40, or 400 new warning labels to the mix, even if FDA considers them "analogues." *Cf.* U.S. Br. 54-55. Changes to "words and

form" of a particular statement does not mean changes to the total number of statements.  Congress knows how to distinguish "text" and "numbers."  *E.g.*, 50 U.S.C. § 1873(a)(1)(F) (requiring agency to report "the number of findings issued under section 1803(i) of this title . . . and the text of any such findings.").  This Court should respect that distinction.  *See Rotkiske v. Klemm*, 140 S. Ct. 355, 361 (2019) ("Atextual judicial supplementation is particularly inappropriate when, as here, Congress has shown that it knows how to adopt the omitted language . . . .").

Further, FDA's reading defies § 1333(d)[2]'s grammatical structure.  Congress let FDA "adjust the . . . text . . . of *any* of the label requirements," *i.e.*, adjust text on a warning-by-warning basis.  *Id.* § 1333(d)[2] (emphasis added).  Had Congress permitted FDA to change the total number of warnings, Congress would have authorized FDA to "adjust the *number* of label requirements," not merely the "text" of "any" given label.  Likewise, § 1333(d)[2] empowers FDA only to modify features of "any" particular warning.  *Id.* (allowing FDA "adjust the format, type size, [and] color graphics . . . of any of the label requirements").  This is strong evidence that Congress did not have cross-cutting changes—like changes to the total number of warnings or how often warnings must rotate—in mind.

 FDA's claim (at 42 n.18) that Congress deprived FDA of authority to alter other major requirements—such as the size and placement of warnings—yet authorized FDA to change the total number of warnings, is incoherent.  FDA notes that 15 U.S.C. § 4402(d) expressly authorizes FDA to increase the required label area for smokeless tobacco warnings from 30% to 50%, but that no similar language with respect to cigarette warnings appears in § 1333(d)[2].  But the smokeless tobacco warnings only include text, not graphics.  If changes to graphic warnings' "format" under § 1333(d)[2] do not include size and placement, FDA never explains what "format" changes § 1333(d)[2] has in mind, especially since FDA agrees that § 1333(d)[1] already authorizes FDA to make minor, cosmetic changes to "format" without rulemaking.

FDA (at 53-54) also incorrectly portrays § 1334(a), a preemption provision, as contemplating more than nine warnings.  Section 1334(a) states: "Except to the extent [FDA] requires additional or different statements on any cigarette package," "no statement relating to smoking

and health, other than the statement required by § 1333 . . . shall be required" on the package. The "additional or different statements" that § 1334(a) describes are types of warnings that FDA can mandate on "any" single pack of cigarettes and thus refers to FDA's discretionary authority to add labels disclosing characteristics, like tar, nicotine, or smoke constituent, of different lines of cigarette products. *Id.* § 1333(e)(1), (3); Pls.' Br. 21-22. That Congress "did not even require any of the other disclosures that Plaintiffs point to," U.S. Br. 54, reflects Congress's decision to make some warnings mandatory, § 1333(a)(1), and others discretionary, *e.g.*, § 1333(e)(1), (3).

FDA interprets the phrase "additional or different statements" under § 1334(a) to refer to FDA's phantom authority to increase the *total* number of § 1333-compliant warnings. That interpretation is untenable, because the phrase "additional or different statements" refers to statements on *a single pack of cigarettes*, not to the total number of statements that manufacturers must rotate across packs to comply with § 1333. Further, under FDA's reading, FDA could add to, but not reduce, the total number of statements. FDA (at 54) also argues that § 1334's use of the word "statements" must refer to the prescribed warning "statements" in § 1333(a)(1), not "disclosure[s]" about tar or nicotine under § 1333(e). But in ordinary language, a "disclosure" is a "statement," as FDA's First Amendment analysis illustrates, *e.g.*, U.S. Br. 30-41. And the TCA uses "disclosure" and "statement" interchangeably. *E.g.*, 15 U.S.C. § 1333(b)(2) (describing § 1333(e) "[t]ar, nicotine, and other smoke constituent disclosure[s]" as "any required statement relating to tar, nicotine, or other constituent . . . yield").

Finally, FDA (at 54) attacks a strawman, contending that Congress would not have limited FDA to nine warnings if "future science disproved some of the default statutory statements." But the *number* of warnings has nothing to do with the substance of any statement, which both sides agree FDA can adjust under § 1333(d)[2]. If science disproved some statements, FDA could replace their text with new, accurate text, so long as FDA engaged in rulemaking and established that the changes would enhance public understanding of smoking-related risks compared to the old versions. FDA's conflation of the total number of warnings with their substance just underscores that FDA's new position departs from the plain meaning of "text." 85 Fed. Reg. at 15,642;

*supra* pp. 2-4.  But courts "may uphold agency action only on the grounds that the agency invoked when it took the action," *Michigan v. EPA*, 576 U.S. 743, 758 (2015), and FDA's newfound reading of "text" appears nowhere in the Rule.

3.  FDA's interpretation of § 1333(d)[2] is not entitled to *Chevron* deference regardless. FDA's brief leans on FDA's power to adjust the "text" of a particular statement—but FDA's Rule said the word "text" is unambiguous.  *See* 85 Fed. Reg. at 15,642.  When an agency insists that a term is clear, its interpretation does not warrant deference.  *Braintree Elec. Light Dep't v. FERC*, 667 F.3d 1284, 1288-89 (D.C. Cir. 2012).  On top of that, *Chevron* is subordinate to "traditional tools of statutory construction" like the canon of constitutional avoidance.  *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1630 (2018).  Even were § 1333(d)[2] ambiguous, that canon bars FDA's interpretation, which raises serious First Amendment problems.  *Infra* pp. 24-37.

Further, *Chevron* only applies to permissible and reasonable interpretations, and FDA's position is anything but.  *See Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 321 (2014); *Merck & Co. v. HHS*, 962 F.3d 531, 535-36 (D.C. Cir. 2020).  FDA identifies no logical limit on how many different warnings FDA could compel under the aegis of modifying the "text" of a single statement.  It defies credulity that Congress carefully authorized FDA to change certain features of default warnings, yet made the sky the limit with respect to the fundamental question of how many warnings FDA can prescribe.  Worse, FDA (at 55) applies the same any-number-goes approach to smokeless tobacco warnings, claiming that Congress's requirement in 15 U.S.C. § 4402(a)(1) for manufacturers to feature four required statements was also just a jumping-off point.

Even if FDA could adjust the number of warnings, FDA's choice of 11 is unreasonable. Even under FDA's view, FDA can change the number of warnings only upon "'find[ing] that *such a change* would promote greater public understanding'" of smoking-related risks.  U.S. Br. 56-57 (quoting 15 U.S.C. § 1333(d)[2] (emphasis added)).  Yet FDA's Rule never explains why 11 warnings, versus nine or some other number, would enhance understanding.  Pls.' Br. 23.  While FDA made (flawed) findings about adjusting the warnings' *substance*, those findings did not purport to justify changing the *number* of warnings.  *E.g.*, 85 Fed. Reg. at 15,643; *infra* pp. 16-23.  For all

6

FDA knows, consumers may absorb a smaller number of warnings better.  But FDA never checked, and FDA's brief never addresses this critical problem.

Further, requiring 11 warnings is unreasonable because that number requires a disproportionate overhaul of industry-standard printing practices, which cannot accommodate odd, prime numbers.  Pls.' Br. 23-24.  FDA (at 55-56 n.24) responds that such overhauls are inevitable to implement the novel graphic warnings requirement.  But that does not justify picking an option that requires millions of dollars of overhauling on top of that.  DeVerry Decl. 6, ECF No. 22-4.  FDA (at 55-56 n.24) claims that by allowing "some level of deviation" from the TCA's rotation requirement, FDA solved these implementation problems.  But Plaintiffs' business should not depend on FDA's bureaucratic munificence.  Plaintiffs cannot sell any cigarettes that do not comply with the TCA, and FDA's current promise gives no assurance that Plaintiffs will not face another multi-million dollar overhaul of their printing practices in the future.

4.  FDA (at 55) is incorrect that Plaintiffs waived this argument.  Plaintiffs' objection to the challenges of rotating a prime, odd number of warnings did not concede FDA's authority to require more than nine warnings.  AR28487-90.  Regardless, "it is not always necessary for a party to raise an issue, so long as the [agency] in fact considered the issue" during the rulemaking.  *Wash. Ass'n for Television & Child. v. FCC*, 712 F.2d 677, 682 & n.10 (D.C. Cir. 1983); *see Nat. Res. Def. Council, Inc. v. EPA*, 25 F.3d 1063, 1074 (D.C. Cir. 1994) ("court may excuse one party's failure to raise an issue in administrative forum where another party pressed and agency in fact considered identical issue"); *Bates Cnty. Mem'l Hosp. v. Azar*, 464 F. Supp. 3d 43, 48-50 (D.D.C. 2020) (similar); *see also Moose Jooce et al. v. FDA*, No. 20-5048, slip op. at 4 (D.C. Cir. Dec. 1, 2020) (resolving constitutional challenge "even though it was not raised during the rulemaking").  Here, other commenters objected that the TCA mandates nine warnings, and FDA engaged with these arguments in the Rule.  AR28403, AR36961-63; 85 Fed. Reg. at 15,641-42.

### B.    FDA Unlawfully Discarded Three TCA-Mandated Warnings

Section 1333(d)[2] prescribes a clear prerequisite for FDA to "adjust the . . . text" of "any of the" default TCA warning statements: FDA must find, in a rulemaking, that "such a change

would promote greater public understanding of the risks associated with the use of tobacco products." The phrase "such a change" unambiguously refers to replacing the "text" of "any" default TCA warning statement with new text. And the word "greater" unambiguously indicates that FDA needs to compare the old text to the new. So FDA can jettison a default TCA warning statement only if FDA finds that new text better informs the public, as compared to the existing text.

FDA made no such findings here. FDA replaced three default TCA warnings (on addiction, death, and quitting) with four new warnings (on amputation, blindness, diabetes, and erectile dysfunction). Yet FDA indisputably never compared the text of *any* of the discarded warnings to the text of *any* replacements. Pls.' Br. 25. Instead, FDA tested whether each of the four new warnings would improve public understanding as compared to a *different* default TCA comparator, like the pregnancy warning. That would have been fine had FDA then replaced the default TCA comparators with the four new warnings. But FDA *kept* those tested TCA comparators, making minor textual adjustments (*e.g.*, changing "harms your baby" to "stunts fetal growth") after finding that *those* changes would improve consumer understanding. Pls.' Br. 25-26. FDA thus never found that the relevant "changes"—eliminating three default TCA statements and replacing them with four new statements—would improve consumer understanding.

FDA (at 57-58) calls this interpretation atextual, but never explains what else the text means. FDA claims the power to make any change that "promote[s] greater public understanding," but does not explain what, exactly, FDA must use as a baseline comparison. FDA also omits that FDA's Rule interpreted § 1333(d)[2] as Plaintiffs do. FDA explained that its first quantitative study attempted to "fulfill its statutory obligation" by "assess[ing] which, if any, of the revised warning statements . . . promote greater public understanding . . . *as compared to the TCA statements*." AR39298 (emphasis added); *see* 84 Fed. Reg. 42,754, 42,767 (Aug. 16, 2019). FDA thus pitted each "revised warning statement" against "its comparator TCA statement," AR39301, based on its interpretation that the TCA requires revised warning statements to be "compared to TCA statement[s] directly" in a text-to-text comparison, AR39304. But FDA's Rule then erred in assigning comparators, evaluating the new warnings (amputation, blindness, diabetes, and erectile

dysfunction) against random TCA statements, rather than the three TCA warnings that FDA axed. Pls.' Br. 25.  FDA (at 57) points to the Rule's many references to making the TCA-required finding, but FDA performed the wrong analysis, and "[m]erely referencing a [statutory] requirement is not the same as complying with that requirement." *Cigar Ass'n of Am. v. FDA*, 964 F.3d 56, 61 (D.C. Cir. 2020); *see* 85 Fed. Reg. at 15,643, 15,657, 15,660-63, 15,686.

FDA (at 58) worries about a hypothetical slate of new warnings that would only show improvements over existing warnings when viewed in tandem.  But if each new individual warning was an improvement over the prior warning when all new warnings were viewed in tandem, FDA would have made a TCA-compliant finding: FDA would have a methodological basis to find that each new warning better informed consumers than its predecessor.

Finally, this Court should reject FDA's misleading *post hoc* claim (at 58) that its second quantitative study "*did* make individualized findings" that the new warnings would improve upon the three TCA warnings that FDA discarded.  This supposed finding was nowhere in FDA's Rule, which instead *disavowed* using the second study to "compare individual results of one cigarette health warning to another."  85 Fed. Reg. at 15,658.  For good reason: the second study did not directly compare the text of the three discarded TCA warnings against their FDA-generated replacements.  Rather, the study compared text *and images* for TCA defaults and FDA's new options against the existing Surgeon General's warnings.  *See id.*  Last, *Chevron* does not apply here. FDA's brief offers no coherent interpretation of § 1333(d)[2], and the interpretation in FDA's Rule—the only interpretation that counts—supports Plaintiffs.

### C.    FDA Unlawfully Withheld Information Central to Its Rulemaking

FDA also failed to publicly disclose "the 'technical studies and data' upon which the agency relie[d] in its rulemaking." *Am. Radio Relay League v. FCC*, 524 F.3d 227, 236 (D.C. Cir. 2008) (cleaned up); *see* Pls.' Br. 26-29.  FDA concedes that data from FDA's two quantitative studies was central to FDA's warning-development decisions.  *E.g.*, 85 Fed. Reg. at 15,658; U.S. Br. 11-12.  Yet FDA refused to release that raw data during the rulemaking, instead releasing FDA-

prepared study reports selectively summarizing results.  Now, the raw quantitative-study data reveals that FDA's graphic warnings do *not* always outperform purportedly "stale" text-only warnings, nor do FDA's graphic warnings inherently add something above and beyond text.  Pls.' Br. 28; Vansickel Decl. 3, 8-9, ECF No. 22-2.  FDA also refused to release the notes and transcripts underpinning FDA's qualitative studies—studies FDA described as "formative" in winnowing its options.  85 Fed. Reg. at 15,664; *see* U.S. Br. 17.  Now, that data reveals that FDA's qualitative study reports *understated* consumers' awareness of smoking-related risks, their disbelief of FDA's blunt causation language, and their extreme emotional responses to disturbing images.  Pls.' Br. 48 & n.5.  All of this adds up to a textbook APA violation: FDA failed to disclose unfavorable data, leading to a deceptively rosy picture of the evidence underpinning the Rule.

1. FDA no longer defends its original, impermissible rationale for withholding this data— that parties might "analyze the data in different . . . ways other than what FDA pre-specified," including ways that FDA considered misleading.  AR23863.2.  Instead, FDA (at 59-60) chastises Plaintiffs for questioning FDA's nondisclosures, pointing to the length of FDA's notice of proposed rulemaking, Plaintiffs' comments on the Proposed Rule, the length of FDA's summaries of its qualitative and quantitative studies, and the number of other references FDA cited.  But there is no verbosity exception to the APA.  All the high-level summaries in the world do not enable others to crosscheck the agency's analysis and determine whether the agency missed other underlying trends in the data that undercut the agency's conclusions.  Only by disclosing the underlying data can interested parties effectively comment by "point[ing] out" where an agency may have drawn "improper conclusions" from the data before it.  *Am. Radio*, 524 F.3d at 236.

Contrary to FDA's claims (at 61), Plaintiffs have not argued that FDA had to disclose "every piece of potentially relevant factual information."  Rather, FDA violated the foundational rule that agencies must "disclose[] in full" data that underpins their rulemakings, especially if that data calls the agency's conclusions into question.  *Am. Radio*, 524 F.3d at 236; *Chamber of Commerce v. SEC*, 443 F.3d 890, 899 (D.C. Cir. 2006).  Contrary to FDA's claim (at 63), agencies do not automatically satisfy that obligation by releasing unredacted summaries, but not the data itself.

FDA (at 62-64) also mischaracterizes the relevant case law.  In *American Radio*, the Federal Communications Commission violated the APA because the redacted staff summaries it released obscured "evidence that could call into question the [agency's] decision to promulgate the rule" and sources "that may contain contrary evidence, inconvenient qualifications, or relevant explanations of the methodology employed."  524 F.3d at 239.  Likewise, in *Portland Cement Association v. Ruckelshaus*, EPA revealed only a "brief summary" of test results of an experiment that was crucial to the rulemaking.  486 F.2d 375, 393 (D.C. Cir. 1973).  That incomplete disclosure violated the APA because the raw data indicted EPA's summary, prompting the D.C. Circuit to warn, "[i]t is not consonant with the purpose of a rule-making proceeding to promulgate rules on the basis of inadequate data, or on data that, [to a] critical degree, is known only to the agency." *Id.* at 393.  Similarly, *Connecticut Light and Power Co. v. NRC* reinforces that the APA requires disclosure of data that is *not* publicly available, previously subject to widespread public comment, or well-known; the data in that case just did not fall within those categories.  673 F.2d 525, 531-32 (D.C. Cir. 1982).  And in *Chamber of Commerce*, the Securities and Exchange Commission violated the APA by withholding "extra-record materials [that] suppl[ied] the basic assumptions" about important features of its rule, despite telling the public that the agency was relying on extra-record materials.  443 F.3d at 902, 906.  So too here, FDA unlawfully withheld critical data impugning the Rule's basic assumptions about the efficacy of graphic warnings.

FDA (at 61) turns to the *ipse dixit* that agencies do not "immediately publish all of the raw data sets for each of [their] studies" in rulemakings.  Plaintiffs' unrebutted examples of timely data disclosures suggest otherwise.  Pls.' Br. 26 n.3.  And FDA did not just fail to "immediately" publish the raw data sets; FDA did not publish them at all.  Contrary to FDA's claim (at 61), there is nothing "typical" about the slow drip of material disclosures during this rulemaking.  FDA cites no other example where an agency failed in the initial notice-and-comment period to disclose study reports for studies the agency concededly relied upon, belatedly dumped hundreds of pages of reports during a truncated supplemental-comment period, then failed to disclose the underlying data necessary to check the agency's representations.

2.   FDA's good-enough-for-government-work defense ultimately fails on its own terms. FDA (at 62-63) seemingly agrees that if the raw data did not merely corroborate FDA's study reports, the agency violated the APA.  But, contrary to FDA's claims (at 61-64), the qualitative and quantitative study reports in no way summarized "all" underlying study data, such that disclosing the raw data would have been duplicative.

Instead, the raw data revealed two devastating problems with FDA's quantitative analysis that FDA's Rule obscured.  *First*, the raw data allowed Plaintiffs, for the first time, to compare graphic warnings one-on-one against text-only warnings—a comparison FDA refused to do.  *See* 85 Fed. Reg. at 15,664; Pls.' Br. 28.  Specifically, Plaintiffs could finally compare how consumers reacted to (i) the Surgeon General's quitting warning, versus (ii) the FDA-developed graphic warning about quitting—the *only* comparison of an FDA-generated graphic warning with a text-only warning where the text of the two warnings was identical.  Vansickel Decl. ¶ 22.  Plaintiffs' analysis, which FDA does not dispute, revealed *no* statistically significant difference between the text-only Surgeon General's warning and FDA's graphic warning on FDA's favored "new information" and "self-reported learning" measures.  *Id.*  Thus, the only data isolating the effect of adding a graphic warning revealed that the graphic *was not effective* over and above the text, indicting FDA's case for graphic warnings.  FDA's response (at 25 n.12)—that FDA chose not to finalize the quitting graphic warning—misses the point.  Faced with data refuting the efficacy of graphic warnings, FDA should have tested other text-only warnings against graphic warnings that used the same text.  FDA's failure to do so indicts the reliability of FDA's whole iterative process.

*Second*, the raw data allowed Plaintiffs to compare individual Surgeon General's warnings with individual, final FDA graphic warnings, revealing that FDA's Rule erred in portraying the Surgeon General's warnings as "effectively invisible."  *E.g.*, 85 Fed. Reg. at 15,638, 15,640; U.S. Br. 7, 69; Pls.' Br. 28.  FDA's study report obscured that result by analyzing the Surgeon General's warnings together as a group.  Vansickel Decl. ¶ 23.  But Plaintiffs' new analysis—which, again, FDA does not dispute—showed that the text-only, Surgeon General's warning for carbon monoxide performed either *better than or the same* as five of FDA's final graphic warnings (harm to

children, nonsmoker lung disease, fetal harm, chronic obstructive pulmonary disease, and heart disease and strokes) on FDA's "new information" measure. And the text-only Surgeon General's warning performed the same as four final graphic warnings (harm to children, nonsmoker lung disease, fetal harm, chronic obstructive pulmonary disease) on the "self-reported learning" measure. *Id.* FDA's study report thus disguised the fact that several of its final graphic warnings performed no better than a longstanding, text-only Surgeon General warning that FDA panned. FDA (at 21) responds by defending its study design, but that is no justification for proceeding with graphic warnings that were not improvements *under FDA's preferred metrics*.

FDA also violated the APA by holding back qualitative study data that indicts the accuracy of FDA's qualitative study reports, which failed to "summarize[]" the relevant "themes and feedback" from participant comments. *See* AR23863.2; Pls.' Br. 29, 48 n.5. The study reports severely understated the extent to which respondents exhibited emotional reactions to the warnings and considered FDA's warnings unbelievable. *See* Pls.' Br. 29, 48 n.5. FDA (at 66) dismisses those comments as "cherry-picked" and duplicative of comments during the rulemaking. But just because FDA's study reports noted these consequences does not excuse FDA's non-disclosure. By understating the *degree* of the reaction, FDA's study reports allowed FDA to bury its head in the sand and purport to be unaware of the warnings' emotional valence. *Infra* pp. 29-35. Regardless, debates regarding the representativeness of study reports, or how FDA should have dealt with omitted data, are precisely the type of "interchange" that FDA was supposed to facilitate during the rulemaking. *Conn. Light & Power*, 673 F.2d at 530.

3. FDA is wrong that its failure to disclose raw study data did not prejudice Plaintiffs. FDA misstates the standard, which is not whether Plaintiffs' analysis of the withheld data would have "affect[ed] the outcome" of FDA's rulemaking. U.S. Br. 65 (quoting *PDK Labs, Inc. v. DEA*, 362 F.3d 786, 799 (D.C. Cir. 2004), a case that has nothing to do with notice-and-comment errors). The D.C. Circuit's evidentiary-omission cases merely require Plaintiffs to show that they would have had something "useful to say" regarding the withheld study data if given the opportunity—a

standard that is "not . . . particularly robust." *Chamber of Commerce*, 443 F.3d at 904-05.  Plaintiffs easily clear that hurdle, and FDA's insistence (at 65) that Plaintiffs did not "persuasively explain how their comments would have meaningfully differed" is nonsense.  After finally receiving the raw data, Plaintiffs proffered new analyses revealing that, even using FDA's own evidence and metrics, graphic warnings are *not* inherently more effective than text alone, as FDA claimed.  Not only that, the qualitative-study results revealed that FDA's study reports obscured the extent of study participants' emotional responses and skepticism in response to FDA's proposed warnings.  Timely access to that data would have allowed Plaintiffs to debunk FDA's misleading study reports, which downplayed participants' adverse reactions to various warning statements and outright buried the mediocre performance of five new FDA warnings against a Surgeon General warning.  *Compare, e.g., supra* pp. 12-13; Pls.' Br. 27-29, 48 n.5, *with* AR12134-35, 23291-92.

Finally, FDA's argument (at 65-66) that its peer reviewers did not request the raw data is no excuse for hiding data, and untrue to boot.  FDA's peer reviewers *did* note that FDA's study reports failed to disclose important underlying data necessary to vet FDA's analysis.  *E.g.*, AR54060 ("[I]t is not clear how alphas were calculated (due to incomplete data)"); AR54099 (suggesting addition of "attrition analysis . . . to show if attrition was differential"); AR54095 (commenting that two of FDA's statistical analyses "seemed odd and I might recheck them").  That FDA's peer reviewers challenged some of the underlying data should have provided all the more reason for FDA to disclose its raw data so that others could check the agency's slipshod work.

### D.    FDA's Selection of Featured Health Risks Was Arbitrary and Capricious

FDA *still* has yet to adequately explain the central decision to the rulemaking: why feature the health risks and conditions that FDA selected?  FDA's Proposed and Final Rules expressed an intent to focus on less-known smoking-related consequences that the 2014 Surgeon General's report spotlighted.  *See* 84 Fed. Reg. at 42,755-65; 85 Fed. Reg. at 15,640.  But that criterion does not explain why FDA featured several universally known consequences, or why FDA zeroed in on a handful of particular risks instead of picking any of the other 51 health-related risks in the 2014 Surgeon General's report.  Nor has FDA ever explained how it decided which conditions

associated with particular diseases to feature (*e.g.*, featuring elevated blood sugar, not other consequences of diabetes).  Pls.' Br. 30-32.

Without some reasoned explanation for these seminal choices, the Rule is arbitrary and capricious, just like the rule in *District Hospital Partners v. Burwell*, 786 F.3d 46 (D.C. Cir. 2015).  There, the agency acted arbitrarily by failing to explain why it calculated final estimates using only 50 hospitals out of the 123 listed in the Proposed Rule as qualifying in a given category; the agency explained why the 50 qualified for that category, but the agency's failure to explain "how the 50 hospitals differed from the 123 . . . identified in the" Proposed Rule rendered the agency's selection arbitrary and capricious.  *Id.* at 58-59.[1]  So too here.  Given FDA's failure to explain, how the 13 health conditions FDA singled out to develop into warnings differ from the 51 smoking-related conditions that FDA identified in its Proposed Rule is anyone's guess.  *See also Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 285–86 (1974) (agency action arbitrary and capricious absent a reasonably discernible path between the facts found and the choice made); *U.S. Sugar Corp. v. EPA*, 830 F.3d 579, 606 (D.C. Cir. 2016) (per curiam).

FDA (at 16) responds that the Rule "carefully explained" FDA's process, then ironically repeats excerpts from the Rule that do not explain how or why FDA pre-selected the 13 health-related consequences it pursued.  Pls.' Br. 30-32.  FDA (at 17) invokes the scientific literature, but does not dispute that the literature portrayed many of FDA's featured conditions (like lung disease, harm to children, and heart disease) as *well-known*.  FDA's cited literature just puts more pressure on FDA's unexplained departure from its self-identified mission of featuring less-known risks.

Likewise, FDA's asserted reliance (at 17) on Surgeon General's reports to identify smoking-related health risks does not answer Plaintiffs' point: those reports list 51 conditions, and beg

---

[1] FDA (at 19 n.9) distinguishes this case, asserting that there is no risk that FDA's failure to explain how it selected 13 health risks from the Surgeon General's list of 51 led to a substantively unreasonable result.  But that is not the test.  *District Hospital Partners* held that the agency acted arbitrarily and capriciously because "[h]ad the Secretary accounted for" all of the hospitals listed in the Proposed Rule, "perhaps the 2004 outlier threshold [*i.e.*, the relevant data] would have been even lower.  Or perhaps not."  786 F.3d at 59.  Same here.  Had FDA accounted for all of the Surgeon General's listed health effects, maybe the results of its studies would have been different.  Or perhaps not.  "Either way, we have no way to know for sure because there was scarcely a word" about the omitted conditions in FDA's Final Rule.  *Id.*

the question how FDA winnowed that list down to 13 conditions to feature in warnings. Pls.' Br. 31. FDA's claim (at 18) to have "looked to conditions caused by smoking or aspects of a disease that have not been addressed through prior warnings" does not explain how FDA narrowed the field, either. FDA's graphic warnings feature smoking-related conditions that previous warnings addressed (like pregnancy risks and the risks of lung disease). Likewise, FDA's account (at 17-18) of how the agency tested warnings about its pre-selected 13 health conditions sheds no light on how FDA picked those conditions to start, or why FDA mixed less- and well-known risks. And FDA's brief does not even try to explain how FDA chose to feature some conditions associated with a smoking-related disease (like high blood sugar for diabetes) but not other conditions. FDA (at 18) attacks Plaintiffs' arguments as "curious," but ignores that its opaque selection process "perplexed" its peer reviewers, too. AR54071, AR54084.

FDA (at 18) defends the Rule's "overarching aim" to improve consumer education. But FDA's Rule purported to pursue that aim by "focus[ing] on less-known health consequences," 85 Fed. Reg. 15,643, then arbitrarily and perversely featured risks that its literature review and internal studies reiterated were "well-known." Pls.' Br. 30-31. Rather than explaining that choice, FDA (at 18) tries to short-circuit its burden, claiming that "[o]nly FDA's final selection of the warnings in the Rule is at issue." That makes no sense. If FDA's initial selection of smoking-related health consequences was arbitrary, the rest of FDA's "iterative" warning-development process is equally arbitrary. FDA's rejoinder fails on its own terms besides: as noted, many of FDA's final warnings *do not* feature less-known risks. Either FDA prolifically diverged from its stated criterion for picking warnings, or FDA followed as-yet-undisclosed criteria for decision-making. Either way, FDA's lack of explanation is arbitrary and capricious.

### E.    FDA Arbitrarily Evaluated Consumer Understanding

FDA's lone justification for the Final Rule is that its graphic warnings would "more effective[ly]" educate consumers about smoking-related health risks, especially risks that are "less known or less understood by consumers." Pls.' Br. 32 (quoting 85 Fed. Reg. at 16,654). But FDA's two quantitative studies—the lynchpin of that finding—are too methodologically unsound

and unilluminating to support the Rule.  As for FDA's qualitative studies, FDA itself disavowed their reliability (no surprise, because the qualitative study results indisputably undermined FDA's conclusions).  FDA's only remaining evidence involves questionable studies of graphic warnings in other countries that do not resemble the specific warnings FDA adopted.  FDA (at 19) tries to brush by those damning problems, claiming an "extreme degree of deference."  But the APA's "required deference does not countenance rubber stamping agency actions" that do not reflect reasoned decision-making.  *Huff v. Vilsack*, 195 F. Supp. 3d 343, 352 (D.D.C. 2016) (cleaned up).

1.  FDA breezes by the threshold methodological problems with FDA's two quantitative studies.  Those quantitative studies tested whether FDA-drafted textual statements and FDA graphic warnings (text and image pairings) presented "new information" and "self-reported learning," two proxies FDA selected to represent whether consumers *understood* FDA's message.  But those studies were riddled with obvious methodological flaws that were not lost on peer reviewers.  *First*, FDA's second quantitative study—the only one that studied FDA's actual selected graphic warnings—produced inherently skewed results, because FDA "primed" participants to reach its preferred results.  Peer reviewers skewered FDA for that basic problem.  Pls.' Br. 33 (citing AR28507, AR54176).  Yet FDA has no response.

*Second*, both quantitative studies were unscientific.  They used non-representative samples of respondents and failed to account for key demographic differences, so there is no scientific basis to extrapolate their results to the general public.  Pls.' Br. 33.  FDA (at 19-20) argues that ignoring key demographic differences and using non-representative samples is "consistent with best scientific practices."  Peer reviewers said otherwise.  *See* AR54066, AR54073, AR54085, AR54089.  So does FDA, for that matter.  FDA never explains why the agency disavowed its *qualitative* studies for being non-representative, yet is willing to overlook that same flaw in FDA's quantitative studies.  *See* 85 Fed. Reg. at 15,666.  FDA's unexplained differential treatment of its own studies exhibits arbitrariness, not technical judgments warranting deference.

*Third*, because both quantitative studies lacked appropriate controls, FDA compared apples to oranges.  FDA's first quantitative study compared FDA-modified statements only against existing TCA statements, and sometimes did not even compare statements about the same risks.  And FDA's second quantitative study compared FDA's new text-and-graphics warnings against text-only Surgeon General's warnings.  That procedure again generally avoided comparing warnings about the same risks and did not test whether adding graphics would make any difference.  Pls.' Br. 33.  FDA's defense of the study's controls (at 20-21) is tautological: that the studies did a good job of testing what they claimed to test.  And it is mystifying for FDA to complain (at 20) that Plaintiffs failed to explain what FDA should have done differently when Plaintiffs' comments did just that.  *See* AR28507.  For instance, FDA could and should have tested whether survey participants considered the new warnings novel solely because the new warning statements were *longer*, a feature that can make even old information seem newer.  *Id.*  And, as a peer reviewer explained, FDA's second quantitative study could and should have tested whether graphics add any new information above and beyond the new text."  *Id.*; AR54136.[2]

These methodological failures cut to the core of the studies' reliability.  And indeed, Plaintiffs' analysis of FDA's late-breaking raw study data substantiates those concerns. Plaintiffs' analysis revealed that the only properly controlled (*i.e.*, apples-to-apples) comparison of a graphic warning with a corresponding text-only warning produced no meaningful difference between the two on FDA's favored variables.  Plaintiffs' analysis also showed that several graphic warnings performed no better than the text-only Surgeon General's warning for carbon monoxide on FDA's chosen metrics, raising questions about why FDA retained those graphic warnings.  *Supra* pp. 12-13.

---

[2] FDA (at 20) emphasizes Reviewer 3's comment that the studies provided for "appropriate control groups," but misses the point.  Even were it appropriate for FDA to compare its new warnings to the existing TCA and Surgeon General's warnings (*i.e.*, to use participants viewing those warnings as the "control groups"), FDA should have controlled for *other* factors that could distort responses.  AR28507, AR55711-55717 (inadequate sample size, selection bias, risk of bias, failure to imitate real-world conditions, lack of meaningful pretesting, possibility of social-desirability bias); *see* AR54072, AR54078 (Reviewer 3 comment that studies should have tested for false beliefs); AR54125, AR54066 (similar comments from Reviewer 2).

2.  Even brushing aside these methodological flaws, FDA's studies did not properly eval-uate whether the new warnings would achieve the TCA-mandated goal of promoting "greater public understanding" of risks than Congress's default warnings.  15 U.S.C. § 1333(d)[2].  FDA does not dispute that the plain meaning of "understanding" is comprehension, Pls.' Br. 34, or that FDA's Rule defined "[u]nderstanding" as occurring only if people "process the information in the message (*i.e.*, acquire knowledge of and learn that information)."  85 Fed. Reg. at 15,655-56.

But FDA did not test comprehension.  Instead, FDA devised completely subjective metrics it dubbed "new information" and "self-reported learning."  As peer reviewers explained, those metrics just asked respondents to indicate whether the information was new or understandable—not whether respondents actually internalized the messages FDA sought to convey.  Pls.' Br. 34-36 (citing AR54063, AR54072-73, AR28507).  That distinction is critical: warnings are useless if viewers consider them new, but take away a different message from what FDA hoped to relay.  Worse, FDA pre-committed to using these metrics, thus abandoning any effort to measure true comprehension.  *See* Pls.' Br. 15.  FDA's failure abdicated its statutory obligation to test "compre-hension" while also bucking the scientific literature, which emphasizes the importance of testing comprehension.  AR54063, AR54072-73.

FDA (at 21-22) defends the "new information" and "self-reported learning" metrics by portraying understanding as a "multifaceted process."  Even assuming that understanding is "mul-tifaceted," FDA's preferred "new information" and "self-reported learning" metrics capture only the first facet.  FDA (at 24-25) admits that these metrics are "predictive," "early indicator[s]" of understanding, and that FDA prioritized study outcomes that provide the "best assessment of initial reactions," rather than measuring more "delayed" outcomes.  Thus, FDA neglected to measure whether participants made it all the way to "understanding" the warnings.  Instead, FDA stopped halfway and assumed that critical aspects of "understanding"—like actually believing the warn-ings' messages—would materialize down the road.  85 Fed. Reg. 15,663.

FDA (at 24) cites its "limited time horizon" to justify using predictions about whether con-sumers would understand the warnings instead of asking questions to make sure.  That is no excuse.

19

As peer reviewers explained, there were efficient ways to test comprehension.  FDA could have used a "formal test of comprehension"—*e.g.*, asking participants to answer objective, "true-false items"—to determine whether participants drew accurate health information from the warnings. AR28507, AR54085; *see* AR54078-79.  The true-false nature of that alternative metric would not require unwieldy "open-ended responses" or "post-implementation study."  *Cf.* U.S. Br. 22 n.10, 24.  FDA (at 21-22) tries to flip its burden, complaining that Plaintiffs did not identify a superior alternative metric for comprehension that would have "aligned with the purposes of FDA's studies."  But Plaintiffs and peer reviewers did just that.  AR28507, AR54085, AR54078-79.

FDA (at 23-24) sweeps any issues with these metrics under the rug, urging deference to its selection of the "new information" and "self-reported learning" metrics based on their support in the literature.  But peer reviewers—not just Plaintiffs, *cf.* U.S. Br. 24—panned FDA's approach as "neither based in empirical evidence nor theory."  Pls.' Br. 36 (quoting, *inter alia*, AR54068). Even if other peer reviewers "endorsed" FDA's approach, U.S. Br. 24, FDA inadequately grappled with the peer-review critiques of FDA's myopic tests for understanding, like that FDA's approach defied "the ordinary concept of understanding."  AR54072; *see Pub. Citizen, Inc. v. FAA*, 988 F.2d 186, 197 (D.C. Cir. 1993) (agency must "adequately explain its result and respond to relevant and significant public comments" (cleaned up)).  The scope of FDA's second qualitative study is no help.  FDA could have recruited a million respondents—but all of them would have been answering incomplete questions that do not effectively measure comprehension.  *See* Pls.' Br. 36.

3.  Taking another tack, FDA (at 25) minimizes the Rule's reliance on the "new information" and "self-reported learning" metrics.  The record belies that portrayal.  FDA's first quantitative study deemed these metrics "primary," AR39294, and the Rule reiterated that they were "the two key measures," 85 Fed. Reg. 15,658.  Because FDA's reliance on those two metrics was arbitrary, FDA's *post hoc* arguments cannot salvage the two quantitative studies.

FDA (at 22) falls back on other metrics to bridge the divide between "new information" and "self-reported learning" versus actual comprehension.  FDA claims that the metrics of "perceived informativeness" and "perceived understandability" suggest that respondents internalized

20

and comprehended FDA's warnings.  And on these other metrics, FDA says (at 25-26), the final warnings were not so bad compared to the Surgeon General's warnings.  But the Rule did not embrace those *post hoc* propositions, and courts can uphold agency action only on the grounds the agency embraced in its rulemaking.  *See SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943).  In any event, FDA does not dispute that *five* of FDA's final graphic warnings—nearly half—failed to affect health beliefs upon repeated exposure, a finding that devastates FDA's case for those five graphic warnings.  That finding also impugns FDA's reasoning more broadly by contradicting FDA's statements that its warnings' effectiveness would *grow* with additional exposure and increased acceptance.  Pls.' Br. 38 (quoting 85 Fed. Reg. at 15,663).  FDA's brief says nothing on that score.  The "perceived informativeness" and "perceived understandability" metrics paint a flawed picture besides.  That respondents self-perceived that they understood or were informed by the warnings says nothing about *what* they supposedly learned, much less that they achieved *actual* comprehension.  That yawning gap is precisely why FDA's peer reviewers condemned FDA's "total[]" reliance on "self-reported" measures, rather than other "confirmed" measures of consumer understanding.  AR54093, AR54066; *see* AR54073, AR54085.

FDA's decision to plow ahead with imperfect and incomplete metrics infected the entire rulemaking process.  For example, FDA shunned the first qualitative study's *most* "prevalent" finding that consumers doubted the accuracy of the definitive causal language that FDA used in most if its warnings (*i.e.*, smoking "causes" X).  AR23337.  On top of that, FDA's qualitative studies overwhelmingly confirmed that participants had problems understanding or accepting many of FDA's proposed warning statements and images.  FDA (at 22) dismisses responses from the qualitative studies as "cherry-picked snippets," but the record is replete with similar reactions of incredulity that FDA's qualitative study reports downplayed.  *Infra* p. 35 n.8.  Nor were these reactions to mere "draft[s]" unrelated to FDA's final graphic warnings, as FDA claims. *See* U.S. Br. 23.  The marked similarity between many of the precursor images and FDA's final images should prevent FDA from brushing those findings aside, and study participants also found FDA's final images confusing.  *Compare* Pls.' Compl. ¶¶ 97-98, *with* Pls.' Br. 1-2; *see also* Pls.' Br. 35.

21

FDA ultimately leaves its qualitative studies in the dust, claiming (at 23) that "[w]hat matters" is that the final warnings performed well on FDA's final quantitative study.  But FDA's failure to defend what the Rule described as "formative" components of FDA's warning-development process exposes the flawed core of the rulemaking.  85 Fed. Reg. at 15,664.

4.  Even apart from the insufficiency of "new information" and "self-reported learning," FDA's quantitative studies do not support the Rule.  FDA's rulemaking inadequately accounted for key results that call into question FDA's choice of final warnings.  *See* Pls.' Br. 35-39.

FDA (at 23) denies "disregard[ing]" key study metrics, but that is the only way to describe FDA's refusal to assess in the second quantitative study whether anybody believed the warnings.  The risk, of course, is that viewers will be disturbed by the grotesque images and fail to believe the message (thereby kneecapping potential "understanding").  FDA (at 27) responds that "'backfiring' is not a study variable" and points to other self-reported measures like "thinking about risks," "perceived understandability," and "recall[]."  But those metrics did not measure whether participants *believed* the messages conveyed by gruesome warnings.  What is more, believability *was* a study variable, at least until FDA jettisoned it when its warnings performed abysmally on that metric in the first quantitative study.  Pls.' Br. 37-38.  So too, *seven* of FDA's final warnings scored low on the "factuality" measure—yet another indicator that consumers questioned the credibility FDA's warnings.  85 Fed. Reg. at 15,660.  FDA's brief does not address those results.

Peer reviewers were confounded as to why FDA did not consider these "crucially important" issues implicating the graphic warnings' credibility with consumers.  AR54073; *see* AR54079 ("What happened to believability?").  Plaintiffs also cited research showing that disturbing or unrealistic graphic warnings may backfire with smokers.  Pls.' Br. 38-39.  FDA (at 27) dismisses this point, citing results suggesting that participants recalled the warnings.  Viewers confronted with disturbing graphic warnings may well remember them, but that is a far cry from believing, internalizing, and understanding the message those warnings convey.  FDA disregarded that important aspect of the problem.  Pls.' Br. 39; AR28509.

5.   The erectile dysfunction warning vividly illustrates how poorly FDA's Rule gauged consumer understanding at every stage—and how FDA inexplicably doubled down on confusing text and images throughout its testing process.  Participants in preliminary studies disbelieved the erectile-dysfunction warning statement.  AR23327.  FDA nevertheless forged ahead with the warning in the two quantitative studies—which revealed that participants flunked the erectile dysfunction warning on believability and factuality.  AR39343-47; AR39723-24; AR39733.

FDA contends that once participants viewed text alongside the confusing image, "[m]ost participants [in an early study] stated that the words helped them understand what the picture was." U.S. Br. 22 (quoting AR23643).  FDA argues (at 23) that means participants "understood the information conveyed by the warning."  Hardly.  The new text gave clues about what the image was supposed to convey (*i.e.*, erectile dysfunction, not shame over what went wrong in the bedroom), *see* AR23641, which suggests that *only* the text conveyed meaning.  Anyway, the quantitative studies confirm that the warning failed on various measures of understanding, even when participants viewed the text and erectile-dysfunction image together.  Pls.' Br. 40.  At every turn, FDA advanced its baffling preference for an erectile dysfunction warning despite relentless negative feedback, calling the reliability of FDA's entire development process into question.

### F.    FDA's Reliance on Inapt Foreign Evidence Was Arbitrary and Capricious

FDA (at 29) defends the Rule's reliance on foreign studies about the general efficacy of graphic warnings, but those studies do not support FDA's warnings here.  FDA acknowledges this, portraying these studies as makeweights for the general effectiveness of graphic warnings.  But FDA does not address these studies' limitations.  Even at face value, many of FDA's cited foreign studies linked graphic warnings' effectiveness with triggering emotional reactions or smoking cessation—aims that FDA disclaimed and refused to study here.  Pls.' Br. 54 n.7.  Worse, FDA omits that FDA itself has cautioned against relying on foreign studies—making FDA's accusation (at 29) that the industry always "mudd[ies] the scientific waters" particularly baseless.  *See* Pls.' Br. 41 (quoting 84 Fed. Reg. 50,566, 50,600 (Sept. 25, 2019)).  Even if foreign studies demonstrate that other graphic warnings were effective abroad, FDA had to explain its deviation from its prior

23

approach rejecting foreign studies.  An agency is not bound to prior methods, but must provide a "reasoned analysis indicating that prior policies are being deliberately changed, not casually ignored."  *Am. Pub. Gas Ass'n v. Fed. Power Comm'n*, 567 F.2d 1016, 1035 (D.C. Cir. 1977).

## II.    FDA's Rule Violates the First Amendment

The Rule is unconstitutional for three independent reasons.[3]  *First*, the Rule's commandeering of the top 50% of every cigarette package, and the top 20% of cigarette advertisement grossly violates the First Amendment.  *Second*, the Rule unconstitutionally forces manufacturers to display sensationalist images that are not reasonably necessary to inform consumers.  *Third*, the Rule compels misleading speech that misinforms consumers about relative health risks.  No one doubts that FDA has a general interest in informing the public about potential adverse effects of tobacco use.  But FDA's repeated assertion (at 29-30, 38-39) of a blanket license to override First Amendment protections when "danger[ous]" products like tobacco are at issue finds no place in any precedent ever, and contrary to FDA's suggestion (at 14-15), FDA's "scientific and factbound" justification for the Rule is subject to *de novo* review.  The Rule flunks any standard of review.[4]

### A.    FDA's Size and Placement Requirements Are Unconstitutional

FDA's spectacularly onerous size and placement requirements alone render the Rule unconstitutional under any level of scrutiny.  FDA has never before attempted a seizure of speech on this scale.  Nor can FDA identify a single court that has countenanced a comparable size-and-placement burden.  Courts have deemed far less burdensome requirements unconstitutional.  Here,

---

[3] FDA is flatly wrong (at 14 n.8) that Plaintiffs abandoned their challenge to the constitutionality of the TCA by failing to mention that argument in their motion for summary judgment.  *See* Pls.' Br. 45 (arguing that the statutory "size and placement requirements . . . are unlawful"), 46, 58, 65 (asking Court to declare that the TCA violates the First Amendment).

[4] FDA (at 45 n.22) responds that D.C. Circuit precedent forecloses heightened scrutiny, presumably referring to *R.J. Reynolds*' application of *Central Hudson* intermediate scrutiny to the earlier round of graphic label warning requirements.  696 F.3d at 1217.  But the Supreme Court's ensuing decisions make clear that *all* content, viewpoint, and speaker-based restrictions must at least be narrowly tailored to advance a compelling state interest to survive review.  *See*, *e.g.*, *Iancu v. Brunetti*, 139 S. Ct. 2294, 2302 (2019) (viewpoint); *Barr v. Am. Ass'n of Political Consultants, Inc.*, 140 S. Ct. 2335, 2346 (2020) (content); *id.* at 2364 (Gorsuch, J., concurring in part) (same); *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015).  Because the content-, viewpoint- and speaker-based Rule requires Plaintiffs to adopt the government's message that consumers should shun their products and because the Rule suppresses Plaintiffs' efforts to promote their products, those intervening Supreme Court decisions control.

the First Amendment harm is particularly acute, as FDA has muzzled tobacco manufacturers and substituted the government's speech for manufacturers' speech in the last and most sensitive forums for their speech, namely, their actual packaging and advertisements.

1. FDA (at 38-39) quibbles with the standard of review for its size-and-placement restrictions, but they fail by any metric. When the government seizes space on packaging and advertisements that manufacturers would otherwise use for their speech, that requirement is a speech *restriction*, and intermediate scrutiny (at least) applies. *E.g.*, *Nat'l Inst. of Fam. & Life Advocates v. Becerra* (*NIFLA*), 138 S. Ct. 2361, 2374 (2018) (scripted statement "regulates speech as speech"); *Ibanez v. Fla. Dep't of Bus. & Prof'l Regul., Bd. of Accountancy*, 512 U.S. 136, 148 (1994) (declining to "sustain[] restriction[] on . . . protected speech"). FDA (at 38-39) also finds it incongruous to apply intermediate scrutiny to the size and placement restrictions while applying a lower level of scrutiny to the warnings' content. But it would be absurd to reward FDA for violating the First Amendment in multiple, independent ways by reducing the First Amendment analysis to the *lowest* applicable level of scrutiny and mushing every violation together.

FDA does not dispute that its mammoth size-and-placement mandate forces Plaintiffs to eliminate their preferred speech, such as discount offers, website advertisements, and other promotions, in favor of FDA's mandatory message. Pls.' Br. 42-43; *see* U.S. Br. 42-43 & n.6. FDA merely contends that the size and placement restrictions are warranted, which is incorrect and insufficient under the Constitution, *infra* pp. 26-29. And commercial-speech restrictions must at least satisfy intermediate scrutiny. *E.g.*, *R.J. Reynolds Tobacco Co. v. FDA*, 696 F.3d 1205, 1217 (D.C. Cir. 2012); *Verizon Cal., Inc. v. FCC*, 555 F.3d 270, 275 (D.C. Cir. 2009).[5]

FDA (at 38-39) unpersuasively dismisses cases invalidating lesser size-and-placement restrictions. FDA notes that the Ninth Circuit invalidated San Francisco's soda-label mandate

---

[5] FDA (at 42-43 & n. 19) urges the Court to disregard the Golden Declaration, ECF No. 22-3, but its objection is baseless. "[I]n cases where relief is at issue, especially at the preliminary injunction stage," courts may review extra-record evidence, including in challenges to agency rules. *Esch v. Yeutter*, 876 F.2d 976, 991 (D.C. Cir. 1989). Regardless, the record independently substantiates the importance of packaging and advertising, and it is self-evident that commandeering enormous swaths of packaging and advertising crowds out existing speech. *E.g.*, AR40506, AR40508.

commandeering 20% of advertisements under *Zauderer*, not intermediate scrutiny. *Am. Beverage Ass'n v. City & Cnty. of S.F.*, 916 F.3d 749, 753 (9th Cir. 2019) (en banc). But that mandate was more disclosure than speech restriction, because, unlike manufacturers here, soda manufacturers had many avenues besides advertisements to convey their messages. Regardless, the fact that a *less*-speech-restrictive labeling requirement flunked a *lesser* standard of scrutiny hardly helps FDA's position. FDA (at 41 n.17) also sidesteps the Seventh Circuit's decision in *Entertainment Software Association v. Blagojevich*, 469 F.3d 641 (7th Cir. 2006), which invalidated a similar size requirement under strict scrutiny. FDA says that case involved video games with social importance, while its Rule involves cigarettes—but there is no First Amendment exception for speech that FDA considers less valuable.

FDA never claims that its size-and-placement restriction would survive intermediate scrutiny. FDA (at 38-43) merely contends that this restriction passes muster under a watered-down version of *Zauderer* (it does not), and (at 44-50) defends the *substance* of FDA's mandated warnings. But FDA's size and placement restrictions independently fail intermediate scrutiny even ignoring the substance of FDA's warnings. FDA has never satisfied its burden to explain why ejecting manufacturers from the top 50% of cigarette packages and the top 20% of advertisements is "not more extensive than is necessary" to promote understanding of smoking risks. *R.J. Reynolds*, 696 F.3d at 1217 (quoting *Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 566 (1980)).

2. Even were *Zauderer* applicable, FDA failed to establish that its size and placement restrictions are not "unjustified or unduly burdensome" and "extend 'no broader than reasonably necessary." *NIFLA*, 138 S. Ct. at 2377. FDA's refusal to test less restrictive alternatives dooms these requirements. Less-restrictive alternatives like smaller warnings or placing the warnings in different locations were readily available. Indeed, Congress and FDA have endorsed less restrictive alternatives in this area. *See* 15 U.S.C. § 4402(a)(2)(A) (30% text-only requirement for

smokeless tobacco packages); 81 Fed. Reg. 28,974, 28,988 (May 10, 2016) (30% text-only re-quirement for pipe tobacco and cigar packages), *vacated by Cigar Ass'n*, 964 F.3d 56.  FDA just refused to consider those options.  Pls.' Br. 45-46; 85 Fed. Reg. at 15,687.

FDA argues (at 41-42) that this Court must defer to Congress' size-and-placement condi-tions, because "[a]ny alternative requirements" would have entailed only "minor changes," and "'restrictions in degree' do not raise constitutional concerns."  U.S. Br. 41 (quoting *Action for Childs. Television v. FCC*, 58 F.3d 654, 667 (D.C. Cir. 1995) (en banc)).  But the government does not get to decide for itself when to consider less restrictive alternatives, and FDA's own actions reveal that there *is* a meaningful difference between "a warning that takes up 50% versus 30%." U.S. Br. 42.  In 2016, FDA made the very comparison that it refuses to make today, rejecting a comment "that [pipe tobacco and cigar] warnings should cover 50 percent or more of a pack's principal surface," and defending the effectiveness of a warning covering 30% of the package.  81 Fed. Reg. 29,065.  And the difference between 50% and 30% of a package is substantial.  Cigarette packages have a small amount of space, and the Rule would force manufacturers to shrink the brand logo on packages, forgo discounts, strip references to manufacturers' websites, reduce visi-ble space for brand colors, and remove brand statements (*e.g.*, "Filtered Cigarettes" or "Uniquely Rich and Smooth").  *See* Golden Decl. ¶¶ 34-37.  The same issues recur for advertisements.

Similarly, FDA errs in relying on the Sixth Circuit's *Discount Tobacco* decision, under which FDA sees "ample room" under the Rule for manufacturers to speak on packages and in advertising.  U.S. Br. 42 (quoting 674 F.3d 509, 567-68 (6th Cir. 2012) (Stranch, J.)).  FDA *is* crowding out critical space, leaving no "ample room."   And *NIFLA* rejects the notion that the government can compel speech so long as there is some remaining area for regulated parties to communicate.  *See* 138 S. Ct. at 2378; Pls.' Br. 44-45.  FDA has no response.

FDA (at 40) says *Zauderer* did not require FDA to consider those alternatives.  But *NIFLA* is clear: under *Zauderer*, compelled-disclosure requirements may "extend no broader than reason-ably necessary."  138 S. Ct. at 2377.  Or, as the en banc Ninth Circuit framed *NIFLA* in *American Beverage*, government compelled disclosures cannot pass constitutional muster if a less-restrictive

alternative—there, "a smaller warning—half the size—would accomplish Defendant's stated goals." 916 F.3d at 757. FDA (at 41 n.17) suggests that this rule applies only when the government concedes that a smaller warning would be equally efficacious. That is not what *NIFLA* says, and regardless just begs the question: we have no idea what FDA would have conceded about smaller warnings, because FDA refused to study their efficacy.

FDA (at 38-39) also urges deference to Congress's purported findings in the TCA that the size and placement restrictions are warranted. FDA omits that Congress made *no* factual findings in the TCA concerning the size-and-placement requirements. Pls.' Br. 45. Regardless, "Congress' predictive judgments are not insulated from meaningful judicial review." *R.J. Reynolds*, 696 F.3d at 1220 n. 15. FDA (at 7 n.2, 39-40) points to a snippet of a single senator's statement suggesting that bigger warnings are more noticeable. But that observation would justify warnings occupying 100% of the packaging. Moreover, that is no congressional finding; "the preferences expressed by certain legislators" reveal nothing about legislative intent. *NLRB v. Sw. Gen., Inc.*, 137 S. Ct. 929, 942 (2017). And, contrary to FDA's contention (at 39, 42 n.18), Congress's longtime regulation of tobacco advertising does not insulate the TCA's size-and-placement requirements from constitutional scrutiny. "When Congress finds that a problem exists, we must give that finding due deference; but Congress may not choose an unconstitutional remedy." *Citizens United v. FEC*, 558 U.S. 310, 361 (2010). Likewise, agency rules must independently comport with constitutional requirements. *See* Pls.' Br. 45.

FDA's reliance on the scientific literature (at 40) is no help, either. Just because the literature suggests that bigger warnings are more noticeable does not give FDA a free pass from the First Amendment. Again, that reasoning would permit the government to adopt any warning, of any size, for any harm. The First Amendment requires more than scientific evidence that bigger is generally better: the government must justify the "*particular method* of achieving a government interest." *Am. Meat Inst. v. U.S. Dep't of Agric.*, 760 F.3d 18, 26 (D.C. Cir. 2014) (emphasis

added).  Further, that literature does not get FDA anywhere in explaining why FDA must commandeer at least 50% of cigarette packages in order to voice its message about cigarette smoking, yet can settle for smaller label requirements for cigars and pipe tobacco.  *Supra* p. 27.

**B.   FDA's Rule Unconstitutionally Requires Inflammatory Messages**

The inflammatory, disturbing nature of FDA's warnings independently voids the Rule.

1. *Zauderer* is the wrong standard, because FDA's warnings are not purely factual or uncontroversial.  Regardless, the warnings are more burdensome than necessary.  Pls.' Br. 47-54.

a. FDA's graphic warnings are not "purely factual" because they "are primarily intended to evoke an emotional response, or, at most, shock the viewer into retaining the information in the text warning."  *R.J. Reynolds*, 696 F.3d at 1216; *see* Pls.' Br. 47-51.[6]  FDA (at 33) incorrectly suggests that its images today are more informative and less emotion-laden than those in 2011. But compare the two images below.  The one on the left is the "small child" that *R.J. Reynolds* described as an "unabashed attempt[] to evoke emotion."  696 F.3d at 1216-17.  The one on the right, paired with the same text, is the even more charged image that FDA's Rule mandates:

   

In a qualitative survey transcript that FDA refused to release during notice and comment, respondents described the image of the child with a respirator as a "[s]care tactic," AR26187, "invok[ing]

---

[6] As Plaintiffs noted, Pls.' Br. 52 n.6, the D.C. Circuit has held that *Zauderer* may apply outside of cases "in which the government points to an interest in correcting deception."  *Am. Meat*, 760 F.3d at 22.  Contrary to FDA's suggestion (at 30 n.13), Plaintiffs have never tried to hide this Circuit's controlling authority.  As Plaintiffs explained, other circuits have read *Zauderer* differently, Pls.' Br. 52 n.6, and properly understood, *Zauderer* applies only to instances in which the government seeks to "correct . . . misleading claims" made by the private party.  *R.J. Reynolds*, 696 F.3d at 1216.

a certain emotion," AR26661, "very explicit," AR26243, and "sadder than the other picture" presented to the group that depicted the same condition (but was not included in the Rule), AR26642. The problem is not unique to this warning. FDA's research confirms that the warnings played to basic human instincts like revulsion to disease, dismemberment, and harming children. Unsurprisingly, throughout the development process, the warnings triggered emotional reactions. *See* Pls. Br. 47-48. As in *R.J. Reynolds*, these sorts of graphic warnings "evoke emotion (and perhaps embarrassment)" in order to "browbeat consumers into quitting." 696 F.3d at 1217.

FDA responds (at 32, 34) that, because the agency refused to inquire into potential emotional responses, FDA cannot have *intended* to provoke an emotional response. *See* 85 Fed. Reg. at 15,668; AR50772. But deliberately ignoring the effects of its warnings on viewers violated the APA. *Supra* p. 13; *Cigar Ass'n*, 964 F.3d at 62. If an agency could blind itself to whether compelled speech elicited an emotional response, *Zauderer* would be the rule for every compelled disclosure, not the narrow exception for "purely factual and uncontroversial" ones. Pls.' Br. 50.

Similarly, FDA maintains that "just because 'a disclosure . . . provokes a visceral response' does not mean the disclosure 'fall[s] outside *Zauderer*'s ambit.'" U.S. Br. 33 (quoting *Disc. Tobacco*, 674 F.3d at 569). But D.C. Circuit precedent forecloses that position. Pls.' Br. 44-45, 52. Messages intended to "shock," *R.J. Reynolds*, 696 F.3d at 1216-17, or that "convey[] moral responsibility," *Nat'l Mfrs. Ass'n v. SEC*, 800 F.3d 518, 529-30 (D.C. Cir. 2015), are not "purely factual." FDA (at 34) similarly suggests that the health effects of smoking, not the warnings themselves, elicit emotional reactions. *See* 85 Fed. Reg. 15,646. But there is a reason that a picture is worth a thousand words—it is one thing to be told about lung cancer; it is another altogether to be shown bloody, diseased lungs in the hands of a coroner. And because FDA never tested less emotionally evocative images, *see* Pls.' Br. 50, FDA's argument lacks any basis in the record.

Further, FDA's studies illustrate that not all images evoke emotion to the same degree. *See* AR23549-23562 (recommending the adoption of certain graphic images because they are "more attention-grabbing" than alternatives). FDA knew that its proposed images elicited emotional responses and selected them anyway. Pls.' Br. 48-49. FDA (at 32) is wrong that Plaintiffs have

"cherry-picked examples" of emotional responses to proposed images.  The qualitative studies are replete with examples of FDA asking participants how attention-grabbing the images were, and participants graded and compared different images along that measure.  *E.g.*, Pls.' Br. 48 n.5 (collecting examples); AR24607-09, 24641-47; *see also* AR54053 (peer reviewer).[7]

Plaintiffs by no means diminish the serious health risks that smoking can cause.  But tobacco is a lawful product, and "the tobacco industry has a protected interest in communicating information about its products and adult customers have an interest in receiving that information." *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 571 (2001).  FDA (at 34 & n.14) tries to distinguish risks associated with "intended uses" of tobacco from those tied to "accidents or incorrect uses" of other products.  But if, as FDA claims (at 34), warnings fall within *Zauderer* as long as the regulating agency pinky-swears that it did not intend to evoke emotions, that distinction makes no difference.  The government could plaster images of children in anaphylactic shock on peanut butter or open heart surgery on red meat, all under the guise of communicating "purely factual information" about the "intended uses" of those products.  There is no limiting principle; FDA offers none, and that alone signals the Rule's unconstitutionality.

b.  FDA's warnings also do not fit within the *Zauderer* compelled-disclosure framework because they are not "uncontroversial" or "non-ideological."  *Nat'l Ass'n of Mfrs.*, 800 F.3d at 529-30; Pls.' Br. 51-52.  Although FDA (at 36-37) states that its sole interest is to promote public awareness, the images that FDA selected plainly communicate an additional message: "Don't buy or use this product."  *See R.J. Reynolds*, 696 F.3d at 1211.  FDA does not dispute that 74.5% of people who viewed the warnings in one of its qualitative studies interpreted the images as telling people not to smoke.  AR28093.  FDA (at 34) suggests that this antismoking message is a mere byproduct of seeing "accurate" depictions of the effects of smoking.  But as the D.C. Circuit has

---

[7] *See* AR24756 (Bladder Cancer) ("This is also a rather strong image also that generates a sense of fear in me."); AR25626 (COPD) ("[I]t just makes you feel uncomfortable looking at it."); AR25015 (Heart Disease) ("Again, the grossness of the picture."); AR24752 (Lung Disease) ("This is a scary picture here."); AR25348 (Lung Disease) ("[Q:] How does that make you feel? [A:] Like saddened."); AR25920 (Neck Cancer) ("[Q:] What is your first impression of this image[? A:] Kind of disgusted[.]"); AR24694 (Secondhand Smoke) ([Q:] How does it grab your attention? [A:] It works sufficiently cruelly.").

recognized, the government may not compel private actors to communicate its messages when they "are biased against or are expressly contrary to the corporation's views." *Am. Meat*, 760 F.3d at 27 (quoting *PG&E v. Public Util. Comm'n*, 475 U.S. 1, 15-16 n. 12 (1986) (plurality)). Plaintiffs "recognize the need for health warnings on cigarette packages and advertisements," AR28474, but FDA may not compel Plaintiffs to stigmatize their own products. *See R.J. Reynolds*, 696 F.3d at 1217.

c. Even if *Zauderer* applied, the Rule compels more speech "than reasonably necessary" to advance FDA's stated interest in consumer education. *NIFLA*, 138 S. Ct. at 2377. To start, text-only warnings may well have equally advanced FDA's consumer-education interest. FDA (at 50) claims to have considered "arguments in favor of text-only warnings" in the abstract, but FDA's arbitrary refusal to actually *test* those warnings belies any real consideration, especially given FDA's failure to explain why text-only warnings are effective for smokeless tobacco products but not for cigarettes. FDA (at 39) says that the TCA requires graphic warnings, but the Constitution trumps statutory text. Nor does FDA contest that the images require text to clarify their meaning, or that the images alone were confusing to many viewers. *See, e.g.*, Pls.' Br. 53 (citing AR23638, AR23606, 23641). Less restrictive alternatives abounded, but FDA failed to consider them, as the First Amendment requires.

On the other hand, FDA cannot satisfy *Zauderer*'s requirement that the Rule be "reasonably necessary" to FDA's stated interest, 138 S. Ct. at 2377, because FDA has not established that its warnings advance that interest. FDA does not explain why the specific graphic images that it selected are necessary to communicate the warning in the associated text. Pls.' Br. 53. Instead, FDA argues (at 43-44, 50) that the literature supports the effectiveness of graphic warnings in general. That does not show that FDA's specific images (or the text-image pairings) are reasonably necessary to advance consumer education. FDA seeks to have it both ways. Sometimes, FDA (at 37-38, 49) embraces the images' efficacy, even though FDA's study says that the emotional impact of graphic warnings is key to efficacy. AR23408. Other times (at 32), FDA disavows any intent to evoke emotion. FDA cannot bury its head in the sand just to fit within *Zauderer*.

2.  Because *Zauderer* does not apply, more stringent scrutiny is appropriate.  FDA does not dispute (at 45 n.22) that recent Supreme Court decisions involving commercial speech have declared viewpoint restrictions *per se* unconstitutional, and that content- and speaker-based restrictions in the commercial context are also presumptively unconstitutional.  *See* Pls.' Br. 54-55 (collecting cases); *supra* p. 24 n.4.  Here, all agree that the Rule discriminates based on the speaker (tobacco manufacturers) and content (speech relating to tobacco products).  And while FDA sees no viewpoint discrimination afoot, that position belies its warnings' emphatic anti-smoking message.  FDA's unambiguous message is that if you smoke, you will go blind, have your toes amputated, urinate orange, and die from cancerous lesions on your lungs; the only way to avoid those dire outcomes is to quit smoking.  This means that strict scrutiny applies, and FDA does not even pretend that its Rule could survive that more searching review.  *See* 85 Fed. Reg. at 15,649.

If nothing else, FDA must satisfy intermediate scrutiny, but FDA cannot show that the Rule "directly and materially advances a substantial state interest in a manner no more extensive than necessary to serve that interest."  *Ibanez*, 512 U.S. at 142; *R.J. Reynolds*, 696 F.3d at 1222.  FDA has not defined its interest with sufficient precision, and FDA's chosen means of pursuing that vague interest is not "direct" and restricts more speech than necessary.  Pls.' Br. 55-58.

a.  Start with FDA's circular informational interest.  Pls.' Br. 55-56.  In *R.J. Reynolds*, the D.C. Circuit rejected FDA's asserted interest in "effectively communicating health information regarding the negative effects of cigarettes," because FDA had failed to identify any metric for what makes communication "effective."  696 F.3d at 1221.  Yet FDA has once again eschewed meaningful barometers for measuring success, identifying no limit on what information the government could compel in the name of better educating the public.  FDA also does not dispute that because (in its view) all warnings become stale, its inaugural slate of graphic warnings may just be opening the floodgates to endless future rounds of compelled speech.  Pls.' Br. 56.

FDA did not set goals for figuring out what study participants actually learned from its graphic warnings.  Pls.' Br. 34.  FDA (at 46-47) responds that it has set out "specific and quantifiable" metrics for "measuring understanding."  But those metrics merely involved reporting

subjective, self-reporting from study participants who viewed the Surgeon General's warnings and then the graphic labels, and then comparing those reactions. 85 Fed. Reg. at 15,658; *supra* pp. 17-18. This method does not reveal what specific information the viewers processed or retained, and thus says nothing about consumer understanding. *Supra* pp. 19-20; Pls.' Br. 13-16, 34. As in *R.J. Reynolds*, FDA has "define[d] 'effectiveness' however it sees fit," and, as a result, its Rule cannot survive intermediate scrutiny. 696 F.3d at 1221.

Instead of offering some limit on its speech-compelling powers, FDA (at 47-48) says government-mandated disclosures need not affect consumer behavior at all. But FDA's cited cases involved disclosures that were necessary to "prevent[] deception," *Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio*, 471 U.S. 626, 651 (1985), "combat the problem of inherently misleading commercial advertisements," *Milavetz, Gallop & Milavetz, P.A. v. United States*, 559 U.S. 229, 250 (2010), or "avoid confusion," *Citizens United*, 558 U.S. at 368. Precisely because those communications could be intrinsically misleading, corrective disclosures necessarily informed consumer behavior. But here, FDA has never claimed that cigarette packages or advertisements are intrinsically deceptive. Nor could it, given that those packages and advertisements currently bear the Surgeon General's warning. At bottom, FDA has no answer to the problem that accepting FDA's interest in all disclosures that communicate any health-related information would give governments "a free pass to spread their preferred messages on the backs of others." *Am. Meat*, 760 F.3d at 31 (Kavanaugh, J., concurring in the judgment).

b. Further, FDA failed to show that the Rule directly and materially advances FDA's asserted interest in consumer education, and restricts no more speech than necessary. Pls.' Br. 57-58; *see Edenfield v. Fane*, 507 U.S. 761, 770-71 (1993). FDA did not ascertain whether consumers actually comprehend risks better after viewing FDA's graphic warnings. *Supra* pp. 19-20; Pls.' Br. 34-35, 57. And while FDA speculates that the Rule advances FDA's consumer-education interest, even the dubious metrics in FDA's studies make that conclusion doubtful. *Supra* pp. 20-23. Mere "speculation," of course, cannot meet FDA's burden. *Nat'l Mfrs.*, 800 F.3d at 526. And

methodological defects afflicted FDA's studies, calling into question the reliability of its results and the extent to which the Rule furthers FDA's stated interest. *Supra* pp. 17-18; Pls.' Br. 57.[8]

Nor are FDA's required warnings narrowly tailored. Pls.' Br. 58. FDA emphasizes (at 50) the importance of warnings on cigarette packages generally, but that does not justify the warnings here. Again, FDA's Rule flatly refused to test less-restrictive alternatives, 85 Fed. Reg. at 15,664, like more frequent rotation of existing warnings, or attention-grabbing textual headlines. Pls.' Br. 58. And because FDA never systematically measured how much emotion different images evoke, FDA did not assess whether less burdensome content—*i.e.*, less sensational or provocative images—would have achieved its goal of promoting public awareness.

### C.    The Rule's Warnings Are Misleading

FDA lacks an interest in anything other than "accurate and nonmisleading" speech. *Nicopure Labs, LLC v. FDA*, 944 F.3d 267, 284 (D.C. Cir. 2019). But the Rule's warnings are unconstitutional under any form of scrutiny because they are likely to be "misinterpreted by consumers": the warnings suggest that the covered health conditions all carry the same risk and severity. *See R.J. Reynolds*, 696 F.3d at 1216.

FDA argues (at 35-36) that all that matters is that smoking in fact causes the depicted medical conditions. But FDA misses the point by relying on support for the "causal link" between smoking and FDA's chosen health risks. Some of those risks are rare; others are common. Some conditions are chronic and non-fatal; others carry high mortality rates. Pls.' Br. 59. Grouping all

---

[8] FDA (at 22, 32, 66) again accuses Plaintiffs of "cherry-pick[ing] snippets" from the administrative record. But at some point, the presence of so many cherries indicates a cherry pie. The record abounds with skepticism of FDA's stark causation language. *E.g.,* AR24292 (Bladder Cancer) ("[I]t should again say *May*, putting it down as definitive is []flat out bulls---."); AR24168 (COPD) (Moderator: "Oh, I see, so your problem with these is not having the word *Can* or *May* or *Is a cause of*?" Participants: "It's too absolute."); AR24220 (Diabetes) ("It just should have *Smoking, Smoking may cause*. It just should have that *May* in there. . . . Because if they were to have the statistic beside this like it wouldn't be very high and it wouldn't stop me from smoking."); AR23883 (Diabetes) ("Just hearing the other causes of diabetes . . . from too many sweets or genetics, so smoking, it just doesn't seem believable."); AR23942 (Head and Neck Cancer) ("If you want to say this will do something, I want the proof. Now if you say it may do it, okay, I understand the may part."); AR23873 (Fatal Lung Disease) ("I … would want to know … if that can only happen if it was one cigarette or like how many cigarettes would it take, like the risk level?"); AR24085 (Fatal Lung Disease in Nonsmokers) ("I would put *Can cause fatal lung disease*,. . . that's like propaganda."); AR24086 (Fatal Lung Disease in Nonsmokers) ("Because it's saying like it can cause, it's not like it's almost certain."); AR23885 (Fatal Lung Disease in Nonsmokers) ("I think … it's fatal depending on the circumstance, like if you have asthma or something… but just generally, … I don't think that's like true-ish.").

conditions together with blanket causation language elides those key distinctions and risks misin-terpretation. *R.J. Reynolds*, 696 F.3d at 1216. FDA's survey participants prove the point: many believed that FDA's warnings overstated risks and falsely equated the likelihood of different con-ditions. *Supra* p. 35 n.8; Pls.' Br. 59. That FDA (at 35-36) derived the causation statements from Surgeon General reports does not make the warnings non- misleading. Those reports contain con-textualizing information about the likelihood and severity of warned-of conditions (which is why the 2014 report, for instance, spans 1,000 pages and is replete with scientific jargon). *See* 84 Fed. Reg. at 42,756 & Ref. 8 (citing 2014 report).

FDA is wrong (at 35) that Plaintiffs object to any warning that lacks "all possible infor-mation about the precise likelihood of a given health risk." Warnings cannot give consumers an inaccurate picture of how likely or how serious the risks of a particular health condition are. The current Surgeon General's warnings cover common conditions and do not create the same misim-pressions. It is one thing to label cyanide or anthrax with skull-and-crossbones graphic denoting toxicity. It is another to require the skull-and-crossbones on *any* substance that could cause poi-soning—from water to rhubarb.

FDA (at 36) also downplays that medical professionals found a number of the images in its graphic warnings inaccurate or misleading. *See* Pls.' Br. 60 (collecting examples); AR28120 (black lungs); AR28127 (amputation); AR28111 (child with respirator). FDA (at 36) insists that the warnings are non-misleading, but its defense adds a host of additional non-smoking conditions. For example, FDA justifies its selection of the head and neck cancer image by saying that it is "not unusual" for patients in "underserved communities" who "lack [] health insurance coverage, . . . financial resources, . . . transportation, . . . and cancer knowledge" to "present at advanced stages" for this form of cancer. *Id.* But nothing in FDA's image suggests those caveats, and FDA's stance would justify portraying any condition that any subgroup experiences sometimes. *R.J. Reynolds* forecloses that approach; the D.C. Circuit rebuked FDA for suggesting that certain images are "a common consequence of smoking" when they are not. 696 F.3d at 1216.

**III.    Plaintiffs are Entitled to Vacatur of the Entire Rule and a Preliminary Injunction**

    **A.    Plaintiffs Are Entitled to Vacatur of the Entire Rule**

1. FDA is incorrect (at 67-70) that the Rule is severable and that this Court could salvage portions. Courts must "hold unlawful and set aside agency action . . . found to be" invalid. 5 U.S.C. § 706(2). The APA thus requires vacatur of unlawful agency rules *in toto*. *E.g.*, *Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998); *Harmon v. Thornburgh*, 878 F.2d 484, 495 n.21 (D.C. Cir. 1989). The D.C. Circuit accordingly vacated FDA's first graphic warnings rule in its entirety. *See R.J. Reynolds*, 696 F.3d at 1222. FDA (at 70) argues that the TCA's severability clause points to a different result by expressing Congress's wish that FDA continue enforcing the TCA and related regulations "to the fullest extent possible." 21 U.S.C. § 387 (note). The D.C. Circuit vacated FDA's previous rule in its entirety notwithstanding the same TCA severability provision. FDA (at 70) distinguishes *R.J. Reynolds* because FDA did not brief severability in that case. But the D.C. Circuit did not rest its total invalidation of the Rule on FDA's forfeiture, *see* 696 F.3d at 1222, and the TCA's severability clause has not changed.

Regardless, there is nothing to sever here. When component parts of a regulation are "intertwined . . . giv[ing] rise to a substantial doubt that partial affirmance would comport with the [agency's] intent," courts must set aside the whole rule. *Tele. & Data Sys., Inc. v. FCC*, 19 F.3d 42, 50 (D.C. Cir. 1994). The flaws here taint all the warnings. Take the First Amendment: The size and placement requirements are independently unconstitutional and apply to every warning. All warnings contain gruesome images intended to provoke an emotional response, and the combined effect of all warnings is also what makes them misleading collectively. The Rule's APA flaws are similarly cross-cutting. FDA violated the TCA by promulgating more than nine warnings; remand would be required for FDA to pick which nine to keep. Likewise, remand is required for FDA to remedy its failure under the TCA to make the required findings before eliminating three TCA-mandated warning. FDA's many process fouls require a redo of the notice and comment process and thus, by their nature, require vacatur. And the lack of evidentiary support and FDA's arbitrary decision-making again infects its entire rulemaking process.

FDA (at 67-70) is thus incorrect that the Rule's severability clauses would save *some* warnings even if this Court invalidates others. When a regulation cannot "function sensibly without the stricken provision[s]," courts set the entire rule aside. *MD/DC/DE Broads. Ass'n v. FCC*, 236 F.3d 13, 22-23 (D.C. Cir. 2001). And FDA ignores the serious implementation challenges that severing the Rule would pose. FDA (at 67) says the lawfulness of text-only warnings "cannot be reasonably disputed." But requiring text-only versions of FDA's warnings would, by definition, be arbitrary and capricious given that FDA never tested whether text-only warnings would further FDA's stated goal. *See* Pls.' Br. at 61. And the costs resulting from compliance with a severed rule are far from "speculative." *Cf.* U.S. Br. at 70. Plaintiffs painstakingly described the time and money required to conform their packaging to the Rule's existing requirements. DeVerry Decl. Adjusting midstream would require Plaintiffs to spend even more time and money.

2. FDA (at 70-72) alternatively urges this Court to limit its judgment to the parties in this case. But this Court has repeatedly rejected that position, and should do so here. *See District of Columbia v. U.S. Dep't of Agric.*, 444 F. Supp. 3d 1, 46–55 (D.D.C. 2020); *Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health and Human Servs.*, No. 20-1630, 2020 WL 5232076, at 43-45 (D.D.C. 2020).

Finally, FDA (at 71-72) asserts that the TCA's severability provision overrides the APA's general rule of vacatur and requires courts to vacate unlawful actions more narrowly. The D.C. Circuit rejected this argument when it set aside FDA's first graphic warnings-rule. *See R.J. Reynolds*, 696 F.3d at 1222. The D.C. Circuit again rejected that argument in a recent challenge to a different TCA rule: "Our analysis begins, and ends, with the [P]laintiffs' statutory claims. Those claims arise under the Administrative Procedure Act, which . . . instructs a reviewing court to *set aside* agency action found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Cigar Ass'n*, 964 F.3d at 61 (emphasis added).

## B.    Plaintiffs Are Entitled to a Preliminary Injunction

The preliminary injunction factors decisively favor enjoining the Rule's effective date until 15 months after this Court issues final judgment on Plaintiffs' claims. The Eastern District of

Texas has twice already held, in granting administrative stays, that all equitable factors weigh in favor of delaying the Rule, for a total of 210 days. *See* Order at 10143, *R.J. Reynolds Tobacco Co. v. FDA*, No. 20-cv-00176, (E.D. Tex., Dec. 2, 2020) R. at 80; Order at 1216, *id.*, (May 8, 2020), R. at 33. Plaintiffs have shown a substantial likelihood of success on the merits, and face irreparable injuries to their First Amendment rights and in the form of millions of dollars they are spending to comply with the Rule—money they cannot recover from the government. Comparatively, the government will suffer no harm from an injunction. FDA twice already has represented that there is no problem delaying the Rule's effective date. And the public's interest in free speech and avoiding false and misleading information weighs in favor of an injunction.

1. Injunctive relief is necessary to mitigate the irreparable harm that Plaintiffs face. FDA (at 72-74) urges this Court to decide the summary judgment motions and Plaintiffs' preliminary injunction motion together. Plaintiffs have no objection to that if the Court's schedule permits a prompt and simultaneous resolution. But Plaintiffs are suffering harms *right now*. Every day, Plaintiffs spend money in anticipation of having to comply with the Rule in less than a year. *See* DeVerry Decl. A preliminary injunction is necessary to preserve the status quo in the event the Court's schedule does not permit a prompt ruling until the Court can rule on the cross-motions for summary judgment. *Abdullah v. Bush*, 945 F. Supp. 2d 64, 67 (D.D.C. 2013).

FDA's other arguments are unavailing. Unrecoverable, certain, and imminent expenditures constitute irreparable harm. *Nat'l Mining Ass'n v. Jackson*, 768 F. Supp. 2d 34, 53 (D.D.C. 2011). FDA (at 73) is incorrect that only business-ending losses can qualify as irreparable financial harm. That standard applies to *recoverable* losses, but does not apply here, because Plaintiffs cannot recover losses from the government. *See Holiday CVS, LLC v. Holder*, 839 F. Supp. 2d 145, 168 (D.D.C.), *rev'd on other grounds*, 493 F. App'x 108 (D.C. Cir. 2012). FDA's citation of *Air Transport Association* is similarly inapt. There, the plaintiffs claimed only a future loss of business and a future loss of goodwill as irreparable injuries. 840 F. Supp. 2d 327, 335 (D.D.C. 2012). And they further claimed that *any* damages against a defendant with sovereign immunity

are irreparable *per se*.  Here, Plaintiffs' irreparable harm is much more concrete and narrow.  They have spent, and will continue to spend, millions to try to comply with the Rule.  DeVerry Decl.

Financial loss is not the only irreparable harm Plaintiffs face.  The threat of compelled speech irreparably harms Plaintiffs, even if that threat is prospective.  *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013); *R.J. Reynolds Tobacco Co. v. FDA*, 823 F. Supp. 2d 36, 51 (D.D.C. 2011).  FDA (at 62) objects that the Rule's speech restrictions will not take effect for a few more months.  But that was also the case in *R.J. Reynolds* and the court still issued a preliminary injunction.  823 F. Supp. 2d at 50-51.

2.  The balance of the equities and the public interest favor a preliminary injunction too.  FDA has no argument that a preliminary injunction would prejudice its interests.  Indeed, FDA has consistently acquiesced in postponing the Rule's effective date.  *See* Joint Mot. at 2-3, *R.J. Reynolds*, No. 20-cv-00176, R. at 30; *Am. Acad. of Pediatrics v. FDA*, No. 16-cv-11985, 2019 WL 1047149, at *2 (D. Mass. 2019).  The Rule's current effective date is untethered from any public health rationale.  FDA (at 74-75) tries to tar Plaintiffs with the tobacco industry's past misconduct, claiming the public's interest in remedying this misconduct requires the Rule to take effect as scheduled.  Of course consumers have an interest in factual information about the health consequences of smoking.  But FDA does not argue that any consumer education interest is urgent.  To the contrary, *FDA* previously suggested delaying the Rule until at least 2023.  *Am. Acad. of Pediatrics*, 2019 WL 1047149, at *2.  As was true for FDA's previous rule, so too here: "[T]he public's interest in preserving its constitutional protections—and, indeed, the Government's concomitant interest in not violating the constitutional rights of its citizens—are best served by granting injunctive relief at this preliminary stage." *R.J. Reynolds*, 823 F. Supp. 2d at 52.

## CONCLUSION

The Rule is unlawful.  Plaintiffs ask this Court to vacate the Rule and enter a preliminary injunction to avoid further irreparable harm as this litigation proceeds.

DATED:  December 2, 2020                    Respectfully submitted,


                                           /s/ *Lisa S. Blatt*
                                           LISA S. BLATT (D.C. Bar No. 429544)
                                           STEPHEN D. ANDREWS (D.C. Bar No. 470994)
                                           SARAH M. HARRIS (D.C. Bar No. 1004964)
                                           MATTHEW J. GREER (D.C. Bar No. 241858)
                                           WILLIAMS & CONNOLLY LLP
                                               *725 Twelfth Street. N.W.,*
                                               *Washington, DC 20005*
                                               *Tel: (202) 434-5000*
                                               *Fax: (202) 434-5029*
                                               *lblatt@wc.com*
                                               *sandrews@wc.com*
                                               *sharris@wc.com*
                                               *mgreer@wc.com*

                                           *Attorneys for Plaintiffs Philip Morris USA*
                                           *Inc. and Sherman Group Holdings LLC*